Hearing Date: February 16, 2006 at 10:00 a.m. (prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Judy G.Z. Liu, Esq. (JL 6449)

- and -

TOFEL & PARTNERS, LLP
800 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 752-0007
Facsimile: (212) 752-8881
Lawrence E. Tofel, Esq. (LT 8631)

Co-Attorneys for Landlord,
East Forty-Fourth Street, L.L.C.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
                                                        :
In re                                                   :    Chapter 11 Case No.
                                                        :
EAST 44TH REALTY, LLC                                   :    05-16167 (RDD)
                                                        :
            Debtor.                                     :
                                                        :
                                                        :
--------------------------------------------------------x

### OBJECTION OF EAST FORTY-FOURTH STREET, L.L.C. TO DEBTOR'S MOTION TO ASSUME LEASE

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

            East Forty-Fourth Street, L.L.C. (the "Landlord"), as owner and triple net

lessor under a lease with the above-captioned Debtor's predecessor in interest (the

"Lease") governing the building located at and known as 228-238 East 44th Street in the

City, County and State of New York (the "Premises"), by and through its undersigned

counsel, hereby respectfully submits this objection (the "Objection") to the Debtor's

Motion to Assume Lease, dated January 31, 2006 (the "Motion"):

<u>**Preliminary Statement**</u>

1.      As a threshold matter, this Objection has been submitted out of an

abundance of caution and need only be considered if the Court determines that the Lease

somehow was not terminated prior to the commencement of the Debtor's chapter 11 case

and therefore is capable of being assumed by the Debtor.  For the reasons stated in the

Landlord's Memorandum of Law,[1] the Landlord respectfully submits that the Lease is

not capable of being assumed and the Motion must be denied.  If the Court concludes,

however, that the Lease is susceptible to assumption, then Landlord objects to the

Debtor's proposed assumption for the reasons set forth below.

2.      In light of the significant monetary and non-monetary defaults

existing under the Lease, as well as the Debtor's historical pattern of failing to timely

satisfy various of its obligations thereunder, this Court is correct to be "quite skeptical"

about the Debtor's ability to cure significant amounts owing to the Landlord under the

Lease.  (Hr'g Tr. of 1/11/06, at 59.)  Significantly, although the Court advised the Debtor

that "[w]hat I really need to see, frankly, is real hard facts that give me confidence that

the [L]ease is going to be assumed" (<u>id.</u> at 50), the Debtor's Motion is entirely devoid of

any such "hard facts".  Instead, the Motion consists of self-serving, bald assertions

regarding the proper cure amount, the ability to pay such amount and unsubstantiated

speculations regarding the future profitability of the Debtor's business.  As there is no

---

[1] The "Memorandum of Law" refers to the Landlord's Memorandum of Law in Further Support of Motion (the "Release Motion") for Order Directing Release and Return to Landlord of Its Property Including All Sublease Proceeds, and Other Related Relief, dated February 1, 2006 [Docket No. 74].

substance to the Motion, the Debtor instead relies on conjured up theories regarding the

Landlord's motives and attempts to distract the Court from the sole issue at hand as a

substitute for its inability to establish a prima facie case and satisfy the legal requirements

to assume the Lease under section 365(b)(1) of the Bankruptcy Code.

3.      As discussed herein, there is only one issue before the Court:

whether the Debtor has satisfied its requisite evidentiary burden in order to support

assumption of the Lease under section 365(b) of the Bankruptcy Code.  Manifestly, for

the reasons discussed herein, the Debtor's Motion does not even come close to satisfying

the applicable standard.  The Motion therefore must be denied.

**Relevant Background**

4.      The undisputed facts are set forth in (i) the affidavit of Lawrence

E. Tofel, sworn to on January 3, 2006 and the exhibits annexed thereto [Docket No. 54]

and (ii) the affidavit of Lawrence E. Tofel, sworn to on February 7, 2006, a copy of

which is annexed hereto as Exhibit 1 (the "Tofel Affidavit").  All such facts are

incorporated herein by reference as if set forth fully and at length herein.

5.      As set forth in more detail in the Tofel Affidavit, significant

monetary and non-monetary violations exist under the Lease, all of which must be cured

by the Debtor in order for it to assume the Lease.  The Debtor's cure obligations may be

grouped in four discrete categories:

- Repair Obligations. The Debtor's outstanding repair obligations under the Lease aggregate $59,250, which amount is comprised of (i) the estimated costs of the repairs remaining to be completed under the so-called Messer Report, which underlies the litigation culminating in the Appellate Division affirmance of the Supreme Court's decision that defaults exist under the Lease, and is attached to the Tofel Affidavit as Exhibit B, and (ii) the estimated costs of completing the repairs required by the "February 2005 Survey", which is attached to the Tofel Affidavit as Exhibit C.  See Tofel Aff. at ¶ 2A.

- <u>Sublease Proceeds</u>.  The "sublease proceeds" are the rents paid by sublease occupants of the Premises.  As a result of the uncured defaults under the Lease, the Landlord became entitled to such proceeds pursuant to the assignment clause found in Article TWENTY-FOURTH of the Lease.  The aggregate amount of sublease proceeds to which Landlord is entitled is at least $990,000, exclusive of interest calculated in accordance with the Lease.  <u>See</u> Tofel Aff. at ¶ 2B.

- <u>Attorneys' Fees</u>.  The Landlord has incurred and/or paid attorneys' fees through January, 2006 in the amount of $948,939.51, net of amounts it has previously received and applied from or on behalf of the Debtor applicable thereto.  <u>See</u> Tofel Aff. at ¶ 2C.

- <u>Appellate Division Costs.</u>  In its unanimous Decision and Order dated December 15, 2005 (the "December 15 Order") in favor of the Landlord, New York's Appellate Division awarded costs to the Landlord, which costs aggregate $996.  <u>See</u> Tofel Aff. at ¶ 2D.

Accordingly, as described more fully in the Tofel Affidavit and subject to the reservations contained therein, the aggregate cure amount owed by the Debtor to the Landlord is at least $2,000,000 (the "Cure Amount").

6.    It cannot be disputed that the Debtor's Operating Reports filed in this case for the period August 5, 2005 through December 31, 2005 reflect that each month the Debtor is operating consistently at a loss.  This was confirmed by counsel for the Debtor at the most recent cash collateral hearing.  (<u>See</u> Hr'g Tr. of 1/18/06 at 18:13.)

**The Debtor Has Failed to Satisfy Its Burden Under Section 365(b)
<u>of the Bankruptcy Code and Therefore May Not Assume the Lease</u>**

A.    <u>Legal Standard Governing Assumption</u>

7.    When assuming an executory contract or unexpired lease, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure these defaults.  If there has been a default the debtor must also provide adequate assurance of future performance under the contract.  Section 365(b) provides:

> (1) If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume
> such contract or lease unless, at the time of the assumption
> of such contract or lease, the trustee –
>
>> (A) cures, or provides adequate assurance that the
>> trustee will promptly cure, such default;
>>
>> (B) compensates, or provides adequate assurance
>> that the trustee will promptly compensate, a party
>> other than the debtor to such contract or lease, for
>> any actual pecuniary loss to such party resulting
>> from such default; and
>>
>> (C) provides adequate assurance of future
>> performance under such contract or lease.

11 U.S.C. § 365(b)(1).

8.     Consistent with the foregoing, in light of the significant monetary and non-monetary defaults existing under the Lease, the Debtor must satisfy the requirements of section 365(b)(1) of the Bankruptcy Code in order to assume the Lease. The Debtor bears the burden of proof with respect to each prong of section 365(b)(1). See In re Embers 86th St., Inc., 184 B.R. 892, 902 (Bankr. S.D.N.Y. 1995); In re F.W. Rest. Assoc. Inc., 190 B.R. 143, 147 (Bankr. D. Conn. 1995) ("Under a strict analysis [of section 365(b)(1)]…the Debtor-in-Possession…bears the burden of proof on the issuances of prompt cure and adequate assurance of future performance…."); In re Memphis-Friday's Assocs., 88. B.R. 830, 841 (Bankr. W.D. Tenn. 1988). The Debtor must satisfy its burden by a preponderance of evidence. See In re PRK Enters., Inc., 235 B.R. 597, 602 (Bankr. E.D. Tex. 1999).

9.     As demonstrated below, the Debtor has failed to satisfy its heavy burden under section 365(b) of the Bankruptcy Code and, as such, may not assume the Lease.

B.      The Debtor Has Failed to Provide Adequate
        Assurance of Prompt Cure Under Section 365(b)(1)(A)

        10.     Under section 365(b)(1)(A), "[a]dequate assurance of a prompt

cure requires that there be a firm commitment to make all payments and at least a

reasonably demonstrable capability to do so." In re Embers, 184 B.R. at 900-01 (quoting

In re R.H. Neil, Inc., 58 B.R. 969, 971 (Bankr S.D.N.Y. 1986)).  In addition, "adequate

assurance" in this context "can be demonstrated by establishing a 'foundation that is

nonspeculative and sufficiently substantive to assure the landlord that it will receive the

amount of the default.'" In re PRK Enters., Inc., 235 B.R. 597, 602 (Bankr. E.D. Tex.

1999) (citing Matter of World Skating Ctr., Inc., 100 B.R. 147, 148-49 (Bankr. D. Conn.

1989)).

        11.     As an initial matter, it should be noted that the Debtor has not

committed in the Motion to make all payments and perform all repairs required to cure

the significant defaults under the Lease.[2]  The Debtor inexplicably continues to argue that

the scope of the required repairs is unknown,[3] notwithstanding the Supreme Court's and

Appellate Division's admonitions to the contrary on this very point.  In addition, the

parties are apart in their views as to the aggregate amount which must be paid by the

Debtor to the Landlord in order to assume the Lease.  While the Debtor alleges that the

---

[2] In order to probe the Debtor's willingness and ability (if any) to cure the existing defaults, the Landlord
convened the Debtor's deposition on February 6, 2006.  That deposition was, in large part, impeded by the
objections, speeches and "testimony" of Debtor's counsel and personal counsel to Debtor's principal, Mr.
Yusef Bildirici, as well as such counsel's repeated and improper directions that the Debtor's witness not
answer relevant questions posed.  Due to the unavailability of the official deposition transcript at the time
this Objection was filed, references to the Debtor's deposition testimony throughout this Objection are
taken from notes made by counsel for the Landlord during the deposition and are subject to verification
upon receipt of the official deposition transcript.

[3] See Motion at ¶ 8 ("The parties' motions were decided by the trial court in an order dated February 26,
2005.  Among other things, the court held that the Debtor was responsible for the repairs at issue, but failed
to define the scope of the work ostensibly required, or to order the Landlord to do so.")

entire cure amount owed to the Landlord for repairs and attorneys' fees is less than

$113,000 (Motion at ¶ 25), this amount is a mere fraction of the sum actually owed by the

Debtor under the Lease (and therefore required to be paid by the Debtor pursuant to

section 365(b) as a condition to assumption thereof).  See Tofel Aff. at ¶¶ 2-3.

      (1)     <u>Debtor Cannot Cure Its Monetary Defaults</u>

      12.     There is absolutely no basis upon which to conclude that the

Debtor is capable of promptly paying, or even intends to pay, the Cure Amount to the

Landlord.  Based upon the representations in the Motion, it is clear that the Debtor has

not made any effort whatsoever to procure an outside source of financing.[4]  Instead, the

Debtor is engaging in pure speculation – much like betting on the lottery – that "part of

the financing for cure amounts will be available from a large set off claim the Debtor has

against the Landlord for approximately $113,000 of overcharges" and that the remainder

of any cure amount will be satisfied by "excess cash flow."  (Motion at ¶¶ 12, 20.)  Aside

from the fact that the alleged set off claim is the subject of litigation, and that the

Debtor's operations have not yielded one dollar of "excess cash flow" during the entire

chapter 11 case, these amounts are woefully inadequate to satisfy the Cure Amount, and

neither proposed "source" of funding provides anything close to a sufficient degree of

---

[4] During the February 6, 2006 deposition of Mr. Yusef Bildirici, he stated that he has had minimal conversations with three separate insiders of the Debtor regarding the possibility of certain limited financing ($100,000) with respect to the Lease, but that no actual financing commitment has been obtained. Notably, the Debtor testified that it did not require any financing as it intended to pay any cure amounts due from the cash flow of its future activities.  Moreover, the Debtor posited that no cure amounts could reasonably be owed in excess of the cost of repairs it has failed to undertake or complete for the prior years. In other words, if, as the Debtor claims, the cost of repairs is $20,000, fees in excess of said $20,000 incurred by the Landlord during nearly two years of litigation could not be assessed as a cure requirement. But, the Debtor cannot in good faith dispute that, pursuant to the Supreme Court's February, 2005 decision, the Debtor is liable to the Landlord for "reasonable attorneys fees which [the Landlord] has incurred since the issuance of the Messer Report in seeking to enforce those provisions of the [L]ease which obligate the [Debtor] to repair the premises."  February 2005 Order, at 4.

assurance that the Debtor will be able to promptly cure its defaults in accordance with section 365(b)(1)(A) of the Bankruptcy Code.

13.    The Debtor's contention that it can satisfy its cure obligations by setting them off against its "overpayments" claim of approximately $113,000 is patently unreasonable.  Such contentions are the subject of a separate pending adversary proceeding before the Court, styled East 44th Realty, LLC v. East Forty-Fourth Street, LLC, Case No. 05-03136 (RDD) (the "Adversary Proceeding"), that the Court has placed on "hold" pending the outcome of the Landlord's Release Motion and the Debtor's Motion.  Rather than provide the Court with hard facts evidencing the Debtor's current ability to satisfy promptly the Cure Amount owing under the Lease, the Debtor's "financing" proposal consists of a speculative recovery in a pending litigation as to which the Debtor has unilaterally declared itself victorious before the Court has even heard the matter.  The Debtor then argues that the $113,000 to be derived from its assured litigation victory should be, in turn, set off against the Landlord's claim for attorneys fees, as any "'reasonable' fees as the Landlord might be entitled to should be no more than the approximate $113,000 amount that the Landlord has refused to transfer back to the Debtor's estate on account of amounts that have been over-billed for New York City tax, water and sewer charges."  (Motion at ¶ 9).  This "plan" for curing the Landlord's accrued and unpaid attorneys' fees is not only disingenuous and self-serving, but does not satisfy the Debtors' heavy burden of establishing a prima facie case for assumption of the Lease.

14.    Importantly, at the hearing held on January 11, 2006, this Court admonished the Debtor that if cure amounts were in significant dispute, which they are,

there would have to be a cushion to cover the possibility that the higher amounts were in

fact due and owing:

> I think the [D]ebtor should assume that . . . I'm not going to
> approve something where the [D]ebtor cuts [the cure
> amount] off at dollar X if there's a significant dispute that
> [it] really is X plus a hundred because it's going to spend
> that hundred either ultimately because it loses on the cure
> dispute or in fighting the cure dispute.  So you have to have
> a cushion there.

(Hr'g Tr. of 1/11/06 at 80.)

15.    By building its case for curing the defaults around a hoped-for

litigation victory, the Debtor has implicitly conceded that it is unable with its current

resources to cure the defaults under the Lease, even if the Court were to accept the

Debtor's view of the cure amounts due.  Obviously, the outcome of the Adversary

Proceeding is undetermined and will remain so until the Court adjudicates the matter.  As

such, the Landlord will not – and is not required to – respond to the Debtor's allegations

concerning the overpayment – the very subject of the Adversary Proceeding – in the

context of this Motion.  (See Motion at 4-7, 9.)[5]

16.    The Debtor's other purported "source" of funding (i.e., "cash flow"

from the operation of the Premises) is equally preposterous.  The Debtor's projections

directly conflict with its own monthly operating reports which reflect materially smaller

revenues and materially greater expenses.  The operating reports also demonstrate that,

since the inception of this chapter 11 case, the Debtor has consistently been operating at a

loss.  Yet, the Debtor somehow purports to satisfy amounts owing under the Lease (and

to provide adequate assurance of future performance) from its projected net profits.

---

[5] Indeed, once the allegations that are the subject of the Adversary Proceeding are removed from
consideration, the Motion consists of a mere five pages of triple-spaced text with no substance relevant to
the burdens the Debtor must satisfy to qualify for assumption of the Lease.

Except for jotting down some unsubstantiated numbers on a piece of paper, which have little connection to its historical business performance, the Debtor has not provided any foundation for its anticipated remarkable and unprecedented turnaround from which this Court reasonably could conclude that any such net profits are likely to materialize.

17.    The case of In re Berkshire Chemical Haulers, Inc., 20 B.R. 454 (Bankr. D. Mass. 1982), is instructive in this regard.  In that case, a debtor/lessee who had committed significant prepetition and postpetition monetary defaults under a commercial lease sought to assume the lease pursuant to section 365 of the Bankruptcy Code.  20 B.R. at 456.  Although the debtor's financial statements demonstrated that the debtor had consistently operated at a loss during the pre- and post-petition periods, the debtor's financial projections indicated the debtor's own "prognosis of future profitability. . . ." Id. at 458.  The court found that the debtor had not satisfied the statutory requirements of "adequate assurance of prompt cure," because "there is no past history of profitability, there is no competent evidence of future profitability, and the debtor's projections seem nothing more than pipe dreams."  Id.  Moreover, the court concluded that it "cannot gamble on the business judgment of a debtor at the risk of continuing harm to a creditor who would otherwise be entitled to the return of its property."  Id. at 459.

18.    Similarly, here the Debtor's financial projections contradict its historical lack of profitability and the projections for the following years are, at best, the product of an overly optimistic outlook.  Consistent with Berkshire Chemical, it is most appropriate for this Court to disregard the Debtor's "pipe dreams" and consider the likely harm to the Landlord if the Debtor were permitted to assume the Lease.  Id.; In re PRK Enters., 235 B.R. at 602 (noting that, in the context of section 365(b)(1)(A), "[i]n

determining whether such assurance [of prompt payment] is 'adequate,' a court should

strive to minimize the risks imposed upon a lessor as it awaits receipt of the curative

payments."); cf. In re R.H. Neil, 58 B.R. at 972 ("[T]he landlord should not be required

to sit by and suffer further loss and delay should the debtor not live up to its

projections."); World Skating Ctr., 100 B.R. at 148 (same).  Given the Debtor's

longstanding failure to perform its obligations under the Lease and questionable financial

condition, it is indisputable that the Landlord would be harmed by further loss and delay

if the Debtor were permitted to assume the Lease.

19.    By its own admission, the Debtor "intends to dispute the [attorneys

fees owing to the Landlord] as unreasonable" and "intends to recover [certain

unidentified] amounts for the benefit of the estate, which will further reduce any amounts

due to the Landlord for cure costs."  (Motion at ¶¶ 20, 19.)  Thus, rather than having

demonstrated in its Motion that it has the financial wherewithal to pay the significant

Cure Amount to assume the Lease, the Debtor has made only one thing crystal clear—it

has provided the Landlord with adequate assurance of prompt litigation, not adequate

assurance of prompt cure.

(2)    Debtor Does Not Intend to Cure Its Non-Monetary Defaults

20.    The Debtor has not demonstrated an *actual commitment* to remedy

all non-monetary defaults (e.g., repair obligations) existing under the Lease.  To the

contrary, the Debtor continues to insist that "at no time has the Landlord specified what

repairs are required to cure the defaults."  (Motion at ¶ 7.)  Pursuant to the December 15

Order, however, the Debtor cannot seriously dispute that it unequivocally "is obligated to

undertake and complete repairs on the building's south façade and chimney as indicated

in [Landlord's] July 2004 notice of default, including bulging bricks and defective and

shallow mortar joints. . . ." December 15 Order at 2. Perhaps anticipating the

recalcitrance that has characterized the Debtor's every action in the state court litigation

and this chapter 11 case,[6] the Appellate Division specifically admonished the Debtor that

it "will not be heard to argue that the work was either not necessary or not properly

specified in [Landlord's] notice to cure." Id. Although the Debtor has indicated in its

Motion that it "*intends* to . . . repair the façade pursuant to the [December 15 Order]"

(Motion at ¶ 23 (emphasis added)), a close inspection of the proposals attached to the

Motion raises questions as to whether the Debtor has in fact committed to *actually*

*effectuate* such repairs. See Exhibits A and B attached to Motion.

        21.    The proposals annexed to the Motion are telling. These proposals

are substantially similar to proposals submitted by the Debtor to the Appellate Division

last May in support of its application for a stay and as part of the Debtor's sworn

submission that (i) it had retained the personnel to effectuate the repairs required under

the Messer Report and (ii) it would complete those repairs if the stay were granted. The

stay was granted, but the Debtor never had the work performed. When the Debtor was

asked during the February 6 deposition what had changed between May, 2005 – when the

Debtor claimed it was prepared to do the work and had similar proposals in place – and

---

[6] An example of such recalcitrance occurred during a hearing held on May 12, 2005 before Judge Diamond
in the State Supreme Court:
        MR. EISLAND [counsel for Debtor]: . . . [I]f we understand what the repairs
        were we would go out and make them.
        THE COURT: I told you a mechanism for understanding. . . .
        MR. EISLAND: . . .[T]he issue really has never been the willingness to make
        the repairs. I see it is totally hard to pin down exactly what he wants done.
        THE COURT: Excuse me, sir. You had an engineer's report and a stipulation.
        It is not so difficult to figure out what the engineer's report was. If you had any
        interest in making it, you could have resolved this a long time ago.
(Hr'g Tr. of 5/12/05 at 34-35.)

the present – when the Debtor has made the same claims and the same showing – counsel directed the Debtor not to answer.

        22.      Moreover, the Bellet proposal (Exhibit A) requires the Debtor to remit a deposit for 50% of the total estimated cost of repairs in order to proceed with the work.  The Debtor has submitted no documentary evidence that it actually remitted such funds.  Further, acceptance of the Merritt Engineering proposal (Exhibit B) will not contribute to effectuating the necessary repairs, as Merritt is the engineering firm whose role is merely to inspect the repairs to the extent made.  In addition, the Merritt proposal requires that the Debtor enter into definitive documentation prior to the performance of any engineering services.  Noticeably absent from the Motion is the executed contract or even a representation that such contract has been signed.[7]

C.      The Debtor Has Failed to Provide Adequate
        Assurance of Future Performance Under the Lease

        23.      In order to assume the Lease, the Debtor also must provide "adequate assurance of future performance" under the Lease pursuant to section 365(b)(1)(C).  While the Bankruptcy Code does not define the term "adequate assurance of future performance," courts have noted that the legislative history underlying section 365(b)(1)(C) reveals that such term is intended to have a "practical, pragmatic construction."  See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985).  In considering the types of evidence that a Debtor might submit in order to demonstrate "adequate assurance of future performance" under section 365(b)(1)(C),

---

[7] With respect to the repairs required by the February 2005 Survey, it is the Debtor's position that it has largely performed the necessary repairs; however, other than its assertions that this is the case, the Debtor has failed to provide the Landlord with documentary evidence establishing such compliance, such as repair contracts, correspondence, plans, specifications or payment invoices documenting the completion of work.

"[c]ourts have consistently [considered] whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee." Richmond Leasing, 762 F.2d at 1310 (citing cases); In re Embers, 184 B.R. at 902 ("[T]he test is . . . whether it appears that the rent will be paid and other obligations met.") (citing In re THW Enters., Inc., 89 B.R. 351, 357 (Bankr. S.D.N.Y. 1988)).

> 24.    Under any reasonable analysis, the Debtor has not met its burden of providing "adequate assurance of future performance" under the Lease.  Indeed, the Debtor purports to have demonstrated "adequate assurance of future performance" simply by virtue of the unsubstantiated one-page projection annexed as Exhibit C to the Debtor's Motion, which the Debtor claims "show[s] that the Building itself generates sufficient cash flow to carry its operating expenses and debt service."  (Motion at ¶ 26.)  Notably, however, the Debtor's projections are not only wholly inconsistent with its historical performance and negative monthly cash flows, as evidenced by the Debtor's own monthly operating reports, but they are also inconsistent with the terms of the Lease, despite the fact that if the Lease were assumed, the Debtor would be legally obligated to honor all of its existing terms.  See In re Rickel Home Ctrs., Inc., 209 F.3d 291, 298 (3d Cir. 2000) ("Once the trustee satisfies these requirements [for assumption under section 365] it may assume the contract or lease, but it must do so in its entirety."); Matter of Superior Toy & Mfg. Co., Inc., 78 F.3d 1169, 1172 (7th Cir. 1996) ("If the court grants a . . . petition pursuant to section 365(b), the contracting party has no choice; he must continue to perform under the terms of the contract . . .").  Accordingly, any projections

which would require a modification of the Lease to be accurate are not entitled to any consideration whatsoever.

25.     One of the two unreasonable assumptions underlying the Debtor's projections is the Debtor's expectation of revenues.  Specifically, the Debtor overstates the existing rent roll and also projects revenues to be generated by the installation of an antenna on the roof of the Premises.  Neither of these assumptions is valid.  The Debtor projects 2006 rental revenues exceeding amounts it has previously collected, but based on the leases produced to the Landlord, nearly half of the present subleases have terms that continue through late 2006 or beyond.  Had the Debtor analyzed the rent roll on a unit by unit basis, which it testified that it did not, it would have discovered that its projection is unrealistic.  The Debtor's admitted failure to analyze the rent roll on a unit by unit basis, in and of itself, renders its projections unreliable.  Furthermore, the Debtor assumes that either the Debtor "will be able to get antenna contract permission from [L]andlord" or the Court will require the Landlord to provide its consent.  Under the Lease, however, the Landlord has an unfettered right to refuse to permit the Debtor to install any item on the roof of the Premises.  For various economic reasons, not least of which is the interference with the Landlord's valuable air rights, the Landlord has not consented to the Debtor's previous requests regarding the antenna, and will not consent now to the installation of any such antenna.  Accordingly, the Debtor's projection of any revenue attributable to the installation of an antenna must be reduced to $0.

26.     The Debtor's second assumption underlying its fanciful projections – that it will able to "pay [its] own insurance, water, taxes etc. according to [L]ease requirements" – is equally false and misleading.  As recently as December, 2005, the

Landlord cooperated with the Debtor when the Debtor requested an opportunity to secure

its own comparable insurance coverage[8] based upon its repeated assertions that it could

procure such coverage less expensively.  The Debtor, consistently over the past three

years and in this instance, failed to make alternative coverage arrangements, and the

Landlord had to renew the existing insurance to avoid a lapse in coverage.[9]  Further, the

Debtor's assumption that it will realize a cost savings from paying its own taxes also is

flawed.  Notwithstanding that the Lease precludes the Debtor from paying its taxes

directly, the Debtor would be required to remit exactly the same aggregate amount of

taxes semi-annually that it currently is required to pay to the Landlord in monthly

installments, in advance.

       27.     The Debtor has not provided any "hard facts" regarding (i) steps

already taken or to be taken by the Debtor in order to effectuate any of the dramatic

expense reductions indicated in its projections or (ii) how the Debtor will continue to

operate the building in full compliance with the terms of the Lease while allocating

considerably reduced amounts to, among other things, maintenance and utility services

related to the Premises.  Notably, the Debtor's projections provide for expenditures

significantly less than the Debtor reflected in its cash collateral budgets and operating

reports, as to which it continually complained that the permitted expenditures were too

restrictive.  In the same vein, the Debtor's projections provide for increased rental income

---

[8] It is worth noting that the insurance policy covering the Premises is a "manuscript" policy offering
specialized risk coverage that few insurance carriers other than the current carrier will underwrite.

[9] At the telephonic hearing held before this Court on December 21, 2005, counsel for the Landlord
informed the Court that "[t]he [D]ebtor not only did not procure additional insurance but now is declining
to reimburse the insurance premium and has budgeted that those premiums will be financed by the
[L]andlord, something obviously that we're not inclined to do."  (Hr'g Tr. of 12/21/05 at 6.)  Notably, this
Court had to order the Debtor to reimburse the Landlord for the premiums before the Debtor would remit to
the Landlord the premiums owed.

significantly greater than that which it currently is collecting, without any explanation for the differential or a prima facie showing that any of the current subleases are due to expire, such that the Debtor would be entitled to aggregate rent increases in 2006 alone of $180,000. In light of the Debtor's projections, which have virtually no connection with the Debtor's actual historic performance, the Landlord is not assured of future performance under the Lease; to the contrary, it is left wondering how the Debtor will continue to operate the Premises in a manner consistent with its obligations under the Lease.

28.    The chart set forth below demonstrates that the Debtor's projections are patently unsupportable:

| Category of Expenditure or Income | 2005 Expenditure or Income | Projected 2006 Expenditure or Income |
|---|---|---|
| Insurance Premiums | $110,000 | $50,000 |
| Utility Costs | $300,000[10] | $200,000 |
| Rental Income | $3,600,000[11] | $3,780,000 |
| Antenna Income | $0 | $36,000 |

29.    The Debtor has submitted as adequate assurance of future performance the projections highlighted above without providing any explanation whatsoever as to how the Debtor intends to achieve these remarkable figures. The Debtor's silence is deafening. Specifically, the Debtor has failed to explain, among other things:

- Insurance Premiums: Pursuant to Article TENTH of the Lease, the Debtor is obligated to maintain primary and excess insurance

---

[10] This amount is the annual median calculated using the Debtor's reported utilities expenses in a low-cost month (September 2005; $12,000) and its utilities expenses in a high-cost month (December 2005; $38,000).

[11] According to the Debtor's operating reports, while operating as a debtor in possession, the Debtor's monthly rental income associated with the Premises was approximately $300,000 per month.

coverage with respect to the Premises. The Debtor has produced no evidence to substantiate how it will remain in compliance with the Lease to maintain required coverage while implementing the proposed reduction of 55% of its insurance premium expenses beginning in 2006.

- Utility Costs: The Debtor has projected a 33% reduction in its utility expenses, but it has offered no explanation as to how it intends to effectuate such a drastic reduction while, at the same time, maintaining the integrity of the Premises going forward. In addition, it must be noted that in calculating this projected figure, the Debtor revealed in its deposition that it arbitrarily has determined to exclude certain typical utility costs from this category, such as steam and electric expenses.

- Rental Income: The Debtor projects an increase of $180,000 in its rental income beginning in 2006, and increasing incrementally for each subsequent year through 2016. Throughout the Debtor's chapter 11 case, the Debtor has realized approximately $300,000 per month in rental income, which is markedly less than the monthly rental income of $315,000 underlying the first year of this projection. Notably, in formulating this particular projected amount, the Debtor did *not* conduct an analysis of the rental terms associated with each sublease, but rather based its "back of the envelope" projection on broad assumptions concerning its alleged right to increase the monthly rent under the subleases by a total of $15,000 per month beginning in 2006.

30.    In addition to the foregoing, the Debtor's projections do not address how the Debtor proposes to satisfy its obligations under the Lease in the post-projection period. Notably, pursuant to Article THIRTY-THIRD of the Lease, in 2017, the Debtor's rent obligation to the Landlord is reset at 10% of the appraised unimproved value of the Premises. Assuming, *arguendo*, that the value of the unimproved Premises at the end of 2016 were $20 million,[12] the Debtor's aggregate rent obligations under the Lease would increase to $2 million in 2017. Given the fact that the Debtor has not demonstrated that it will be able to comply with its current obligations under the Lease,

_____

[12] Debtor's principal testified in his February 6 deposition that he would ascribe a value of $20 million to the undeveloped Premises.

there certainly is no basis for the court to conclude that the Debtor would be able to comply with its obligations under the Lease following such rent escalation in 2017.

31.    Based on the foregoing, the Debtor manifestly has not satisfied its heavy evidentiary burden under section 365(b)(1) of the Bankruptcy Code and the Court should deny the Motion.

D.    The Debtor's Statements Regarding the Alleged Value of
the Lease and the Landlord's Alleged Motives Are Red Herrings

32.    As the Debtor presumably recognizes that it is incapable of satisfying the governing legal standard for assumption of the Lease, it has raised various irrelevant points in an apparent attempt to distract the Court's attention from the sole issue at hand:  whether the Debtor can satisfy the requirements of section 365(b)(1) of the Bankruptcy Code.

33.    Notwithstanding the Debtor's own admission that it has not obtained a formal appraisal of the value of the Lease (which only begs the question of why no such appraisal was obtained), the Debtor repeatedly refers to the so-called "substantial value" of the Lease which purportedly will "provide for payment in full for all creditors."  Motion, ¶¶ 4-5, 11.  The value of the Lease is irrelevant for purposes of curing defaults; indeed, the Lease could be worth $13,000,000 or $13,000 but the requirements to assume it under section 365(b)(1) of the Bankruptcy Code are the same.

34.    In a similar attempt to distract the Court from the straightforward legal issue at hand, the Debtor hurls baseless accusations, such as that the Landlord has been "waging a ruthless litigation campaign to terminate the Lease so that it can make the profit instead of the Debtor."  (Motion at ¶ 6.)  In fact, as long as the substantial defaults under the Lease have been cured, the Landlord's interest is only to have a responsible

tenant.[13]  If the Debtor does not assume the Lease, and is no longer the tenant, and the

Lender, as Leasehold Mortgagee, picks up the Lease in the Debtor's stead, the Landlord

will be entitled to the same amounts from the Lender under the pick-up lease that the

Landlord would otherwise receive from the Debtor if the Debtor remained the tenant and

had complied with its obligations under the Lease.

        WHEREFORE the Landlord respectfully requests that the Court, if and to

the extent that the Court concludes that the Lease has not been validly terminated under

New York law, (i) deny the Motion, with prejudice and (ii) grant the Landlord such other

and further relief as is just.

Dated: February 7, 2006
      New York, New York

                              _____/s/ Judy G.Z. Liu_____
                              Judy G.Z. Liu, Esq. (JL 6449)
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153

                                - and -

                              Lawrence E. Tofel, Esq. (LT 8631)
                              TOFEL & PARTNERS, LLP
                              800 Third Avenue
                              New York, New York  10022

                              Co-Attorneys for Landlord,
                              East Forty-Fourth Street, LLC

---

[13] The Debtor has chronically failed to perform its obligations to the Landlord under the Lease (as well as the May, 2003 Settlement Agreement resolving prior litigation) and has not demonstrated in the Motion or by its conduct in this case, that it has any greater or continuing regard for its obligations.

**Exhibit 1**

**Tofel Affidavit**

NY2:\1612208\10\YJZK10!.DOC\42883.0003

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
EAST 44TH REALTY, LLC,                  :        Case No. 05-16167 (RDD)
                                        :
                Debtor.                 :        AFFIDAVIT IN SUPPORT OF
                                        :        LANDLORD'S OBJECTION TO
                                        :        DEBTOR'S MOTION TO ASSUME
------------------------------------------------------x        LEASE

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK   )

        Lawrence E. Tofel, being duly sworn, deposes and says:

        1.        I am the Manager of East Forty-Fourth Street L.L.C. ("Landlord"), the owner and,

pursuant to a lease with debtor's predecessor-in-interest (the "Lease"), the triple-net lessor of a

mixed commercial and residential building located at 228-238 East 44th Street in the City,

County and State of New York (the "Premises"). I am also an attorney, duly licensed to practice

law in Courts of the State of New York and this Court, and a partner of Tofel & Partners, LLP,

which, together with Weil Gotshal & Manges, LLP, are attorneys for the Landlord herein. I am

fully familiar with the facts set forth herein and submit this affidavit to explain the various

components of the amounts presently due to the Landlord under the Lease, as well as the

estimated costs of completing required repairs to the Premises.

        2.        Annexed hereto as Exhibit A is a summary of the aggregate cure amounts due in

connection with the Lease (the "Summary"). As reflected in the Summary, the Debtor's cure

obligations may be grouped in four discrete categories:

A.    Repair Obligations. First, the estimated aggregate cost of curing the repair

obligations of which the Landlord is presently aware under the Lease

aggregate $59,250.00. This amount is comprised of the estimated costs of

the repairs remaining to be completed under the 2002 "Messer Report"

(which underlies the litigation that culminated in the recent Appellate

Division affirmance of the New York Supreme Court's February 2005

decision that defaults exist under the Lease), a copy of which is annexed

hereto as Exhibit B, as well as the estimated costs of completing the

repairs required by the February 16, 2005 tri-annual inspection survey

performed under the Lease (the "February 2005 Survey").

(i) The Messer Report. I am advised by Landlord's engineers (H.

Nejat Haim, P.E.) that the cost of completing the repairs required

by the Messer Report cannot be established with any degree of

certainty unless and until scaffolding has been erected and the

affected surfaces inspected. Nonetheless, the engineers advised

that the estimated cost of repairing the bulging bricks observed and

reported in the Messer Report is approximately $18.00 per square

foot, and that the surface requiring repair is approximately 150

square feet. To these sums, the engineers have added the cost of

the required repointing, erecting and maintaining the scaffolding

and obtaining all necessary permits and insurance. Accordingly,

the current estimate of these costs aggregates $15,000.

(ii) The February 2005 Survey. At the request of the New York

Community Bank, in May, 2005, Landlord obtained a cost estimate

to perform the repairs required by the February 2005 Survey. That

estimate, a copy of which is annexed as Exhibit C, aggregates

$44,250.00.[1]

B.    Sublease Proceeds. The second component of the cure amount consists of

sublease proceeds (the rents paid by sublease occupants of the Premises)

to which the Landlord became entitled pursuant to Article TWENTY-

FOURTH of the Lease. Pursuant to Article TWENTY-FOURTH, the

subleases and proceeds were assigned to the Landlord as of March 10,

2005. The Lease provides that the sublease proceeds are assigned to, and

become the Landlord's property, once the default—declared on July 2,

2004—continued unabated (and unstayed) for more than thirty (30) days;

the assignment occurs at the time the Landlord is authorized to give Notice

terminating the Lease by virtue of a default continuing for more than thirty

(30) days. Landlord is entitled to the subleases and their proceeds during

the period that the defaults exist (i.e., March 10, 2005 to the present (the

"Default Period")); they revert back to the Debtor only when the cures are

effectuated.

Based on the Debtor's Operating Reports attributable to the period

August 5, 2005 – December 31, 2005, and utilizing an average gross

monthly rental of slightly more than $300,000 per month for the months

---

[1] During the February 6, 2006 deposition of the Debtor, the Debtor claimed that many of the repairs had been undertaken and completed but was unable to provide any documentary support to establish that any such work was done.

March through July, 2005, the gross sublease proceeds collected during the Default Period slightly exceeded $2,900,000. Subtracting from that amount the amounts previously paid or remitted to the Landlord for rent and additional rent, the net sublease proceeds not remitted to the Landlord during the Default Period are in excess of $1,800,000.[2] Landlord recognizes, however, that for purposes of this analysis, with the exception of sums paid to the Leasehold Mortgagee and for the "management fee", an argument can be made that the Debtor's expenses would have been borne by the Landlord, if the Debtor were no longer the tenant under the Lease. While the Landlord reserves its right to utilize the gross sublease proceeds (net only of sums already paid to the Landlord) as the proper cure amount in this category, viewing and analyzing the sublease proceeds issue from the perspective most favorable to the Debtor, the amount of sublease proceeds due to the Landlord is at least $990,000. This amount is based exclusively on the aggregate of the sums paid to the Leasehold Mortgagee (approximately $72,000 per month) and the so-called "management fee" (six (6%) percent of the $300,000 monthly rent roll) of $18,000 per month. For the eleven (11) month period (March 10, 2005 through February 10, 2006), this sum aggregates $990,000, exclusive of interest calculated in accordance with the Lease.

C.    <u>Attorneys' Fees</u>. In addition, the Landlord has incurred and/or paid attorneys' fees and costs through January, 2006 in the amount of

---

[2] Those amounts do not include $3,526.42 of sublease proceeds paid to the Landlord by two occupants of the Premises. These amounts were applied upon receipt against sums then due the Landlord and are incorporated into the total claimed cure amount.

$948,939.51, net of amounts it has previously received and applied from or on behalf of the Debtor applicable thereto. This amount includes fees of the Landlord's principal outside counsel (Tofel & Partners) for the twenty-one (21) month period April, 2004 through January, 2006 of $683,517.15; fees of the Landlord's special Landlord-Tenant counsel (Itkowitz & Harwood) during the same period of $17,978.05, and fees of its special Bankruptcy counsel (Weil Gotshal & Manges, LLP) during the period September, 2005 – January, 2006 of $244,077.78. Consistent with the Supreme Court's February, 2005 Order granting Landlord summary judgment holding the Debtor liable for "reasonable attorneys fees which [the Landlord] has incurred since the issuance of the Messer Report in seeking to enforce those provisions of the [L]ease which obligate the [Debtor] to repair the premises," these fees have been incurred during periods both prior to the July 2, 2004 Notice of Default as well as during the litigations that have proceeded thereafter in New York's Supreme Court, New York's Appellate Division, the New York Court of Appeals and during this bankruptcy case. Landlord will provide invoices to Debtor, as part of the discovery process, documenting such amounts.

D.    Appellate Division Costs. Finally, the last category of cure amounts consists of $996.00 of costs awarded the Landlord by New York's Appellate Division in its unanimous Decision and Order dated December 15, 2005 in favor of the Landlord. This amount is comprised of costs

allowed by statute, including Landlord's printing and related out-of-pocket costs which are reimbursable under New York's Civil Practice Law and Rules.

3.     Based on the foregoing, and subject to the reservations based upon estimates as herein reflected, the aggregate cure amount is approximately $2,000,000.

/s/ Lawrence E. Tofel
Lawrence E. Tofel

Sworn to before me this
7th day of February, 2006

/s/ Robert Michael Gee
     Notary Public

Robert Michael Gee
Notary Public State of New York
Reg No. #01GE6127971
Qualified in New York County
Commission Expires June 6, 2009

Notary Public

**Exhibit A**

**Summary of Cure Amounts**

## SUMMARY OF CURE AMOUNTS

| | |
|---|---|
| PROFESSIONAL FEES | $948,939.51 |
| REPAIRS | $59,250.00 |
| SUBLEASE PROCEEDS (best case for Debtor) | $990,000.00 |
| Costs per Appellate Division | $996.00 |
| **BALANCE DUE** | **$1,999,185.50** |

**Exhibit B**

**Messer Report**

APARTMENT BUILDING — 230 EAST 44TH STREET

BUILDING CONDITION SURVEY REPORT



I. LEONARD  MESSER, P.E.                                    MARCH 14, 2002
PHONE: (718) 591-3113      FAX: (718) 591-4548



# I. Leonard Messer, P.E.

### Consulting Engineer

## P.O. Box 030500, Elmont, NY 11003-0500

Tel: (718) 591-3113
Fax: (718) 591-4548

## Building Condition Survey — Apartment Building

### 230 East 44th Street, Manhattan

March 14, 2002

**Building**

| | |
|---|---|
| Owner: | East Forty-Fourth Street L.L.C. |
| | % Robert H. Eder, Pres. |
| Address: | 3601 S.E. Ocean Boulevard |
| | Stuart, FL  34996 |
| Contact: | Helen Fernandez |
| Phone: | (561) 283-9301 |
| Fax: | (561) 283-2743 |

**Premises**

| | |
|---|---|
| Lessee: | CS East 44th Street L.P. |
| Management: | Knightsbridge Management |
| | 235 West 48th Street |
| | New York, NY  10036 |
| Phone: | (212) 582-4000 |
| Fax: | (212) 582-3448 |
| Prop. Mgr: | Steve Cruz |
| Garage Lessee: | Park On 44th Garage |
| Manager: | Ivan |
| Phone: | (212) 559-8851 |

---

**DATA:**

| | |
|---|---|
| C of O #: | 58573 dated November 1, 1963 |
| Block: | 1317   Lot:   30 |
| Use: | 164 Apartments, store, restaurant & Garage |
| Stories: | 13 plus cellar, sub-cellar, sub-sub-cellar and penthouse |
| Structure: | Concrete frame with brick & block window walls. |
| Floors: | Concrete     Facade:  Brick |

Elevator 1 NYC ID #: 1P26223

Elevator 2 NYC ID #: 1P26224

Name Plate Data:

Westinghouse Elevator Co.

| | |
|---|---|
| RPM: | 1030/1150 |
| HP: | 10 |
| AMP: | 55A |
| Installed: | 1963 |

---

| | |
|---|---|
| Size of Bldg: | Height: 107' |
| | Width: 130' |
| | Depth: 100' |

Elevator Maintenance Co. —

Schindler Elevator Corp.

620 Twelfth Ave., New York, NY

Tel: (212) 708-1000

I. LEONARD MESSER, P.E.        230 EAST 44TH STREET                    PAGE 2

**REPORT & RECOMMENDATIONS** - Site inspections were made by Hooshang Nejat-Haim, PE of the interior sections of the apartment building including the parking garage and stores, and by Mitchell Barron of the building facades and roof of the building located at 230 East 44th Street. Mr. Nejat-Haim was accompanied by Mr. Steve Cruz of Knightsbridge Management Co., Mr. Tibor Guba and Willie, the superintendent of the building.

The building consists of thirteen stories plus penthouse with three cellar levels. Construction is concrete frame and deck, with brick and block cavity walls. The building is currently in use as a rental apartment building with leased parking garage, hair dressing salon and restaurant.

**Certificate of Occupancy:** There are actually thirteen & penthouse stories, although C. of O. #58573 shows "twelve & penthouse stories." The thirteenth floor is numbered "fourteen."

**Building condition:** The building was noted in our previous report as having many deficiencies, many of which remained from the 1994 report. Most of these deficiencies reported previously have been corrected. There are some new problems, and some items that remain unresolved. Examples follow, many of which are covered in more detail in the photo pages and discussions below.

As noted previously, many of the conditions requiring attention have been brought about by poor basic maintenance and many instances of inappropriate or improperly performed and/or poorly planned repair work. Other contributing factors were generally poor workmanship during the initial construction, (such as the missing weep holes), several design omissions and shortcomings and damage possibly caused during construction of the adjacent building at the east property line.

Our 1994 investigation found evidence of cracking and other damage that may have resulted approximately thirteen years ago from blasting during construction of a new building on the east property line. This cracking has yet to be properly addressed.

I.   **Items discussed in the "Basic Maintenance" sections of previous reports that have been corrected:**

    A.  Water tank & enclosure: The condition of the water storage tank and its enclosure is acceptable. Note that there is some brick work required (see the basic maintenance section of this report).
        1.  The roof at the house tank has been pitched and no longer ponds.
        2.  There are no leaks from the tank.
        3.  The concrete beams and columns within the tank enclosure have been repaired--these repairs are of poor workmanship, but are serviceable.
        4.  The level alarm system is operating properly.
        5.  The concrete copings over the walls surrounding the tank have been pointed and reset as necessary.
        6.  Brick pointing and other brick repairs made at the interior of the enclosure is of poor workmanship but is serviceable.
        7.  The scuppers serving the tank enclosure have been straightened and the perimeters sealed and are acceptable.
    B.  The brick pointing and repairs made at the roof parapets are of poor quality but are acceptable.
    C.  All exhaust fans on the roof were operating at the time of this inspection.

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET                    PAGE 3

D. All windows have been replaced except at apartment 8E.
E. All roof level electrical panels are properly closed.
F. Cleaning the facade of the building, recommended in the 1994 report, would be for cosmetic reasons only. High-pressure cleaning might introduce moisture into the brickwork, potentially causing damage to the brickwork. Therefore, cleaning is not recommended at this time.
G. New pipe insulation has been installed at the cellar areas.
H. There was no storage of unwanted materials in the electrical switchgear room as reported previously and there was clear access to this area.
I. Masonry work has been performed at all facades. Cracking remains a concern, as does the uncorrected weep hole problems.
J. The condition of the structural concrete at the garage has been corrected. Workmanship was, however, poor.
K. The compactor room is in acceptable condition. The compactor was installed approximately 3 years ago. The area and the compactor is protected by a sprinkler system as required by law.
L. The public hallways were found to be clean, neatly painted and in acceptable condition.
M. The elevator machine room is neat and has no problems. There is no storage of materials in this room. The control boxes are clean. The certificate of inspection is maintained on premises. The Department of Buildings Elevator Division last inspected the elevators on 12/17/2000.
N. The building is in compliance with the Fire Department Local Law 10 of 1999 and laws concerning the installation of window gates.

II. **Items observed during this inspection** resulting from lack of proper maintenance:

A. Cracked and spalled brick on the exterior of the roof tank enclosure was observed (see photos).
B. Mechanical Room:
   1. The fire resistive ceiling above the steam regulating station was not continuous. This condition is compromising the 3 hour minimum fire rating of the room. Mr. Cruz acknowledged the defect and directed his assistant to install cement boards or similar fire-rated material to correct the defect.
   2. The steam vacuum breaker pipe was dripping condensate and excess steam in the area and producing water puddles in the mechanical room. To eliminate this condition all drips must terminate in the drain system. Leonard Power Co. maintains the steam system and will be contacted to direct this pipe in to the drain system. It was also noted that the existing drain is too small to accommodate the addition of this pipe. Mr. Cruz agreed to enlarge the existing drain to accommodate this additional pipe.
   3. There was an elbow that had a noticeable crack causing steam and condensate to leak out and add to the water puddles. Mr. Cruz acknowledged the defect and directed his assistant to contact Leonard Power Co. to replace the elbow.
C. A leak was found at the ceiling of the first garage level. It was identified that water leaks from the same drain in the mechanical room that was discussed above. This drain system is scheduled to be enlarged and cleaned.
D. In the electric distribution and meter room, it was noted that the concrete wall has blisters and is eroded at few locations. There were also some holes in this area that need to be filled with concrete (see photos). The fresh air intake and vent opening was found to be quite dirty at the time of inspection. Mr. Cruz acknowledged the defect and directed Willie to vacuum the vent and patch the holes.
E. On the 3rd floor in the electric closet and meter area several electric panels and breaker boxes were found to be without covers (see photos). Mr. Cruz acknowledged the defect and directed his assistant to contact Con Edison or an electrical contractor to provide covers for the boxes. When the contractor arrives, the superintendent will inspect all electrical closets for this purpose

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET                    PAGE 4

and will see that all covers are installed.

F. The concrete walls of the stair enclosures have many blisters of various sizes. Some of them have been patched. All the blistered walls should be repaired and painted. Mr. Cruz acknowledged the defect and directed the superintendent to repair the walls and paint to match the existing paint.

G. There is an old water meter on the lower garage level that was leaking (see photos). The superintendent reported that this meter is scheduled to be removed by DEP since this building has a new water meter with a back flow prevention device.

H. Through-wall air conditioner sleeves have been replaced in a piecemeal fashion. The majority of the sleeves remain the originally installed equipment.

I. Several facade conditions noted in the 1998 report have yet to be addressed (see photos).

III. **Design/installation problems:** The following conditions should be addressed:

A. The problem weep holes addressed in previous reports have not yet been corrected. As discussed previously, many weep holes are missing or are located too high in the walls as to be functional.

B. There is a large metal fresh air intake duct in the mechanical room that runs through the building and terminates outside near the entrance door and in the proximity of the windows of the hairdresser shop. The location of this discharge is unsafe and undesirable. This installation would allow hot steam to discharge to the building entrance (means of access or egress) in the event of a steam accident in the mechanical room such as a steam piping burst. The steam unit of Con Edison advises that ventilation for the mechanical room must be designed to maintain a maximum temperature of 100 degree Fahrenheit in a normal day and that the point of discharge must be a place that would not injure people entering or exiting the building or pedestrians passing by the building. It is recommended that this matter be further investigated to find a more desirable configuration.

C. The equipment in the laundry room is maintained by Coin Machines Co. Because of the configuration of this area the main vent pipe is running against the wall before it enters the flue pipe. Due to the obstructions in this area the main vent line was found to slope down. This configuration causes the vent to clog rapidly and allows exhaust gases to enter the area. Mr. Cruz acknowledged the defect and directed his assistant to arrange with the Coin Machines Co. to vacuum the vent line more often.

IV. **Insurance Replacement Value:**

The estimated replacement cost of this building (a Class "A" fireproof multiple dwelling) is $18,298,600.

The replacement cost was computed predicated on the following:

- The existing building was substantially damaged by an "incident" such as a massive gas explosion.
- The building was in a substantially unsafe condition as a consequence of the damage sustained.
- The extent of the damage was of a magnitude so as to preclude economical repairs—that is, the cost of repairing and restoring the superstructure would exceed the cost of substantial replacement.

As a check on rationality the cost of replacing the referenced building as a new building has also been estimated, with only 5-story masonry bearing wall tenements to be demolished on the selected site. This approach "broke-out" from the replacement estimate ONLY those costs dependent on there having been

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET                    PAGE 5

a similar building on the site, such as:

- The costs of clean-up and decontamination of the existing building after the "incident".
- The demolition and removal of the damaged superstructure and the repair of those portions of the substructure that could rationally be expected to survive the "incident".
- The repair of the remaining substructure to receive the new superstructure.

Additionally, those costs have been compared with the estimated cost of constructing the same building from scratch on a site only occupied by small 5-story masonry bearing wall buildings, such as:

- The demolition and clearing of the site.
- The excavation of the site.
- The construction of the substructure ready to receive the new superstructure.

This analysis developed estimated costs of only $1,459,600 in the first instance--that is, using the costs incorporated in the $18,298,600 amount.

Using the costs incident of building the replacement building in a site occupied by small 5-story masonry bearing wall buildings and ignoring the cost of clean-up and decontamination of the existing building after the "incident" plus the demolition costs resulting from removal of the damaged superstructure and substructure, the estimated cost would rise by $304,140 for a total estimated replacement cost of $18,602,740.

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET          PAGE 6

Breakdown of projected replacement cost after a devastating incident:

| Description | | amount/units | cost/unit | total item cost |
|---|---|---|---|---|
| Clean-up & decontamination following incident: | | 142,500sf | $2.60/sf | 370,500 |
| Demolition & disposal of superstructure above salvageable structure work: | superstructure | 21,300sf | $3.70/sf | 78,810 |
| | substructure | 1,250,000cf | $0.50/sf | 625,000 |
| Repairs to salvaged substructure areas: | | | L.S. | 184,000 |
| Superstructure concrete work, complete: | | 145,000sf | $26.50/sf | 3,842,500 |
| Exterior walls, including interior finishes: | | 40,000sf | $23.50/sf | 940,000 |
| Windows and exterior doors: | | 900 units | $340 ea. | 306,000 |
| Interior walls, including finishes (two sides) plus doors and frames: | | 120,000sf | $16.50/sf | 1,980,000 |
| Floor finishes--apartments and public halls: | | 136,000sf | $6.50/sf | 884,000 |
| Kitchens, including appliances, cabinets & countertops: | | 164 units | $2,350/unit | 385,400 |
| Plumbing: | | 164 units | $8,900/unit | 1,459,600 |
| Electrical work: | | 164 units | $7,850/unit | 1,287,400 |
| Heating, air conditioning & ventilating work: | | 164 units | $6,800/unit | 1,115,000 |
| Elevators: | | 2 elevators | $142,000 ea. | 284,000 |
| Roofing & related sheet metal work: | | 11,000sf | $13.00/sf | 143,000 |
| Lobby & public hall finishes & furnishings: | | | L.S. | 121,000 |
| Sprinkler system & related garage extras: | | | L.S. | 126,000 |
| Commercial spaces--prepare for tenant alterations only: | | | L.S. | 79,000 |
| Subtotal: | | | | $14,211,410 |
| General Contractors general conditions, overhead & profit: | | | 16% (approx.) | 2,273,826 |
| Total Construction Costs: | | | | $16,485,236 |
| Architectural, Engineering & Expediting Costs: | | | 11% (approx.) | 1,813,376 |
| Total Projected Replacement Cost of Building | | | | $18,298,612 |

FEB-07-2006 20:11
02/07/2006 21:05 FAX 2127528881   TOTAL TROUP'S PAYMENT.
P.09/23
05-16167-smb   Doc 80   Filed 02/07/06   Entered 02/07/06 23:53:11   Main Document
Pg 38 of 57

I. LEONARD MESSER, P.E.     230 EAST 44TH STREET     PAGE 7

Break-out of construction items applicable only to building replacement after a devastating incident:

| Description | | amount/units | cost/unit | total item cost |
|---|---|---|---|---|
| Clean-up & decontamination following incident: | | 142,500sf | $2.60/sf | 370,500 |
| Demolition & disposal of superstructure above salvageable structure work: | superstructure | 21,300sf | $3.70/sf | 78,810 |
| | substructure | 1,250,000cf | $0.50/sf | 625,000 |
| Repairs to salvaged substructure areas: | | | L.S. | 184,000 |
| Subtotal: | | | | $1,258,310 |
| General Contractors general conditions, overhead & profit: | | | 16% (approx.) | 201,330 |
| Total Construction Costs: | | | | $1,459,640 |

Costs for development of a new site "from scratch" for construction of an identical building

| Description | amount/units | cost/unit | total item cost |
|---|---|---|---|
| Demolish & clear small structures (+/- 5-story masonry bearing wall buildings) | 700,000cf | $0.25/cf | 175,000 |
| Excavation: underpinning, sheeting, etc. | 9,000cf | $13.00/sf | 117,000 |
| seat footings to rock, pumping, etc. | | L.S. | 79,000 |
| general earth & rock excavation, off-site disposal, etc. | 10,000cy | $15.50/cy | 155,000 |
| Substructure work: footings & piers (predicated on area of the site) | 13,000cy | $8.50/sf | 110,500 |
| foundation walls | 9,000sf | $26.00/sf | 234,000 |
| slab-on-grade--includes vapor barrier and crushed stone, etc. | 13,000sf | $13.00/sf | 169,000 |
| suspended slabs and ramps | 26,000sf | $18.50/sf | 481,000 |
| Subtotal of items for development of new site: | | | $1,520,500 |
| General Contractors general conditions, overhead & profit: | | 16% (approx.) | 243,280 |
| Total Construction Costs: | | | $1,763,780 |

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET          PAGE 8

| East Forty-Fourth Street L.L.C. Apartment Building at 230 East 44th Street, Manhattan Current Status of Conditions Noted in Previous Building Condition Survey Reports | | | | | | |
|---|---|---|---|---|---|---|
| **7/12/94 Report** | | | | **9/15/98 report** | | |
| Page No. | Description | Status | | Page No. | Description | Status |
| 2 | Missing weep holes | uncorrected | | 2 | Water tank roof | corrected |
| 2 | Window replacement | all but 8E | | 2 | Corroded float switch | corrected |
| 2 | Coping waterproofing | corrected | | 2 | Water tank structure | corrected |
| 2 | Pipe insulation | corrected | | 2 | Trash chute coping & screen | corrected |
| 2 | Cracking at east wall | uncorrected | | 2 | Roof parapets | corrected |
| 3 | Terrace decks | corrected | | 3 | Roof fans | corrected |
| 3 | Plumbing leaks | corrected | | 3 | Roof electrical panels | corrected |
| 3 | Roofing leaks | none reported | | 3 | Cellar pipe insulation | corrected |
| 3 | Garage concrete slabs | corrected | | 3 | Mechanical equipment | corrected |
| 3 | Blocked roof drains | corrected | | 3 | Electrical room clutter | corrected |
| 3 | Water tank & enclosure leaks | corrected | | 3 | A/C sleeves | uncorrected |
| 3 | Exhaust fans | corrected | | 3 | Masonry work | corrected |
| 3 | Floor drains @ restaurant entrance clogged | corrected | | 3 | Garage structure | corrected |
| 3 | Aluminum rail supports | corrected | | 3 | House pumps | replaced |
| 3 | Loose nosing angles | corrected | | | | |
| 4 | Deteriorated PH terrace projections | corrected | | | | |
| 4 | Interior items | corrected | | | | |
| 4 | Building exterior cleaning | not required | | | | |
| 5 | Garage: | | | | | |
| | Drainage | corrected | | | | |
| | Ceiling | satisfactory | | | | |
| | Entrance Door | corrected | | | | |
| | Ramps | corrected | | | | |
| | Exit Door | corrected | | | | |
| | Hole | corrected | | | | |
| | Leaks | corrected | | | | |
| 5 | Leaks at restaurant | corrected | | | | |
| 6 | All apartments | corrected | | | | |
| 6 | Water & moisture | corrected | | | | |
| 6 | Exit doors at garage | corrected | | | | |

I. LEONARD MESSER, P.E.        230 EAST 44TH STREET                        PAGE 9



Cracked and spalled brick at exterior of tank enclosure



Cracked and spalled brick at exterior of tank enclosure

FEB-05-2006
02/07/2006 21:07 FAX 2127528881          TOFEL GROUP & PARTNERS.          P.12/23

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET          PAGE 10



Deteriorated wall in electric distribution & switching room

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET                    PAGE 11



Missing breaker panel covers



Missing breaker panel covers

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET                    PAGE 12



Leaking water meter on lower level of garage



Spalling stucco at east wall—loose material should be removed and repairs made
as necessary

I. LEONARD MESSER, P.E.      230 EAST 44TH STREET      PAGE 13



Open cross-sill joint—typical



Open joint in marble trim over window—typical

I. LEONARD MESSER, P.E.        230 EAST 44TH STREET                    PAGE 14



Bulged brick at lintels, upper levels of east elevation. Remove and replace brick;
replace spandrel flashings; scrape, prime and paint lintels.



Step cracking and shifted masonry under 12th floor east terrace.

I. LEONARD MESSER, P.E.          230 EAST 44TH STREET                    PAGE 15

**APPENDIX**

There are currently two open Department of Buildings violations (see printout and violation copies). These violations were issued on February 5, 2002 for failure to provide the proper informational tags on the elevators. This is not considered a hazardous condition by the Dept. of Buildings. The elevator maintenance company should be contacted as soon as possible to have the devices tagged, however.

The Certificate of Inspection dated 12/20/01 from Dept. of Housing Preservation & Development stating that the building is in compliance with Multiple Dwelling laws is posted.

The building is in compliance with the five year test of sprinkler & stand pipe systems. Monthly inspection of these systems is contracted to Action Sprinkler Systems.

Fire Department permit accounts are free of violations (see printout).

# New York City Department of Buildings

```
03/07/02      PUBLIC ACCESS PROPERTY PROFILE OVERVIEW          BISPIQ70
228........ EAST   44 STREET............ 1 MANHATTAN    10017 BIN# 1037565


EAST   44 STREET       228 - 238        HEALTH AREA : 50    TAX BLK: 1317.
                                        CENSUS TRACT:  88   TAX LOT: 30...
                                        COMMUNITY BD: 106   CONDO  :
                                        MULTI STRUCT: 01    VACANT :
```

```
DOB SPECIAL PLACE NAME :                        1    PROPERTY RECORD(S)
DOB BUILDING REMARKS    :
FINANCE OCCUPANCY CODE : D6-ELEVATOR APT    LANDMARK STATUS:

    COUNTS FOR THIS BIN                     RECORD VERIFIED : YES
    ACTIONS      : 32  , 8   JOBS/FILINGS (PF4)  SPECIAL STATUS :
    VIOLATIONS DOB : 35  , 2   OPEN                    LOCAL LAW : YES
            ECB : 13  , 0   OPEN   (PF12)                  SRO : NO
    COMPLAINTS   : 13  , 0   OPEN   (PF11)
```

```
PF 3 = ELEVATORS   ENTER KEY= ACTIONS  PF 5/6/7 = NEW ADDR/BIN/BLK-LOT
PF 8 = BOILERS    (TYPE : .... )   PF 9/10  = BROWSE BIN/BLK-LOT
*NO ARA'S FILED                    PF 15    = BROWSE 1   PROPERTY RECORDS
PF 14 = LPC/HPD/LOFT USE ONLY      PF 16    = ADDTN'L PROPERTY INFO
```

```
03/07/02   67   ACTIONS AT 228 EAST   44 STREET MANHATTAN       BISPOCV3
                  BLOCK: 01317   LOT: 00030                       PAGE 1

A . ALT  1211-63        BN  136-62VAULT      BN  1486-62SHED
B . BN   2591-62HOIST   BN  3658-62HOIST     BN. 3788-62CHUTE
C . BN   2757-64P       BN  696-70P          BN  1167-73P
D . BN   7685-89        CO  57159-TEMP       CO  57217-TEMP
E . CO   57330-TEMP     CO  57776            CO  58573
F . COM  1508-63P       COM 1989-63          COM 4599-63E
G . DP   436-61         EA  858-94           EBN 1809/93SO/022594#PP
H . ELV  61-62          NB  14-61P           PA  163-64
I . PRS  934-63         PRS 2197-64          PRS 485-76
J . SP   845-61         SPR 111-62           SPR 34-64
K . SR   501-63E        V*  022580E1337C3    V*  082181E563CD61
L . V*   070182E1409    V*  102284CBCWO1     V*  042985CBLP05
M . V*   040787LL1080HAZ281M V* 999999NO FORM05-09- ZV  1-66*
N . V*   090194LL629105829   V* 082995LL629109298   V* 091697LL6291180365
O . V*   050498LL629107343   V* 052589CMTF3LE       V* 052589ZMTF1LE
P . V*   052589ZMTF2LE   V*  040590CMTF3LE     V*  040590ZMTF2LE
Q . V*   040590ZMTF1LE   V*  043090CMTF8LE     V*  043090CMTF4LE
R . V*   043090ZMTF1LE   V*  043090ZMTF2LE     V*  043090CMTF3LE
```

FEB-07-2006-7:30:11
02/07/2006 21:10 FAX 2127528881
05-16167-rdd Doc 80 Filed 02/07/06 Entered 02/07/06 23:53:11 Main Document
NOFEL TROUP & PARTNERS.
Pg 48 of 57
P.19/23

```
03/07/02    67    ACTIONS AT 228 EAST   44 STREET MANHATTAN        BISPOCV3
                      BLOCK: 01317   LOT: 00030                    PAGE 2

A . V*    043090CMTF7LE      V*    043090CMTF6LE     V*    043090CMTF5LE
B . V*    072690E1396B3      V*    070192LL1080NRF0606 V*  081092ZMTF2LE
C . V*    081092ZMTF3LE      V*    081092CMTF4LE      VP*  050593E1374B01
D . V*    062893LL108101375  V*    050593E1374B/02    V    020502E9444/148414
E . V     020502E9444/148415 VEC*  060888CBFF01       VEC* 111693E1372B1
F . VEC*  021590CB2EP05       VEC* 111693E1372B2       VEC* 011598C0652
G . VEC*  072397E1466B03      VEC* 072397E1466B04      VEC* 011698E1300B2
H . VEC*  011698E1300B1       VEC* 011598C06SI         VEC* 02249E288B01
I . VEC*  120294E1372B3       VEC* 022394E288B01
J .
K .
L .
M .
N .
O .
P .
Q .
R .

PF1-PREV SCREEN    PF6-REFRESH(ENTR TYPE .... )   COL. NO. TO ZOOM
```

# DEPARTMENT OF BUILDINGS NOTICE OF VIOLATION

**NAME:** *East Forty-Fourth Str Robert M. Edar*

**MAILING ADDRESS:** *3001 SE Ocean Blvd Ste 203   Stuart   FL   34996-0737*

STREET | CITY | STATE | ZIP CODE

### NEW YORK CITY DEPARTMENT OF BUILDINGS
#### NOTICE OF VIOLATION(S) AND ORDER TO CORRECT VIOLATION(S)

YOU ARE HEREBY NOTIFIED THAT THERE EXISTS A VIOLATION IN THE SUBJECT PREMISES AS DESCRIBED HEREIN. YOU ARE HEREBY DIRECTED TO REMOVE THIS VIOLATION, PURSUANT TO SECTIONS 26-115 AND 26-116 OF TITLE 26 OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK, IN ADDITION TO THE ITEMS CHECKED BELOW, REPAIR OR REPLACE ALL WORN, DEFECTIVE, MISSING AND IMPROPERLY MAINTAINED ELEMENTS WHICH CONTRIBUTE TO THE MALFUNCTION OF THE ELEVATOR.

ALL REQUESTS FOR REINSPECTION TO REMOVE THIS VIOLATION MUST BE IN WRITING, INCLUDE A COPY OF THE VIOLATION AND BE ADDRESSED TO THE ELEVATOR DIVISION OF THE DEPARTMENT OF BUILDINGS, ATTENTION: VIOLATION REINSPECTION UNIT, 60 HUDSON STREET, NEW YORK, N.Y. 10013, 5th FLOOR. ALL OTHER INQUIRIES MAY BE DIRECTED TO TEL. # (212) 312-8740 or 8738.

**RONNY A. LIVIAN, P.E.**
ACTING COMMISSIONER

[form fields and checkbox tables — handwritten entries]

☑ 27-987 FAILURE TO MAINTAIN (BP2)   ☐ 27-967 FAILURE TO MAINTAIN  HAZARDOUS (BPH)

**ELEVATOR PART**

[detailed checklist of elevator parts omitted detail]

| ELEVATOR PART | 7 3 | | | | | | | | |
| VIOLATING CONDITION | 6 | | | | | | | | |
| SUGGESTED REMEDY | 16 | | | | | | | | |

ADDITIONAL INFORMATION:

I PERSONALLY OBSERVED THE VIOLATING CONDITIONS CITED

R. Yurevitsky
PRINT AGENCY INSPECTOR'S NAME

AGENCY INSPECTOR'S SIGNATURE

I understand that the falsification of any statement is a misdemeanor under Section 26-124 of the Administrative Code punishable by a fine or

PVT 46418

# DEPARTMENT OF BUILDINGS NOTICE OF VIOLATION

BY VP-01 (11/00)

**NAME:** East Forty-Forth Str. Robert H. Eder

**MAILING ADDRESS:**

| STREET | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 3601 SE Ocean Blvd Ste 203 | Stuart | FL. | 34996-6737 |

## NEW YORK CITY DEPARTMENT OF BUILDINGS
## NOTICE OF VIOLATION(S) AND ORDER TO CORRECT VIOLATION(S)

YOU ARE HEREBY NOTIFIED THAT THERE EXISTS A VIOLATION IN THE SUBJECT PREMISES AS DESCRIBED HEREIN. YOU ARE HEREBY DIRECTED TO REMOVE THIS VIOLATION, PURSUANT TO SECTIONS 26-115 AND 26-116 OF TITLE 26 OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK. IN ADDITION TO THE ITEMS CHECKED BELOW, REPAIR OR REPLACE ALL WORN, DEFECTIVE, MISSING AND IMPROPERLY MAINTAINED ELEMENTS WHICH CONTRIBUTE TO THE MALFUNCTION OF THE ELEVATOR.

ALL REQUESTS FOR REINSPECTION TO REMOVE THIS VIOLATION MUST BE IN WRITING, INCLUDE A COPY OF THE VIOLATION AND BE ADDRESSED TO THE ELEVATOR DIVISION OF THE DEPARTMENT OF BUILDINGS, ATTENTION: VIOLATION REINSPECTION UNIT, 60 HUDSON STREET, NEW YORK, N.Y. 10013, 5th FLOOR. ALL OTHER INQUIRIES MAY BE DIRECTED TO TEL. # (212) 312-8740 or 8718.

RONNY A. LIVIAN, P.E.

ACTING COMMISSIONER

| PLACE OF OCCURRENCE 223 E 44 ST. | BORO: M | DATE OF VIOLATION | Type: | Agency No | Item # |
|---|---|---|---|---|---|
| No. of Stories: | Block: 1317 | Lot: 30 | 2/5/02 | E | 9444 | 1 |
| Occupancy at time of inspection: Commercial | | | Elevator No. P 26224 | | |
| SECTIONS VIOLATED: Administrative Code section(s)   27-987 & RS-18 | | | | | |

☑ 27-987 FAILURE TO MAINTAIN (BP7)          ☐ 27-967 FAILURE TO MAINTAIN - HAZARDOUS (BP8)

### ELEVATOR PART

**INSIDE CAR**
- 01. Emergency stop switch
- 02. Alarm system
- 03. Car enclosure
- 04. Side emergency exit
- 05. Car door/gate
- 06. Car door/gate contact
- 07. Door reopening device
- 08. Car door to landing sill
- 09. Car door gibs
- 10. Car button station
- 11. Car lighting
- 12. Emergency lighting
- 13. Car mirror
- 14. Certificate frame

**OUTSIDE HOISTWAY**
- 15. Hoistway doors

- 16. Hoistway door gibs
- 17. Vision panel
- 18. Interlocks
- 19. Parking device
- 20. Hall button station
- 21. Indicators

**TOP OF CAR**
- 22. Top emergency exit cover
- 23. Governor release carrier
- 24. Door hangers & connectors
- 25. Door operator
- 26. Normal limits
- 27. Final limits
- 28. Guide shoes
- 29. Counterweight
- 30. Hoistway

- 31. Electric wiring
- 32. Pipes and ducts
- 33. Overhead & deflector sheave
- 34. Traveling cable & junction

**MACHINE ROOM**
- 35. Machine room
- 36. Machine room door
- 37. Controller - selector
- 38. Reverse phase relay
- 39. Traction sheave
- 40. Governor
- 41. Governor switch
- 42. Drum
- 43. Pump unit
- 44. Generator
- 45. Slack cable switch

- 46. Hoist cables
- 47. Governor cable
- 48. Car counterweight cable
- 49. Drum counterweight cable
- 50. Main machine
- 51. Visual check gears/bearings
- 52. Machine brake
- 53. Lighting machine space
- 54. Machine/disconnect switch

**PIT**
- 55. Pit light
- 56. Pit stop switch
- 57. Pit
- 58. Car guide-rails & brackets
- 59. Cwt. guide-rails & brackets
- 60. Buffers

- 61. Car safety & tail rope
- 62. Underside platform
- 63. Tension weight
- 64. Comp. chains, rope & switch

**ESCALATOR/MOVING WALK**
- 65. Fire shutters
- 66. Skirt switch
- 67. Comb plate teeth
- 68. Comb plate/threshold switch
- 69. Handrails
- 70. Step/tread
- 71. Key switch
- 72. Emergency stop button

**ALL TYPES**
- ⑦3. Entire device
- 74. Miscellaneous
- 75. Current five-year test

### VIOLATING CONDITION

- A. Altered
- B. Insufficient
- C. Padlocked
- D. Unsecured
- E. Rubbing
- F. Lost motion
- G. Improper fuses
- H. Worn
- I. Damaged
- J. Misaligned
- K. Rusted
- L. Defective
- M. Missing
- N. By-passed
- O. Dirty
- P. No means of access
- Q. Unguarded
- R. Illegal
- S. Not fireretardant
- T. Unlabeled
- Ⓤ. Device not tagged
- V. Not level
- W. Unlocked
- X. Inoperative
- Y. Oil leak
- Z. Water leak

### SUGGESTED REMEDY

- 01. Adjust
- 02. Clean
- 03. Install guards
- 04. Patch
- 05. Perform & file test
- 06. Properly secure
- 07. Provide
- 08. Regroove
- 09. Remove
- 10. Renew
- 11. Repair
- 12. Replace
- 13. Reshackle
- 14. Seal
- 15. Shorten
- ⑯. Tag device
- 17. Provide means of access

☐ CEASE USE

|  | ELEVATOR PART | 7 | 3 |  |  |  |  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | VIOLATING CONDITION | U |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | SUGGESTED REMEDY | 16 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

ADDITIONAL INFORMATION: _____

I PERSONALLY OBSERVED THE VIOLATING CONDITIONS CITED

A. Livinsky
**PRINT AGENCY INSPECTOR'S NAME**

**AGENCY INSPECTOR'S SIGNATURE**

a misdemeanor under Section 26-124 of the Administrative Code punishable by a fine or

```
     DATE : 01/23/02        F. P. I. M. S.        TIME : 16:27:11 :
*************************************************************
*         A C C O U N T    I N Q U I R Y    B Y    N U M B E R         *
*************************************************************
         District  Office : 93        Administrative Company : E21
===========================================================
Account # : 70024823   Type : SP Hazard Rank :      Alpha Prefix : G   No Fee : N
===========================================================
Owner Name   : KNIGHTSBRIDGE MGMT CORP    No of Items :     Owner Est : 07/22/85
Account Est : 11/08/84           Permit Exp Dt : 06/07/06    Last Insp  : 06/07/01
Last Billed : 06/13/01           Last Paid    : 07/12/01    Paym Clear : 07/26/01
           Date Printed  --->        Permit :   N/A         Insp Order : 10/18/00
                              Fines Owed :                  Yearly Fee :     320.00
Balance Due :
Spr/Stp Typ : A    Violations  : 0 Lien Excptn: 0  Return Mail :  0 Dup Bill : 0
Cash Aging  : >30  Out of Town : 0  See List : 0              Inspection Status : 0
Acctng Stat : 0    Permit Status : 0    Delinquent yrs : 00     N.G. Check : 0
===========================================================
   Premises   Address :    230     E   44            ST      100170000
     Additional Info :
   Billing   Address :    235     W   48             ST      100360000
     Additional Info :

                                               Function:    00
```

```
    .  *  DATE : 01/23/02      F. P. I. M. S.     TIME : 16:24:58 :
***************************************************************
 *   A C C O U N T    I N Q U I R Y    B Y    N U M B E R         *
***************************************************************
        District  Office : 94         Administrative Company : E021
===============================================================
Account # : 70065164   Type : ST Hazard Rank :    Alpha Prefix : G   No Fee : N
---------------------------------------------------------------
Owner Name  : APRAN ASSOC            No of Items :        Owner Est : 07/22/85
Account Est : 11/08/84        Permit Exp Dt : 10/10/01   Last Insp : 10/10/96
Last Billed : 11/13/96        Last Paid     : 12/16/96   Paym Clear : 12/30/96
          Date Printed --->        Permit : N/A          Insp Order : 05/09/01
                                 Fines Owed :             Yearly Fee :    365.00
Balance Due :                                        Return Mail : 0 Dup Bill : 0
Spr/Stp Typ : W   Violations : 0 Lien Excptn : 0        Inspection Status : 9
Cash Aging  : >60  Out of Town : 0  See List : 0           N.G. Check : 0
Acctng Stat : 0    Permit Status : 0   Delinquent yrs : 00
===============================================================
  Premises  Address :  230    E  44        ST    100170000
     Additional Info :                     ST    100240000
  Billing   Address :  210    W  89
     Additional Info :
                                        Function:   00
```

**Exhibit C**

**February 2005 Survey**

# COST ESTIMATE REPORT
## FOR
## FEBRUARY 16, 2005 INSPECTION

### 230 EAST 44TH STREET
### NEW YORK,      NY

Reported by:
H. Nejat Haim, P.E.
1372 Jefferson Street
Floral Park,   NY    11001
Tel:  (516) 437-6783
Cell: (917) 453-2966

Date:
May 2, 2005

H. Nejat Haim, P.E.
1372 Jefferson Street
Floral Park, NY 11001

# Cost Estimate Report

Premises:    230 East 44th Street
             New York, New York

This report addresses the estimated cost to correct the deficiencies observed during our February 16, 2005 inspection of the above referenced building.

This estimate is based on our past experience for similar repairs and today's fair market value and is adjusted for the above referenced location.

It is possible that the actual cost of these repairs may be different than our estimation due to various factors such as the method of repairs, the level of workmanship, required licenses and permits, insurance, the extent of supervision and the quality assurance inspection.

## Exterior Items on the Roof and Penthouse Level

Water tank masonry enclosure - Repoint the water tank masonry structure at various locations and elevations including the set-up costs:

$1800.00

Repoint the inner side of the parapet walls at various locations -

$1000.00

Flat roof over the stairwell - Strip off the flat roof, re-pitch the roof with insulating board (manufactured by Firestone) and install a new modified bitumen roofing system:

$2500.00

Supply and install a gooseneck for the steel access ladder -

$500.00

H. Nejat Haim, P.E.
1372 Jefferson Street
Floral Park, NY 11001

Repoint the exterior wall above the penthouse apartments -

$8000.00

**Garage Area**

Replace/repair fixtures to provide for sufficient illumination -     $2500.00

Replace/repair the condensate pump -     $750.00

Clean the floor drains at various locations and install replacements for the
damaged or nonfunctioning drain pipes -     $2000.00

Repair the spalled concrete areas -     $3000.00

Replace/repair the non-functioning exit signs -     $250.00

Rewire the electric supply for the florescent light fixture at the second means
of egress -     $500.00

Discard all the garbage and debris in the garage area -     $1500.00

Repair the broken drain pipes coming from the first floor tenant - $750.00

Install spring loaded mechanisms in all the exit doors -     $700.00

Install a push bar mechanism in the door leading to East 44th Street –
$400.00

Replace the steel diamond cover plate over the storm water pit - $350.00

Repair/replace the exhaust fan -     $750.00

H. Nejat Haim, P.E.
1372 Jefferson Street
Floral Park, NY 11001

## Building Interior

Replace the coupling joint connecting the Con Edison steam supply pipe to
the building -                                   $17,000.00

The total estimated cost for the repairs listed here is        $44,250.00.

## South Façade Wall

The scope of our inspection was limited due to the lack of access for a close
up inspection. We noted that some repairs on this wall including the
chimney structure have been performed.  In addition, we verified that the
Department of Buildings records show that a permit was issued for the
restoration of this wall (permit application # 103294267). However, the
issue of the bulging bricks is not yet satisfactorily addressed. In order to
establish the scope of repair work and map the south wall in detail,
suspended scaffolding is needed to be rigged to provide a close up
inspection.

The cost of scaffold and inspection is-                 $5,000.00