| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | February 10, 2006<br>10:00 a.m. |
| ---------------------------------------------------------x<br>In re | Chapter 11 |
| EAST 44TH REALTY, LLC, | Case No. 05-16167 |
| Debtor.<br>---------------------------------------------------------x | |

### REPLY MEMORANDUM IN SUPPORT OF MOTION TO ASSUME LEASE

East 44th Realty, LLC (the "Debtor") and Yusef Bildirici, the Debtor's managing member, as and for their Reply Memorandum in support of the Debtor's Application for an order authorizing the Debtor to assume the lease (the "Lease") by and between the Debtor and East Forty Fourth Street L.L.C. ("Landlord") for the building located at 228-238 East 44th Street, New York, New York (the "Building"), respectfully represent as follows:

**(a)** **after twice considering the same arguments the Landlord is making in opposition to the Debtor's motion to assume, the Appellate Division refused to deem the Debtor's lease terminated,**

**(b)** **the Landlord has no claim to the Debtor's rents because the Landlord failed to either take actual possession of the rents or to obtain the appointment of a receiver, so the Landlord's interest in the Debtor's rents remains inchoate,**

**(c)** **the Landlord's claim for attorneys fees should be denied as unreasonable given the improper "ends sought" by the Landlord, the relatively small "amounts in issue" for repairs, and the Landlord's failure to proffer time sheets, invoices or other evidence of legal services performed,**

**(d)** **under section 502(d) of the Code, the Landlord's cure claim may be temporarily disallowed altogether, until such time as the Landlord returns the overcharges it has collected as additional rent, and**

**(e)** **the Landlord's challenges to the Debtor's projections are inherently suspect because the Landlord chose not to order an expedited transcript of Mr. Bildirici's deposition, and instead to "reconstruct" the transcript from the Landlord's counsel's notes.**

**AFTER TWICE CONSIDERING THE SAME ARGUMENTS THE LANDLORD IS MAKING IN OPPOSITION TO THE DEBTOR'S MOTION TO ASSUME, THE APPELLATE DIVISION REFUSED TO DEEM THE DEBTOR'S LEASE TERMINATED**

1. The Landlord's Memorandum filed on February 1, 2006 primarily argues that the Debtor cannot assume the Lease because the Lease has terminated under New York law. Absent from the Landlord's Memorandum, however, is any reference to any State Court order finding that the lease has terminated.

2. Indeed, the Landlord has concealed the fact that on <u>two</u> occasions, the Appellate Division <u>declined</u> to deem the Lease terminated based upon the <u>same</u> arguments contained in the Landlord's Memorandum submitted to this Court.

3. By way of background, the Bankruptcy Court entered a lift stay order on September 12, 2005 to permit the pending State Court appeal between the Debtor and the Landlord to proceed to decision by the Appellate Division, First Department. At that time, the Debtor was prosecuting its appeal from the Supreme Court decision which, among other things, found that the Debtor was required to make certain repairs to the South façade of the Building.

4. Prior to perfection of the appeal, and before the Petition was filed, the Landlord opposed the Debtor's motion for an interim stay pending appeal and cross-moved to the Appellate Division to dismiss the Debtor's appeal as moot by virtue of the fact that the Lease had

been terminated as of March 31, 2005. (Exhibit A)  The Landlord repeated those arguments in its appellate brief.  (Exhibit B)  The exact same arguments are repeated in the Landlord's memorandum herein in opposition to the Debtor's motion to assume the Lease.

5.    This argument, however, was <u>twice</u> rejected by the Appellate Division, the New York State Court having jurisdiction over the issue.  The first time, the argument was rejected in the Appellate Division's decision dated May 26, 2005, summarily denying the Landlord's cross-motion to dismiss the appeal as moot. (Exhibit C)  The Appellate Division rejected the Landlord's termination argument a second time, when it declined to even address the issue in its decision on the appeal, dated December 15, 2005, notwithstanding that the Landlord's argument that the appeal was moot by virtue of the purported termination was a centerpiece of the Landlord's principal argument on the appeal.   (Exhibit B)  Instead, having twice considered the Landlord's argument that the Lease had been terminated, the Appellate Division ruled that the Debtor was required to repair bulging bricks and mortar on the south facade of the Building.

6.    Accordingly, the Landlord's argument that the Lease has been terminated is inconsistent with, and indeed, flatly contradicted by, the decision of the Appellate Division finding that the Debtor <u>has a current obligation</u> to make certain repairs.  That is, if the Appellate Division had accepted the Landlord's argument that the Lease had been terminated prior to the filing of the petition and the perfection of the Appeal, the Appellate Division clearly would not have held that the Debtor was and continued to be responsible for repairs to bulging bricks and mortar joints on the south facade.  On the contrary, the State Court's finding that the Debtor's

3

obligation to make these repairs is extant, plainly presumes the viability of the Lease. Any other conclusion would render the decision a nullity.

7.      The Appellate Division's refusal to deem the Lease terminated is entirely consistent with the Appellate Division's earlier orders on May 6 and on May 26, granting the Debtor's motion for a stay pending appeal, thereby staying the effect of any purported Termination Notice served by the Landlord. It should come as no surprise, therefore, that the Appellate Division was unprepared to find that the Lease had terminated by virtue of the Supreme Court order or otherwise.

8.      In any event, if this Court decides to revisit the issue of whether the Lease did in fact terminate pre-petition, the Debtor respectfully suggests that the Court should not be mislead by the Landlord's analysis. Rather, this Court should be guided by the orders entered in the State Court. As noted in the Debtor's Motion to Assume, the Debtor obtained a Yellowstone injunction. The Supreme Court then vacated the Yellowstone injunction. The Appellate Division, however, stayed the Supreme Court vacature of the Yellowstone injunction pending appeal. Accordingly, by virtue of the Appellate Division stay, the Supreme Court vacature of the Yellowstone injunction could not have been enforced until the appeal was decided. By the time the appeal was decided, however, the Debtor was in bankruptcy and protected by section 362 of the Bankruptcy Code against lease termination.

9.  Since there is no State Court order recognizing that the Lease has been terminated, much less ordering or giving effect to the purported termination of the Lease – notwithstanding the Landlord's repeated demands that it do so – there is no basis under Bankruptcy law to find that the Lease has terminated.

10. Against this background, the Landlord's reliance on the cases it cited is misplaced. For example, the Debtor has never argued that a lease that terminated pre-petition can be assumed. The Debtor has argued that this Lease did not terminate pre-petition. Thus the many pages of case law cited by the Landlord holding that a terminated lease cannot be assumed in bankruptcy is immaterial. The Landlord's discussion of the New York law regarding so-called Yellowstone injunctions is not relevant to this Court's consideration either, because, as noted above, the Appellate Division has already considered the same arguments and the same law, and declined to find that the Lease had terminated.

11. By the same token, the Landlord's case law holding that no warrant of eviction is necessary where a lease has already terminated is fatally flawed since the Landlord failed to convince the State Court that the Lease in the case has terminated.

12. Based upon the foregoing, nothing in the Landlord's Memorandum challenges the Debtor's right to assume the Lease, and as set forth in the Debtor's motion to assume, the Debtor has the ability to cure its defaults under the Lease.

**THE LANDLORD HAS NO CLAIM TO THE DEBTOR'S RENTS BECAUSE THE LANDLORD FAILED TO EITHER TAKE ACTUAL POSSESSION OF THE RENTS OR TO OBTAIN THE APPOINTMENT OF A RECEIVER, SO THE LANDLORD'S INTEREST IN THE DEBTOR'S RENTS REMAINS INCHOATE**

13. In the wee hours this morning, the Landlord finally revealed the amounts it is asserting as and for its cure claim. The amounts asserted are unreasonable, and only highlight the Landlord's predatory scheme since the inception of the Lease.

14. For example, the Landlord seeks so-called "sublease proceeds" of approximately $1 million based upon the unsupported legal argument that the rents from the Building became the Landlord's property commencing March 10, 2005. The Landlord asserts that by virtue of the assignment of rents clause in the Lease, and the Landlord's default notice, the Landlord is entitled to absolute ownership of the rents. Neither the law nor the facts support the Landlord's completely unsubstantiated claim.

15. At best, the assignment of rents clause in the Lease gives the Landlord a subordinate security interest in the sublease proceeds. The Landlord has no present interest in those rents because the Landlord failed to take possession of the rents or to obtain the appointment of a receiver before the Petition Date. As set forth by the Bankruptcy Court in *In re Northport Marina* 136 B.R. 911 (Bankr. E.D.N.Y. 1992):

> The nature of Citibank's interest is to be determined under New York law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). While it is true that some language of the Agreement on which Citibank relies speaks in

> absolute terms, that is it appears to convey an immediate right to rents to Citibank, the document in its entirety makes Citibank's right to immediate collection dependent on an "Event of Default" which is consistent with a security arrangement rather than with an outright assignment. *See e.g., Sullivan v. Rosson,* 223 N.Y. 217, 119 N.E. 405 (1918). In New York an assignment of rent clause operates merely as a pledge of rent to which the pledgee does not become entitled until it asserts its rights. *Ganbaum v. Rockwood Realty Corp.,* 62 Misc.2d 391, 393, 308 N.Y.S.2d 436, 438 (Sup.Ct.1970). See also, *In re Constable Plaza Assoc., L.P.*, 125 B.R. 98, 101 (Bankr.S.D.N.Y.1991); *In re Riverside Nursing Home,* 100 B.R. 683, 684 (Bankr.S.D.N.Y.1989).
>
> Similarly, under New York law, a mortgagee is not entitled to collect rent pursuant to an assignment of rent merely upon the occurrence of a default. In the event of default, the mortgagee has an equitable claim to unpaid rents, but this equitable lien does not come into force and effect until the appointment of a receiver or the entry into possession by the mortgagee. Until that time the fee owner of the property and not the mortgagee has title to the rents. *New York Life Ins. Co. v. Fulton Dev. Corp.,* 265 N.Y. 348, 193 N.E. 169, 170 (1934); *Sullivan v. Rosson,* 223 N.Y. 217, 119 N.E. 405 (1918); *In re Sterling Bank & Trust Co.,* 21 N.Y.S.2d 566, 569 (Sup.Ct.1940).

136 B.R. at 916-917. The *Northport Marina* Court cited to *In re Constable Plaza Assoc., L.P.,*

125 B.R. 98 (Bankr.S.D.N.Y.1991), which similarly held as follows:

> It is settled law in New York that an assignee of future rents who has done nothing to perfect its rights will not prevail over an execution creditor or a trustee in bankruptcy. *Sullivan v. Rosson,* 223 N.Y. 217, 119 N.E. 405 (1918). The Second Circuit in *In re Brose,* 254 Fed. 664 (2d Cir.1918) early held that as a result of the *Sullivan* case an assignment of rents clause in a mortgage operates merely as a pledge of the rents, to which the pledgee does not become entitled until it asserts its rights. The court also quoted, with approval, the following language of the United States Supreme Court:
>
> The general rule is that the mortgagee is not entitled to the rents and profits of the mortgaged premises until he takes actual possession, or *until possession is taken, in his behalf, by a receiver....* (Emphasis added) *Freedman's Savings Co. v. Shepherd,* 127 U.S. 494, 502, 8 S.Ct. 1250, 1254, 32 L.Ed. 163 (1888).

16. In summary, the Landlord failed to take either take actual possession of the rents or to obtain the appointment of a receiver, so the Landlord's interest in the Debtor's rents is inchoate.

17. Moreover, the Landlord's claim to the rents is further undermined by paragraph 24 of Lease regarding assignments of rents, which provides that the Landlord's assignment is potentially subject to the Leasehold mortgagee's assignment of rents. In addition, paragraph 24 conditions the assignment on the issuance of a valid default notice. The Debtor, however, has always contended that the Landlord's default notice was defective, and that issue is far from settled.

18. In summary, the Landlord's demand for a $1 million cure claim is based upon a misleading presentation of the facts and completely erroneous interpretation of the law, which only serves to illustrate the unreasonable nature of the Landlord's demands.

**THE LANDLORD'S CLAIM FOR ATTORNEYS FEES SHOULD BE DENIED AS UNREASONABLE GIVEN THE IMPROPER "ENDS SOUGHT" BY THE LANDLORD, THE RELATIVELY SMALL "AMOUNTS IN ISSUE" FOR REPAIRS, AND THE LANDLORD'S FAILURE TO PROFFER TIME SHEETS, INVOICES OR OTHER EVIDENCE OF LEGAL SERVICES PERFORMED**

19. The Landlord's demand for approximately $1 million of legal fees is just as unreasonable.

20.     Indeed, in the Landlord's Objection, the Landlord concedes that the total cost of the repairs that triggered the Landlord's termination notice and subsequent litigation was no more than approximately $60,000, and the only work left to be completed (and which was the subject of the State Court litigation) is approximately $15,000 of facade work.  It bears repeating that the Debtor made three attempts to complete the work it was required to do at that time, but on each occasion the Landlord summarily denied that the completed work was acceptable, and refused to provide any information whatsoever why it was unacceptable.

21.     The determination of what is reasonable for legal fees in these circumstances is subject to this Court's determination under section 506(b) of the Bankruptcy Code.  In that regard, the Debtor respectfully submits that this Court should be guided by the principals set forth in In re Nicfur-Cruz Realty Corp. 50 B.R. 162 (Bankr. S.D.N.Y. 1985).  The Nicfur-Cruz Court held that the Bankruptcy Court should examine the legal fees sought in the context of both the "ends sought" by the creditor, and other factors, including the amount of fees incurred relative to the amount of value at risk.

22.     Specifically, the *Nicfur-Cruz* Court held as follows:

> The requirement of Code § 506(b) that fees be "reasonable" imposes a limitation on the amount of contractually agreed upon attorneys' fees which may properly be awarded by the bankruptcy court in addition to any limitation or consideration that would be placed under state law. This reasonableness requirement mandates that the bankruptcy court consider, among other things, both the policies, purposes and provisions of the Bankruptcy Code. . .

9

> It is inherently unreasonable to ask a debtor to reimburse attorneys' fees incurred by a creditor that are not <u>cost-justified</u> either <u>by the economics of the situation or necessary to preservation of the creditor's interest in light of the legal issues involved.</u> (emphasis added)

<u>Id.</u> at 167.

23.  Applying these factors, the <u>Nicfur-Cruz</u> Court denied all legal fees expended for services that "were not reasonably required to protect the Weinstein Mortgage or its value," and then further reduced the amount sought after "giving due regard to the actual hours expended, the hourly rates sought, the legal issues pursued, the difficulties encountered, the amounts in issue, and the results achieved." Id. at 174.

24.  In this case the Debtor urges this Court to adopt the same approach. The Landlord <u>concedes</u> that at all relevant times, the Landlord <u>was aware of the limited cost of the work necessary</u>, and the fact that the work would serve cosmetic purposes only. In fact the Appellate Division ruled against the Landlord on this issue as well. At the time the Debtor moved in the Appellate Division for a stay pending appeal, the Landlord cross-moved for a $1 million bond to cover the cost of the disputed repairs. The Appellate Division <u>denied</u> the Landlord's cross-motion, implicitly finding that there was no evidence that the subject repairs were necessary for health or safety purposes.

25.  In short, the Debtor contends that the Landlord has been manufacturing litigation for the improper purpose of terminating the Lease. Accordingly, the Debtor disputes

the legal fees claims as unreasonable. Indeed, although ostensibly dissatisfied with the Debtor's repair work on three occasions, the Landlord chose <u>not</u> to take control over that item and then bill the repair cost as additional rent as provided under the Lease, the most cost effective way of dealing with the problem, but instead engaged in years of unnecessary litigation for the purpose of taking back the Lease for which the Debtor had paid $20 million, and running up legal fees on the assumption that the Debtor would be responsible for such fees, thereby eliminating all risk arising from such unnecessary litigation.

26. Even if the Court finds that the Landlord may have a claim for attorneys fees against the Debtor notwithstanding the improper "ends sought" and the relatively small "amounts in issue," the Bankruptcy Court is in no position to award any legal fees to the Landlord because the Landlord has failed to allege, let alone establish, the "actual hours expended, the hourly rates sought, the legal issues pursued, [or] the difficulties encountered." <u>Nicfur-Cruz</u> 50 B.R. at 167. The landlord has proffered no time sheets, invoices or other evidence of legal services performed herein.

27. Based upon the foregoing, the Debtor respectfully submits that no amounts are due for legal fees as part of the Debtor's cure to assume the Lease.

**UNDER SECTION 502(D) OF THE CODE, THE LANDLORD'S CURE CLAIM MAY BE TEMPORARILY DISALLOWED ALTOGETHER, UNTIL SUCH TIME AS THE LANDLORD RETURNS THE OVERCHARGES IT HAS COLLECTED AS ADDITIONAL RENT**

28. The Landlord's response to the Debtor's assertion that it intends to setoff the water bill overcharges against the Landlord's cure claim calls into question whether the Landlord is entitled to any cure claim at all.

29. Significantly, the Landlord has not responded to the facts establishing that the Debtor is entitled to approximately $113,000 for overcharges for New York City water bills. Rather, the Landlord asserts that since the Debtor was forced to file an adversary proceeding to recover the overcharges, the Landlord does not have to return the overcharges until a judgment is entered. Once again, the Landlord's Objection only highlights the Landlord's unreasonable nature.

30. Fortunately, section 502(d) of the Bankruptcy Code protects a debtor against such unreasonable conduct. Specifically, 502(d) of the Code provides that a creditor is not entitled to assert a claim against a debtor's estate until such creditor returns amounts that are recoverable under the avoidance provisions of Chapter 5 of the Bankruptcy Code. As this Court has observed,

> As noted by Collier, section 502(d) of the Bankruptcy Code does not even necessarily require the entry of a judgment, let alone the failure to enforce one, for a claim to be disallowed: "To assure the effectuation of the purpose of this section, a claim may be disallowed at least temporarily and for certain purposes,

> subject to reconsideration, simply upon the allegation of an avoidable transfer. But to prevent abuse of this section this initial disallowance should be made by judicial determination, whether it be obtained in a claim objection or by some form of declaratory judgment action." (Citations Omitted)

*In re Red Dot Scenic, Inc.*, 313 B.R. 181, 184 (Bankr. S.D.N.Y., 2004).

31.   As set forth in the Debtor's Motion, the Debtor's review of the New York City water bill records indicated that the Debtor overpaid $112,693.49 as of December 28, 2004. Annexed hereto as Exhibit D is a detailed analysis of this amount, which was previously incorporated in the Debtor's Complaint in Adversary Proceeding 05-03136. Given the facts set forth in the Debtor's Complaint on this issues, the overwhelming weight of authority cited in the Debtor's motion herein, and the Landlord's failure to even respond to the factual allegations or the law cited, the Debtor respectfully submits that this Court would be well within its discretion to declare at this time that the transfer is avoidable, and that the Landlord cure claim "may be disallowed at least temporarily and for certain purposes, subject to reconsideration."

32.   Based upon the foregoing, the Debtor requests that the Court temporarily disallow any cure claim asserted by the Landlord until such time as the Landlord returns the overcharge amount, and, alternatively, if the Court is unprepared to temporarily disallow the Landlord's cure claim altogether, the Court should find that at a minimum, the Debtor has established that the subject funds will be available to pay any required cure claim.

**THE LANDLORD CHOSE <u>NOT</u> TO ORDER AN EXPEDITED TRANSCRIPT OF MR. BILDIRICI'S DEPOSITION, AND INSTEAD TO "RECONSTRUCT" THE TRANSCRIPT FROM THE LANDLORD'S COUNSEL'S NOTES**

33.  The Landlord's challenges to the Debtor's projections are inherently suspect because the Landlord chose **not** to order an expedited transcript of Mr. Bildirici's deposition, and instead to reconstruct the transcript from the Landlord's counsel's notes. The Debtor's believes that such notes are unreliable, at best.

34.  For example, Mr. Bilidrici testified at length regarding the projections. With respect to projected rents increases, Mr. Bilidrici testified that there are three classes of tenants: stabilized, market and commercial, and that the combined average rental increase for this year should be 5%. For purposes of the Debtor's projections in subsequent years, a more conservative 3% increase was projected.

35.  As to the projected antenna income, the Landlord asserts that it has "unfettered discretion" to deny the Debtor the right to lease space for this purpose. The Lease, however, provides that the Landlord can not unreasonably withhold its consent. If necessary, the Debtor will make a motion in this Court to enter into such a lease, and this Court will determine whether the Landlord's refusal is reasonable.

36. The Debtor anticipates large savings for insurance based upon quotes it has received, which were provided to the Landlord at the deposition. Mr. Bilidirici testified that subsequent to obtaining such quotes the Landlord contacted the Debtor's insurance broker and obstructed the Debtor's ability to obtain such insurance.

37. With respect to utilities, Mr. Bildirici testified that the Debtor's projections are based upon actual results. The cash collateral application contained projections with a larger cushion to avoid the necessity of additional Court hearings in months where actual bills exceeded projections.

38. The Landlord's concern that the Debtor may not have sufficient income to pay the increased rent in the year 2017 is a complete red herring, because the Debtor has no obligation to pay rent beyond the year 2016, unless the Debtor exercises its renewal option, which renewal is subject to the Debtor's sole unfettered discretion.

39. In summary, the projections credibly establish that the Building itself generates sufficient cash flow to carry its operating expenses and debt service – notwithstanding the Landlord's attempt to impugn such projections based upon a self-serving "reconstruction" of Mr. Bilidirici's deposition. Indeed, the Debtor has never fallen into default on in the payment of rent, even when burdened by the large legal fees necessary to litigate against the Landlord.

40. Moreover, the Landlord's interest is senior to both the mortgagee's and the Debtor's interest in the Lease. Accordingly, the Lease's value stands as additional assurance that the Landlord is protected against any potential future performance problem. <u>In re Service Merchandise Co., Inc.</u>, 297 B.R. 675 (Bankr. M.D.Tenn. 2002); <u>In re Sapolin Paints, Inc.</u>, 5 B.R. 412 (Bankr. E.D.N.Y. 1980);

41. In summary, the Debtor not only has the right to assume the Lease, the Debtor has the ability to cure any defaults under the Lease, and to provide adequate assurance of future performance.

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to assume the Lease, and that the Court grant such other, further and different relief as this Court may deem just and proper.

Dated:    New York, New York
          February 7, 2006

> BACKENROTH FRANKEL & KRINKSY, LLP
> Attorneys for Yusef Bildirici
>
> By:    s/Mark Frankel
>        Mark A. Frankel (MAF-8417)
>        489 Fifth Avenue
>        New York, New York  10017
>        (212) 593-1100
>
> DAVIDOFF MALITO & HUTCHER, LLP
> Attorneys for the Debtor
>
> By     s/Larry Hutcher
>        605 Third Avenue, 34th Floor
>        New York, New York 10158
>        (212) 557-7200