1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    -------------------------------------- X
                                            :
4    In Re:                                 :  Case No. 05-16167
                                            :
5    EAST 44TH REALTY, LLC,                 :
                                            :  One Bowling Green
6                          Debtor.          :  New York, NY 10004
                                            :  February 10, 2006
7    ---------------------------------------X

8
                      TRANSCRIPT OF MOTION TO ASSUME
9              BEFORE THE HONORABLE ROBERT D. DRAIN
                     UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:            ESTHER S. TRAKINSKI, ESQ.
                                GURSKY & PARTNERS, LLP
13                              1350 Broadway, 11th Floor
                                New York, NY  10018
14
     For the Creditor:          JUDY G.Z. LIU, ESQ.
15                              WEIL, GOTSHAL & MANGES LLP
                                767 Fifth Avenue
16                              New York, NY  10153

17   For Owner/Landlord:        LAWRENCE E. TOFEL, ESQ.
                                TOFEL & PARTNERS, LLP
18                              800 Third Avenue, Suite 12
                                New York, NY  10022
19
     For **:                    ABRAHAM J. BACKENROTH, ESQ.
20                              BACKENROTH, FRANKEL & KRINSKY, LLP
                                489 Fifth Avenue
21                              New York, NY  10017

22   Court Transcriber:         TRACY A. GEGENHEIMER, CERT*D-282
                                TypeWrite Word Processing Service
23                              356 Eltingville Boulevard
                                Staten Island, New York 10312
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

2

1          THE COURT:  Okay, East 44th Realty?

2          (Pause/counsel confer.)

3          MS. TRAKINSKI:  Judge, we've got two motions on.

4  It's our assumption as the debtor that the motion to assume

5  will go first?

6          THE COURT:  Yes.  I assume that, too.

7          MS. LIU:  Your Honor, I just wanted to address this

8  housekeeping point.  There's two motions on and the gating

9  issue in our motion is whether the lease had terminated.  And

10 if Your Honor may recall, we submitted a brief on that point --

11         THE COURT:  It's a gating issue in both.  So, I don't

12 really --

13         MS. LIU:  So we thought that what would make sense

14 was to address the termination issue first because if Your

15 Honor agreed --

16         THE COURT:  Well, you can't -- it applies to both

17 because you can't assume a lease that's been terminated also.

18         MS. LIU:  Well, that's correct so that if you ruled

19 based on the brief that the lease had terminated, it wouldn't

20 make sense to go into the --

21         THE COURT:  All right.  So let me hear the --

22         MS. LIU:  -- motion to assume --

23         THE COURT:  -- debtor first on that issue.  I can

24 hear that for both -- I'm going to -- I'm not going to hear it

25 twice.  I'm going to hear it from both --

3

1          MS. TRAKINSKI:  I had planned on addressing it --

2          THE COURT:  -- motions.

3          MS. TRAKINSKI:  -- first thing in our argument,

4   Judge --

5          THE COURT:  Okay.

6          MS. TRAKINSKI:  -- if that makes any difference.

7          THE COURT:  Okay.

8          MS. LIU:  So what did we decide?

9          THE COURT:  I'm going to hear the assumption motion

10  first, but the first thing I want to hear in connection with

11  the assumption motion is whether the lease is still alive or

12  whether it terminated as a result of the default notice.

13         MS. TRAKINSKI:  And that's precisely where I intended

14  to start, Judge.

15         THE COURT:  Okay.

16         MS. TRAKINSKI:  A housekeeping issue from our

17  standpoint, I'm Esther Trakinski.  I've been before the Court

18  before.  Your Honor will recall that Warren Graham [Ph.] had

19  been the debtor's principal counsel.

20         THE COURT:  Right.

21         MS. TRAKINSKI:  Warren is no longer with the firm.

22  He's moved on and you're stuck with me today.

23         THE COURT:  Okay.

24         MS. TRAKINSKI:  Let's talk about the termination.

25  The debtor's entire -- I mean the landlord's entire position

4

1    throughout these proceedings, as well as below, has been that

2    the lease was terminated back as of March 31st, 2005 and while

3    I won't bore you with the technical details, unless of course

4    Your Honor wants to hear them, he has twice made that argument

5    to the Appellate Division, twice asked the Appellate Division

6    to make a factual finding that the lease was terminated as a

7    matter of law and twice the Appellate Division has rejected

8    that argument.

9            THE COURT:  Well, it didn't completely reject it.

10   The first time it said that the mootness argument could be

11   raised on the appeal.

12           MS. TRAKINSKI:  That's true, Your Honor, and it was

13   raised on the appeal, it was briefed exhaustedly on the

14   Appellate Division in its decision found that the debtor has a

15   present tense obligation to perform the repairs and cannot

16   argue that the notice to cure was defective.  It's a present

17   tense obligation.

18           If in fact the lease had been terminated, there

19   wouldn't have been a present obligation to do anything.  The

20   appeal would have and should have been under New York law

21   dismissed as moot.  The Appellate Division expressly declined

22   to do that and at the end of their rather short opinion,

23   summarily rejected the rest of the landlord's arguments that

24   were proffered in its motions preceding the briefing of the

25   appeal, as well as in the appellate brief itself.

5

1          And if Your Honor would like to look at the decision

2   with me, it's attached as an exhibit to our objection to the

3   motion for turnover.

4          THE COURT:  Right.  Let me turn to that.

5          MS. TRAKINSKI:  Let me just find my copy as well,

6   Your Honor.  I believe it's Exhibit A.  And I have extra copies

7   if Your Honor wishes.

8          THE COURT:  This is the decision dated -- it says

9   decided on December 15, 2005?

10          MS. TRAKINSKI:  Correct, Your Honor.

11          THE COURT:  Slip opinion?  Okay.  No, I have that.

12          MS. TRAKINSKI:  In the third line of the decision,

13   "Summary judgment declaring that the plaintiff is obligated to

14   undertake and complete repairs on the building -- and chimney

15   as indicated in the July 2004 default notice, including" et

16   cetera, et cetera "is affirmed unanimously with costs."  It's a

17   current obligation.

18          Now if you turn the page and continue, Your Honor,

19   the last line of the decision "We have considered plaintiff's

20   other arguments and find them to be unavailing."  The principal

21   argument referred to in that --

22          THE COURT:  But weren't you -- wasn't your client the

23   plaintiff?

24          MS. TRAKINSKI:  You're right, Your Honor.  I take

25   that back.  Suffice it to say they still didn't find the lease

6

1   terminated.

2          THE COURT:  Well --

3          MS. TRAKINSKI:  They didn't find the lease

4   terminated, they found a present obligation to perform the

5   repairs.

6          THE COURT:  All right.  Let me -- I'm going to turn

7   for a second to the Mann Theaters [Ph.] case.

8          MS. TRAKINSKI:  Yes, Your Honor.

9          THE COURT:  Now, I will be the first to confess that

10  this is somewhat of a cryptic case, although it has some fairly

11  unconditional language in it.  But the Appellate Division does

12  say in this case where it talks about the consequences of a

13  lapse of a Yellowstone injunction while an appeal was pending,

14  "The failure to obtain such a further temporary restraint

15  pending appeal places the tenant entirely at the mercy of the

16  appellate court.  For if it is decided that the denial of the

17  original toll application was warranted, no further time will

18  be available to effect a cure.  A successful appeal, however,

19  restores to the tenant whatever cure time remained when the

20  original temporary toll application was made."

21          Now, I understand, A, that the Appellate Division in

22  this case didn't say anything one way or another specifically

23  about the -- whether the original toll application was right or

24  not, but it did rule against the debtor saying that there had

25  in fact been a breach.  So, why should I assume that it isn't

7

1  retroactive under this language?

2       MS. TRAKINSKI:  For a number of reasons, Judge.

3  First and foremost, the Appellate Division granted a stay.  And

4  so the language Your Honor referred to that talks about the

5  tenant being at the mercy of the appellate court is in the

6  absence of a stay.  The Appellate Division dealt with that

7  issue.  They granted the emergency stay.  Then they considered

8  the full motion to stay which included the landlord's cross-

9  motion to terminate the appeal as moot -- to dismiss the appeal

10  as moot on the grounds of that termination and issued an

11  interim stay.

12       Now, while there was a notice to cure and an alleged

13  default, the time to cure had not run when the tenant got a

14  Yellowstone injunction in accordance with the provisions of

15  Yellowstone and its progeny.  It had complied with Yellowstone.

16       What I believe that the Second Department in the Mann

17  case is talking about is an instance where there is no proper

18  Yellowstone granted.  There had been a Yellowstone in this

19  case.  We have a chain of stays here, including the bankruptcy

20  stay under 362 that preserved at a minimum that cure period

21  that remained under the July 2nd, 2004 default notice.

22       THE COURT:  So in effect you're saying that the May

23  26, 2005 stay by the Appellate Division was essentially a stay

24  pending appeal and reinstated the Yellowstone -- the effect of

25  the Yellowstone injunction that had, pursuant to Judge

8

1   Diamond's order, lapsed?

2           MS. TRAKINSKI:  The only modification I make to that

3   statement, Judge, is it was the May 6 emergency stay that

4   reinstated the effect of the Yellowstone, yes.  And none of the

5   cases --

6           MS. LIU:  Your Honor, I --

7           MS. TRAKINSKI:  -- that were --

8           MS. LIU:  -- I think this is a --

9           MS. TRAKINSKI:  Excuse --

10          THE COURT:  Well let me --

11          MS. TRAKINSKI:  Excuse me.

12          THE COURT:  No, let -- no, this is important.

13          MS. LIU:  Okay.

14          THE COURT:  I want to -- you'll have your chance to g

15  through this --

16          MS. LIU:  Okay.

17          THE COURT:  -- Ms. Liu.

18          MS. TRAKINSKI:  We attached --

19          THE COURT:  Well, let me make sure I have the dates

20  right.

21          MS. TRAKINSKI:  May 6 was the emergency stay that was

22  contingent upon the debtor paying $350,000 of alleged

23  additional --

24          THE COURT:  Right.

25          MS. TRAKINSKI:  -- rent for which we've never --

9

1            THE COURT:  I'm sorry, and the May 26 one granted it

2    in --

3            MS. TRAKINSKI:  On --

4            THE COURT:  -- on the conditions of the May 6 stay.

5            MS. TRAKINSKI:  Correct.

6            THE COURT:  Right, okay.

7            MS. TRAKINSKI:  And we've --

8            THE COURT:  Is the May 6 stay anywhere in the record?

9    I couldn't find that.

10           MS. TRAKINSKI:  You know, Judge, it looks to me like

11   it wasn't.  It was just a endorsed order that had been signed

12   by the judge that filled in these conditions.  I apologize for

13   it not being in the record.  We can have it provided to the

14   Court readily.

15           THE COURT:  And did it refer at all to Judge

16   Diamond's decision or how the -- you know, whether the stay had

17   lapsed and was --

18           MS. TRAKINSKI:  No.

19           THE COURT:  -- being restate or anything like that?

20           MS. TRAKINSKI:  No.  There has never --

21           THE COURT:  It was just --

22           MS. TRAKINSKI:  -- ever --

23           THE COURT:  It was just an emergency stay?

24           MS. TRAKINSKI:  Correct on the condition of payment

25   of $350,000 which the landlord alleged was additional rents for

10

1   which we've never gotten accounting, but that's another issue

2   we'll deal with later.

3            None of the cases --

4            MS. LIU:  Your Honor --

5            MS. TRAKINSKI:  -- that --

6            Excuse --

7            MS. LIU:  I --

8            THE COURT:  Please.

9            MS. LIU:  All right.  I'll --

10           THE COURT:  We're not going to have interruptions in

11  this hearing.

12           MS. LIU:  Okay.  I'll address it later.

13           THE COURT:  This is a very --

14           MS. LIU:  It's just that it was important.

15           THE COURT:  -- complicated issue.

16           MS. LIU:  Okay.

17           THE COURT:  Okay.

18           MS. TRAKINSKI:  Thank you, Judge.

19           The entire argument below centered on the mistaken

20  argument that the landlord proffered that the moment the

21  Yellowstone was improvidently and incorrectly vacated that all

22  best are off, you got back to the very beginning and a new

23  Yellowstone had to have been obtained.  And not just an

24  emergency stay, not just a continue effect, but a new

25  Yellowstone injunction.

11

1          None of the cases that the landlord has ever cited

2   and I -- believe me, Judge, I personally did the research on

3   this exhaustedly.  There's no a single case out there that says

4   if a judge vacates a Yellowstone and a tenant still has a right

5   of appeal that the failure to get an extension or an emergency

6   stay immediately blows the whole thing out of the water and

7   you're stuck.

8          THE COURT:  What about --

9          MS. TRAKINSKI:  What the case --

10          THE COURT:  What about TW Dress Corporation?

11          MS. TRAKINSKI:  TW Dress Corporation, the tenant

12   never got a Yellowstone.  There was never a Yellowstone.

13          THE COURT:  No, there was.  Said it --

14          MS. TRAKINSKI:  No, there wasn't, Judge.  There was

15   an application made for the Yellowstone and counsel failed to

16   show up.

17          THE COURT:  Well, I'm sorry, they obtained a TRO.

18          MS. TRAKINSKI:  They obtained a TRO.  The counsel

19   never showed up for the Yellowstone injunction hearing.  Not a

20   singe one of the cases and forgive me, Judge, I don't have the

21   cases in my hand, but I wrote the brief, so, you know, I feel

22   fairly confident the briefing was exhaustive on this issue and

23   I frankly didn't think Your Honor was going to want to hear it,

24   but I'm happy to answer Your Honor's questions.  The fact

25   remains there's not a single case out there and there's not a

12

1  single statute out there that says if you mistakenly don't

2  extend the TRO on precisely the day it -- the Yellowstone

3  rather, it expired, then you're out of the box.  That just is

4  not the law.

5        There are numerous New York cases and our briefs are

6  full of them in which the courts -- the Appellate Division say

7  that tenants will not be victim or subject to the whims of the

8  lower courts.  Now, look, the Appellate Division said you were

9  wrong, you have to do the repairs and we're going to live with

10  that.  And I think it's much more important at this juncture

11  for Your Honor to focus on the magnitude of the repairs which

12  I'll get to.  But we're prepared to do them.  We've taken

13  steps.  The debtor has entered into contracts with both an

14  engineer to supervise the work and a contractor to do the work.

15  There's been a deposit made and we're waiting for the weather

16  to go over 40 degrees on a consistent basis.  The scaffolding

17  will go up and inside of two weeks, Judge, the $15,000 of

18  repairs will be done.  Will be done.  The lease was never

19  terminated.

20        THE COURT:  Okay.

21        MS. TRAKINSKI:  Mr. Tofel has tried that argument

22  twice in the Appellate Division and in fact -- in fact, they

23  made a motion to the court of appeals for leave to appeal the

24  issuance of the stay on the grounds that the lease was

25  terminated and they got denied at the appellate -- at the court

13

1   of appeals.  Not that I'm suggesting the court appeals

2   addressed that issue.  I don't believe that they did.

3          But he's been trying this for nine months and he

4   spent a million dollars in legal fees propounding this argument

5   and none of the state courts have ever found merit in it.

6          And the Appellate Division -- believe me, the

7   Appellate Division is not shy to dismiss appeals as moot if in

8   fact they're moot.  And they didn't do that.  They found that

9   we have a present ongoing obligation to do these repairs.

10  We've taken steps to do it.  It's a $15,000 job.  And the

11  landlord admits that in their objection to our assumption

12  motion.

13         A $15,000 job which by the way, Judge, under

14  paragraph 12 of the lease, the landlord could have gone any

15  time and done it and billed us for it.

16         So, here we are.  The lease is still in full force

17  and effect.  The debtor has been in compliance with its terms

18  all along.  There's never been any monetary defaults under the

19  lease, except for disputed attorneys fees which we still

20  dispute.

21         THE COURT:  Did -- you had attached the landlord's

22  papers in front of the Appellate Division on the mootness

23  issue.

24         MS. TRAKINSKI:  Yes.

25         THE COURT:  The debtor's papers weren't attached.

14

1          MS. TRAKINSKI:  You didn't attach the reply?

2          THE COURT:  Did it respond on the basis of --

3          MS. TRAKINSKI:  Yes, we did, Judge.  And I can

4    summarize it and provide you with a brief.  I was under the

5    misimpression it was provided.

6          Under New York law, a case is only or an appeal is

7    only deemed to be moot if it's not going to have an immediate

8    effect on the rights of either parties.  And there's myriad

9    court of appeals cases cited in our papers which if I could get

10   to e-mail, I could probably provide to Your Honor.

11         That's not the case here.  Okay, the court found

12   there's a present obligation to perform these repairs.  Very

13   much was there an effect on the rights of the parties, not

14   least of which the issue of whether or not there was a lease in

15   existence was the only issue that matters from the debtor's

16   perspective.

17         So there is absolutely no argument to be made, no

18   factual predicate to be argued on that this is a moot appeal.

19   The court of appeals addressed the issues.  They made their

20   ruling.  They issued a decision.  It's not moot.

21         THE COURT:  Is the Appellate Division decision now

22   final?

23         MS. TRAKINSKI:  We have no intention of appealing it

24   as of this moment.

25         THE COURT:  The appellate time period hasn't run yet?

15

1          MS. TRAKINSKI:  Yeah, it has run, Your Honor.

2          THE COURT:  It has.  And also the time to ask for

3  clarification or anything like that has run?

4          MS. TRAKINSKI:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MS. TRAKINSKI:  Thirty days.  If --

7          THE COURT:  Okay.

8          MS. TRAKINSKI:  Unless I'm misquoting, but my

9  understanding is the rule is 30 days.  I have to admit I

10  haven't looked at it in a while.

11          We have no intention of appealing.  We've hired the

12  contractors.  We're ready to do the work.  We're --

13          THE COURT:  Okay.

14          MS. TRAKINSKI:  You know, we're proceeding.  And if

15  Your Honor -- if we were standing here in April, I'd probably

16  be able to tell you the work was done.  I mean that's -- and

17  I'm the one who's been talking to the engineers.  It's -- you

18  know, it's relatively --

19          THE COURT:  All right, but before you get on to that,

20  let me hear from the landlord on the termination issue.

21          (Pause.)

22          MS. LIU:  Good morning, Your Honor, and I apologize

23  if I was --

24          THE COURT:  That's okay.

25          MS. LIU:  -- trying to interrupt.  It was just that

16

1    it was an important point, but I'll address it now.

2              THE COURT:  Okay.

3              MS. LIU:  Okay.  On January 11, you know, we were all

4    here on the landlord's motion for release of the sublease

5    proceeds; what you've called the lift stay motion.  And at that

6    hearing, of course we -- you know, we addressed, you know, some

7    of the arguments about the termination of the lease and, you

8    know, the debtor made two arguments.  These arguments were that

9    there was a -- that a warrant of eviction was necessary in

10   order for the lease to have been terminated and that the state

11   court had already ruled that the lease was not terminated.  So,

12   the argument they're making today on that point was the same as

13   that made at that hearing.

14             Now, as to the first argument, of course the Court

15   invited further briefing and the landlord submitted a brief all

16   about the subject of how to terminate a lease under New York

17   law.  And the brief made a thorough analysis of the law and, I

18   think maybe for the first time that it had been done, made an

19   attempt, and I think we did it successfully, of reconciling the

20   so-called warrant of eviction cases, such as Joker, Eau Claire

21   Bakery, WAS and GSVC, with the -- what I'll call the

22   Schwartzberg [Ph.] and Policy Realty case, which were the Seven

23   Stars Restaurant case and the Scarsdale Tire case, and Policy

24   Realty which was the district court case.

25             Now, in the latter cases, there was a distinct

17

1    difference factually between the warrant of eviction cases and

2    the so-called -- I'll call them the conditional limitation

3    cases.  Because what the Schwartzberg cases and the Policy

4    Realty case demonstrated -- and by the way, the Schwartzberg

5    case in Seven Stars relied on Yellowstone and, you know, this

6    intrigued me because Schwartzberg was the same judge who wrote

7    GSVC.  And so, the issue was how do you reconcile these two

8    cases and the fact is that the two Schwartzberg cases and the

9    Policy Realty case stand for the proposition which is

10   recognized under New York law that a lease can be terminated

11   under New York law by operation of what they call a conditional

12   limitation.

13           We, therefore, established that the lease can be

14   terminated by its terms by notice of default followed by notice

15   of termination and the Policy Realty case, district -- Southern

16   District of New York -- by the way, which all the parties were

17   involved in; I think you may have seen our footnote in the

18   brief -- stated -- and I quote from this decision:

19           "A lease may be terminated under New York

20           law by operation of a conditional

21           limitation.  In this manner, the landlord

22           sends the tenant in default a notice of

23           termination of the lease stating that the

24           lease will be deemed terminated upon a

25           specified date due to tenant's default.

18

1            The lease is terminated when the time

2            expires rather than on any further act by

3            the landlord."

4        Now, we demonstrated in the brief that the debtor is

5   -- that -- is relying on the warrant of eviction cases and

6   they're very factually different.  Those all involve

7   proceedings where they were summary proceedings for nonpayment

8   of rent and they were situations where the landlord hadn't

9   claimed that the lease had been terminated.  Okay.

10       And so, today -- and so we -- you know, we believe we

11  had a classic termination of the lease by way of the

12  conditional limitation.

13       Now, the debtor is arguing again today that the

14  Appellate Division, you know, twice rejected the landlord's

15  position that the lease had been terminated and it's not

16  correct for several reasons.

17       First of all, at the hearing in January, Your Honor

18  visited this point and you asked -- I'm looking at the January

19  11 transcript on page 31.  And Your Honor asked, "Did the

20  Appellate Division in its ruling deal with the issue whether

21  the lease was terminated?"  And the debtor replied -- and

22  there's -- the debtor's counsel replied, "There's nothing in

23  the State Supreme Court Appellate Division which has reached

24  the determination or reached the question as to whether this

25  lease is terminated and that issue hasn't even been breached."

19

1        And by the way, I am -- I'm going through pages 30 to

2   35 of the transcript.  I'm not reading every word.  I'm taking

3   excerpts.  Okay?

4        So, but then the -- you know, so the -- having taken

5   the position earlier that the state courts had terminated the

6   leases, the debtor flip flopped on the issue itself and said

7   there's nothing in the --

8        THE COURT:  Well, no, that's not what -- what did you

9   just say?

10        MS. LIU:  No, I'm saying first they made this

11   statement --

12        THE COURT:  But that statement didn't say that the

13   debtor -- that the state court had terminated the lease.

14        MS. LIU:  Correct, I didn't say that.  Oh, no.

15        THE COURT:  That's what I think you just said.

16        MS. LIU:  No, Your Honor, I didn't say that.  I'm

17   saying they said that there is nothing in that decision which

18   has reached the determination on this question.  And we agree

19   with that.  We're not relying on the state court decision

20   saying it's, you know, terminated or not.  We're saying they

21   didn't address the issue and it isn't correct to say that

22   they've ruled on it.  That's my point.  Okay?

23        And then you pulled up the decision and you said at

24   the end of the decision its says motion seeking leave to

25   supplement record and for other relief denied.  And you said,

1  "Well, what was that other relief."  And the answer was well,

2  they moved to dismiss the appeal as moot on the grounds the

3  lease had terminated.  And you said -- the Court said, "Let's

4  stop.  Moot."  And you said, "It's just a mootness motion."

5  And we said correct.  Okay.

6         And so, you said, "You know, I find it hard to

7  believe that the Appellate Division has actually ruled that the

8  lease is not terminated."  And Mr. Graham said, "I'm fine with

9  at least saying, Your Honor, that the Appellate Division has

10  not spoken."  And you said, "Okay.  All right."

11         And so, the point is that the debtor's counsel,

12  having taken the position that the state court decisions

13  decided the issue and said that the lease had not been

14  terminated, they flip flopped on the issue and wound up

15  conceding that the state court in face just hadn't ruled on

16  whether the termination --

17         THE COURT:  Well, but wait a minute.  What legal

18  principle supports that this is a binding concession?  This

19  isn't -- this is --

20         MS. LIU:  I'm saying that they argued that at that

21  time and took the position -- debtor's counsel took the

22  position that the state court opinions -- the state court

23  opinion had not ruled on the issue one way or the other --

24         THE COURT:  But is that binding on them?

25         MS. LIU:  Well, I think it's of importance, yes.

21

1              THE COURT:  Is it binding on them?

2              MS. LIU:  Can they change their mind?  I guess they

3    can, Your Honor.

4              THE COURT:  Okay.

5              MS. LIU:  Now, Your Honor recognized these were

6    mootness motions, okay, and that the Supreme Court and the

7    Appellate Division had simply denied the motions and didn't

8    rule on the merits of them.  And actually, the debtor again

9    admits this in their reply.  Their reply simply states that the

10   Appellate Division summarily -- quote, summarily denied the

11   landlord's cross-motion to dismiss the appeal as moot and

12   declined to even address the issue in its decision on appeal in

13   the December 15 -- that was in the December 15 opinion.

14             So the debtor makes our point.  The state courts just

15   summarily dismissed the mootness motions and declined to

16   address the termination issue on the merits.  And in each case

17   just summarily denied the mootness motion.

18             THE COURT:  It's odd though --

19             MS. LIU:  Now --

20             THE COURT:  -- that they would do that.  I mean I

21   understand for res judicata purposes, I think you're right.  At

22   least insofar as the preliminary injunction is concerned,

23   particularly given the fact that it preserved the issue for --

24   to be heard on appeal.  It's not necessarily a final order.

25   But, it is kind of odd that they would deny the mootness,

22

1  particularly knowing that this is in bankruptcy and I -- you

2  know, that it's subject to assumption, a 365 that they would

3  deny -- that they wouldn't address the mootness and actually

4  take the time to rule to affirm the court below in setting the

5  breach.

6          MS. LIU:  And well, but I think that is --

7          THE COURT:  Wait, wait, wait.

8          MS. LIU:  -- because what was at issue all along in

9  that proceeding if you remember when it was before the State

10 Supreme Court from 2004 -- what was at issue were the cures and

11 the repairs --

12         THE COURT:  Well, yes, but I --

13         MS. LIU:  -- and the supreme --

14         THE COURT:  I mean I did read the --

15         MS. LIU:  Right, so --

16         THE COURT:  I did -- no, no, no.  I read the

17 appellate papers and there was a lot of ink --

18         MS. LIU:  But --

19         THE COURT:  -- spent on arguing that it was moot.

20         MS. LIU:  Yes, Your Honor, but it can't be said

21 really that they ruled on the merits that the --

22         THE COURT:  No, I'm beyond that.  I --

23         MS. LIU:  Okay.

24         THE COURT:  I have a hard time, as you do, seeing it

25 as a res judicata --

23

1          MS. LIU:  Right.

2          THE COURT:  -- law the case --

3          MS. LIU:  And they don't --

4          THE COURT:  -- type of thing.  Although, you know,

5    some courts say that mootness is a jurisdictional issue.  But

6    leaving that aside --

7          MS. LIU:  They -- you know, they just dismiss them

8    summarily without discussion and I don't -- I have a hard time

9    understanding how that is a decision on the merits.

10         Now, then the debtor makes two additional arguments.

11   Okay?  And each one is based on factual inaccuracies and I

12   would like to correct those.  The debtors argues that the

13   Supreme Court vacated the Yellowstone injunction.  True.  But

14   that the Appellate Division somehow stayed that vacatur pending

15   appeal and that by virtue of that stay, the vacatur of the

16   Yellowstone injunction wouldn't have been enforced until the

17   December opinion was written and by that time, you know, the

18   debtor was in bankruptcy.  But that's not --

19         THE COURT:  But it --

20         MS. LIU:  -- chronologically what happened.

21         THE COURT:  It stayed all enforcement action by the

22   landlord.

23         MS. LIU:  It -- pardon?

24         THE COURT:  It stayed all enforcement action by the

25   landlord.

24

1          MS. LIU:  Yes, but let me go very carefully through

2   this because this is why I stood up before and I apologize for

3   that --

4          THE COURT:  Okay.

5          MS. LIU:  -- but this is important.

6          THE COURT:  All right.

7          MS. LIU:  The debtor acknowledges that when the trial

8   court vacated the Yellowstone injunction, they had -- they

9   actually complained in both their motion and in their

10  opposition to the landlord's motion that when the trial court

11  vacated the Yellowstone injunction that it had failed to

12  provide the debtor with enough time then to effectuate the

13  repairs that were necessary.  Because the timing was this:  The

14  vacatur was February '06 -- February 26.  At that time when

15  they vacated it, there were four days debtor says.  Four days

16  left to cure the repairs and that was hardly enough time, the

17  debtor complained, because the cures of course would take more

18  time than that --

19         THE COURT:  Complained where?

20         MS. LIU:  Pardon?

21         THE COURT:  In what form did the debtor complain

22  about there not being enough time?

23         MS. LIU:  In their paragraph 8 of the motion here

24  today for --

25         THE COURT:  No, but I'm talking about did -- I'm just

25

1   trying to figure out what -- it was then.  It wasn't to the

2   Appellate Division.  It wasn't to --

3           MS. LIU:  Also there I assume, but I'm saying that --

4           THE COURT:  Well --

5           MS. LIU:  -- they recite these facts in the

6   bankruptcy court papers also.

7           THE COURT:  All right.  Okay, so --

8           MS. LIU:  Okay?

9           THE COURT:  -- that's what you're pointing to?

10          MS. LIU:  Yes.

11          THE COURT:  Okay.

12          MS. LIU:  And -- but the key point is this:  When the

13  Supreme Court vacatur occurred, it is true the debtor had only

14  a few days left to complete the cure.  Those remaining days

15  lapsed, okay?  And the landlord issued on March 10, the notice

16  of termination.  The notice by its terms was effective April 1

17  and all this time there's no more -- there's no stay, Your

18  Honor, nothing.

19          And then the debtor didn't obtain the Appellate

20  Division stay until 70 days later after the Supreme Court had

21  already vacated the Yellowstone injunction.  And so, it's

22  impossible for the Appellate Division to have stayed the

23  Supreme Court's vacatur of the Yellowstone injunction.  It was

24  gone February 26.  The debtor has four days left to cure.  They

25  lapsed.  The landlord then can issue the notice of termination

26

1   under the lease.  March 10.  It's effective at the end of

2   March.  So the lease as of April 1 is terminated.

3                THE COURT:  But then --

4                MS. LIU:  The May --

5                THE COURT:  By then why on May 6 did they issue an

6   order enjoining --

7                MS. LIU:  Well, that was the whole --

8                THE COURT:  -- any action by the --

9                MS. LIU:  That was inexplicable and --

10               THE COURT:  Well, but you know judges -- I --

11               MS. LIU:  Well --

12               THE COURT:  I used to think that when I was a lawyer,

13  judged do inexplicable things.  But now that I'm a judge,

14  there's always a reason.

15               MS. LIU:  Well, Your Honor --

16               (Laughter.)

17               MR. TOFEL:  If I could rise?

18               Judy.  Judy.  Judy.

19               THE COURT:  I mean I can't --

20               MR. TOFEL:  Judy.

21               THE COURT:  -- assume that they just, you know --

22               MS. LIU:  It --

23               THE COURT:  -- fell on their head and --

24               MS. LIU:  It --

25               THE COURT:  -- said well, we're --

27

1          MS. LIU:  When --

2          THE COURT:  -- ignoring this --

3          MS. LIU:  When it's --

4          THE COURT:  -- when it was all in front of them.

5          MS. LIU:  It stated and it had no basis to -- all I'm

6     saying, Your Honor, is there was no more Yellowstone injunction

7     in place and all of these events have taken place.  When the

8     Appellate Division issued its stay, it didn't undo the effect

9     of the notice of termination.  It couldn't.  That time had

10    passed already.  That had already occurred.  So what it --

11         THE COURT:  Well, but let me stop you because I asked

12    your opponent the same question about Mann.

13         MS. LIU:  Yes, and we --

14         THE COURT:  You -- wait, no, let --

15         MS. LIU:  -- cited Man.  Yes.

16         THE COURT:  I understand you did.  I know.  But, you

17    say that the Appellate Division couldn't toll or couldn't undo

18    what the lapse of the Yellowstone injunction accomplished.  But

19    isn't that exactly what the Appellate Division in Mann did?  It

20    gave them --

21         MS. LIU:  What it does --

22         THE COURT:  It gave them additional time to cure.

23         MS. LIU:  But here the time had already lapsed.

24    What --

25         THE COURT:  It had lapsed there.

28

1          MS. LIU:  What the Appellate Division stay did was it

2  stopped the landlord from collecting the rent.  That is a

3  fact --

4          THE COURT:  That's not all --

5          MS. LIU:  -- because it was stayed.

6          THE COURT:  That's not all it did though.

7          MS. LIU:  But by then, the lease had already

8  terminated.  Now, why are you saying that in Man, they allowed

9  them to -- let me just get the page where I have Man.  Absent a

10  toll -- it says, "Absent a toll of the cure period" and here

11  I'm saying we had none.

12          THE COURT:  There was no toll in Man.  That's why the

13  court said on page 475, "We reached the nettlesome issue of

14  whether the tenancy interest have time to cure the default."

15  The landlord argues that special term had no power, which is

16  what you're saying, the Appellate Division had no power to

17  revive a cure period which expired as a consequence of its

18  failure to continue the Yellowstone injunction.

19          MS. LIU:  Well, and --

20          THE COURT:  That's exactly what happened here.

21          MS. LIU:  And they quote a -- and the quote is

22  "Absent a toll of the cure period."  Here there was no toll.

23          THE COURT:  I --

24          MS. LIU:  Here --

25          THE COURT:  There was --

29

 1            MS. LIU:  In that case --

 2            THE COURT:  No, but all I'm saying is in <u>Mann</u> there

 3   wasn't either.

 4            MS. LIU:  Well --

 5            THE COURT:  In <u>Mann</u> there was no toll either until

 6   imposed again retroactively by the Appellate Division.

 7            MS. LIU:  Well, I don't --

 8            MR. TOFEL:  Well --

 9            MS. LIU:  I -- sorry.

10            MR. TOFEL:  Your Honor, if I could.  I guess the

11   question that we're discussing is whether that imposition is in

12   fact to use Your Honor's word, retroactive.  Let me --

13            THE COURT:  I agree.

14            MR. TOFEL:  Let me see if I can just also summarize a

15   couple of very quick issues because I understand --

16            THE COURT:  Well, I want to stay on this point.

17            MR. TOFEL:  No, no, no, I understand that, but Your

18   Honor has raised a couple of issues.  Why didn't the Appellate

19   Division from a jurisprudential perspective deal with the issue

20   of mootness?  The answer to that is as Your Honor knows better

21   than anybody else in this room, the -- in writing decisions of

22   this ilk, one deals with the narrowest, narrowest possible

23   issue.

24            In order to deal with mootness, which is an issue of

25   discretion, not jurisdiction.  I heard Your Honor comment on

30

1  that.  It's a discretionary issue.  In order to in fact deal

2  with the issue of mootness, the Appellate Division would have

3  had to consider not just what happened before Judge Diamond in

4  leading up to her February 25 decision, but what happened

5  thereafter.  That is conceptually and analytically a broader

6  question.  The Appellate Division did not reach that, reached

7  the narrowest issue and simply said Judge Diamond got it right.

8       And the comment from counsel describing the Appellate

9  Division or reading into the language of the Appellate Division

10 decision that they're talking about a present right is I think

11 the height of disingenuousness.  It is the -- the Appellate

12 Division is quoting Judge Diamond's decision.  It's talking

13 about what arguments have been made.  It's not talking about or

14 breathing life into a terminated lease.  We all know that an

15 appellate court could not do that as a matter of law.  That's a

16 simple fact of life.

17       THE COURT:  Well, see that's why I have a problem

18 with that proposition.  I understand your issue, which is it is

19 somewhat difficult to figure out whether -- what the Appellate

20 Division intended by its stay and further, what the Appellate

21 Division intended vis-a-vis that stay when it ruled in

22 December.

23       MR. TOFEL:  Well, I --

24       THE COURT:  But -- let me finish.  But if you look at

25 the Mann case, the Appellate Division apparently there believed

31

1   it had the power, notwithstanding the sending of a notice of

2   default, to resurrect a cure period.

3           MR. TOFEL:  No, no, no, I think what it did, Judge,

4   in analyzing the case was we as the appellate court have a

5   right to look at what the lower court did and we have the right

6   because a timely notice of appeal was filed.  We have a right

7   to determine whether what the lower court did was proper.  If

8   what the lower court did was proper, we're done.  If what the

9   lower court did was improper and they reverse, it doesn't

10  revive a right to cure.  What it's saying is there was no

11  default.

12          THE COURT:  But as I read Man, they affirmed the

13  lower court.  They said the lower court was right in finding

14  there is a default.  It's a weird case.

15          MS. LIU:  But didn't they --

16          MR. TOFEL:  Oh, no, I --

17          MS. LIU:  But didn't the tenants there --

18          MR. TOFEL:  The latter part -- the latter comment I

19  would agree with, Judge.

20          MS. LIU:  Didn't the tenants there move to toll the

21  cure period?  Here --

22          THE COURT:  And it didn't happen.

23          MS. TRAKINSKI:  No.  Can --

24          MS. LIU:  Pardon?

25          THE COURT:  And it wasn't toll.

32

1          MR. TOFEL:  The --

2          MS. TRAKINSKI:  Judge, can I --

3          MR. TOFEL:  Let me deal with a couple very quick

4   items, please.

5          THE COURT:  It wasn't toll.

6          MS. LIU:  It --

7          THE COURT:  I mean there was -- there's an

8   implication.  I agree with you.  There's an implication in the

9   opinion, but it's not a --

10         MS. LIU:  But here --

11         THE COURT:  No, let me finish.  It's -- there's an

12  implication in the opinion that the lower court may have just

13  as an administrative matter not entered --

14         MS. LIU:  Yes.

15         THE COURT:  -- its new order --

16         MS. LIU:  Yes, because --

17         THE COURT:  -- because it did eventually enter a new

18  order, you know, 20 days later.  But here --

19         MS. LIU:  But --

20         THE COURT:  -- the Appellate Division itself entered

21  an order --

22         MS. LIU:  But here --

23         THE COURT:  -- a stay.

24         MS. LIU:  But in Man, there seems to be some

25  suggestion that the special term goofed and didn't continue the

33

1  toll and --

2          THE COURT:  Doesn't really say that though.

3          MS. LIU:  -- let the time elapse and --

4          THE COURT:  I don't think.  I mean there's an --

5          MS. LIU:  You know, I think --

6          THE COURT:  -- implication of that, but it doesn't

7  really say --

8          MR. TOFEL:  No, but those are the facts of the <u>Mann</u>

9  case.

10         MS. LIU:  The problem here is that --

11         MS. TRAKINSKI:  Judge, can I make --

12         MS. LIU:  -- nobody can say that the -- nobody can

13 point to anything that says that that Appellate Division stay

14 was retroactive and purported to continue --

15         THE COURT:  Well, let me ask you that --

16         MS. LIU:  -- the Yellowstone injunction.

17         THE COURT:  Let me ask you on that question because

18 weren't the counterclaims by the landlord -- didn't they also

19 include the claim that the lease was terminated?

20         MR. TOFEL:  No.

21         THE COURT:  In front of Judge Diamond.

22         MR. TOFEL:  No.

23         MS. LIU:  I have to defer to Mr. Tofel.

24         THE COURT:  No?

25         MR. TOFEL:  They don't.

34

1          THE COURT:  Okay.  All right.

2          MS. LIU:  It was only brought up, you know, on the

3  mootness is what I understand.  Okay?

4          THE COURT:  Okay, so that wasn't --

5          MR. TOFEL:  No, and --

6          THE COURT:  -- a counterclaim.  It was just a --

7          MR. TOFEL:  And I want to --

8          THE COURT:  It was a defense that it was moot.

9          MR. TOFEL:  I also want to briefly --

10         THE COURT:  All right.

11         MR. TOFEL:  -- comment, Your Honor.  I --

12         THE COURT:  All right.

13         MR. TOFEL:  I don't know if Your Honor wants to hear

14  more about this.  As Your Honor may recall from January 11 and

15  from comments of my colleague, the motion that the Appellate

16  Division dealt with at the very foot of its decision, which was

17  to supplement the record -- Your Honor remembers there was

18  an --

19         THE COURT:  You're talking about the December

20  decision now?

21         MR. TOFEL:  Yes, Your Honor.

22         THE COURT:  Okay.

23         MR. TOFEL:  There's a reference if Your Honor recall

24  and some argument's been made as to what was intended or stated

25  by the Appellate Division in its -- said the motion supplement

35

1    the record and for other relief is denied.

2            As Your Honor may recall, we did not have at the time

3    we were last here, the actual motion to supplement the record.

4    The motion to supplement the record I have in my hand I could

5    hand Your Honor.

6            The relief that was sought -- and again I -- it's set

7    forth in the papers, but what we did is there was a proceeding

8    before Judge Bernstein on August 10 at the very beginning of

9    this case.  We asked the Appellate Division to allow us to

10   supplement the record to consider that transcript because we

11   argued in that motion that that transcript showed that the

12   debtor was forum shopping and because the Appellate Division

13   had said we will grant you a stay conditioned upon your

14   perfecting for a certain term.  They then engaged in forum

15   shopping.  They didn't meet that burden.

16           So the argument to the Appellate Division in the

17   motion, which the Appellate Division denied, was based on

18   what's set forth in the August 10 transcript and based on the

19   forum shopping, based upon the failure to perfect for the

20   October term and file their brief August 8, you should dismiss

21   the appeal.  They denied that relief.

22           So all I'm saying, Your Honor, just to -- is that the

23   relief that's denied has nothing to do with the termination of

24   the lease.  It simply was another attack upon the debtor's

25   application or the continuation of the stay based upon the

36

1   forum shopping.  But --

2           THE COURT:  Okay.

3           MR. TOFEL:  -- the point again is -- and this I think

4   is the ultimate point Ms. Trakinski made.  She talks about the

5   chain of stays.  Frankly, Judge, if there were an unbroken

6   continuing chain of stays, she'd be right.

7           MS. LIU:  But here there was a --

8           MR. TOFEL:  But there wasn't.

9           MS. LIU:  There was a 70 day lapse.

10          THE COURT:  Well, but do you -- I looked, too, and

11  the closest I came were the two cases I cited.  But I've not

12  been able to find a case where --

13          MS. LIU:  I think we cited other cases in our brief

14  about --

15          THE COURT:  No, I don't -- well, let me --

16          MS. LIU:  -- the lapsing --

17          THE COURT:  Let me finish.

18          MS. LIU:  -- Yellowstone.

19          THE COURT:  Let me finish.  Where -- as opposed to

20  failing to get an injunction in the first place, it lapsed

21  pending appeal and the court said sorry, the lease is

22  terminated.  I didn't -- the closest I came, which arguably was

23  fairly close, was the TW Dress Corporation case.  That was a

24  TRO --

25          MS. LIU:  Right.

37

1          THE COURT:  -- that terminated.

2          MS. LIU:  But the cure period --

3          THE COURT:  Arguably for a technicality.

4          MS. LIU:  -- expired and lapsed and --

5          THE COURT:  But I'm -- are there other ones that you

6    can point me to?

7          MS. LIU:  I thought we had cited some in our brief

8    here, Davenport Dress Corp., Norly [Ph.].  I understand Your

9    Honor has issues with Man, but I think that -- you know, as

10   I -- again, you know, there seem to be that issue about the

11   administrative aspect of it and here, I think the most

12   important thing is they can't point to anything in that stay

13   that definitely says it was retroactive and, you know, it

14   doesn't seem like it --

15         THE COURT:  But -- I'm sorry, go ahead.

16         MS. LIU:  What I was going to say is that with a gap

17   of 70 days, it just seems kind of odd.  The cure period lapses.

18   The Yellowstone injunction is terminated.  It's vacated.

19   There's only a few days remaining to cure.  And nothing happens

20   except the notice of termination and all of that in between.

21         Then April 1 happens and we say under state law the

22   conditional limitation is effectuated and April 1 --

23         THE COURT:  All right.

24         MS. LIU:  -- the lease is gone.

25         THE COURT:  But then why would --

38

```
 1              MS. LIU:  And then --

 2              THE COURT:  -- they bother issuing a stay?

 3              MS. LIU:  Well, we thought it was -- you know, Your

 4    Honor, as a practitioner, we thought it was incorrect.

 5              THE COURT:  All right, but --

 6              MS. LIU:  Okay?

 7              MR. TOFEL:  No, I can deal with that actually --

 8              THE COURT:  Well, let me --

 9              MR. TOFEL:  -- directly, Your Honor.

10              THE COURT:  But --

11              MR. TOFEL:  The issue --

12              THE COURT:  Just --

13              MR. TOFEL:  The issue before them was simply the

14    collection of rent.

15              MS. LIU:  You know, the problem --

16              MS. TRAKINSKI:  That's not true.

17              MS. LIU:  -- is this:  I think the reason they issued

18    the stay in my opinion, candidly, is that the landlord was just

19    about to start collecting the rent.  In fact, had started

20    collecting I believe some --

21              MS. TRAKINSKI:  Judge, that's --

22              MS. LIU:  -- rent and that --

23              MS. TRAKINSKI:  That's not true.

24              THE COURT:  But there's an --

25              MS. LIU:  And --
```

39

```
 1            MS. TRAKINSKI:  That's not true, Judy.

 2            THE COURT:  But there's an appeal --

 3            MS. LIU:  If it isn't true --

 4            THE COURT:  -- overall.  There's an appeal --

 5            MS. LIU:  Okay.

 6            MS. TRAKINSKI:  It's not true.

 7            MS. LIU:  But the landlord had the right to start

 8   collecting rent.  That stay prevented that effectuation of the

 9   notice of termination.

10            THE COURT:  But if that were really the case,

11   wouldn't it been -- I mean particularly given the fact that

12   mootness was briefed in connection with the request for the

13   stay that wouldn't they have just simply said, you know.  I

14   don't even know why they would have bothered anyway.

15            MR. TOFEL:  No, the issue of --

16            THE COURT:  Even if it was just the right to collect

17   rent.

18            MS. LIU:  Well, then why didn't they --

19            MR. TOFEL:  The issue of mootness was not just --

20            MS. LIU:  -- issue a -- you know, a definitive on the

21   merits, you know, decision about termination?  They didn't.

22   They just summarily dismissed it, so we can't speculate that

23   they would really have found that the lease didn't terminate.

24   It didn't address the facts.

25            MR. TOFEL:  Your Honor --
```

40

```
 1            MS. LIU:  Or the law, Your Honor.  It didn't --

 2            THE COURT:  Well, it --

 3            MS. LIU:  -- address it.

 4            THE COURT:  It didn't address it either way.

 5            MR. TOFEL:  Well, Your Honor, if I can also --

 6            THE COURT:  I mean that's the thing.

 7            MS. LIU:  That is correct.

 8            THE COURT:  It didn't address it either way.

 9            MS. LIU:  And didn't address it either way and that's

10  why we're in here today --

11            THE COURT:  Right.

12            MS. LIU:  -- you know, arguing that we think under

13  state law it did terminate.

14            THE COURT:  That it should be retroactive.

15            MR. TOFEL:  Your Honor, if I can --

16            MS. LIU:  And that the stay should not be

17  retroactive.  That everything --

18            THE COURT:  No, no, I'm sorry, that --

19            MS. LIU:  That the stay --

20            THE COURT:  That the termination should be

21  retroactive --

22            MS. LIU:  That the termination --

23            THE COURT:  -- notwithstanding the stay.

24            MS. LIU:  -- occurred and that whatever the Appellate

25  Division did to stay what the landlord would do next, which
```

41

1    would have been to collect the rent, it stayed it pending

2    appeal.  And then they decided after all that the Supreme Court

3    was right and that there were cures.  But unfortunately, the

4    ironic thing is when you sent us all back to state court, we

5    all hoped we'd find out the answer.  Okay?  And we didn't come

6    back with this answer.  We came back just with the affirmance

7    of the cure repairs.  Okay?

8          And the Appellate Division did not address the issue

9    of termination and I don't see how, based on that record, that

10   Your Honor could find that it retroactively continued the

11   Yellowstone injunction or that anything was in tended by that

12   decision other than affirming the fact that cures had to be

13   made and they just summarily dismissed the mootness motion.

14         THE COURT:  But if cures had -- I mean, but in a way,

15   isn't the fact that they're affirming that cures have to be

16   made a suggestion that that's the context that they were

17   viewing this, as opposed to a lease termination?

18         MS. LIU:  Well, I believe that's right.  I'm saying

19   that they focused on whether the cures had to be made an did

20   not focus on the issue of termination and made no ruling.

21   That's our point.  That's exactly what we're saying and instead

22   the debtors reading into what they did and saying ah,

23   implicitly, they ruled on termination and we're saying not so.

24   You can't implicitly read an opinion on the merits, Your Honor,

25   and that's our position on this.  And we believe the lease

42

 1   terminated.

 2        THE COURT:  But aren't both sides implicitly reading

 3   in what they want into this opinion?

 4        MS. LIU:  No.  No.  I think it's a lot worse to

 5   implicitly say that on the merits the Appellate Division ruled

 6   by --

 7        THE COURT:  No, I'm not -- no, no, no, I'm not saying

 8   that.  I'm not saying that.  I'm just saying each side wants to

 9   read into this its own retroactivity.  You want to read in the

10   retroactivity back to the expiration of the Yellowstone

11   injunction and they want to read in retroactive that it was

12   preserved.

13        MS. LIU:  Well, I'm not even arguing retroactivity.

14   I'm saying it occurred before the termination occurred before

15   any stay stopped it from occurring.  It couldn't undo it, I'm

16   saying, and there's no evidence that the Appellate Division

17   decision in fact was intended to do that.  You would think

18   they'd issue an order saying now here this, I'm issuing my stay

19   and I got -- and I'm declaring that the termination notice is

20   not effective.

21        THE COURT:  But what about --

22        MS. LIU:  It didn't say that.

23        THE COURT:  But what about the fact that the last act

24   that they had done before that ruling was in fact to issue an

25   injunction?

43

1          MS. LIU:  But that was May 6, Your Honor.

2          THE COURT:  Yes.

3          MS. LIU:  Sorry, May 26 was the injunction, really.

4          THE COURT:  Right.

5          MS. LIU:  And then they went on and took the appeal.

6  May 26 is 70 days after the Appellate Division --

7          MR. TOFEL:  If I can interrupt --

8          THE COURT:  Okay, but that just comes back to the --

9          MS. LIU:  -- sorry, the Supreme Court stay was

10  vacated.

11         THE COURT:  That comes back to the inexplicability --

12         MR. TOFEL:  If I can, Your Honor --

13         THE COURT:  -- of the order whether it is explicable.

14         MR. TOFEL:  What Ms. Liu --

15         MS. LIU:  So --

16         MR. TOFEL:  -- says is entirely correct.  We are not

17  trying to read retroactivity into what the Appellate Division

18  said.  The Appellate Division said what it said.  What is said

19  is and all it said is Judge Diamond was right.  Judge Diamond

20  was right.  We affirm.

21         MS. LIU:  That's right.

22         MR. TOFEL:  The question then is simple.  What

23  happened thereafter?  And what happened thereafter -- and no

24  one disputes these facts -- Judge Diamond renders his decision.

25  It was served in accordance with the CPO**1:12:32** law.  A

44

1   notice of termination was then given in a timely manner.  The

2   debtor did nothing.  It served a notice to take appeal.  It

3   didn't seek a stay.  The lease then terminates.  More time

4   passes.  And then when the landlord goes to effect the

5   collection of the subleases, that's a memo dated April 27,

6   that's what prompts the debtor to go into the Appellate

7   Division on May 5 and 6.

8           MS. TRAKINSKI:  That's --

9           MR. TOFEL:  And that's all the Appellate Division

10  did.  All they did was stay and say don't go any farther.  The

11  panel will deal with this.  "I, as a single justice," Judge

12  Friedman said, "I have limited power.  We're going to maintain

13  the status quo.  Whatever it is today, it's freeze."

14          Nobody suggested a stay can reverse history.  It

15  doesn't expand history.  It just stops time.  Time stopped on

16  May 6.  What happened before May 6 no one disputes.

17          MS. TRAKINSKI:  Judge, can I just correct one

18  misstatement of fact is that --

19          MR. BACKENROTH:  The answer**1:13:36** was I would

20  like to speak, Your Honor, just briefly.

21          THE COURT:  Okay.

22          MS. TRAKINSKI:  The so-called notice that the

23  landlord sent to the tenants to collect rent was not --

24  unequivocally not the motivation for seeking a stay.

25          MR. TOFEL:  Oh.

45

1        MS. TRAKINSKI:  Larry, I gave you a chance, please.

2        The tenant, not happy with its predecessor counsel,

3   hired Davidoff Malito and Davidoff Malito proceeded

4   accordingly.  That memo had nothing to do with it.  It just

5   underscored the notion the landlord was acting for its own

6   benefit.

7        And I just want to point out to Your Honor and, you

8   know, it's our fault that our briefs are not before the Court,

9   but Mann is not a case in isolation.  There are a number of

10  other cases in which the Appellate Divisions in both the Second

11  Department and the First Department did exactly what Your Honor

12  was asking Ms. Liu about.  They fixed a mistake made below,

13  issued an injunction to cover a gap between either a improperly

14  vacated or improperly denied Yellowstone injunction to give the

15  parties a chance to pursue their appeals.

16        MS. LIU:  Your --

17        MS. TRAKINSKI:  And one point --

18        Excuse me, Larry.

19        MS. TRAKINSKI:  One point that really needs to be

20  emphasized is in the absence of that relief, the whole

21  appellate process in the case of the forfeiture of valuable

22  assets like these leases becomes a completely nullity.

23        THE COURT:  Well, but let me -- but that --

24        MS. LIU:  Your Honor, how about the --

25        THE COURT:  Let --

46

```
 1          MS. LIU:  Sorry.

 2          MR. TOFEL:  The reference to --

 3          THE COURT:  No, let me --

 4          MR. TOFEL:  -- existing authority --

 5          THE COURT:  Let me --

 6          MR. TOFEL:  -- just simply not exist.

 7          THE COURT:  Please.

 8          The cases you refer to.  What happens when the --

 9  well, if the appellant loses on appeal?  Is it retroactive to

10  the date of the order appealed from?

11          MS. TRAKINSKI:  From my recollection, none of the

12  cases address that, Judge.  None of the cases, and I don't

13  recall seeing a case that does.  I'm not saying they don't

14  exist, but I haven't looked at that issue.  What the cases all

15  say clearly is once having followed Yellowstone's procedures,

16  tenants have a right to the full benefit of appeal whether they

17  prevail or not.

18          MS. LIU:  Your Honor, I --

19          MS. TRAKINSKI:  That --

20          MS. LIU:  I would --

21          MS. TRAKINSKI:  Judy -- please --

22          MS. LIU:  Beg your pardon.

23          MS. TRAKINSKI:  I let you finish, please.

24          THE COURT:  Well, do you have a --

25          MS. LIU:  Go ahead.
```

47

```
 1            THE COURT:  Do you have --

 2            MS. LIU:  Go ahead.

 3            THE COURT:  -- a cite for that?

 4            MS. TRAKINSKI:  Unfortunately, I don't have our

 5   briefs here.  I -- it's our mistake.  In Warren's departure, we

 6   got a little bit sloppy.  I can get them to you this afternoon,

 7   Your Honor, no problem.

 8            MR. TOFEL:  Judge, there are no cases.

 9            MS. LIU:  Your Honor, how about the --

10            MR. TOFEL:  There just --

11            MS. TRAKINSKI:  Larry --

12            MR. TOFEL:  There's not a single case --

13            MS. TRAKINSKI:  Larry --

14            MR. TOFEL:  -- that deals --

15            THE COURT:  Well --

16            MS. LIU:  Can I --

17            THE COURT:  I mean --

18            MS. TRAKINSKI:  Larry --

19            THE COURT:  -- she's telling me there is.  I mean --

20            MS. LIU:  Is --

21            MS. TRAKINSKI:  Larry -- Judy --

22            MR. TOFEL:  She's also telling you that they've cited

23   them in briefs before, but they're -- the briefs are not

24   submitted to you.  Why would that be, Judge?

25            MS. TRAKINSKI:  You know what?  Larry, please.  I let
```

48

1    you talk even though I disagree with a lot of what you said.

2         Judy, same for you.  This will go a lot faster if we

3    all give each other the same courtesy.

4         Judge, I cited a number of briefs in the appellate

5    briefs -- cases.  He doesn't agree with my citation.  That's

6    his prerogative.  Your Honor can read them for yourself.  I

7    happen to agree with your reading of the <u>Mann</u> case.  Perhaps

8    you'll agree with my reading of the cases that are cited in

9    conjunction with the <u>Mann</u> in the same discussion.

10        The fact is that none of the cases that either Mr.

11   Tofel or Ms. Liu in her new brief have cited involve a

12   situation where a tenant obtained the Yellowstone injunction

13   that was then vacated and sought to appeal that vacatur.  Each

14   and every case cited in all the myriad briefs that have been

15   written and submitted to myriad courts on behalf of the

16   landlord involve circumstances in which tenants failed to

17   pursue a Yellowstone injunction in accordance with procedures

18   described by Yellowstone and the cases.  And that's an

19   absolutely devastating distinction from their standpoint.

20        Now we lost on the appeal.  I can't deny that.  The

21   Appellate Division does not typically address issues that they

22   don't believe have any imminent and immediate effect on

23   anybody.  Especially at the end of the year when they're trying

24   to clear their docket.  I mean, Judge, you know that better

25   than I do, I'm sure.  They issued this decision inside of six

49

1   weeks after the oral argument.  That's unheard of except at the

2   end of the year.  We can read into it what we will.

3          They did affirm the lower court

4   (indiscernible)**1:17:29** have been complete nullity if the

5   lease in fact had been terminated.  They were fully informed of

6   the argument.  Ms. Liu and her colleagues came up with some new

7   cases, all these cases about, you know, warrant of eviction and

8   such.  They're irrelevant because they all presume termination.

9          We didn't have a termination, Judge.  We had a

10  Yellowstone.  And it wasn't 70 days between the time of the

11  Yellowstone being vacated and the injunction being reinstated.

12  It was more like 40 to 50 because they didn't serve notice of

13  entry until March and we went in on a motion to reargue in

14  front of Judge Diamond which nobody seems to care about.  We

15  went.  We got another TRO in the interim that Judge Diamond

16  issued and then declined to extend it which is when we went to

17  the Appellate Division for a stay.  On May 6, they granted out

18  application.

19         That's all there is to it.  There's a lease here.

20  The Appellate Division ignored, rejected, denied -- what other

21  verb you want to choose, he brief mootness to them twice.  They

22  rejected it.

23         MS. LIU:  Your Honor --

24         MS. TRAKINSKI:  They rejected it.  They don't take

25  jurisdiction of disputes they think have absolutely no

50

1  effect --

2          THE COURT:  Okay.

3          MS. TRAKINSKI:  -- on the parties' rights.

4          THE COURT:  All right, Mr. --

5          MS. LIU:  How --

6          MR. BACKENROTH:  Your Honor, could I have --

7          MS. LIU:  Your Honor --

8          MR. BACKENROTH:  -- one comment --

9          MS. LIU:  -- how about the --

10          I just would like to just respond.

11          Is the Yellowstone case itself an answer to this?

12  You know, I'm looking at it and, you know, there.  There was a

13  lapse of, you know, a cure period and it went to the Appellate

14  Division and --

15          THE COURT:  No, they never got the -- they didn't get

16  the injunction.

17          MS. LIU:  But what they said was that tenant didn't

18  obtain a temporary restraining order --

19          THE COURT:  Right.

20          MS. LIU:  -- before the landlord had mailed --

21          THE COURT:  There wasn't --

22          MS. LIU:  -- the notice of termination.

23          THE COURT:  I know.  But that -- I don't think that

24  is relevant to this --

25          MS. TRAKINSKI:  You're putting the cart before the

51

1   horse.

2           THE COURT:  -- particular issue given the injunction.

3           MR. BACKENROTH:  Your Honor, if I could have one

4   small comment.  I'm not going to become lieutenant counsel in

5   this case.  One point I would like to make.  It appears to be

6   what you have before Your Honor is an issue of construction and

7   determination what the Appellate Division, what the courts

8   below did.  The one word that has not yet been used, but has to

9   be used in terms of construction is the word forfeiture.

10          As a rule of construction, courts abhor forfeitures.

11  Therefore, if they are two reasonable explanations or

12  interpretations of the documents before them, whether it's a

13  contract or I -- and I would argue whether or not concerning

14  the termination that the rule of construction is that we abhor

15  forfeitures.  Therefore, that should be taken into mind when

16  Your Honor looks at the various things that was on both -- as I

17  said, it's our position we support of course the debtor that

18  the issue concerning whether or not the lease had terminated,

19  had been briefed twice, Appellate Division had in front of it.

20  As far as I'm concerned, that's res judicata things that you

21  did raise or could have raised are the type of things and the

22  fact that the court doesn't grant it to you -- silence speaks a

23  lot as well.

24          So, I'm not going to argue the other issues, but I

25  think in terms of construction, I think that the Court has to

52

1  take that into consideration.  Thank you, Your Honor.

2         MS. LIU:  Your Honor, I'll just say that that's not

3  res judicata.  The Court didn't make a ruling on the merits and

4  I guess what we're all saying is -- you know, is there's some

5  uncertainty about the nature of the Appellate Division stay.

6  It's retroactivity.  We say it wasn't, they say it was and is

7  that a basis to say that this is such a sure thing on which to

8  hold that the lease, you know, wasn't terminated.

9         THE COURT:  Okay.

10         MS. LIU:  You know, if you think that this is

11  something to pursue, then what we should do is let the parties

12  go back maybe to state court and determine -- and ask the

13  Appellate Division what did you mean --

14         THE COURT:  Well, I asked that, but the time's gone

15  on that issue.

16         MR. TOFEL:  Go to Judge Diamond.

17         MS. TRAKINSKI:  Judge, we spent --

18         MR. TOFEL:  You wouldn't go to the Appellate

19  Division.  The --

20         MS. TRAKINSKI:  Well, but, Judge, look, there are a

21  couple of issues that are still open.  The sufficiency of the

22  cure notice from the perspective of the time provided to cure

23  even though the Appellate Division found that the description

24  of the work was sufficient.  Nobody's ever -- no court that is

25  has ever passed on the claim in the complaint with respect to

53

1   the adequacy of the time to cure.

2           MS. LIU:  But, Your Honor --

3           MS. TRAKINSKI:  Nobody --

4           MS. LIU:  -- the Supreme Court --

5           MS. TRAKINSKI:  Judy --

6           THE COURT:  Well, no, no, no, let her finish.

7           MS. LIU:  Go ahead.

8           MS. TRAKINSKI:  Please.

9           THE COURT:  Let her finish.

10          MS. TRAKINSKI:  Nobody -- no court has passed or

11  examined even the sufficiency of the termination notice itself

12  at issue.  We have defenses to it.  The problem is --

13          THE COURT:  But isn't that implicit in Judge

14  Diamond's ruling?  I mean she --

15          MS. TRAKINSKI:  No, she never had the termination.

16          THE COURT:  Oh, no, because that's a termination

17  notice --

18          MS. TRAKINSKI:  And she never --

19          THE COURT:  -- as opposed to --

20          MS. TRAKINSKI:  No.  Judge, she never addressed the

21  issue of the --

22          MR. TOFEL:  The notice of default it is.  You're

23  absolutely correct, Judge.

24          MS. TRAKINSKI:  Excuse me.  Mr. Tofel, please.  I

25  restrain myself when you speak.  Please give me the same

54

1  courtesy.

2          Judge Diamond never addressed the sufficiency of the

3  cure of notice from the standpoint of the amount of time it

4  provided.  The lease provision for cure says reasonable time so

5  long as the cure is commenced.  The landlord's notice only

6  gave, you know, whatever the brief period of time was that was

7  insufficient.  Four days certainly isn't enough to do the work.

8  That's another issue to be litigated.

9          But more to the point, Judge, they've already spent a

10  million bucks on this.  My client's already spent God knows how

11  much money, I don't want to know, on this issue.  You want to

12  send us back to state court so we can spend another hundred

13  thousand dollars of the debtor's money on this issue?

14          I mean with all due respect, I submit that Mr.

15  Backenroth's point that it's a matter of construction of the

16  Appellate Division's decision at this point is an excellent one

17  and, you know, I'm confident Your Honor is perfectly well-

18  equipped to make that determination and allow the parties to

19  move on to the assumption issue.  Let's get on with the

20  business of this debtor.  Let's get on with the issues that

21  really are salient here and proceed with the order of the day.

22          MR. TOFEL:  The suggestion that no one has ever dealt

23  with the sufficiency of the time to cure is sophistry.  It was

24  -- and Your Honor is completely correct.  It is entirely

25  implicit in Judge Diamond's decision.  The issue of the

55

1  adequacy of the notice of default was never raised and to the

2  extent that it was raised, she dealt with it by granting

3  summary judgment.  The fact that notice -- the fact -- to

4  suggest that there was --

5          THE COURT:  Well, she does --

6          MR. TOFEL:  -- inadequate time to cure --

7          THE COURT:  She does rule that the defendant's --

8  that the plaintiffs contend that the defendant's notice of

9  default was issued in bad faith and she says no, that's not

10 true.

11         MR. TOFEL:  We also should keep in mind if we're

12 dealing with the equities --

13         MS. TRAKINSKI:  That's --

14         MR. TOFEL:  -- the equities of what we're dealing

15 with that Judge Diamond -- this motion -- the Yellowstone that

16 she granted was granted I believe on July 28 or July 30 of

17 2004.  Her summary judgment decision is dated February 24 of

18 '05.  There are a number of months, as Your Honor will note by

19 looking at a calendar, during that time during which the debtor

20 I guess could have, which is really the purpose of Yellowstone

21 -- it's to give time to effect a cure.  But no, the debtor

22 didn't do that.

23         The debtor continued to maintain that the agreement

24 that it had signed --

25         THE COURT:  All right, we're kind of getting off the

56

1  point here.

2           MS. TRAKINSKI:  Just want to point out, Your Honor,

3  if you read on page 9 of the -- well, the last page of Judge

4  Diamond's decision, she did not rule on sufficiency of the

5  notice.  All she did was grant the defendant's request in --

6  for a declaratory judgment that the tenant was obligated to

7  perform the repairs.  There are several other causes of action

8  in the complaint, including a declaration that cure -- the

9  notice of cure was insufficient because it didn't provide

10 sufficient time to cure the pair, so if this were to go back to

11 Supreme Court, that issue is still open.  And that was briefed

12 below, not addressed directly --

13          Larry, please.

14          So that issue is respectfully still open, as is or

15 would be the sufficiency of the termination notice, the --

16          THE COURT:  But nevertheless, you're suggesting that

17 we shouldn't go back.

18          MR. TOFEL:  The suggestion, Your Honor --

19          MS. TRAKINSKI:  Judge --

20          THE COURT:  Well, no, let --

21          MR. TOFEL:  Sorry.

22          MS. TRAKINSKI:  I think it is perfectly within your

23 power to construe the Appellate Division's decision and I

24 obviously believe it should be construed as a acknowledgment or

25 at least the presumption the lease is still in effect, allow us

57

1  to assume the lease if you think we met the standard of 365 and

2  let's get on with the order of the debtor's business.  That's

3  why we're here.

4        MS. LIU:  All the Appellate Division order did, Your

5  Honor, was affirm the Supreme Court decision and her decision

6  in finding that there were --

7        THE COURT:  No, but let's go --

8        MS. LIU:  -- defaults to cure.

9        THE COURT:  But this was all -- this all got started

10 because I -- maybe I misheard you.  I thought you said, Ms.

11 Liu, that if there's an issue on this, we should go ask Judge

12 Diamond about it?

13       MS. LIU:  What my point is that what seems to be at

14 issue is not Judge Diamond's decision.  She ruled there was a

15 default and in ruling that it's implicit that she notices were

16 proper.

17       THE COURT:  No, no, no, that's not --

18       MS. LIU:  So I don't see that.  Okay.  What seems to

19 be troubling Your Honor is the Appellate Division stay and

20 whether it did or didn't undo the notice of termination which

21 otherwise was effective --

22       THE COURT:  Right.

23       MS. LIU:  -- April 1.

24       THE COURT:  Right.

25       MS. LIU:  And, you know, obviously we're -- we

58

1   weren't troubled by it and Your Honor is.  Your Honor is

2   troubled by it because you think well, maybe it was

3   retroactive, yet there's nothing --

4           THE COURT:  No, but I --

5           MS. LIU:  -- in that stay that --

6           THE COURT:  I'm just trying to address -- I thought

7   you were making a point that --

8           MS. LIU:  No.

9           THE COURT:  -- beyond -- so you're happy to have a

10  ruling here, as opposed to going back to state court?

11          MS. LIU:  The Appellate Division to --

12          MR. TOFEL:  Go ahead.

13          MS. LIU:  Pardon?

14          MR. TOFEL:  I think if Your Honor is asking whether a

15  matter of state law should be decided in a state court, I think

16  a state court is the proper forum to decide that.  It's hard

17  enough for this Court to do it from its perspective.

18          THE COURT:  Well, where is even the forum at this

19  point?

20          MR. TOFEL:  Oh, no, I --

21          THE COURT:  That's where I have a hard time --

22          MR. TOFEL:  I can answer --

23          THE COURT:  -- because the Appellate --

24          MR. TOFEL:  -- that question.  Your Honor, Judge

25  Diamond has already made it clear informally, informally what

59

1   her view --

2          THE COURT:  No --

3          MR. TOFEL:  -- of --

4          THE COURT:  No, I'm just interested in legal.  I

5   don't want to --

6          MR. TOFEL:  No, no, I understand that.  I think there

7   is a --

8          THE COURT:  Wouldn't Judge Diamond just be

9   interpreting what they did as much as I am?

10         MR. TOFEL:  No.  Well, Judge Diamond would I think be

11  interpreting, if you will, to use your word, under state law,

12  what happened or what happens, what is the legal ramification

13  or effect from her decision, service of an order and the

14  passage of time with the notices that have been transpired.

15         THE COURT:  Okay.

16         MR. TOFEL:  I think that is -- however, I do want to

17  respond very briefly to something that Ms. Trakinski said.  In

18  response to the summary judgment motion that Judge Diamond

19  granted, a number of issues were raised.  The issues that were

20  not raised, adequacy of the notice and things like that, have

21  been waived.  That is not something that could still be

22  litigated in state court --

23         THE COURT:  All right.  In any event, it's not --

24  she's not asking to litigate them there today.

25         MR. TOFEL:  Well, no, no, I -- but the suggestion by

60

1   Ms. Trakinski, because I've now worked with her long enough, is

2   well, we don't want to do that because all these issues still

3   need to be decided.   Respectfully, all these issues don't need

4   to be decided.   That's why --

5             THE COURT:  All right, it's all --

6             MR. TOFEL:   That's why the debtor came to this court

7   and said --

8             MS. TRAKINSKI:  Since when did you take residence --

9             MR. TOFEL:   -- and said this --

10            THE COURT:  Fine.

11            MS. TRAKINSKI:   -- in my brain?

12            THE COURT:  It doesn't matter.  It doesn't matter.

13   No one wants to decide them.

14            MS. LIU:  Okay.  So --

15            THE COURT:  All right.  So, I would like to see the

16   cases you refer to.

17            MS. TRAKINSKI:  Certainly, Your Honor.

18            Your Honor, should I -- excuse me, should I e-mail

19   them directly to your -- the Court or should I file them?

20            THE COURT:  Well, let me just -- as a timing matter

21   though, I've heard enough at least and read enough at least to

22   think that we should not lose the hour or so that we have and I

23   believe the debtor needs to move on then to show that it in

24   fact assuming -- and I've not ruled on this issue yet because I

25   want to see the cases.  But assuming that I find that there is

61

1   a lease that can be assumed under Section 365 -- again, that's

2   not an issue that I've decided yet, but on the assumption that

3   -- or, you know, on the hypothetical assumption that that's how

4   I decide, there's still an issue that obviously the landlord

5   hotly disputes that the debtor is able to meet the requirements

6   of Section 365 as far as cure, inadequate assurance and future

7   performance, and so you should put your case on, on that.

8           MS. TRAKINSKI:  Certainly, Your Honor.

9           THE COURT:  And as far as the cases you referred to,

10  in addition to sending them to me, you should send them to Ms.

11  Liu and Mr. Tofel.

12          MS. TRAKINSKI:  Of course, Your Honor.

13          THE COURT:  And I think -- you know what?  You don't

14  have to send me the actual case.  Why don't you just file

15  something on ECF and then send e-mail to us, including Mr. Liu

16  and Mr. Tofel, with the cite.  You know, short letter saying

17  these are the cites of the cases.

18          MS. TRAKINSKI:  Okay, I thought I just would file the

19  two briefs that were filed below.

20          THE COURT:  You can do that, too.  But I'm assuming

21  there's other stuff in those briefs besides the cases you're

22  referring to, so I'd like you to -- in your cover note, at

23  least to say --

24          MS. TRAKINSKI:  Refer, yes, Your Honor.

25          THE COURT:  -- you know, we direct the Court's

62

1   attention to the following three cases or whatever they are.

2           MS. TRAKINSKI:  Certainly, Your Honor.

3           THE COURT:  Okay.

4           MS. TRAKINSKI:  And shall I include the mootness

5   cases as well, Judge?  The response to the mootness argument?

6           THE COURT:  No.

7           MS. TRAKINSKI:  Okay.

8           THE COURT:  No.  Oh, you mean that you did in the

9   Appellate Division?

10          MS. TRAKINSKI:  Yeah.  I mean it's in the same

11  briefs.

12          THE COURT:  No, I -- that's okay.

13          MS. TRAKINSKI:  Okay.

14          THE COURT:  I mean they'll be there.  You don't have

15  to highlight them.  I'll just see that.

16          MS. LIU:  And would be respond, Your Honor?

17          THE COURT:  You want to.  You can do that.

18          MS. LIU:  We'd have an opportunity to respond to --

19          THE COURT:  Sure.

20          MS. LIU:  -- the cases?

21          THE COURT:  Sure.

22          MS. LIU:  Thank you.

23          MS. TRAKINSKI:  Well, I'm not going to do any

24  additional argument.  It's all in their --

25          THE COURT:  No, if you can --

63

1          MS. TRAKINSKI:  Their papers have responded to them

2   already, Judge.

3          THE COURT:  Well, no, I think if there's a -- if they

4   want to distinguish a case that you rely on or something like

5   that, that's fine.

6          MS. TRAKINSKI:  Certainly, Judge.

7          So we've covered the termination issue.  Let me just

8   touch briefly again on the underlying issue that we need to

9   understand is the backdrop.  This is we're talking about a

10  $15,000 repair issue.  And that's important because it speaks

11  to the ability of the debtor to cure the default and then of

12  course the issue of the reasonableness of the legal fees that

13  are going to be part of the necessary cure.

14         As Your Honor saw in their papers I guess filed late

15  Tuesday night, the objection to the motion to assume, the

16  debtor for the first time has quantified its legal fees --

17         THE COURT:  Mean the landlord.

18         MS. TRAKINSKI:  I mean the landlord, I'm sorry.

19  Forgive me, I'm not used to debtor and landlord.

20         The landlord has quantified its legal fees relating

21  to this set of issues shall we say at about a million dollars.

22  And while the papers will break down in amounts the assignment

23  of the fees to the various law firms involved, we don't have

24  any time sheets, we don't have any bills, we have no invoices,

25  we have nothing to tell us what all this activity was.

64

1          In sum, $750,000 to Mr. Tofel's firm and I think it's

2    not insignificant that Mr. Tofel is also the landlord's

3    manager, his agent.  Two hundred and twenty-five thousand

4    dollars to his so-called special bankruptcy counsel, Weil

5    Gotshal.

6          I come out of Skadden Arps, Judge.  I'm still

7    flabbergasted.  I don't really understand how a quarter million

8    dollars of fees have been racked up in this matter so far, but

9    be that as it may and that's just the bankruptcy.  And

10   seventeen thousand and change to the Ickowitz [Ph.] firm on the

11   state court litigation which is the only fee amount that even

12   remotely approximates the amount in controversy.

13          As Your Honor knows much better than I do --

14          THE COURT:  Course that can be turned both ways.  One

15   thought that definitely crossed my mind is if this is really a

16   15,000 repair, why have the debtors -- why has the debtor gone

17   through this whole process?

18          MS. TRAKINSKI:  I'll tell you why, Your Honor.  And

19   it's important to sort of distinguish the parts of the process

20   the debtor had undertaken to pursue.  As Mr. Tofel's made very

21   clear, they were on -- standing on the cusp of terminating the

22   lease.  The tenant went into state court, got a Yellowstone

23   injunction to cut it all off because they disputed the clarity

24   of the default notice and whether or not they were obligated to

25   perform the repairs that he was demanding.  There was

65

1    absolutely no understanding of the nature of the repairs.

2          You have to recall, Judge, that -- and, you know,

3    perhaps you don't have as much background -- the tenant had

4    literally been begging long before Davidoff Malito was ever

5    hired for an explication -- an explanation of what had to be

6    done.  They had gone and done the repairs it required under the

7    so-called Messer report in 2002 that started all of this.  The

8    landlord's compliance inspection noted certain additional

9    repairs had to be done.  They went up and did them.  They had

10   it reinspected.  They went and did some more and it was never

11   enough, until we had the July 2002 default notice served.

12         They got the Yellowstone injunction and

13   notwithstanding the issuance the Yellowstone injunction,

14   predecessor counsel still tried to get some sort of sense of

15   what the repairs were and were never satisfied.  Tofel just --

16   Mr. Tofel just never would tell us.  He

17   (indiscernible)**1:34:35**  I don't have to.  You go and do it.

18   The scaffolding was down by then, even though the tenant had

19   offered to send its engineer up with the landlord's engineer to

20   actually go map the facade and determine what was done.

21         Now, it's also important to note that while the

22   tenant didn't go and do what it thought might be sufficient --

23   and I respectfully submit that even if they had done what they

24   thought the defective mortar joint and bulging brick work was

25   done, I can say with a fair degree of confidence that it

1  probably would not have been good enough and we probably would

2  have been fighting anyway.

3          But Mr. Tofel had the right under paragraph 12 of the

4  lease to send his own crew in there, to put the scaffolding up,

5  to do the work and bill the tenant.  And then we would have had

6  a dispute over whatever the dollar amount was that was owed and

7  we wouldn't have had this whole bru-ha-ha.

8          The bank's counsel can attest to the fact that Mr.

9  Tofel has consistently refused to specify what the repairs were

10  because when the purported termination was served on the bank,

11  the bank had to do what it had to do to protect it's rights and

12  it started to engage in negotiation with Mr. Tofel about what

13  it would have to do to pick up the lease as permitted under the

14  mortgage.  And got the same frustrating responses and had to be

15  reduced to filing an action in state court on the very same

16  issues.

17          So, you know, the answer is the tenant needed some

18  clarification of what its obligations were and the only thing

19  the tenant pursued was the appeal.  That's it.  And I'm not

20  going to bore Your Honor right now, unless of course you're

21  interested, with all the different motions and shenanigans and

22  plays and chess moves that we had to go through to get us here

23  today to sustain an existence here.

24          We didn't know it was a $15,000 repair until we

25  finally got the Appellate Division's decision.  We sent the --

67

 1   a few engineers out.  We had a few opinions and we finally got

 2   this estimate that had a definitive number to it.  We had --

 3   there had been some inquiries beforehand during the pendency of

 4   the appeal with the engineers who suggested it wasn't such a

 5   big repair, but we didn't know.

 6         Mr. Tofel admits in his papers, his opposition

 7   papers, this is a $15,000 component.  In fact, back in May,

 8   unbeknownst to us, he had the engineer who had identified this

 9   work to begin with go in and do a cost estimate of some work

10   that was required under the next engineering report, the

11   February '05, which parenthetically he suggests still needs to

12   be done.  It's been done already, Your Honor.

13         But even his engineer told him back in May '05,

14   before all this started, that it would cost $5,000 to put a

15   scaffolding up to map out the south facade and determine what

16   needed to be done.  Well, you know, we never knew that.  He

17   never served that estimate on us.  He never suggested that --

18   let's do it.  And during the negotiations and during attempts

19   to try and resolve this -- some of which I was involved in,

20   some of which I wasn't -- the tenant said, you know, your

21   engineer will put up -- let's send your engineer to map it out

22   so you're happy with the work and he's always refused.

23         So, you know, that's sort of a long answer to what

24   should have been a simple question, Judge.  We had to preserve

25   our rights and while we did push the appeal -- we can't say we

68

1   didn't -- the rest of the legal maneuverings that have cost the

2   landlord a million dollars and the debtor, you know, probably a

3   quarter or more were not of our making.  We were being

4   completely reactionary.

5          So here we have a $15,000 dispute, give or take a few

6   dollars, and we've got a demand for a million dollars in legal

7   fees.  Now let's talk about the repairs first.  The proposals

8   were submitted to the Court for the engineering and for the

9   contractor to do the work.  I referred to them earlier.  They

10  have been signed.  Mr. Bildaritchie**1:38:18**, the debtor's

11  manager, has paid the one-half deposit, $6,300.  I have a copy

12  of the check if Your Honor would like to see it for the record.

13  He paid that amount.  It's been paid.

14         He is prepared to deposit the balance of the contract

15  amount in escrow with Davidoff Malito if the Court would -- you

16  know, would feel more comfortable as an assurance.  But the

17  work is going to get paid.  The engineer has assured me as soon

18  as the weather permits, the work will be done.

19         The legal fee issue is a needier issue.  Your Honor

20  has got to examine them from the perspective of the

21  reasonableness, the economic and commercial reasonableness of

22  the fees.  They're just -- they're outrageous.  It's -- under

23  no construction, can a rational economic actor in the

24  marketplace rationalize spending a million dollars to get

25  $15,000 worth of value, particularly when you could have gone

69

1  and done it yourself.  <u>Nick Frocruise</u> is absolutely clear on

2  this issue.  There is no commercial reasonableness here.

3          Your Honor is going to have to have a hearing.  I'm

4  sure you're going to have to examine the bills if and when

5  they're produced.  But no matter what it is those bills and

6  those invoices are going to show in terms of the activity, the

7  cases are very clear.  It's not rational and it's not justified

8  in this case.  Whatever the reasonable amount of fees is and,

9  you know, we've taken the position that really no fees are

10 reasonable given that the landlord had the right to do it.

11 Whatever amount you find is reasonable, even if you throw in

12 the extra $45,000 worth of work that the landlord is trying to

13 imply is part of the dispute, which it wasn't -- even if you

14 call the repair work 60,000 or 100,000 dollars which is a vast

15 exaggeration, a million dollars worth of legal fees is just not

16 an economically rational amount.

17         The landlord is also contending that the nine hundred

18 and ninety-some thousand dollars worth of rents have to be

19 turned over -- oh, one point that my colleague reminds me of.

20 This issue of the $350,000 that the debtor paid as a condition

21 of the May 6th emergency stay.  The landlord has never

22 indicated what that was for.  We've asked for an accounting of

23 those amounts over and over again.  Never gotten anything.

24         The representation made by counsel at the Appellate

25 Division on the argument for that interim stay, which I have to

70

1    disclose I was not part of, was that they were additional

2    rents.  However, the debtor has no idea what they are.  We

3    can't figure out what $350,000 deficiency in payments there

4    was.  We can only imagine that it's for legal fees.

5         So, we've got the issue of whether or not he's

6    already been paid 350.  There's also the $150,000 in the water

7    and sewage charge escrow that the landlord is holding and Your

8    Honor has on the last page of the exhibits to our motion to

9    assume a statement from the landlord year end 2004 that shows

10   113 roughly in that escrow.  The earlier pages of that same

11   exhibit that has the client's -- the debtor's rather

12   spreadsheet shows that that account is up to $150,000.

13   Interestingly enough, this year the landlord didn't issue the

14   same statement showing the balance in that escrow account.

15        There is also some question as to whether or not the

16   landlord has escrow account under the tax provision.  There's a

17   provision in the lease under the tax payment -- it's paragraph

18   8 of the lease at page 14 -- that the landlord can take

19   payments, advance payments of tax monies a certain portion and

20   hold them in escrow.  I've asked Mr. Tofel for an accounting of

21   that escrow account or confirmation that it does exist and I

22   have been characteristically told that he doesn't have to give

23   it to me.

24        And while he may not strictly be obligated to provide

25   it, I think that as a commercial matter and under his fiduciary

71

1  duty as the escrow agent, he does have some duty to provide it.

2  And in the -- certainly in the context of this court where we

3  believe that the landlord holds about half a million dollars of

4  cash that belong to the debtor, there's certainly a context

5  within which he should be ordered to do so.

6           So let's go back -- now let me get to the collateral

7  assignment of rents provision.  Under paragraph 24 of the

8  lease, the landlord is contending that he has a right to over

9  $900,000 in back rent from the previous year from the -- from

10 March 10th, I believe his papers say.  Parenthetically, it

11 should be April 1st, but paragraph 24 is a classic collateral

12 assignment of rent.  It's a security device that the landlord

13 does not have possession of or right to possess until he

14 perfects or seeks to enforce his right to title either by

15 taking actual possession or putting a receiver in.

16          Your Honor is probably familiar with the <u>Vienna Park</u>

17 decision from the Second Circuit, <u>North Port Marina</u> from this

18 court I believe.  He's got a cash -- he's got the cash

19 collateral order that gives him the adequate protection of that

20 collateral.  And as Your Honor knows, he enforces that right

21 very very strictly.

22          Even if he had a perfected security interest, Judge,

23 we've argued in our papers that before he would have any right

24 to possession, he's got to account for the various funds I

25 referred to, including the 350 and the water escrow.

72

1          The characterization of that provision in any event,

2    Judge, is misleading.  That provision provides for a temporary

3    assignment I guess of the rents during the pendency of the

4    default period, but once the default is cured, he no longer has

5    a right to it.

6          I've addressed the commercial reasonableness of the

7    legal fees.  I'm not sure that there's much more to say.  The

8    one thing that we really do need to bear in mind, Judge, when

9    we examine the reasonableness is also the record of concealment

10   and mischaracterization of facts here.

11         The landlord has neglected to inform the Court that

12   it was paid $350,000 on May 6 as a condition of the interim

13   stay.  He's also not informed the Court that he's never

14   bothered to account to the debtor for those funds.  We still

15   need to know what they are and whether in fact they were

16   appropriately paid.  If in fact they covered legal fees, then

17   arguably, he's in violation of the lower court's order because

18   Judge Diamond referred to the issue of fees to a referee.  So

19   there was no fixed amount to which he was entitled as of that

20   moment anyway.

21         He's blithely subsumed the $45,000 worth of repairs

22   that he says were called for in the February '05 engineering

23   report without informing the Court that he's gotten a

24   certification from the debtor -- in fact, from me -- November

25   17, 2005 and I've got that memo, certifying that all the items

73

1   were complete.  You know, he'll back-handedly in the papers say

2   well, the debtor declined or refused or couldn't come up with

3   documents to prove that at the deposition, so that de facto

4   means they were never done.  That's sort of a nonsensical

5   argument, but, you know, there's a very good reason.  Most of

6   the work was done either by Con Edison, by the super of the

7   building.  We didn't have to bring out contractors.  He's

8   gotten a certification from me, November 17th, 2005, and he's

9   never objected to it.  Not until he was preparing for the

10  deposition and demanding that I give him documents.  So, that's

11  another issue.

12          He's known all along or at least since May of '05

13  that the repairs to the facade, the mortar joints and the

14  bulging bricks was not a big deal.  He's also well aware I

15  believe that it's just a cosmetic repair.  We have to bear in

16  mind that there was no safety issue, no health issue here.

17  These bulging bricks were as-built condition.  There's no

18  dispute in the record about that.  There's no cracking the

19  mortar joints, no cracking in the bricks.  There's nothing to

20  suggest that the bricks are going to fall off on anybody's

21  head.  And in fact, the mortar joint repairs were in the cycle

22  for the ordinary maintenance that was coming up this spring

23  anyway, and that's what our engineer had always told them.

24          There are misrepresentations in the papers concerning

25  the tax provisions and water bills and the insurance in the

74

1  sense that the landlord has asserted in its papers that the

2  tenant has no right under the lease to pay those amounts.  I

3  submit that Your Honor just take a look at the provisions at

4  issue.  Paragraph 10 for insurance.  Paragraph 8 for taxes and

5  water and sewage.  Those are pages 12 through roughly 14 of the

6  lease.

7          The tenant in the first instance, has the obligation

8  to pay all of those charges and then provide proof to the

9  landlord that they've been paid.  It does not provide for the

10  landlord having the exclusive right to handle these charges.

11          Now that we're on the insurance issue, let me just

12  comment that the debtor has tried for quite some time at least

13  since I know him to get a better quote for the insurance and in

14  fact believes he can.  The landlord has argued in the papers

15  that we haven't been able to prove that we can get, quote,

16  comparable insurance, although on footnote 8 in the brief

17  opposing the motion to assume, the landlord states that the

18  insurance he has is some extraordinary insurance, suggesting as

19  I understand it that it's in excess of what's required under

20  the lease.

21          The debtor has consistently maintained and has gotten

22  quotes of about $50,000 versus the 115 I believe that the

23  current premium the landlord is paying.  We understand that the

24  landlord has instructed the insurance broker not to deal with

25  our client, which is one of the reasons he wasn't able to get

75

1   that insurance, but there is a very strong indication and I

2   believe a likelihood that the insurance premiums will be able

3   to be reduced.  Again, the projections that we put in our

4   papers that show Your Honor that there is more than adequate

5   cash once this litigation is put to bed to pay whatever the

6   cure amount is, is underscored again by the fact that the sewer

7   and water charges, for example, are being paid.  They're in

8   excess.  There's more than enough money in that escrow account

9   to pay the water charges for the next year, if not a year and a

10  half, two years.

11          Let's take a look at the projections, Your Honor,

12  just so you have a sense of what I'm talking about.  It's

13  Exhibit C to our motion to assume the lease.  You see 2006

14  there's a net profit of $371,650 and these projections were

15  done with the deletion of the legal fee expense that has been

16  weighing the debtor down for the last year.  It also assumes,

17  Your Honor, that the insurance, water and tax figures are

18  brought into control.  And it also assumes the income from an

19  antenna that the debtor has the opportunity to have placed on

20  the roof.

21          Now, we have asked over and over again for permission

22  under paragraph 32 of the lease to put that on the --

23          THE COURT:  Well, when you say the debtor has the

24  opportunity --

25          MS. TRAKINSKI:  Sprint is --

1          THE COURT:  -- what is --

2          MS. TRAKINSKI:  -- champing at the bit to put it up

3    there.

4          THE COURT:  Okay.

5          MS. TRAKINSKI:  They've submitted a draft contract.

6    The landlord has consistently refused.  I understand that

7    they're still prepared to do it.  The landlord says in its

8    briefs that it has, quote, the unfettered right to refuse to

9    give it's approval.  It's plainly not wrong.  Look at paragraph

10   32 of the lease.  Consent shall not be unreasonably withheld.

11         But more to the point just so Your Honor understands

12   it, the escalations in the rent income on this projection

13   through the year 2016, which is the end of the current term,

14   his argument that we won't be able to pay in 2017 is a red

15   herring.  We don't have to renew the lease in 2017.  The lease

16   goes up.  We have the option.  It's a crazy escalation.

17         Year 2006, the debtor reasonably assumed a five

18   percent increase in rents, which Your Honor I'm sure

19   understands is the standard in doing appraisals.  But then from

20   2007 for the duration of the lease, the tenant was conservative

21   in only assuming a three percent increase, just to make sure

22   that the projections really could support the notion that

23   the -- all the obligations under the lease could be met.  The

24   tenant has never been in financial default with the exception

25   of objecting to a substantial amount of legal fees charged by

77

1   Mr. Tofel's firm for what the tenant has always maintained are

2   ordinary management fees.

3            But we've never been in default.  We've never been in

4   default on the mortgage either.  And if you look at the

5   projections, the net profits go from 371 plus in 2006 to over

6   450 in year seven.  All the way to 1.3 million in 2006 (sic)

7   with the same incremental increases in the interim.

8            So it's very clear that even if Your Honor finds that

9   $100,000 of fees should be awarded to the landlord, which

10  believe me we don't think is reasonable either, there's

11  perfectly -- you know, there's sufficient cash flow on this

12  property to pay that amount and to pay it very promptly.

13  Doesn't have to be dragged out for five years.  It could be

14  paid in a relatively prompt period of time so long as the

15  debtor is permitted to actually operate its business.

16           While I'm on a roll, Judge, the characterization of

17  longstanding failures to comply with the lease obligations is

18  an exaggeration.  That's not the case.  Mr. Bildaritchie and

19  his company took the lease in 2002 and they've been compliant

20  ever since.  There have been disputes about whether something

21  is sufficient or not, but that always happens in landlord

22  tenant context.  Until we got to this bulging brick mortar

23  joint issue, he was never in default.  He's not been in default

24  since.  It's again been, you know, these arguments and what I

25  believe frankly is make way.  It's fairly clear that the

78

1  landlord would prefer that this tenant were gone, so it's not

2  surprising he's trying to strictly enforce what he perceives to

3  be his rights.

4          The dig that they take at the Merit contract, the

5  sufficiency of the proposal from Merit Engineering that we

6  submit that it's not a binding contract because it's contingent

7  on the execution of additional contracts is simply not true.

8  If you read Merit, it's a standard part of their form that says

9  the commencement of engineering services is conditioned on the

10  execution of formal documents.  They're not doing engineering

11  services.  It's very clear it's consulting services and

12  supervisory services.  I've been assured by Merit's

13  representative there is no further documentation or contracts

14  that are necessary.  They're ready to go out and do their

15  work.  Wayne --

16          THE COURT:  And no further price?

17          MS. TRAKINSKI:  Pardon me?

18          THE COURT:  No further payment?

19          MS. TRAKINSKI:  The payment will be, as the contract

20  says, on an hourly basis.  And his fee is in there and Mr.

21  Schultz [Ph.] doesn't anticipate it's going to be more than a

22  few thousand dollars which is why we get from the approximately

23  $13,000 in the Wayne Bellit [Ph.] contract to about 15, 16 to

24  account for the Merit engineering fees.

25          I also spoke to Mr. Shultz, who is the only gentleman

1  by the way who's ever been on a scaffolding looking at the area

2  at issue, to get a sense from him about the realistic nature of

3  the hundred square foot estimate that the Wayne Bellit contract

4  is based on.  Mr. Shultz believes that an exaggeration based on

5  his observation.

6          Now, Mr. Tofel's papers indicate that his engineer

7  said it was approximately 150 square feet.  Even if you give

8  them 150 square feet, it's only another two or three thousand

9  dollars.  It's not order of magnitude.  We're still in the

10  range 100 to 150 square feet.  If we do the math, it's still in

11  that under $20,000 range, which, as I've indicated, is almost

12  all paid already.  So that's not going to be an issue.

13          The only issue is when the weather warms up.  That's

14  the only thing that's waiting.  They, on my instructions

15  whatever the day that those proposal or they commenced whatever

16  filing procedures they had to commence in order to get the

17  appropriate paperwork done and as soon as the weather permits,

18  they're ready to slate us in into their schedule and within a

19  few weeks, it's going to be done.  So that's not going to be an

20  issue.

21          As I said, whatever was in that February '05 report,

22  that's already been done.

23          (Pause/counsel confer.)

24          MS. TRAKINSKI:  Excuse me, Your Honor, one moment.

25          My colleagues remind me that in talking about Nick

80

1  Frocruise, I didn't trot out the entire standard. Not only

2  must it be economically reasonable, but it's got to be cost

3  justified. And, you know, the same argument applies for a 15,

4  even a $60,000 repair. Even a hundred thousand report, Judge.

5  A million dollars worth of legal fees when he had the right to

6  go and do it himself and bill us is, you know, under no

7  circumstance, cost justified.

8          MR. BACKENROTH: Your Honor, if I could speak next.

9  Very shortly. I don't intend to repeat over what she said,

10  just point out a few other items.

11          The issue of legal fees is something that has been

12  addressed by other courts and something that the bankruptcy

13  courts address on an ongoing basis.

14          The Bankruptcy Code provides as part of a proof of

15  claim in certain instances you're entitled to legal fees.

16  However, that is not an unfettered right. If you want to pay

17  legal fees of $10 million to pursue a $15 million claim and you

18  want to write a check to do that and for whatever reason you

19  wish to do that, maybe you have the right to do that, but you

20  don't have the right to charge the bankruptcy estate for that

21  kind of activity. It has to be cost justified.

22          Many times you have instances where someone says,

23  "Hey, it's his nickel. Right? Nothing to worry about. No

24  down side. You know, if I win I hit the jackpot. If I lose,

25  well, you know, I'll stick it into the fees and it's their

1   nickel."  No, no, no, it doesn't work that way.  You can incur

2   fees but it has to be cost justified.

3            There is, I think, as a matter of law -- although

4   maybe there are no such things as an absolute matter of law --

5   where we now have it clear from their response papers that

6   we're talking about a $15,000.00 item and, notice, something

7   even more clear from their response papers, apparently -- which

8   is one of the reasons why we were keen on getting a deposition

9   but it just didn't work out in the period of time involved --

10  they used some effort to figure out just what really is

11  involved over here, they did call up an engineer and they asked

12  him to spell out for me, "Well, just what is involved over

13  here?"  So the landlord does have this activity taking place

14  and, of course, since he doesn't challenge the fact that it's a

15  $15,000.00 or $18,000.00 issue -- it doesn't make any

16  difference for the purposes of this discussion since he doesn't

17  challenge that -- obviously, that's what he understood what was

18  involved as well.  Of course, he tries to add another

19  $40,000.00 based on a February report which is not the Messer

20  (sic) report which is in 2002 is, I guess, an attempt to make

21  some number that sounds like it's something more but at the end

22  of the day it's a question of law, is it cost justified to do

23  this and I think as a matter of law it is not.

24           When you have alternatives you cannot open up the

25  pocketbook and stick it to the debtor's estate just because

82

1    maybe you have a legal right to pursue that.  You have an

2    obligation to be cost justified in what you do before you

3    charge this estate for legal fees as opposed to charging your

4    client for legal fees and that's the standard and it comes up

5    in the context of where, you know, somebody has some provision

6    in his mortgage or things of that nature which allows him to

7    charge it back because in essence the estate is paying for it.

8    The estate is paying or it, that's something that this Court

9    rules upon; the adequacy of legal fees.  I think that's where

10   this Court would have to rule on the adequacy of legal fees.  I

11   think the fact that they have not put in time sheets or any

12   justification other than just putting a number -- and

13   obviously, they haven't because they didn't put in around

14   $900,000.00.  There was an exact figure, I think it was

15   $980,000.00 or whatever it is.  There was an exact figure

16   there.

17          So they only put in time sheets in response.  They

18   don't break down what they did in what instances and I think

19   that that is telling because there's a second standard.  It's

20   not only are they cost justified, there's a second -- for

21   proper modus (sic).

22          One of the things that the Court, I think, has to

23   look at is that would somebody spend $30,000.00, $20,000.00, if

24   it was his own money because I think that's probably where you

25   start off.  Would I as a landlord spend $20,000.00 in legal

1   fees to correct a $15,000.00 problem?  Would I insist upon not

2   telling the debtor what exactly do you have to do.  Now, maybe

3   I have the right not to tell him.  Maybe I have the right not

4   to tell him, you know, what I'm saying, I fold my hands, "you

5   know something you go ahead and do it a second time or a third

6   time and let's see whether or not, you know, then I'll complain

7   about that."  You may have the right to do that but you know

8   something, it's not cost justified to do that and it's not cost

9   justified in order to stick to legal fees when you want to

10  pursue another approach and it also raises the specter of

11  whether or not what this was really about and Your Honor may

12  not even have to get to that issue because I think they don't

13  get past cost justified.

14          As to whether or not the million dollars that was

15  spent over here in legal fees, if they spent a million dollars

16  on legal fees, was for the purposes of an improper objective,

17  not to correct a $15,000.00 item.  It was spent for the

18  purposes of getting back a leasehold interest with tens of

19  millions of dollars.

20          Now, Your Honor, I want to point out something with

21  regard to the projections which, I think, has to be pointed

22  out.  There's a line item over there of $800,000.00 a year to

23  the bank.  Now, they only continue to get that money, of

24  course, is the rent gets paid.  So when you talk about adequate

25  assurances of future performance you are talking about not only

84

1   the debtor's equity cushion, you're talking about an equity

2   cushion of $800,000.00.  They have to be paid their rent

3   obligations because otherwise the bank doesn't get their money

4   either so you're talking about not a cushion of, just for

5   argument sake, $9 million based on our estimates over the next

6   ten years, you're talking about an additional $8 million in

7   which would be otherwise payable to -- and which would not be

8   payable if all obligations under the lease are not kept.

9         So I think you have more than that and you also have

10   the fact that the economic payments that were to the landlord

11   have been made.  But for what we believe is predatory activity,

12   they've been getting their payments in the past.  We're talking

13   about a $15,000.00 dispute and I'm glad that we now have

14   brought this matter to a head before Your Honor because this

15   could, unfortunately, continue on and on and I think Your Honor

16   was correct in asking us to bring on the motion, tee it up so

17   that we finally get this thing to a head.

18         Thank you very much.

19         THE COURT:  Where is it stated in the papers in terms

20   of any evidence that the repairs in connection with the

21   February survey have been done?

22         MS. TRAKINSKI:  Judge, frankly, it's not in the

23   papers because I didn't think it was an issue until I saw Mr.

24   Tofel's response.

25         I have, however, the memo that I sent certifying it

85

1   and I've got copies.  I can hand it up to Your Honor or we can

2   file it as a supplemental filing in connection with the

3   motions.

4           THE COURT:  Well, is that issue disputed?

5           MR. TOFEL:  What is disputed, Your Honor -- there's

6   no question that I got a memo from Ms. Trakinski dated November

7   7th which says certain items of repair have been done.  We

8   haven't gotten any support as to whether they've been done, how

9   they've been done.  There are a whole host of items that Ms.

10  Trakinski says, "Well, those problems are actually the problem

11  of a subtenant, whether it's the restaurant or the garage,

12  we've told them to take care of it."

13          I don't think that's actually taking care of the

14  tenant if they are a tenant.  Their responsibility is to simply

15  say, "Well, we passed it off to a subtenant."  But there is a

16  serious doubt as to whether that work has been done.

17          However, to bring it full circle, our engineers have

18  estimated -- and this was done at the request, actually, of the

19  bank, it wasn't done surreptitiously, it was done at the

20  request of the bank in late April or early May to quantify that

21  because the bank  had identified someone who they wanted to

22  pick up the lease and said, "Tell me what the repairs are, tell

23  me what they cost" and we sent our engineers out there and they

24  came back.  It's a guesstimate by people who are substantially

25  smarter than I in engineering issues but it's out there.  I

86

1   don't know what work has been done.  We have no evidence that

2   any of the work has been done.  If it's been done.  Great.

3           THE COURT:  Okay.

4           MS. TRAKINSKI:  Judge, I just want to point out that

5   the implication that we're in default on this is just yucky.  I

6   mean he's implying that the debtors didn't do something that I

7   as an officer of this Court certified to him that it was done.

8           THE COURT:  All right.

9           Well, anyway, the fact of the receipt of the

10  certification is not disputed.  Right?

11          MR. TOFEL:  It's not a certification, Your Honor.

12          THE COURT:  Whatever it is.

13          MR. TOFEL:  It's a memorandum.

14          MS. TRAKINSKI:  Judge, there's no --

15          MR. TOFEL:  Excuse me.  Let me finish.  You know, you

16  were not interrupted.

17          MS. TRAKINSKI:  You're right.  I apologize.  You're

18  right.

19          MR. TOFEL:  What's yucky?  I just listened to a

20  lawyer who wasn't involved in this talk about conversations

21  that never took place --

22          THE COURT:  All right.

23          I just wanted to know whether this document --

24          MR. TOFEL:  This is a letter.  This is nothing more

25  than a letter.

1            MS. LIU:  Can I have my turn, please?

2            MR. TOFEL:  Which I'm sure Ms. Trakinski has.  We

3    have.  We can hand it up to Your Honor.  It's a letter that

4    says:

5            "Dear Larry:

6            We looked at the February inspection report, this is

7    what's been done, here's how we've dealt with it."

8            MS. LIU:  May I have my turn?

9            MS. TRAKINSKI:  Judge, I have the letter for you --

10           THE COURT:  Just a minute.  I just want to finish off

11   with this one thing.

12           MS. TRAKINSKI:  I have the memo if Your Honor would

13   like.  My client leans over and reassures me that everything

14   that the subtenants had to do is done.

15           I just want to note for the record there's no

16   obligation to do anything but inform the landlord that the

17   repairs are done.  The landlord hasn't sent anybody in to check

18   that they were or were not done.

19           THE COURT:  All right.

20           MS. TRAKINSKI:  So the innuendo is a little bit

21   unnecessary.

22           THE COURT:  All right.

23           MS. TRAKINSKI:  Your Honor, would you like me to pass

24   this up or should I file this just so we have a complete

25   record?

88

1           THE COURT:  Why don't you file it?

2           MS. TRAKINSKI:  Okay, Your Honor.

3           Thank you.

4           THE COURT:  Okay, Ms. Liu.

5           MS. LIU:  Your Honor, the purpose of today's hearing,

6      when you scheduled it, was to have a summary proceeding which

7      would give you an idea of whether assumption was appropriate

8      here and you made clear at the January 11th hearing that you

9      were skeptical of the debtor's ability to cure the amounts

10     owing to the landlord under the lease and what you said in

11     setting up this hearing and I believe what you had in mind was

12     that this would be sort of a summary hearing and then if we

13     have to get to another hearing about the actual detail of the

14     amounts owed we would do that and what you said at that time

15     was, "What I really need to see, frankly, is real hard facts

16     that give me confidence that the lease is going to be assumed"

17     and while Ms. Trakinski's remarks have focused on the attorneys

18     fees and other cure amounts, what she's glossed over in

19     debtor's own motion is that the motion doesn't come close to

20     establishing these hard facts.

21           Now, in opposition, the landlord has set forth in the

22     objection the amounts that we believe to be cured and I want to

23     address each and every one of Ms. Trakinski's points but in my

24     order of getting there if you don't mind.

25           Now, the repairs and other costs that we've asserted

89

1   come to $2 million.  I understand that they raise an issue with

2   the sublease proceeds, okay, maybe it's $1 million but we're

3   still dealing with $2 million or $1 million and the debtor's

4   operating reports reflect that each month the debtor has

5   operated consistently at a loss and their case for

6   demonstrating today their ability to cure the monetary defaults

7   under the lease is largely built on winning $113,000.00 in the

8   pending adversary proceeding.  So the debtor has sort of become

9   judge and plaintiff at the same time and it's deemed itself the

10  winner of the adversary proceeding about the overpayments of

11  taxes, water sewage, that Your Honor hasn't heard yet.  In

12  fact, you've stayed it and they said, "Well, they're going to

13  win that dispute and that's $113,000.00."  But then the next

14  leap is that the debtor says, "And when I get that money that

15  I'm assured to win, I'm going to set that off against the

16  landlord's obligations and cap the attorneys fees at that

17  amount because I think that's reasonable."

18          Now, the attorneys fees are substantial and I'm going

19  to get to the point of why that is but it is at least prima

20  facie not established that that is a reasonable argument to

21  make as to how they'd have the financial wherewithal to assume

22  the lease; $113,000.00 that's disputed in a litigation and it

23  isn't clear that that's an overcharge setoff amount and the

24  notion that then they would not pay that amount even but set it

25  off against attorneys fees and write off the other $800,000.00

90

1    is pretty absurd.

2            The other argument they make is that with this

3    historical record of running negative each month, suddenly,

4    next year we're going to see a remarkable turnaround and

5    there's going to be almost $400,000.00 of excess cash flow and

6    I'm going to get into more detail about the projections.

7            Your Honor also stated at the other hearing that if

8    the cure amounts were in significant dispute, which they are

9    here, there would have to be a cushion to cover the possibility

10   that the higher amounts in fact are due and owing and Your

11   Honor said, "I think debtors should assume that I'm not going

12   to approve something where the debtor cuts" -- and then we have

13   essentially, I have brackets because the language was funny but

14   you can look at the transcript at Page 80 of the January 11th

15   hearing -- "I'm not going to approve something where the debtor

16   cuts the cure amount off at dollar X if there's a significant

17   dispute that it really is X plus $100 because it's going to

18   spend that $100 either ultimately because it loses on the cure

19   dispute or in fighting the cure dispute."  So you have to have

20   a cushion here and that's what Your Honor said.

21           But here, by relying so heavily on the litigation

22   victory, the debtor has implicitly conceded that it's unable to

23   cure the defaults under the lease with its current resources

24   even if you accept their view of the cure amounts, even if they

25   needed only $113,000.00, they don't have it, not on this record

91

1   and not on the record of their motion and so they devote most

2   of their motion to arguing the case that's not before Your

3   Honor, that's in the adversary proceeding about the $113,000.00

4   and by the way, they don't explain what would happen to their

5   motion to assume if they lost in the adversary proceeding.

6   There is always a possibility when you litigate you may not win

7   and they haven't even addressed, "Well, what do we do when we

8   don't even have the $113,000.00 because we might lose?"

9          As to the projections, they contradict the debtor's

10  historical lack of profitability.  In fact, they are really the

11  sort of pipe dreams that were eluded to in the Berkshire

12  Chemical case that we cited where the debtor can't substantiate

13  their contentions regarding future profitability.  The rents

14  are overstated and at the deposition of Mr. Bildirici, the

15  debtor conceded that the rent roll was not analyzed on a unit-

16  by-unit basis but the landlord did review the leases and nearly

17  half of the present subleases have terms that go beyond late

18  2006 or beyond.  So you can't possibly -- it's our position --

19  you would never be able to make those rent numbers that they're

20  not projecting and the debtor's failure to analyze the rent

21  roll on a unit-by-unit basis, looking at when each lease comes

22  off and judging whether the rent, therefore, could go up or

23  not, renders the projections in that regard unreliable.

24          Now, the antenna contract.  The landlord has not

25  consented to previous requests to put that antenna on the roof

92

1  and he has no intention of consenting and you will not be able

2  to find a provision in the lease that would coerce the landlord

3  into doing that.  That's a business decision he's got the right

4  to make --

5          THE COURT:  There's no reasonableness gloss (sic) on

6  it?

7          MS. LIU:  Not addressing the antenna, Your Honor.

8  There are provisions throughout the lease about not withholding

9  consent but these have to largely do with alterations, repairs.

10  You go to the landlord, you say, "Here's what I want to do."

11  Here, this gets into a whole realm of air rights and space on

12  the roof and it isn't something that -- it's our position that

13  the landlord does not have to consent to that.

14          As to insurance, water and taxes.  Okay.  Insurance.

15  We went through the whole insurance renewal thing in December

16  as Your Honor well knows.  The debtor asserted at that time

17  that the landlord was standing in its way and that it could

18  procure less expensive insurance and the landlord said, "Fine,

19  go ahead and do it," but he pointed out to Your Honor that

20  there was only a certain amount of time that the landlord could

21  wait or the coverage would lapse and Your Honor understood

22  that.  What happened?  The debtor failed to procure the

23  alternative arrangements and the landlord had to renew the

24  existing insurance and then the Court had to compel the debtor

25  to reimburse the landlord for the premiums because they hadn't

93

1   paid and Your Honor remembers all of that.  You had to set a

2   date certain by which they would pay.

3          THE COURT:  Has the landlord or any of its agents

4   told the broker or the insurance company not to deal with the

5   debtor?

6          MS. LIU:  No, what happened was the reverse.

7          Your Honor was told that same thing and what really

8   had happened was that, inexplicably, the debtor's broker called

9   up the landlord's insurance broker purporting to have taken

10  over --

11                  (Pause in proceedings.)

12         MS. LIU:  I have to get back to a point but I want to

13  finish what I'm talking about right now.

14         The debtor's broker had contacted landlord's broker

15  purporting to now be the party who can properly deal with the

16  insurance policy and demanded changes be made.

17         When Mr. Tofel found out about that on behalf of the

18  landlord and when this whole alternative arrangement was

19  discussed in December he told Your Honor about that and Your

20  Honor stated in that hearing that it was inappropriate for

21  debtor's broker to be contacting landlord's broker like that

22  and purporting to deal with the policy and so it was really the

23  other way around is my point.  So there was no interference to

24  answer your question directly.

25         As to the taxes, the debtor seems to want to pay them

94

1  directly.  The lease precludes that and the debtor, anyway,

2  would have to remit exactly the same aggregate amount of taxes

3  semi-annually that it currently is required to pay to the

4  landlord monthly in advance so that doesn't seem to be a point

5  one way or the other that's going to alleviate the costs that

6  the debtor has built into its projections.

7        THE COURT:  So the landlord represents that it's

8  paying and billing only for the taxes and there's no cushion in

9  there?

10       MR. TOFEL:  That's correct.

11       MS. LIU:  That's correct, Your Honor.

12       MR. TOFEL:  But the lease has a provision -- and I

13  can point Your Honor to it -- that from and after a certain

14  date the landlord has the right to collect in advance so that

15  it is assured when it comes time to pay the taxes semi-annually

16  that it actually has the money.  Obviously, if the debtor were

17  simply to remit it directly and the debtor did not remit it

18  that puts the landlord between a rock and a hard place,

19  reaching into its own coffers to remit taxes that it hadn't

20  collected plus the security provisions of the lease.

21       THE COURT:  Okay.

22       MS. LIU:  So the fact is, Your Honor, there are no

23  hard facts provided here as to how the debtor is going to

24  effectuate the dramatic expense reductions that they have

25  proposed and how they're going to be able to operate the

95

1   building.  They've revealed in the deposition that certain

2   amounts that are usually included in a utility line, for

3   example -- I'm going to get into a couple more of these

4   examples later but -- utility costs, they've removed from that

5   line item steam and electric expenses.  Well, you know, that's

6   pretty typical utility costs and I want to come back to the

7   line items because after the deposition we have some additional

8   observations there.

9        The fact is that the projected expenditures are less

10  than the figures that were all along in the debtor's cash

11  collateral budgets and operating reports and they couldn't make

12  a living all through the bankruptcy proceeding, they're running

13  negative, but suddenly, Your Honor, they found $400,000.00 of

14  excess cash flow.  It's a little incredible.

15       THE COURT:  Well, let me explore that.

16       When you say that they're running negative, there's

17  no DIP financing.  Right?  In this case.

18       MS. LIU:  Correct.

19       THE COURT:  And they're paying adequate protection to

20  the lender and they're paying the rent.  So when you say

21  they're operating negative, in what sense do you mean?

22       MS. LIU:  Well, you know, they didn't have any excess

23  cash flow and they conceded on the record several times, each

24  month they have negative cash.  They have negative cash.  So

25  what I'm saying is that their projections are not credible,

96

1  that they would turn that around and show that this year that

2  we're in they're suddenly going to pull off a net profit and

3  the only reason they get there is because of what they've done

4  with the projections which I'll explain in just a few moments.

5       THE COURT:  Well, as I understood it, the debtor did

6  not go into this case with a lot of cash on hand.  Right?

7       MS. LIU:  That's correct, Your Honor.

8       THE COURT:  So where is the money coming from to fill

9  what Ms. Liu says is the monthly deficit?

10      MS. LIU:  It's coming from the $113,000.00 that

11 they're going to win --

12      THE COURT:  No, no, no, I'm talking about right now

13 in the case.

14      MS. TRAKINSKI:  There is no deficit, Judge.  There's

15 no excess cash, that's true, but there's no deficit.  Remember,

16 the management fee was reduced so you've got a little bit of

17 wiggle room there but there's no deficit.  The rent is being

18 paid, the lender is being paid, the legal fees that the lender

19 is entitled to under the mortgage is being paid.  I mean

20 there's no deficit.  I don't know where Ms. Liu gets her

21 information.

22      The debtor, Mr. Bildirici, was examined for six hours

23 in depositions on these issues.  We don't have a transcript.

24 Ms. Liu wasn't present.  She's relying, I assume, on her

25 colleague's characterization of the testimony.

97

1          MS. LIU:  We have a transcript, Your Honor

2          MS. TRAKINSKI:  We haven't heard a single fact about

3    any bill that's not been paid, any other creditor that's

4    complaining, any salary that hasn't been met and any other

5    expense of operation, whether it's the office or the building

6    that hasn't been covered.

7          THE COURT:  All right.

8          MS. LIU:  Well, I'm going to address that in a few

9    moments and there is a transcript, Your Honor.

10         THE COURT:  Okay.

11         MS. LIU:  First, I want to address one of the

12   arguments they made in their reply about the sublease proceeds.

13         You know, we've had this issue, Your Honor, of

14   whether it was or it wasn't an outright assignment and, you

15   know, they've taken the position here that the landlord wasn't

16   perfected -- you know, if it's nothing more than a conditional

17   assignment, that landlord hadn't taken possession of the rents

18   before the bankruptcy and isn't entitled to it and that's

19   essentially the argument they made.

20         But, you know, there is case law and I can cite you

21   two cases that supports the argument that the debtor may be

22   estopped from arguing that the landlord hasn't perfected its

23   interests in the sublease rents and the reason is because

24   there's a difference between a total failure of a creditor to

25   act to perfect its interests as compared with the creditors'

98

1    inability to perfect because the debtor took affirmative action

2    to thwart it such as --

3            THE COURT:  But that just distinguishes between being

4    a secured and an unsecured creditor.  Right?  I mean their

5    fundamental point is that this isn't really a default because

6    the landlord is only owed the lease and its paid the lease.

7            MS. LIU:  No --

8            THE COURT:  Except for the cure costs.

9            MS. LIU:  Well, our position is this -- and, again,

10   even for today's purposes if you took out $990,000.00 there's

11   still a million dollars that we're talking about.

12           THE COURT:  All right.

13           MS. LIU:  Which we don't think that they can address.

14           THE COURT:  Okay.

15           MS. LIU:  But I think the point that I'm making is

16   that when there's a default and Your Honor said Vienna Park

17   [Ph.] means that it's a conditional assignment, all we're

18   saying is that the default did occur, Judge Diamond ruled that

19   it occurred.  There was a default under the lease and repairs

20   had to be made but she ruled there was a default and, of

21   course, it's our position that the cure period lapsed and that

22   it's all kind of tied into all of the arguments here but the

23   point is simply that if you go from the period of the default

24   forward, that's how much in lease proceeds -- you know what it

25   is, it's not the sublease proceeds, the $990,000.00 is

99

1  comprised of the payments made to the lender as adequate

2  protection and the management fee.  That's what it's comprised

3  of over that period of time.

4         THE COURT:  But why is -- I mean I don't want to

5  spend a lot of time on this because, frankly, I see no merit in

6  this argument whatsoever.

7         MS. LIU:  I'll move on then.

8         THE COURT:  How could it be any cure of something

9  owed to the landlord?  It's collateral security for what?

10  What's the collateral security for?

11         MS. LIU:  During the time of default -- well, because

12  the lease assigns it during the period of the default to the

13  landlord.  It undoes it when the debtor pays the cure but

14  during the period --

15         THE COURT:  All right.  But what is the cure?

16         MS. LIU:  But during the period you're allowed to

17  collect -- during the period of default why should the landlord

18  pay the bank?  That's the point.

19         THE COURT:  The landlord is not paying the bank.

20         MS. LIU:  Pardon?

21         THE COURT:  The landlord is not paying the bank.

22         MR. TOFEL:  That begs the question, of course, as to

23  whether there was a default, the lease was terminated --

24         THE COURT:  Oh, yes, I understand that but --

25         MR. TOFEL:  -- or Article 24 of the lease which says

100

1  from and after the event of a default the sublease proceeds go

2  to the landlord.

3          THE COURT:  Right.

4          But that all goes to the -- all right, fine.

5          MS. LIU:  So all I'm saying is that there's case law

6  about how even if you didn't perfect, the reason is important -

7  - if the debtor took action to block you, they're estopped from

8  arguing the point.

9          THE COURT:  But those cases all deal with security

10  interests, right?  In enforcing security interests.

11          MS. LIU:  But they argued that this was akin to a

12  security interest and they cited <u>Vienna Park</u> to you so they

13  can't have it both ways.

14          THE COURT:  But maybe I'm missing something but a

15  security interest secures something.  It secures a debt.

16  Right?  Where's the debt?

17          MS. LIU:  It secures the landlord against the

18  debtor's default.

19          THE COURT:  No, but what debt?  What monetary

20  obligation?

21          MR. TOFEL:  No, no, but a debt or an obligation.  It

22  secures an obligation.

23          THE COURT:  Yes.

24          MR. TOFEL:  First of all, if I were to accept Your

25  Honor's premise that it's a security interest -- it's not

101

1   something that I accept --

2            THE COURT:  All right.

3            MR. TOFEL:  -- but let's go down that road for a

4   moment.

5            THE COURT:  Okay.

6            MR. TOFEL:  A security interest secures an

7   obligation.  An obligation isn't exclusively an economic

8   obligation.  It's an obligation of performance.  The

9   performance here gives rise to the notice of default, the

10  notice of termination.  The March 10th date is when the notice

11  of default -- the period of default -- had then continued for a

12  period of thirty days.  That's from the July 2, 2004 giving of

13  the notice, then it stops when Judge Diamond issues her

14  <u>Yellowstone</u> [Ph.], it then recommences when she lifts and

15  vacates her <u>Yellowstone</u> and then runs for a period of days in

16  accordance with state law with the order being served and the

17  period then elapsing.

18           The obligation is the debtor's or tenants'

19  obligations to perform under the lease and the lease provides

20  at Article 24 that in the event the tenant fails to perform its

21  obligations "the following occurs."

22           THE COURT:  Okay.

23           MR. TOFEL:  I hope that answers your question.

24           THE COURT:  It does.

25           No, it does, that's fine.

102

1          MS. LIU:  Your Honor, I don't want to --

2          THE COURT:  It's fine.

3          MS. LIU:  But as I said before, even without that

4  amount involved here, we still have about a million dollars to

5  deal with.

6          Now, let's get to the attorneys fees.  Yes, they have

7  to be reasonable and, you know, the debtor is arguing that the

8  landlord's claim for the attorneys fees should be denied

9  because it was for improper ends and that all of this was for

10  $15,000.00 but what they forget to tell you was that the

11  litigation here was triggered by the debtor's own failure to

12  comply with the terms of a May 2003 settlement agreement.  That

13  is what put the parties at issue with each other since that

14  period of time and since that period of time there's been

15  litigation because the debtor breached a May 2003 settlement

16  agreement.  That is what happened and that's what the state

17  courts have found occurred.

18          THE COURT:  Well, what provision of the parties'

19  agreements provides for attorneys fees?

20          MS. LIU:  I will tell you.

21          Actually, the Supreme Court when it issued its

22  decision said the following, "The debtor is liable to the

23  landlord for reasonable attorneys fees which the landlord has

24  incurred since the issuance of the Messer report in seeking to

25  enforce those provisions of the lease which obligate the debtor

1  to repair the premises" and that's aside from, of course, the

2  lease provisions which have attorney fee provisions in them but

3  the Supreme Court, itself, put that in its order.

4          THE COURT:  To enforce the repair provision.

5          MS. LIU:  Because the landlord is recognized as

6  enforcing its rights.

7          THE COURT:  What are the provisions in the lease?

8          MS. TRAKINSKI:  Paragraph 12, Your Honor.

9          THE COURT:  Let's let Ms. Liu answer.

10         What are the provisions in the lease that deal with

11 attorneys fees?

12         MS. LIU:  My colleague --

13         THE COURT:  Because I'm assuming that you're not just

14 relying on Justice Diamond's language.

15         MS. LIU:  No, that's correct and my colleague will

16 find the provision.

17         THE COURT:  Okay.

18         MS. LIU:  Now, reasonable --

19         THE COURT:  No, no, no, he's found it.

20         MS. LIU:  Sorry.

21         MR. TOFEL:  It's 46.

22         THE COURT:  Now, what does that provision say?

23         MR. TOFEL:  No. 26 is -- I wouldn't even begin to

24 summarize or characterize it.  It's a comprehensive

25 indemnification.  I'm not trying to be glib, Your Honor, I want

1    to answer your question but I'm not so sure I understand your

2    question.

3              THE COURT:  Well, isn't there a specific provision of

4    the lease dealing with attorneys fees?  I mean normally there

5    is in a commercial New York lease.

6              MR. TOFEL:  Article 26 is a comprehensive

7    indemnification of the tenant for the landlord for all damages

8    that the landlord would sustain including but not limited to.

9    If you're asking where in the paragraph --

10             THE COURT:  All right.

11             So that's an indemnification provision.

12             MR. TOFEL:  Yes.

13             THE COURT:  All damages?

14             MR. TOFEL:  Correct.

15             There are other provisions.  Ms. Trakinski is

16   correct.

17             THE COURT:  Is there another --

18             MR. TOFEL:  There are similar attorneys fees and

19   default provisions, I believe, in Article 12, in Article 14, in

20   Article 15, in Article 16.  I don't know if Your Honor has a

21   copy of the lease or actually what we're looking at and we've

22   all been talking about the second amendment of the lease which

23   has its operative provisions and if Your Honor does not have

24   that we can hand it up.

25             It has a relatively elaborate table of contents which

105

1   is somewhat simpler to review than the lease itself.

2              MS. TRAKINSKI:  Not really.

3              MR. TOFEL:  Just the table of contents, Esther.

4              But there are a number of provisions that I think it

5   would point Your Honor to.

6              THE COURT:  Well, it's important.

7              MR. TOFEL:  I'm sorry?

8              THE COURT:  The cases make a distinction as to what

9   the provisions say so I think that's important.

10             For example, No. 15 says, "all expenses incurred by

11  the landlord in recovering possession of the premises."

12             MR. TOFEL:  U-hum.

13             THE COURT:  So if that's what you're relying on I

14  have to look at the fees in light of that provision.

15             I don't know what's been done to recover possession

16  as opposed to enforce Justice Diamond's language which is to

17  enforce the repair obligation.

18             So it is important for me to know which --

19             MS. LIU:  Well, again, Judge Diamond's language goes

20  to its fees incurred since the issuance of the Messer report.

21  That was in March 2002.

22             THE COURT:  Right.

23             MS. LIU:  Seeking to enforce those provisions of the

24  lease which obligate the debtor to repair the premises.

25             THE COURT:  Right.

106

1           MS. LIU:  So that goes to the breached 2003

2    settlement agreement that I mentioned and all of the --

3           THE COURT:  All right.

4           But I am assuming that the $900,000.00 of fees is not

5    all pre-dating -- well, it can't because Weil, Gotshal has

6    $250,000.00.  It's not pre-dating Justice Diamond's opinion so

7    I'm just trying to figure out --

8           MS. LIU:  Can you say that again?

9           I wasn't clear what Your Honor --

10          THE COURT:  The language that you just read?

11          MS. LIU:  Yes.

12          THE COURT:  If that were the exclusive basis for the

13   landlord to rely on the debtor's paying the fees, I'm not sure

14   it would apply to anything Weil, Gotshal did because it's all

15   in connection with what she was facing at the time.  So there's

16   a provision in the lease that deals with separate --

17          MS. LIU:  Yes, but we're not relying solely on that,

18   Your Honor.  As Mr. Tofel just said, there are provisions in

19   the lease that allow attorneys fees.

20          You know, if you want us to delineate all of the ones

21   that pertain then we're going to have to do that.

22          MR. TOFEL:  Well, I sense from Your Honor -- there

23   are.  You're correct.  There are a number of provisions under

24   this lease that would give rise to various indemnification and

25   the scope of indemnity.

107

1          We have not made an effort -- we didn't think we

2   needed to or it was appropriate to do in the context of this

3   motion -- but we certainly can if Your Honor would like and if

4   Your Honor thinks it would be helpful, we can try to apportion

5   if you will or characterize under the various provisions how

6   those fees we believe would be recoverable under those various

7   provisions.

8          THE COURT:  Okay.

9          MS. LIU:  In any event, Your Honor, again for today's

10  purposes there's a million dollars of attorneys fees, I don't

11  know, even if it was half, you know, we're talking about the

12  fact that reasonable fees don't equate with what the debtors

13  argued which is, "You take $113,000.00 of my setoff claim and

14  you set that off against the attorneys fees and you cap it at

15  $113,000.00," that equally as absurd an argument.

16         THE COURT:  Well, but they make a different point

17  which is in reviewing the fees I should look at the purpose of

18  the incurrence of the fees.

19         MS. LIU:  That's right and with the lease provisions

20  coupled with what the Supreme Court has stated, the point is

21  that all of this litigation that got kicked off was because the

22  debtor made promises in a May 2003 settlement agreement and

23  breached them and the landlord had the right to enforce his

24  rights and what happened after that, well, all of the state

25  court litigation that preceded this bankruptcy case.

108

1          THE COURT:  Well, but do you really spend $100.00 to

2   save $1.00?

3          MS. LIU:  Well, that's their characterization of it,

4   Your Honor, but there was a whole settlement agreement with

5   obligations stated and agreed to.

6          THE COURT:  But wasn't this the only breach?

7          MR. TOFEL:  No.

8          THE COURT:  Well, what other breaches --

9          MS. LIU:  I think Mr. Tofel is more familiar with the

10  May 2003 settlement agreement in terms of the detail.

11         It had to do with underlying it was the Messer report

12  but there were other obligations.

13         MR. TOFEL:  Well, let's step back --

14         THE COURT:  I'm going to ask a different question.

15         How much of the roughly million dollars of fees is

16  related to enforcing some other default being rectified than

17  this repair default?

18         MR. TOFEL:  Let me try to answer your question this

19  way.

20         At the time that we were negotiating with the bank --

21  this is now late April -- early May 2005 -- and, again, I

22  understand you've heard a lot about this but let me just set

23  the table for you.  At that point we and the bank believed, as

24  we believe today, the lease has terminated so we are now

25  negotiating for the bank to pick up the lease as Your Honor has

109

1   heard so much about.

2          The bank asked for us to identify what the economic

3   cures were?  At that point simply looking at legal fees --

4   there were certain items of unpaid rent and additional rent at

5   that point -- but only looking at legal fees, we're probably in

6   the $200,000.00 range and that is that takes you from

7   compliance with the Messer report up through if you will the

8   time frame we're talking about, end of April, beginning of May

9   2005.  That's to deal with if you will the litigation between

10  July 2004 and the immediate fallout before we get to the

11  Appellate Division of enforcing Judge Diamond's decision --

12  what I mean by "enforcing," I'm talking about the notices,

13  etc., etc., and negotiating then with the bank.  The fees that

14  have been incurred after that are defending the appeal and

15  dealing with this bankruptcy proceeding, all of which flow out

16  of that.

17          I hope that answers your question.

18          THE COURT:  It does.

19          MS. LIU:  Your Honor, I think you asked before of the

20  debtor like, "Why didn't you just make the repairs?"  They

21  said, "Oh, well, we wanted to and we tried but the landlord

22  wouldn't let us."  Well, we cited in our objection at Footnote

23  6, you know, a colloquy that occurred in the state court on May

24  12th and Judge Diamond was overseeing that hearing and counsel

25  for the debtor at the time said, "You know, if we understand

110

1   what the repairs were we would go out and make them."  The

2   Court said, "I told you a mechanism for understanding" and then

3   the debtor's counsel cut that statement off and said, "The

4   issue, really, has never been the willingness to make the

5   repairs.  I see it totally hard to pin down exactly what he

6   wants done."  The Court said, "Excuse me, sir, you had an

7   engineer's report and a stipulation.  It's not so difficult to

8   figure out what the engineer's report was.  If you had any

9   interest in making it, you could have resolved this a long time

10  ago."  My point, Judge, is that it takes two to make a

11  litigation and if they were litigating it and the Messer report

12  and other things were at issue in the 2003 settlement agreement

13  and, as Mr. Tofel said, the $200,000.00 takes you up to May and

14  then the debtor is constantly appealing, you know, all of these

15  things which they have the right to do but, you know, that's

16  where the fees come from.

17         THE COURT:  So your point -- let me make sure I

18  understand it -- is that this isn't just a repair issue because

19  in fact the repairs weren't made and, therefore, the landlord

20  went to the next step which the landlord is entitled to do

21  under the lease which is to send the default and then to try to

22  enforce termination and those are all rights the landlord has

23  under the lease and the landlord shouldn't be penalized or have

24  its fees reduced because it was taking those steps.

25         MS. LIU:  That's correct, Your Honor.

111

1           Now, I don't know if I heard Ms. Trakinski argue this

2    here but in their reply, you know, they raise 502(d) and Your

3    Honor's decision in Red Dot Scenic and they used that for the

4    basis of saying, "Oh, well, the landlord shouldn't have any

5    cure amount claim right now because, well, there's that

6    $113,000.00 that's pending, you know, in the adversary

7    proceeding" and they're asking you to make a judicial

8    determination today that the landlord is liable for the

9    $113,000.00 set off claim and they invite you to do that based

10   on the bare allegations in the motion to assume, the

11   allegations in the adversary proceeding which, by the way, is

12   not before the Court today and then they say on the basis that

13   landlord failed to respond to the factual allegations which are

14   the subject of that adversary proceeding.

15          Well, you know, Your Honor stayed the adversary

16   proceeding, the landlord isn't required to answer the

17   allegations in that proceeding and have them somehow imported

18   into this proceeding.  No discovery has occurred in that

19   proceeding, the debtor hasn't established that it's entitled to

20   those amounts, this is a motion to assume the lease and the

21   debtor has to show that it has financial wherewithal to cure

22   but its source of financing derives from the presumed win in

23   the adversary proceeding and that's why they're trying like

24   crazy to end run the adversary proceeding and pull all that in

25   to their motion.

1        THE COURT:  Was the $350,000.00 that was paid as a

2   condition to getting the Appellate Division stay, what was that

3   applied to?

4        MS. LIU:  There were, as I understand it at the time,

5   the lease has everything pooled, all obligations under the

6   lease are pooled and as I understand it -- tell me if I'm wrong

7   -- it was set off against the then existing obligations that

8   had occurred under the lease in the context of another hearing

9   --

10        THE COURT:  Attorneys fees?

11        MS. LIU:  -- to dig down on that.  We could document

12   that.

13        THE COURT:  But was that attorneys fees?

14        MS. LIU:  No, it was not attorneys fees.

15        MR. TOFEL:  It wasn't earmarked for anything, it

16   wasn't limited for anything, it was to pay $350,000.00 of what

17   we advised the Appellate Division were approximately

18   $550,000.00 or more of then liabilities.

19        THE COURT:  But what were those liabilities?

20        MR. TOFEL:  Those liabilities -- at the time, Your

21   Honor?  Those liabilities consisted in -- let me just give you

22   kind of tranches -- base rent, additional rent by which I mean

23   taxes, insurance -- I believe there were some insurance

24   proceeds, I think substantial insurance premiums had not been

25   paid, and other obligations due under the lease but those were

113

1    various tranches.

2            THE COURT:  So it wasn't attorneys fees?

3            MR. TOFEL:  I don't know what Your Honor means by

4    that.  I want to answer a direct question directly.

5            THE COURT:  Well, the lease provides -- what

6    obligation under the lease in Paragraphs 12, 14, 15 and 16 is

7    attorneys fees?

8            MR. TOFEL:  You're asking whether any of that money

9    was applied against fees?

10           THE COURT:  Yes.

11           MR. TOFEL:  Yes.

12           THE COURT:  Okay.

13           The bulk of it?

14           MR. TOFEL:  No.

15           THE COURT:  Okay.

16           MR. TOFEL:  That is all accounted for.  Just so we

17   understand each other, every bit of money has been accounted

18   for in the cure amount.

19           THE COURT:  No, my question was really going to this

20   point.  Is the roughly million dollars that's in the cure

21   claim, does that reflect already the payment of the money to

22   attorneys fees?

23           MR. TOFEL:  Yes.

24           It reflects the payment of --

25           THE COURT:  So it's not of payments that have

114

 1    previously been applied?

 2              MR. TOFEL:  Correct.

 3              The affidavit that I submitted to Your Honor in fact

 4    says just that.

 5              THE COURT:  Okay.

 6              MS. LIU:  I'm sorry, Your Honor, I wasn't aware of

 7    the facts so it's good that Mr. Tofel is here.

 8              THE COURT:  Okay.

 9              MS. LIU:  But the point is that by pulling in the

10    adversary proceeding allegations into their motion, you know,

11    they're trying to get that determined today and that

12    $113,000.00 is pending in the other action and it really has no

13    bearing here because even if you subtracted out, as I've said

14    before, the $113,000.00 there's still other amounts in

15    attorneys fees and other charges owed.

16              So, you know, we believe that they've done that

17    because they want to, frankly, draw attention away from the

18    fact that they can't satisfy the cure amounts.

19              THE COURT:  No, I understand that point.

20              MS. LIU:  Okay.

21              Then they complained that we didn't have the

22    transcript and that we probably got Mr. Bildirici's testimony

23    incorrect but we've checked it against the transcript and

24    everything is in order and we do have a transcript.

25              Now, I think the rest of the points that they raised

 1  are easy to dispose of and I will get to the projections.

 2         With respect to the projected rental increase, we've

 3  argued that they didn't do a targeted unit-by-unit analysis and

 4  Mr. Bildirici testified that what he did was just sort of

 5  figure that the combined average rental increase should be five

 6  percent.  Now I did hear them say that, so, they put three

 7  percent in the numbers but I guess our math showed --

 8         THE COURT:  No, it was three percent after 2006.

 9  Right?

10         MS. TRAKINSKI:  Yes.

11         MS. LIU:  Okay.  After 2006 but five percent --

12         MR. TOFEL:  Five percent for 2006.

13         MS. LIU:  Five percent for 2006.

14         THE COURT:  Right.

15         MS. LIU:  Okay.

16         But the fact is that they confirmed that the debtor

17  didn't do a unit-by-unit analysis so the fact that you ballpark

18  it, I mean it's not going to necessarily be accurate and that's

19  bumping up the rent, even this year alone $180,000.00 which we

20  think is inaccurate.

21         Now, let me get back to the antenna.

22         My colleague tells me that there is -- and so I want

23  to correct this -- that there is a reasonableness requirement

24  for denial of the antenna but the landlord's position is that

25  his denial of allowing the antenna on the roof is not

1   unreasonable because of the landlord's protecting of his air

2   rights on the building and that was the position he's been

3   taking so we thought it was inappropriate for them to put into

4   their $36,000.00 worth of annual rent on the antenna and, by

5   the way, the debtor hasn't cited to a section but the landlord

6   is saying that it's subject to that --

7           MS. TRAKINSKI:  I did cite Paragraph 32.

8           MS. LIU:  Okay.  Well, thank you, if you did.

9           We've also -- in the reply they've said some more

10  about the insurance and in the projection they knocked off

11  $60,000.00 of what today costs $110,000.00 worth of insurance.

12  Again, I mentioned before, they've had every opportunity to get

13  less expensive insurance and the landlord did not obstruct

14  their ability to get it.  I've explained to you it was their

15  broker that wrongfully contacted landlord's broker so to just

16  lop off $60,000.00 is not a realistic projection and the debtor

17  doesn't attempt to explain why the steam and electric were

18  excluded from the utility projections, they've lopped off

19  $100,000.00 of that line item and then they contend in their

20  reply, "Oh, well, the cash collateral application contained a

21  larger cushion than what was necessary."  Well, if that was the

22  case then why did the debtors spend all of the cushion in the

23  budget and still run negative and if that were the case why did

24  the debtor complain that the amounts in the budget and the cash

25  collateral orders were way to restrictive and, Your Honor, does

117

1   that mean that the debtor misrepresented all through the case

2   its cash needs to the Court in seeking its cash collateral

3   orders?

4           In the deposition the debtor produced exhibits and

5   the cash collateral budget from September was Exhibit 15 and i

6   you compare that to Exhibit 20 from the depositions which is

7   essentially it's exactly these projections that they've

8   attached to their reply, or rather, motion to assume, it's

9   apparent that what we make of the deposition testimony and of

10  these exhibits is the following:  It's apparent that the

11  components of certain line items in the budget like

12  "maintenance" or "other" have been modified in order to adjust

13  the bottom line so while the aggregate amount of the line item

14  in the projections may be the same as the September budget,

15  $87,000.00 of largely repair and maintenance items that had

16  been in the budget have been eliminated.

17          So when Your Honor said to me before, "Well, you

18  know, have they been paying your rent and have they been paying

19  the lender," they have but at the expense of not paying

20  $87,000.00 worth of what was originally in their September

21  budget and it's largely for repair and maintenance items that

22  go right to the heart of caring for the building and I want

23  give you some examples.

24          In the September budget there was an amount included

25  in maintenance for -- I'll give you three examples -- fire

118

1    safety maintenance system, $3,500.00; repair material for

2    tenant turnover, $10,000.00; and a big line item, other

3    building repairs, $13,900.00.  That is now not in the budget.

4    Now, the debtor hasn't made the repairs and they haven't

5    budgeted it for this year.  How are they going to make it?  Is

6    it, again, based on the $113,000.00 they're going to win from

7    the adversary proceeding?  So we have misgivings, Your Honor,

8    that these have been taken out of what was in their budget and

9    the cumulative amount is $87,000.00 that's no longer in their

10   projection that used to be in their budget.

11          In the other category there was a line item in the

12   September budget of cleaning material for the building,

13   $6,000.00; garbage bags and compactor bags and cleaning

14   material for the building, $10,500.00 and now in the

15   projections there's only a projection of so-called supplies for

16   $2,800.00 and a big line item in the September budget for

17   repair on building facade, $8,000.00.  It's not budgeted in the

18   projections going forward.  Where are they going to get the

19   money?

20          Now, additional items which are still included in the

21   projection --

22          THE COURT:  Well, isn't that what they paid during

23   the case then?  I'm sorry, isn't that what they pay at cure,

24   that last item?

25          MS. LIU:  But how are they going to pay the cure if

1    it's not budgeted for -- we're in 2006.  It's not in the

2    projections.  It's not accounted for is my point and they

3    haven't paid it yet.

4            MS. TRAKINSKI:  Yes, we have paid it.

5            MS. LIU:  And the additional items that were in the

6    projections but have been drastically reduced in the budget are

7    these:  painting the apartments -- 30 apartments a year at

8    $800.00 an apartment, $24,000.00.  They put it in at $7,226.00

9    --

10           THE COURT:  Is this all adding up to the $87,000.00?

11           MS. LIU:  These are examples of --

12           THE COURT:  Included in the $87,000.00.

13           Okay, I'm going to cut you short because --

14           MS. LIU:  No, no, these now I'm addressing --

15           THE COURT:  They're not?  It's extra?

16           MS. LIU:  -- the $87,000.00 was -- that's one thing

17   of completely taken out of the projections.  Now I'm addressing

18   additional items which, although they are included in the line

19   items in the budget, they are drastically reduced from the

20   September budget and these are the painting of the apartments,

21   $24,000,00 a year is now only put in there at $7,226.00; the

22   steam repairs was $14,000.00 in the budget in September, now

23   it's $4,199.00 and the last example, floor repair and

24   polishing, it was $9,000.00.  Now, floor repair alone is in

25   there at $3,000.00.

120

1          So the projections, we believe, are unreliable and

2    not reflective of the kind of things that they were supposed to

3    be expending to care for the building and the deleted items --

4    it's really telling -- go directly to the care and maintenance

5    of the building and so the projections on their face don't

6    provide adequate assurance of future performance of the lease

7    obligations and caring for the building.

8          The point is that the projections are highly

9    questionable.  They have never ever in their history achieved

10   those kind of numbers that they are projecting for 2006 and

11   beyond, never had practically $400,000.00 of net cash flow.

12   These are based on faulty analyses and the debtor's hope to win

13   the $113,000.00 in the adversary proceeding and their hope that

14   they'll somehow set that off against all of the attorneys fees

15   and limit it to $113,000.00 and that the debtor's proposal is

16   just too fantastic and it's got obvious flaws and it undercuts

17   any credibility.  There's just no way that the debtor could

18   say, "Bing, I'm turned around now and my business is suddenly

19   so lucrative, even though I operated this way in my whole

20   Chapter 11 case, suddenly starting this year, wow, I'm going to

21   turn it all around based on projections that we believe are --

22          THE COURT:  Okay.  I got you.

23          MR. BACKENROTH:  Your Honor, very quickly --

24          MS. LIU:  I'm not finished, Your Honor.

25          THE COURT:  All right.

121

1          MS. LIU:  And the Court obviously should deny the

2    motion because we think that you have not been given the basic

3    facts that you could determine would enable them to assume the

4    lease.  The financial wherewithal is just not there.

5          THE COURT:  Okay.

6          MS. LIU:  Now, one other point I wanted to make and

7    this goes back to the Mann Theater [Ph.] case.  I had my

8    colleague read that case while Your Honor was busy hearing us

9    and he has cited me to Page -- it looks like 801 of the

10   decision --

11         MS. TRAKINSKI:  I'm sorry, what page are you

12   referring to?

13         MS. LIU:  801.

14         MS. TRAKINSKI:  What case?

15         MR. TOFEL:  Mann.

16         MS. LIU:  Apparently, Mann Theater, the holding is

17   expressly limited to situations of erroneous or inadvertent

18   failure by the lower court --

19         THE COURT:  It doesn't say by the lower court.

20   That's the problem.  That's what they don't do.

21         MS. LIU:  Pardon?

22         THE COURT:  It doesn't say that it was specifically

23   the lower court that failed.  It just said "erroneous failure."

24         MS. LIU:  Okay.  I'm sorry.  I'm just reading what he

25   wrote to me.

122

1          THE COURT:  All right.

2          MS. LIU:  To continue the tenant's cure period and if

3     you would look a the language on 173.

4          THE COURT:  Okay.

5          MS. LIU:  But it does look like they say, "We now

6     hold that an erroneous or inadvertent failure to continue a

7     properly granted ex parte toll (sic) will not extinguish a

8     tenant's opportunity to cure."  Well, that seems like it's very

9     limited in its facts and --

10         THE COURT:  The landlord in that case argued that the

11    failure was not the Court's but the debtor's.  Just as the

12    landlord here is arguing that the failure was Mr. Bildirici's

13    failure to get a stay.

14         MR. TOFEL:  But the failure in Mann was the Court's.

15         THE COURT:  I disagree with you.

16         MS. LIU:  Well, I just thought I would point that

17    out.

18         THE COURT:  All right.

19         But maybe these other cases that I'm going to read

20    will make it clearer.

21         MR. BACKENROTH:  Very quickly, because I know the

22    clock is ticking.

23         THE COURT: Very briefly.  Yes, yes.

24         MR. BACKENROTH:  Two minutes, Your Honor.

25         No. 1, in terms of there's a separate standard in

123

1    terms of reimbursement of legal fees which is a federal

2    standard, it's not only what is under state law because the

3    Code specifically provides concerning claims which is secured

4    and unsecured attorneys fees interests.  So this is not just

5    simply an issue of what it said in the state court, it's a

6    question of what's reimbursable under federal law.

7            No. 2, the question is if Your Honor determines that

8    the lease had properly been terminated, of course, this whole

9    thing is moot but if the lease had not been properly terminated

10   and if the landlord's objective was for a $15,000.00 default to

11   take a leasehold interest that's worth -- he believed that was

12   purchased for $18 million -- then we believe that that's an

13   improper purpose and it's an unjustified cost.

14           So I'm just addressing the one point that Your Honor

15   had raised as to that and, finally, as to the $113,000.00.

16   That is probably the most outrageous item of all of the things.

17   Do you know that what is attached to the moving papers is the

18   landlord's rung (sic) and statement of what is in the account,

19   $112,000.00, mere pennies, and that's as of the end of last

20   year.  To come in here and say, "Well, that's in dispute.  I

21   don't know.  Do you know that you can see from our schedules

22   that they reduced it from $9,000.00 to $6,000.00, on monthly

23   payments because it obviously went down" and now walk in here

24   and say, "Well, we just disagree" which is by the way the

25   letters they sent back.  Let him produce the statement now that

124

1  it's as of the end of December 2005.  You're going to see

2  $155,000.00 sitting over there.  One cannot just walk into

3  court and say, "Judge, it's in dispute" when he generates a

4  bill or statement that says this is the amount of money that is

5  excess in the account.  It's incredible.

6       MS. TRAKINSKI:  Your Honor, the debtor has made

7  allegations that it has overpaid certain amounts.  That is the

8  subject of an adversary proceeding in front of Your Honor and

9  Your Honor will determine it and my point earlier was that it

10 is not appropriate to bring that in here and have that out as

11 if Your Honor determined it and it's only $113,000.00 of what

12 otherwise is at issue here and they're assuming that they have

13 a win there and the landlord believes it has valid defenses to

14 that lawsuit and they're just pretending that they've won and I

15 think that's inappropriate.

16       As to the landlord's motives, we've addressed that in

17 our papers and those are ugly allegations.  It's pretty obvious

18 that the parties haven't gotten along since 2003 and,

19 unfortunately, there's been a lot of litigation but as you well

20 pointed out before, does that mean a landlord shouldn't enforce

21 its rights when there's a default under a settlement agreement

22 and should sit back and not incur fees for fear that he'll be

23 then told by the tenant, "A ha, in pursuing me you should now

24 be capped equal to the amount that was in dispute when I caused

25 all the trouble anyway."  That just seems to be a very unfairly

125

1   prejudicial position to take when two parties are in dispute

2   and that the tenant, having caused it all from its breach which

3   has been confirmed by the Supreme Court in the Appellate

4   Division, that the tenant can now turn around and say to the

5   landlord, "Ha, ha, now you don't get your attorney fees either

6   because our dispute was small"?

7            THE COURT:  Okay.  All right.

8            MS. TRAKINSKI:  Why didn't they harder, also, to

9   resolve it?

10           MR. TOFEL:  Your Honor --

11           THE COURT:  I don't want to hear about this point

12  again.

13           MR. TOFEL:  No, no, I'm not.  I promise.

14           THE COURT:  All right.

15           MR. TOFEL:  My hand to God, I'll be good because I

16  know, Esther, you want to respond --

17           MS. TRAKINSKI:  I just want to make one point.

18           THE COURT:  Well, no, let --

19           MR. TOFEL:  Let me deal with one issue which we

20  haven't actually discuss but we've heard some reference to.

21           There was as Your Honor will recall, an observation

22  made in our opposition to the motion to assume that there's no

23  accounting for any period after 2016.  The debtor has now come

24  to court and said, "Well, we have an option, maybe we won't

25  renew the lease."  Two observations; (1) one doesn't pay $18

126

million to generate $8 million of free cash.  That's not much

of a return on an investment and, I think, as Mr. Bildirici

testified the other day, it's an eighty year lease, he treats

it as an eighty year lease so that the motion to assume doesn't

deal with a tremendous escalator.

THE other reason I rise is because that subsequent

period -- the periods after 2016 -- directly relate to the

antenna issue.  The antenna gives Sprint, who is the proposed

user or operator of this antenna, five year options ad

infinitum so once that antenna is on the building it's Sprint's

option to renew it forever.  If the debtor is going to

terminate or walk away at the end of 2016, they can't put an

antenna on the building, it would have a clouding and

encumbering effect later on.

THE COURT:  Okay.

Can you address the point that Ms. Liu made about the

items that were in the budget but no longer in the projections

or that were substantially reduced in the projections?

MS. TRAKINSKI:  Yes, Your Honor.

There were just one or two other points I just wanted

to raise.

THE COURT:  Okay.

MS. TRAKINSKI:  It's been redistributed to other

categories, Judge, because the projection numbers are

categorized with the presumption that the debtor will be able

1  to exercise the ordinary discretion that a business has to

2  allocate its funds.

3          I have been told by Mr. Bildirici that all of the

4  budget items and all of the ordinary maintenance items are

5  distributed among the categories.  For example, the $87,000.00

6  that Ms. Liu made very much of and I honestly haven't really

7  come to understand where those numbers come from, are

8  distributed among, for example, the maintenance categories and

9  the other categories and I'm referring to Exhibit C to our

10  motion to assume and the steam numbers, for example, that's

11  just rolled into another category.

12          THE COURT:  What category?

13          MS. TRAKINSKI:  It's all under utilities as I

14  understand it.  I mean I could be mistaken.

15          MR. BACKENROTH:  Your Honor, it was testified to in

16  great detail, Your Honor, in the deposition when these

17  questions were in fact asked and Mr. Bildirici explained that

18  these --

19          THE COURT:  Well, why don't you give me the

20  deposition transcript.

21          MS. TRAKINSKI:  Judge, it's a little bit peculiar,

22  you know, Weil, Gotshal knows how to get an expedited

23  transcript with all due respect to you all --

24          THE COURT:  Well, there's one now.  I'll just look at

25  it.

128

1          MS. TRAKINSKI:  Right.

2          We haven't seen it either, Judge, because it wasn't

3    expedited.

4          The other point that I wanted to address is --

5          MR. TOFEL:  We didn't order it either.

6          THE COURT:  I don't care.  I just want to see it.

7          MS. TRAKINSKI:  The other point I wanted to address

8    was the math on this fee calculation issue.  Mr. Tofel had

9    represented to the Court that in the context of the

10   negotiations with the bank he had come to $200,000.00 of fees

11   that represented the portion from the execution of the

12   settlement agreement through the Judge Diamond decision.

13         A couple of things to point out.  First of all, at

14   issue in the action before Judge Diamond were the fees that the

15   landlord incurred in connection with enforcing the settlement

16   agreement which under the agreement he's entitled to recover to

17   the extent that they're reasonable.  The number was

18   approximately $40,000.00 that was in front of the Court.  So

19   there was a $40,000.00 fee dispute there that apparently

20   another $160,000.00 was spent to defend.  So I just want Your

21   Honor to understand that even if you take that $200,000.00

22   number at face value which, obviously, we don't think the Court

23   should do, we've never even seen an accounting of that number,

24   and that number, unlike the current number before the Court,

25   clearly is a round figure.

1          The $800,000.00 from the time the decision was issued

2     to the day we're standing here, or I should probably say, the

3     end of last month, is still wildly out of proportion to the

4     $15,000.00 dispute and I just want to note that we've never

5     heard anything from the landlord, either in its papers and in

6     their multiple presentations, to explain why they didn't just

7     go and do the $50,000.00 repair and bill us for it and it would

8     have obviated all the litigation.

9          So unless Your Honor has any other questions, that's

10    all I have.

11          THE COURT:  Okay.

12          MS. LIU:  Your Honor, you'll see in the deposition

13    transcript -- but when you review it you need to look at

14    Exhibit 20 compared to Exhibit 15.  Exhibit 20 is exactly their

15    Exhibit C in their motion but it's got a piece of paper

16    attached to it and that piece of paper is the key to figuring

17    out what's been left out and when you compare the budget in

18    September, Exhibit 15, with the assumptions of what's in those

19    line items in Exhibit 20, we made this compilation and we saw

20    that items had been moved out and entirely cleaned out of the

21    projections.  That's the $87,000.00.  Other items have been put

22    into a category of not paying them anymore and others were kept

23    in but reduced and that is what it's based on.  It's based on

24    not only Mr. Bildirici's testimony but this very important

25    schedule which was attached to their Exhibit 20.

1          It has it in black and white how the things have been

2     rejiggered, some of them have been moved into other items, all

3     right.  For example --

4               THE COURT:  All right.  That's fine.

5               MS. LIU:  Okay.

6               THE COURT:  I'll look at it.

7               MS. LIU:  You know, electricity is not in utility.

8               THE COURT:  I have 200 people in the other courtroom

9     waiting for me.

10              MS. LIU:  Okay.

11              I wanted to just call your attention to that.

12              THE COURT:  All right.

13              It's obvious that I'm not going to rule from the

14    bench on this matter and I'm saying that for two or three

15    reasons; the first is that I still haven't made up my mind on

16    the issue that we started with and I would like to see the

17    additional cases and if the landlord wants to comment on those

18    cases or provide any case that is more on point to our facts,

19    you should have an opportunity to do that.

20              Secondly, the issue here if I do find that the lease

21    is in fact extant and, therefore, assumable is, first, ability

22    to cure and, second, adequate assurance of future performance.

23    On that issue, I believe that the record is reasonably clear as

24    to the actual performance obligations of the debtor which are

25    relatively small in terms of dollar amount.  However, there is

131

1   an enormous difference with respect to the other element of

2   cure which is the attorneys fees and with respect to the

3   attorneys fees, simply, the amount sought is so high that I'm

4   going to need to see the time records for them, particularly in

5   light of the various bases for a right to be paid attorneys

6   fees under Justice Diamond's order as well as the lease itself

7   and my review of the case law which in the cure context is

8   pretty careful in parsing through what is and what is not

9   coverable in connection with landlord's attorneys fees under

10  365 in connection with cure.

11          In addition, if in fact the landlord is relying on an

12  indemnification provision, leaving aside the whole issue of

13  reasonableness, there may well be issues as to mitigation.  On

14  the other hand, I accept to a significant extent the landlord's

15  argument that the debtor here is putting all of the risk of the

16  cure on the landlord, that is the debtor is saying that I

17  should accept that the landlord is already holding its cure

18  payment, notwithstanding the fact that the landlord disputes

19  it.  Secondly, that only a small portion of the fees ultimately

20  will be found to be properly part of the landlord's cure claim

21  and that the cure can, therefore, be set in a low amount.

22          I think that the risk on the money that is at issue

23  in the adversary proceeding largely, if not entirely, should be

24  on the debtor, not because of the merits of the proceeding but

25  simply because what's being proposed here is a cure payment and

132

1  I think that if the tenant truly believes that it is ultimately

2  going to be found to be its money then it should take the risk

3  since it can make that assumption down the road as far as

4  credits against the lease if it's not returned or simply the

5  fact that it's going to get it back.

6          I'm also not totally in agreement with the point that

7  since only $15,000.00 ultimately was at dispute here, the

8  landlord's fee should be in the range of $15,000.00 to

9  $75,000.00 or $100,000.00.  Certainly, I don't agree with that

10  if the range is around $15,000.00 or $20,000.00 because the

11  landlord does have other rights under the lease including the

12  right to send a default notice and to terminate and it

13  shouldn't just have to sit back and let those rights lapse

14  while the amount is being discussed.  On the other hand, if it

15  appears in reviewing the time records and dealing with the cure

16  claim in more detail after reviewing them that the landlord

17  actually did have an opportunity to resolve this in a suitable

18  way before too much time lapsed, then but only then do I think

19  it really is appropriately capped.

20          That still leaves the issue of how much the fees

21  ultimately are under the documents and under the reasonableness

22  standard and $1 million is a lot.

23          As far as guidance to the parties is concerned,

24  particularly in light of what I just said and my view that the

25  projections are somewhat optimistic, although not necessarily

133

1    showing a deficiency position, that is they may simply be

2    optimistic in the sense that the equity is going to make less

3    money here than they thought they were, I think that ultimately

4    -- and this is just a preliminary impression -- if the debtor

5    is going to assume this lease it's going to have to come out of

6    pocket of at least a few hundred thousand dollars because of

7    the landlord's claims.  It may get some of that back down the

8    road and it may have other assets down the road but I think

9    that what I see in the application is an application that

10   basically asks me to accept in every respect that the debtor is

11   right on the antenna, on the amounts held by the landlord, on

12   the landlord's fees, etc. and I just don't accept that so,

13   ultimately, if the parties do want to resolve this I think it's

14   going to be a few hundred thousand dollars at least to do it.

15          Is there a date when we're back here again anyway?

16          MS. TRAKINSKI:  No.

17          MR. TOFEL:  None presently set, Judge.

18          THE COURT:  Well, I think we should come back here on

19   March 3rd and by that time I should have received the time

20   records and any submissions that the parties want to make and

21   I'll have a chance to review the transcript which someone ought

22   to give me and that will give you time to give Mr. Bildirici

23   time to sign it, which he should do, after reviewing it.

24          MR. BACKENROTH:  Could we also have depositions now

25   that we have a little time to --

134

1          THE COURT:  That's fair but I think that as far as

2     submissions are concerned, they should be made by February

3     21st.

4          MR. TOFEL:  Your Honor, I have a question and an

5     observation.

6          The question is --

7          MS. LIU:  So when does Ms. Trakinski have to get her

8     cases in so we can respond?

9          THE COURT:  Oh, that, I'm assuming is going to be --

10    well, can you get them in -- can you just file your cases or

11    your thing later today?

12         MS. TRAKINSKI:  Monday morning?  Is that all right?

13         THE COURT:  Monday morning.  That's fine.

14         MS. TRAKINSKI:  That's no problem.

15         Judge, if I may can we just push that March 3rd date

16    maybe another week or ten days because we all have personal

17    vacations and kids and things scheduled between now and

18    President's Week and the like.

19         THE COURT:  I assumed you all were working when I

20    wasn't.

21         MS. TRAKINSKI:  Well --

22         THE COURT:  Yes.  No, no, that's fine.

23         MS. TRAKINSKI:  And I'd like time to be able to

24    examine this million dollars worth of fees in detail.

25         THE COURT:  March 10th.

1          MR. TOFEL:  Well, let me deal with two questions.  I

2   have one question appropo of Your Honor's observations.

3          Your Honor made a comment about -- I won't

4   characterize it -- but the topic was opportunities that may or

5   may not have arisen to settle the dispute at different points.

6          THE COURT:  I'm really talking early on.

7          MR. TOFEL:  My question is to Your Honor, how would

8   Your Honor like to address that issue?  There is a sharp

9   factual difference of opinion as to what went on with respect

10  to those efforts.  From the landlord's perspective we made

11  every effort to resolve it and I'm not going to go into it now

12  as to the proposals were made and how they were dealt with, the

13  question is does Your Honor want briefs, does Your Honor want

14  to hold a hearing on that, take testimony?  We just need some

15  guidance on that since that is an issue that Your Honor has

16  shown some concern about.

17         THE COURT:  I know.

18         I don't know how much --

19         MS. TRAKINSKI:  How about the record on appeal,

20  Judge?

21         MR. BACKENROTH:  And a deposition that we would like

22  to submit after we take it from the landlord.

23         MS. TRAKINSKI:  I'm sending you the briefs.  I'll

24  submit the record on appeal.

25         MR. TOFEL:  The record on appeal doesn't deal with

136

1   this.

2          MS. TRAKINSKI:  It has all the correspondence between

3   counsel and --

4          THE COURT:  I'm going to ask you all to basically to

5   try to address that on your own.

6          If you need to get a hold of me in the beginning of

7   March, you can do it then.

8          MR. TOFEL:  The last issue.

9          As I understand it --

10          MS. TRAKINSKI:  Can we just put the submission date

11   on March 3rd since you've moved the hearing to March 10th?

12          THE COURT:  That's fine.

13          MS. TRAKINSKI:  Thank you.

14          MR. TOFEL:  What submissions?

15          THE COURT:  Except for your submission on Monday.

16          MS. TRAKINSKI:  Correct.  Yes.

17          Can I ask a question because, you know, maybe I'm

18   just -- when you say submissions do you want briefs or do you

19   want just these documents?

20          THE COURT:  No, I'm just giving you a chance -- the

21   time records?

22          MS. TRAKINSKI:  Yes.

23          THE COURT:  And your chance to comment on the

24   tenant's cases.

25          MS. TRAKINSKI:  The cases?

137

1          THE COURT:  Yes, I'm not really looking for a lot

2     more briefing on this.

3          MR. TOFEL:  Lastly, Your Honor --

4          THE COURT:  I mean I think, frankly, if you want to

5     comment on their attorneys fee point you can do that because

6     they raised that in their reply and that was a new point but

7     that's really it.

8          MR. TOFEL:  Without putting words in anybody's mouth,

9     I think the conversations that went on in the last several days

10    with respect to my deposition, that is the deposition that the

11    debtor wants to take of me -- and, again, Ms. Trakinski and Ms.

12    Liu had those conversations -- as I understood it and as I

13    still understand it we were dealing with, putting aside lease

14    termination issues, the assumption issues in really a kind of a

15    two-tiered part; one is on a summary basis and the other is if

16    Your Honor finds that there is a right to assume and Your Honor

17    is sufficiently comfortable or not, one way or another, then we

18    would then hold a more detailed hearing.

19         What I understood was it's really not until we get to

20    that second phase.

21         THE COURT:  Well, we're getting into that second

22    phase.  I mean that's what this is coming up to be.

23         If I read her cases Monday and decide that you guys

24    win on termination, I'll let you know right away.

25         MR. TOFEL:  Okay.

138

1          The only reason I'm suggesting is -- and I understand

2     that they've been chomping at the bit to take my deposition --

3     I think we also all agree that if we don't need to get there,

4     we don't need to get there.

5          THE COURT:  Right.

6          If I don't call you on Monday, then assume that we're

7     getting there.

8          Although, you know what, that's not entirely fair.

9          The debtor needs to accept the fact that there's

10    going to be at least a few hundred thousand dollars here of

11    payments and if the debtor can't come up with that then I don't

12    want anyone to be burdened with more of this litigation.

13         MS. TRAKINSKI:  Understood, Your Honor.

14         THE COURT:  Okay.

15         So maybe that's the first thing that needs to be

16    resolved.

17         MR. TOFEL:  How would Your Honor propose that that be

18    resolved since the debtor has testified that it has no outside

19    sources of financing and it hasn't sought them?

20         THE COURT:  Well, I don't know.  It needs to be

21    resolved and I leave it up to the debtor.

22         MS. TRAKINSKI:  It's got another chance to go look

23    for it.

24         MR. TOFEL:  Well, no, does that mean there will be a

25    date certain by which the debtor has to obtain sources of

139

1  financing?

2       THE COURT:  Not to obtain, just to accept the fact

3  that they're going to have the money.

4       MR. BACKENROTH:  Your Honor, we will inform the Court

5  of what sources we have available to deal with that issue and

6  Your Honor then can decide --

7       THE COURT:  Before Mr. Tofel is deposed I want to

8  know that.

9       MR. BACKENROTH:  We'll let Your Honor know that.

10      THE COURT:  Okay.

11      MR. TOFEL:  Thank you for your time today.

12      THE CLERK:  What time on the 10th?

13      THE COURT:  Ten o'clock.

14      MR. TOFEL:  Thank you, Your Honor.

15                     * * * * *

16

17

18

19

20

21

22

23

24

25

140

\* \* \* \* \*

I certify that the foregoing is a transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_____

TRACY A. GEGENHEIMER, CERT\*D-282

Dated:  February 14, 2006