UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                        :

In re:                                :        Chapter 11
                                          :

EAST 44TH REALTY, LLC,         :        Case No. 05-16167 (RDD)
                                          :

                      Debtor.     :
-------------------------------------------------------X

**TRUSTEE'S MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY
PROCEDURE 9019(a) SEEKING APPROVAL OF
GLOBAL STIPULATION AND MUTUAL RELEASES BETWEEN AND
AMONG DAVID R. KITTAY, CHAPTER 11 TRUSTEE FOR THE DEBTOR,
NEW YORK COMMUNITY BANK AND EAST FORTY-FOURTH STREET L.L.C.**

TO:     THE HONORABLE ROBERT D. DRAIN,
        UNITED STATES BANKRUPTCY JUDGE:

        David R. Kittay, Chapter 11 Trustee ("Trustee") of the estate of East 44th Realty, LLC

(the "Debtor" or the "Estate"),  respectfully requests that this Court approve, pursuant to Federal

Rule of Bankruptcy Procedure 9019, the terms of a global stipulation (the "Stipulation") settling

the claims and pending litigation between and among the Trustee, New York Community Bank

(the "Lender"), as successor by merger to Roslyn Savings Bank, and East Forty-Fourth Street

L.L.C. (the "Landlord") and respectfully states:

<u>PRELIMINARY STATEMENT</u>

        1.       The Stipulation between and among the Trustee, the Lender and the

Landlord puts an end to years of extensive and expensive litigation between the Debtor, the

Lender and the Landlord.  Cessation of the litigation, and the threat of continued litigation,

allows the Trustee to proceed with the sale of the Debtor's only asset, a claim to rights as a tenant

under a ground lease (the "Ground Lease")[1] to real property located at 228-238 East 44th Street,

New York, New York (the "Property"), puts an end to uncertainty regarding the Landlord's

assertion that the Lease was terminated pre-bankruptcy, and allows the Trustee to proceed with a

plan of liquidation which will pay creditors in full and may provide a recovery to equity.

2.      The settlement, which includes a monetary cure payment to the Landlord

of $1.7 million, embodies an approximately 14% reduction in legal fees accrued by the Landlord

to date, the elimination of potentially up to $500,000 in future litigation costs, and the Landlord's

agreement to give up his claim to space lease proceeds aggregating approximately $2 million.

All told, the Stipulation represents a reduction of up to 62% of the amount that might arguably

have been due and owing to the Landlord as a cure amount pursuant to Bankruptcy Code Section

365. In addition, this settlement negates a potential disastrous holding by the appellate court that

the Lease terminated in 2005. The settlement allows for the Trustee's sale of a "clean" asset and

increases the likelihood of bringing in potential bidders for the asset. The settlement also has the

support of the Debtor's largest creditor constituency, the Lender, and its most vociferous creditor,

the Landlord.

## BACKGROUND

3.      On August 5, 2005 (the "Filing Date"), the Debtor filed a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the Southern District of New York (the

"Court").

---

[1]      The Debtor also has the corresponding rights as sub-lessor to space leases (the "Space Leases", the Space Leases and the Ground Lease are collectively referred to hereinafter as the "Lease").

4.      The Debtor's sole principal asset is its claim to the Ground Lease, and

corresponding Space Leases.  The Lease has engendered a multitude of litigation.

**A.      Pre-Petition Litigation**

5.      In December 2002, the pre-petition Debtor[2] took an assignment of the

Lease from CS East 44th Street.  Apparently unbeknownst to the Debtor, the assignor, CS East

44th Street ("CS"), had failed to repair the Property as required under the terms of the Lease.

Accordingly, the Landlord refused to consent to the assignment and served a notice of default on

the Debtor and CS for breach of contractual obligation to make necessary repairs.

6.      In response, the Debtor brought an action (the "First Litigation") in New

York State Supreme Court (the "State Court") seeking, among other things, a declaration that

there had been no breach of the lease.  The Debtor also sought, and obtained, a so-called

*Yellowstone* injunction restraining the Landlord from terminating the Lease during the pendency

of the state court action.

7.      In May, 2003, the Landlord and the Debtor resolved the First Litigation

pursuant to a settlement agreement (the "State Court Settlement") in which the Landlord

consented to the assignment to the Debtor and the Debtor agreed to rectify all of the engineering

deficiencies previously noted in an engineering report and to have any additional work performed

that the Landlord's engineer believed necessary.  The State Court Settlement also provided the

Landlord the opportunity to confirm that all necessary work had been performed and required the

---

[2]      Solely for purposes of this motion, the pre-petition Debtor will be referred to as the
Debtor.

Debtor to promptly have any such additional work performed at its own expense.  Finally, the

State Court Settlement precluded the Debtor's ability to claim that repair work was not required

and afforded the Landlord the opportunity to enforce its rights under the Lease if the Debtor

failed to cure defaults that had been previously identified as needing repair.

8.      In November, 2003, a compliance inspection was done and the Landlord

was advised by the engineer that various previously identified deficiencies had not been

corrected.  Notwithstanding the fact that the Debtor had entered into the State Court Settlement

that precluded its ability to contest the necessity of the repairs, the Debtor refused to make certain

repairs and, in July 2004, the Landlord served the Debtor with a notice of default.  In response,

the Debtor commenced another state court action[3] (the "Second Litigation") seeking declaratory

and injunctive relief, as well as monetary damages.  Again, the State Court issued a *Yellowstone*

injunction which tolled the Debtor's time to cure its alleged defaults and restrained the Landlord

from taking any steps to enforce the notice of default during the pendency of the Second

Litigation.  The Landlord counter-claimed for declaratory relief and attorneys' fees.  Thereafter,

the Landlord moved for summary judgment dismissing the Second Litigation and declaring that

the Debtor was immediately obligated to make the repairs.  The Debtor then counter-claimed for

an order dismissing the declaratory relief portion of the Landlord's summary judgment motion.

9.      The State Court, by decision (the "Diamond Decision") dated February 24,

2005, issued by the Honorable Marylin Diamond, dissolved the *Yellowstone* injunction, declared

the Debtor obligated to make the repairs in question and referred to a Special Referee the

---

[3]      This action is captioned *East 44 Realty, LLC v. East Forty-Fourth Street, LLC*, Index No.
110952/04, Supreme Court of the State of New York, New York County.

4

question of the amount of legal fees to which the Landlord was entitled. The Landlord's costs related to the First and Second Litigation exceeded $27,000.

10.    The Debtor failed to respond to the Diamond Decision, and on March 10, 2005, the Landlord gave notice to the Debtor that, by virtue of prior defaults and the passage of time, the Lease would terminate effective April 1, 2005. The Debtor then moved by order to show cause for a rehearing and reconsideration of the Diamond Decision. The Landlord was compelled to prepare pleadings in opposition to the Order to Show Cause and was, ultimately, successful. Simultaneously, the Debtor prepared a Notice of Appeal of the Diamond Decision which did not include a stay request. In response, the Landlord asserted that the Lease had terminated as of April 1, 2005. The Landlord expended in excess of $150,000 in successfully opposing the motion and the appeal.

11.    If the Lease had in fact terminated, a fact the parties still dispute today, various consequences would have resulted. The Landlord asserts that as a result of the Lease termination, it was entitled to all of the proceeds from the space leases entered into between the Debtor and the Debtor's sub-tenants. The Lender and the Debtor dispute this interpretation of the Lease (the "Space Lease Dispute"). Moreover, if the Lease had in fact terminated, then the Lender was entitled to a "pick-up" lease with the Landlord effective as of the date of termination. This, too, resulted in litigation. Although the Landlord spent significant time meeting with counsel to the Lender trying to quantify both the monetary cure amounts that would have to be satisfied before the Lender could assume the Lease and the non-economic cure obligations, the

parties were unsuccessful and the Lender commenced a State Court litigation[4] against the

Landlord (the "Lender Litigation") seeking:  (1) a declaratory judgment and (2) to toll its time to

pick up the Lease.  The Landlord filed responsive pleadings.  Costs of litigating the Lender

Litigation through May of 2005 were approximately $73,000 for the Lender and $70,000 for the

Landlord.

12.    Meanwhile, the Debtor continued its litigation against the Landlord in the

Appellate Division of the State Court (the "Appellate Litigation[5]") and sought an injunction

against termination of the Lease and a stay pending appeal.  Although the Debtor was

unsuccessful in obtaining the injunction, it did obtain a stay that precluded, pending appeal, the

Landlord from enforcing the Landlord's rights to collect rental payments from the Debtor's sub-

tenants (this relief is referred to as the "Appellate Relief").  The Landlord expended an additional

$38,000 in legal fees.  The Appellate Litigation did not end with the Appellate Relief.  Instead,

because the Landlord believed that the Debtor had materially misrepresented facts to the

Appellate Division and the Debtor refused to stipulate to clarification for the record, the Landlord

expended in excess of $34,000 litigating this matter to the Court of Appeals (the "Court of

Appeals Litigation").  Ultimately, the Debtor stipulated to the relief the Landlord had originally

requested.

---

[4]    *New York Community Bank v. East Forty-Fourth Street, L.L.C.,* Index No. 05-106297,
Supreme Court of the State of New York, New York County.

[5]    By Decision and Order dated December 15, 2005 (the "December 15th Decision"), the
Appellate Division unanimously affirmed, with costs, the Diamond Decision holding the Debtor in
default under the Lease and granting partial summary judgment against the Debtor and in favor of the
Landlord.

**B.**     **Events Prior to the Appointment of a Chapter 11 Trustee**

13.     On August 5, 2005, the Debtor filed for Chapter 11 protection.  While the filing of bankruptcy stayed each of the First Litigation, the Second Litigation, the Appellate Litigation and the Court of Appeals Litigation, those battles waged on in the context of the bankruptcy case.

14.     On August 5, 2005, the Debtor filed its *Emergency Motion for Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection to 11 U.S.C. §§ 361 and 363, and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* (the "Cash Collateral Motion") seeking authorization to use the Lender's cash collateral (the "Cash Collateral") on the terms and conditions negotiated with the Lender.  After a hearing on August 10, 2005, the Court permitted the Debtor and the Lender to stipulate to certain matters including the limited use of cash collateral, subject to a reservation of the Landlord's rights concerning, among other things, the termination of the Lease and the pre-petition assignment of the space lease proceeds to the Landlord.  Thus, in substance the First Litigation, the Second Litigation, the Appellate Litigation, the Lender Litigation and the Space Lease Dispute continued in the context of cash collateral[6].

---

[6]     The initial cash collateral order has been continued, and modified, as follows:  on September 9, 2005, the Court so-ordered the *Interim Stipulation (A) Authorizing Use of Cash Collateral and (B) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363* (the "First Cash Collateral Stipulation"); on September 30, 2005, the Court so-ordered the *Second Interim Stipulation (A) Authorizing Use of Cash Collateral and (B) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363* (the "Second Cash Collateral Stipulation"); on May 26, 2006, July 10, 2006, September 29, 2006, and October 3, 2006, the Court so-ordered the Third, Fourth, Fifth and Sixth *Interim Stipulations (A) Authorizing Use of Cash Collateral and (B) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363*, respectively, pursuant to the same terms as the Second Cash Collateral Order and adjourning the final hearing on the cash collateral motion; on January 22, 2007, the Court so-ordered the *Seventh Interim Order Authorizing Use of Cash Collateral* (the "Seventh Cash Collateral Stipulation"). After the Seventh Cash Collateral Stipulation was so-ordered, the Trustee was appointed and the Trustee,

15.    As early as September 26, 2005 (the "First Cash Collateral Objection), the Landlord sought to protect its rights under the Lease by interposing objections to the Debtor's motions to utilize cash collateral. Specifically, the Landlord asserted in its First Cash Collateral Objection that irrespective of Lease termination, the space lease proceeds were assigned to the Landlord months before the bankruptcy and that the Debtor's failure to deliver information to the Landlord and Lender rendered the Landlord unable to assess the Debtor's need for the use of cash. The Landlord filed subsequent and similar objections on November 22, 2005 and December 20, 2005.

16.    Meanwhile, the Landlord continued its Space Lease Dispute by moving by order to show cause on January 3, 2006, for an order directing the release and return to the Landlord of all rents paid to the Debtor since April 1, 2005 (the "Bankruptcy Space Lease Dispute"). The Landlord argued that it was entitled to the rental proceeds of the 164 residential apartments located in the Property. As in the Lender Litigation, the Lender disagreed with the Landlord's position and interposed an objection to the Bankruptcy Space Lease Dispute arguing that if the Lease had in fact terminated, the Lender then had "pick-up" rights and that it was the Lender, not the Landlord, that was entitled to the space lease proceeds. The Debtor also objected

---

the Lender and the Landlord agreed that good cause existed to modify the Seventh Cash Collateral Stipulation to provide for the payment by the Trustee of certain expenses, including insurance and other expenses for the months of February 2007 and March 2007, and therefore entered into the *Stipulation Regarding Trustee's Use of Cash Collateral*, which was so ordered by the Court on March 5, 2007 (the "March 5th Stipulation"); and by Order dated March 27, 2007 (the "March 27th Stipulation") the Court modified the Seventh Cash Collateral Stipulation and the March 5th Stipulation to: (1) permit the Trustee to make certain payments from the Lender's Cash Collateral, (2) extend the terms of the Cash Collateral Stipulation and March 5th Stipulation through April 9, 2007 and (3) adjourn the March 29, 2007 hearing on cash collateral to April 10, 2007; by Order dated April 3, 2007 (the "April 3rd Stipulation") the Court modified the Seventh Cash Collateral Stipulation and the March 5th Stipulation and the March 27th Stipulation. The March 27th Stipulation has been periodically modified and now extends through August 9, 2007.

to the relief requested in the Bankruptcy Space Lease Dispute.

17.    After expending approximately $89,000 ($34,000 by Tofel & Partners and

$52,000 by Weil Gotshal & Manges, LLP ("WGM")) arguing over cash collateral and the space

lease proceeds, the Space Lease Dispute remains extant.

18.    Notwithstanding the Landlord's repeated assertion that the Lease had

terminated in the Spring of 2005, by motion dated January 31, 2006 (the "Assumption Motion"),

the Debtor sought to assume the Lease.  The Landlord objected, arguing that (a) the Lease was

not capable of being assumed as it had previously terminated, and (b) even if the Lease remained

in existence, the significant monetary and non-monetary defaults existing under the Lease, and

the Debtor's historical pattern of failing to timely satisfy its obligations, precluded the Debtor's

assumption.

19.    After a hearing before the Court on February 10, 2006, the Court requested

supplemental briefing on the keystone issue of whether the Lease existed.  The Debtor, the

Debtor's principal, Josef Bildirici (the "Debtor's Principal" or "Bildirici"), and the Landlord filed

extensive pleadings in support of their positions.  Ultimately, at the March 10, 2006, hearing on

the Assumption Motion, the Court ruled that the Lease had not terminated and was capable of

being assumed.  On April 17, 2006, the Landlord filed its Notice of Appeal and Motion for an

Order Certifying Issues for Interlocutory Appeal (the "Interlocutory Appeal").  The Debtor

opposed the Interlocutory Appeal.  Thus, the First Litigation, in substance, continued in this

Court.  While the District Court dismissed the appeal, ruling that the standards for an

interlocutory appeal had not been met, the merits of the Landlord's claim regarding lease

termination have not been addressed by an appellate court, and would be raised by the Landlord,

9

absent this Stipulation, in conjunction with any assumption or assignment of the Lease.

20.    The Landlord and Debtor continued to disagree on every aspect of the

Debtor's Chapter 11 case until, on January 22, 2007, the Landlord moved (the "Trustee Motion")

for the appointment of a Chapter 11 Trustee to sell the Property, distribute the proceeds of such

sale and run the Property while the sale was pending.  The Landlord asserted that the Debtor's

Principal repeatedly breached his fiduciary duties to the Debtor and its creditors and chronically

disregarded the directions and orders of the Court.  The Landlord also asserted that the Debtor

repeatedly sought to delay, frustrate and impede resolution of the sale of the Property because

any proposed sale would not pay equity in full on its investment in the Lease.

21.    Specifically, the Landlord alleged, among other things, that

notwithstanding the fact that the Debtor had entered into an agreement with the Landlord

pursuant to which the Debtor had a limited time period in which to market the sale of the Lease

(which the Landlord had agreed to modify) and was in fact obligated to accept any offer equal to

or in excess of $20 million, the Debtor had failed to report the receipt of such offers.  The

Landlord asserted that Marcus & Millichap, the real estate brokers the Debtor had retained

without Court authorization, advised the Landlord that the Debtor had received not less than

eight offers for the Property.  Subsequently, Marcus & Millichap advised the Trustee that the

Landlord's assertion was accurate and that although they brought various offers to Bildirici, he

took no action and did not respond to the offers, which were thereafter withdrawn.

22.    Moreover, as set forth in the Landlord's Trustee Motion, after identifying a

buyer and agreeing upon a sale price that would generate a 100% recovery to the Debtor's

creditors, Bildirici, who had expressed dissatisfaction with the proposed return to equity,

commenced a proceeding before the Jewish Bet Din Rabbinical Court and obtained an order

tantamount to an injunction prohibiting the potential purchaser (who was a religious individual)

from proceeding with the sale.

23.     The Lender supported the Landlord's Trustee Motion in the hopes that the

appointment of a trustee would put an end to the rancourous litigation, stop the accumulation of

additional costs and provide a means to have the Lender's claim satisfied and end the Lender's

relationship with an entity that was not acting as a fiduciary for its creditors.

24.     Although the Debtor initially opposed the Trustee Motion (resulting in

additional litigation expense to the Landlord of approximately $84,000), it ultimately consented

to the requested relief.  On February 14, 2007, the Court entered an order granting the relief

requested in the Trustee Motion and directing the appointment of a Chapter 11 trustee with all of

the powers and duties arising under Section 1104(a) of the Bankruptcy Code.


**C.      The Trustee Determines that, in His Business Judgment, Sale
          of the Property Is in the Best Interest of the Debtor, Its Estate and Creditors**

25.     Recognizing that the Landlord and the Debtor had diametrically opposite

views as to almost everything that had transpired before and since the filing of the Debtor's

bankruptcy case, the Trustee determined to meet with all interested parties to ascertain the best

course of action for the Debtor, its creditors and estate.  Accordingly, the Trustee arranged

meetings with Bildirici, the Landlord's attorney and the Lender's counsel.  Not surprisingly, the

parties' positions were fairly intractable:  the Landlord insisted that the Lease had terminated, the

Trustee had nothing to sell and in any event, no party would be interested in buying the Lease

11

because the Landlord was unwilling to change the back-end terms of the Lease, *and* the cure

costs would be astronomical because the Landlord was entitled to all of the Space Lease

proceeds; the Debtor's Principal insisted that the Lease still existed and that a sale could not go

forward unless equity would recover a substantial portion of its investment or, alternatively, that

equity should be allowed to assume the Lease and stay in place; and the Lender insisted that its

goal was to sell the Lease as expeditiously as possible but in a manner that would satisfy its claim

in full.

26.    Given the parties' divergent views, the Trustee began reviewing the

pleadings that had preceded his appointment to determine the validity of each parties' allegations

and best course of action.  After reviewing the pleadings, the Trustee remained convinced that his

initial business judgment was correct: the best course of action was to market and sell the Lease,

and on July 10, 2007, the Court approved the bidding procedures for the sale of the Lease.

27.    Accordingly, the Trustee contacted a number of real estate brokers and

potential purchasers to assess their interest in the Premises.  Ultimately, having solicited no solid

interest from these brokers and potential purchasers in either marketing or purchasing the Lease,

the Trustee met with Marcus & Millichap, who provided the Trustee with a letter of intent from

an interested party.  Based on Marcus & Millichap's willingness to be paid on a sliding scale

favorable to the Estate and its ability to locate a potential purchaser when the Trustee had not

been able to locate a potential broker, let alone a ready, willing and able purchaser for the

Property, the Trustee determined to retain Marcus & Millichap.

28.    Marcus & Millichap worked with the Trustee and the Lender and

identified a number of potential purchasers for the Lease and Property (collectively, the Lease

12

and Property are sometimes hereinafter referred to as the "Asset"). Relying on its efforts during

the initial stages of the Chapter 11 case when it advertised the Lease and directly contacted over

6,000 potential purchasers, Marcus & Millichap contacted approximately 45 entities it believed

might currently be interested in purchasing the Asset.

29.    In order to solicit the highest and best stalking horse offer, the Trustee

directed Marcus & Millichap to send each potential purchaser a copy of the proposed form of

contract as well as a cover letter that set forth the terms of the bidding procedure and advised the

parties that the Asset would ultimately be sold at auction. The proposed form of contract

contained a break-up fee to induce the parties to become the stalking horse bidder.

30.    In addition, the Trustee personally advised both the Landlord and the

Debtor's Principal that they were welcome to, and in fact the Trustee encouraged them to, bid on

the Asset. Although the Trustee believed that the Debtor's Principal's conduct[7] during the course

of the Chapter 11 case would most likely preclude the Debtor from being the party to whom the

Lease was assigned, the Trustee also believed (and still believes) that a consortium of bidders of

which the Debtor's principals are merely passive investors could successfully bid on the Asset.

In fact, as the Trustee explained in Court on July 10th, given that any offer in excess of the $16.2

---

[7]    Among the reasons the Landlord will assert as to why the Debtor is unable to provide it
with adequate assurance of future performance are because the Debtor: (a) commingled the tenants'
security deposits; (b) failed to disclose to its real estate broker, Marcus and Millichap, and tenants
entering into new space leases with the Debtor that the Debtor was in bankruptcy; (c) tortiously
interfered with the sale of the Lease which would have benefitted all parties and most specifically the
Landlord by seeking (and obtaining) relief from the Bet Din; (d) created, and left unremedied, dangerous
conditions in the Property and tried to pass the responsibility on to the Debtor's sub-tenants; (e) failed to
obtain insurance on the building for the benefit of the sub-tenants and the Debtor's creditors; (f)
misrepresented its funding of escrow accounts; (g) failed to follow the Court's instruction regarding
disclosure to the Landlord; (h) failed to remedy violations identified by the New York City Department
of Housing; and (i) failed to pay water and sewer charges.

million presently before the Court would just result in a greater distribution to equity, equity has, in some ways, an advantage when it bids.

31.      Four entities timely submitted bids to be the stalking horse bidder for the Asset and one late bid was submitted as well.  The Trustee carefully reviewed each timely offer (including the proposed changes to the form of contract) and, ultimately, the Trustee determined that the offer of Global Capital Holding L.L.C. of $16.2 million was the highest and best stalking horse offer (the "Offer").

**D.     Events Surrounding the Sale Motion**

32.      Having determined that the offer of Global Capital L.L.C. ("Global"or the "Purchaser") was the highest and best stalking horse offer, the Trustee directed his attorneys to prepare pleadings seeking approval of bidding procedures and the auction process.   The Trustee filed his *Motion of the Chapter 11 Trustee For:  (I) an Order (A) Approving an Agreement for the Trustee to Assume and Assign, Sell and Convey Leases, (B) Approving Bidding Procedure (Including Break-Up Fee), and (C) Approving Notice and (II) an Order Approving the Trustee's Sale of the Leases* (the "Sale Motion") on June 13, 2007.

33.      Having determined to assume and assign the Lease and the Space Leases, the Trustee directed his professionals to calculate the cure amounts necessary to satisfy his statutory obligations under Section 365 of the Bankruptcy Code.  Because the Trustee/Estate was current in all its obligations relating to the Space Leases, the Trustee turned his attention to the cure obligations (both monetary and otherwise) due and owing to the Landlord.

34.      The first thing the Trustee did was to review the Assumption Motion, the

14

Landlord's objection to the Assumption Motion and the transcript of the March 10, 2006 hearing

on the Assumption Motion (the "March 10th Hearing").  As it had through out the case, the

Landlord took the position that the Lease had terminated prior to the commencement of the

Chapter 11 case and could not, therefore, be assumed.  The Court, which had asked for additional

briefing on the termination issue prior to the March 10th Hearing, held that the Lease was extant

and could be assumed.  Not surprisingly, the Landlord made known its intention to appeal the

Court's decision and on April 17, 2006, the Landlord filed its Notice of Appeal, as well as its

Motion for an Order Certifying Issue for Interlocutory Appeal.

35.     Once the Court determined that the Lease still existed and was susceptible

to assumption, the question of cure costs and duties arose.  This, too, was a matter of contention

for the parties.  In its Assumption Motion, the Debtor stated that its cure costs to the Landlord

aggregated approximately $128,000.  The Landlord, in it's Assumption Objection, stated that the

aggregate cure costs were at least $2 million.  The Court meanwhile had previously advised the

Debtor that if it wished to go forward and depose the Landlord's counsel and proceed on the

Assumption Motion, it would have to escrow some amount of money for cure costs.

36.     Although the Debtor asserts that the Court ruled as a matter of law that

$300,000 represented the maximum cure amount the Debtor would owe to the Landlord, a

careful reading of the Transcript of the March 10th Hearing reveals that the Court specifically

stated, at page 11, lines 19-23, that the $300,000 was not a ruling on the cure amount, rather it

represented the maximum amount the Court thought the Debtor would be willing to pay for the

Lease.

37.     Given the widely divergent views on the cure amount, the Trustee directed

15

his counsel to obtain all of the Landlord's attorneys' time records and thoroughly review and

analyze them in light of the Lease provisions. The Trustee and his attorneys spent many hours

reviewing and classifying the Landlord's attorneys' time entries. Because the Landlord's time

records naturally were not maintained in accordance with the Office of the United States

Trustee's Guidelines, the Trustee's attorneys spent considerable time consulting with the

Landlord's attorneys as to the nature of the activity for which time was being billed. Having

completed the factual analysis and obtained a greater understanding of the nature and type of

work performed for the Landlord, the Trustee's lawyers once again reviewed the relevant Lease

provisions and the law governing the granting of attorneys' fees.

        38.    While reviewing the time records and the docket, the Trustee began to

realize that much of the legal work performed by the Landlord's attorneys' was a direct result of

the Debtor's misconduct and failure to perform its obligations under the Lease and the State

Court Settlement and its repeated attempts to stymie the Landlord through the use of frivolous

litigation. For example, although the First Litigation was resolved pursuant to the State Court

Settlement, the Debtor failed to perform its obligations under the State Court Settlement and then

commenced a lawsuit against the Landlord when the Landlord sought to enforce the terms of the

State Court Settlement. Similarly, when the Landlord was granted partial summary judgment in

response to the Second Litigation, the Debtor responded by commencing additional litigation

which the Landlord was compelled to defend in order to preserve its asset, the Lease. Even the

filing of the Chapter 11 case did not stop the Debtor from causing needless litigation: for

example, despite the Landlord and the Debtor agreeing that the Debtor would have a certain

limited amount of time to attempt to sell the Lease (within certain parameters) the Debtor failed

16

to advise the Landlord that offers within those parameters had been made to the Debtor.

Moreover, the Debtor interfered with the sale of the Lease by seeking relief from the Bet Din.

    39.  As a result of the Trustee's analysis, the Trustee determined that the

Landlord was entitled to an award of reasonable legal fees pursuant to the following Lease

provisions:

> TWELFTH:  If the Tenant shall default in the performance of any covenant contained
> herein and to be performed on the Tenant's part, the Landlord may, after thirty days'
> notice to the Tenant, or without notice if in the Landlord's opinion an emergency exists,
> perform the same for the account and at the expense of the Tenant.  If the Landlord shall
> incur any expense, including reasonable attorneys' fees, instituting, prosecuting or
> defending any action or proceeding instituted by reason of any default of the Tenant, the
> Tenant shall reimburse the Landlord for the amount of such expense.  Should the Tenant,
> pursuant to this Lease, become obligated to pay the Landlord one or more sums of money
> in addition to the specific rent provided or in this Lease, the amount thereof shall be
> deemed additional rent and may, at the option of the Landlord, be added to any
> subsequent instalment (sic) of the specific rent due and payable under this lease, in which
> event the Landlord shall have the remedies for default in the payment thereof provided by
> Paragraph "THIRTEENTH".

>          ***

> The provisions of this Paragraph "TWELFTH" shall survive the termination of this lease.

> THIRTEENTH:

>          ***

> The Tenant agrees that in no event shall Tenant seek what is popularly know as a
> "Yellowstone Injunction" if the Tenant should be served with a default notice pursuant to
> this paragraph, if such default notice is with respect to the non payment of monies due to
> the Landlord for rent and/or additional rent (including but not limited to payments
> required under Paragraph "EIGHTH" hereof) in order to extend the period during which
> the default may be cured, or for any other purpose and hereby expressly waives its right to
> do so.  In the event that despite the language of this provision, the Tenant does so move,
> the Tenant agrees that any motion for a stay as well as the action itself should be
> dismissed by the Court, and Tenant further agrees that the Court should issue sanctions
> against the Tenant in any amount that the Court considers reasonable, but in the very least

17

for the amount of reasonable legal fees and disbursements incurred in opposing said motion and action.

FOURTEENTH:

*** 

(2) In the event that this lease be terminated by summary proceeding, or otherwise as provided in Paragraph "THIRTEENTH", or if the premises shall have been abandoned, and whether or not the premises be relet the Landlord shall be entitled to recover from the Tenant, and the Tenant shall pay to the Landlord, in addition to any damages becoming due under Paragraph "FIFTEENTH", the following:

> (a) An amount equal to all expenses, if any, including reasonable counsel fees, incurred by the Landlord in recovering possession of the demised premises, and all reasonable costs and charges for the care of said premises while vacant, which damages shall be due and payable by the Tenant to the Landlord at such time or times as such expenses shall have been incurred by the Landlord; ...

40.    With this framework in mind, the Trustee spent significant time conferring with the Landlord so that he could better understand the work being performed by the Landlord's attorneys, the necessity of such work and the context in which it was performed.  Additionally, the Landlord and the Trustee exchanged case law concerning the appropriateness of certain fees and, ultimately, negotiating the legal fees owed to the Landlord.  All told, the Trustee determined that there was a reasonable argument that the legal portion of the cure cost due and owing to the Landlord aggregated at least $1,940,662.42 through June 2007.  (The Landlord and his counsel have continued to accrue expenses in negotiating the Stipulation and will continue to accrue expenses in defending the terms of the Stipulation to the extent it is, inevitably, opposed.)   The $1,940,662.42 can be broken down as follows:

| Firm and time period | Fees | Expenses |
|---|---|---|
| Tofel 1/05 - 1/31/06    = | 668,255.99 | 19,248.24 |

18

| | | | |
|---|---|---|---|
| Tofel 2/06 - 12/06 | = | 375,878.25 | 9,366.63 |
| Tofel 1/07 - 12/07 | = | 288,882.75 | 5,232.47 |
| Weil 9/05 - 1/31/06 | = | 237,416.00 | 5,469.39 |
| Weil 2/06 - 12/06 | = | 249,552.00 | 17,649.93 |
| Weil 1/07 - 12/07 | = | 70,158.50 | 1,192.28 |
| Itkowitz & H 2005 | = | 17,978.05 | 2,215.55 |
| | | | |
| Total: | = | 1,908,121.54 | 60,374.49 = $\underline{1,968,496.03}$[8] |

41.     The Trustee and his professionals also analyzed each time entry and

attached it, to the best of their ability, to a category and came up with the following break-down

of all fees (not including expenses) into categories:

Totals for all Landlord Counsel

Appeals

| | |
|---|---|
| Tofel Pre - 2006 (Ct App) | 78,753.75 |
| Tofel Pre - 2006 (App Div) | 137,796.25 |
| Tofel Pre - 2006 (Jan App) | 18,145.50 |
| Tofel Pre - 2006 (Yellowstone) | 3,741.25 |
| Tofel Pre - 2006 (prepare for prospects) | 716.25 |
| Tofel Pre - 2006 (Mann) | 2,644.75 |
| Tofel 2006 (Mann) | 4,152.50 |
| Tofel 2006 | 41,239.00 |
| WGM Pre - 2006 (Yellowstone) | 142.50 |
| WGM Pre - 2006 Appeal | 1,279.50 |
| WGM Pre - 2006 108 | 4,525.00 |
| WGM Pre - 2006 Jan appeal | 41,508.00 |
| WGM 2006 | 6,972.50 |

                                                                341,616.75

| | |
|---|---|
| Assumption | |
| Tofel Pre - 2006 | 34,635.50 |
| Tofel 2006 | 27,692.50 |
| WGM Pre - 2006 | 8,360.00 |
| WGM 2006 | 98,240.75 |

---

[8]     The above times were calculated by adding the summary sheets for each month from the professionals' legal bills.

WGM  2007                              246.00

                                                                      169,174.75

Bank Litigation

Tofel Pre - 2006                    121,524.50
Tofel 3/05                            2,200.00
WGM Pre - 2006                          873.00

                                                                      124,597.50

Bankruptcy

Tofel Pre - 2006                     97,272.00
Tofel 3/05                              675.00
Tofel 2006                            1,896.00
Tofel 2007                           13,609.50
WGM Pre - 2006 (Adv. Pro.)            6,082.50
WGM Pre - 2006                       54,909.50
WGM 2006                                427.50
WGM 2007                              1,952.00
WGM (5/6) 2007                          104.00

                                                                      176,928.00

Cash Collateral

Tofel Pre - 2006                     37,794.75
Tofel 2006                           39,048.00
Tofel 2007                           15,617.25
WGM Pre - 2006                       52,155.50
WGM 2006 (Space Lease Proceeds)      13,480.50
WGM 2006                             13,041.50
WGM  2007                             5,738.50
WGM (5/6) 2007                        2,010.00

                                                                      178,886.00

Conversion

Tofel 2007                           15,845.75
WGM (5/6) 2007                          312.00

                                                                       16,157.75

Discovery

| | | |
|---|---|---|
| Tofel 2006 | 61,372.75 | |
| Tofel 2007 | 16,338.00 | |
| WGM 2006 | 11,231.00 | |
| WGM 2007 | 1,511.50 | |
| | | 90,453.25 |

Inspection/Engineering report

| | | |
|---|---|---|
| Tofel Pre - 2006 | 4,925.25 | 4,925.25 |

Insurance

| | | |
|---|---|---|
| Tofel Pre - 2006 | 23,912.00 | |
| Tofel 3/05 | 3,825.00 | |
| Tofel 2006 | 7,472.00 | |
| Tofel 2007 | 40,015.75 | |
| WGM Pre - 2006 | 1,260.00 | |
| WGM 2006 | 13,290.50 | |
| WGM  2007 | 1,394.00 | |
| | | 91,169.25 |

Landlord Tenant Services

| | | |
|---|---|---|
| Itkowitz & Harwood | 17,978.05 | |
| | | 17,978.05 |

Miscellaneous

| | | |
|---|---|---|
| Tofel Pre - 2006 | 58,759.25 | |
| Tofel 3/05 | 4,844.50 | |
| Tofel 2006 | 148,173.50 | |
| Tofel 2007 | 101,313.00 | |
| WGM Pre-2006 | 56,154.50 | |
| WGM 2006 | 26,794.50 | |
| WGM 2007 | 23,843.00 | |
| WGM (5/6) 2007 | 1,138.00 | |
| | | 421,020.25 |

Order to Show Cause

| | | |
|---|---|---|
| Tofel Pre - 2006 | 12,558.50 | 12,558.50 |

Sale

| | | |
|---|---|---|
| Tofel 2006 | 32,538.50 | |
| Tofel 2007 | 18,735.75 | |
| Tofel 2007 | 11,650.75 | |
| WGM 2006 | 3,656.50 | |
| WGM 2007 | 1,145.50 | |
| WGM (5/6) 2007 | 2,378.00 | |
| | | 70,105.00 |

Security Deposit

| | | |
|---|---|---|
| Tofel 2007 | 4,650.00 | |
| | | 4,650.00 |

Settlement

| | | |
|---|---|---|
| Tofel 2006 | 4,228.50 | |
| WGM 2006 | 21,194.75 | |
| WGM 2007 | 492.00 | |
| | | 25,915.25 |

Termination of Lease

| | | |
|---|---|---|
| Tofel Pre - 2006 | 2,484.00 | |
| Tofel Pre - 2006 | 2,322.50 | |
| Tofel 3/05 | 8,892.50 | |
| Tofel 2006 | 575.00 | |
| WGM Pre - 2006 | 5,777.50 | |
| WGM 2006 | 42,489.50 | |
| | | 62,541.00 |

Trustee

| | | |
|---|---|---|
| Tofel 2006 | 3,150.00 | |
| Tofel 2007 | 51,626.75 | |
| WGM 2006 | 807.50 | |
| WGM 2007 | 27,807.50 | |
| | | 83,391.75 |

Analysis by Category[9] Total Fees:   $1,892,068.30

42.     Legal fees were not the only cure cost the Landlord was asserting.  In accordance with Paragraph TWENTY-FOURTH of the Lease, the Landlord claimed that as of April 1, 2005, the date the Lease allegedly terminated, the Landlord was owed all the Space Lease proceeds.  Paragraph TWENTY-FOURTH of the Lease provides, in relevant part, that:

> Tenant hereby assigns to the Landlord all subleases . . . as well as all rents or other sums of money which may hereafter become due and payable thereunder to the Tenant . . . . Upon the curing of such default, such assignment shall become null and void.

The Landlord asserts that this entitles it to collect all rents from the Space Leases from the date of default, until such default is cured, in addition to collecting the monies necessary to cure the default.  According to the Landlord's interpretation of the Lease, in order to cure the default and assign the Lease, the Trustee is obligated to pay any default under the Lease <u>and</u> the rents that accrued from the Space Leases during the default. The Landlord estimated this amount at $2 million as of August 1, 2007 (the "Space Lease Claim").

43.     The Trustee did not believe that the Landlord's position reflected the current state of the law.  Thus, he directed his attorneys to research the Landlord's Space Lease Claim.  Based on the Trustee's research, namely, *Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 145 F.3d 124, 134 (3d Cir. 1998) and *Truck*

---

[9]     The amounts for this section do not completely line up with the totals for fees on the summary sheets of the Landlord's Professionals' invoices.  This is due to a variety of reasons, including: (1) certain of the time entries were for services that the Trustee deemed 'managerial' and not legal and those time entries were not categorized; (2) billing rates for certain professionals were not always clear (for example WGM's invoices listed the rates for paraprofessionals on a sliding scale) and the Trustee used his best efforts to determine the appropriate rates in analyzing the entries; and (3) in at least one case the Trustee believes not all time entries for a time period were provided.  To analyze this volume of invoices and address each time entry was a huge task and the differential in the numbers was not great enough to suggest that the task be redone to a complete certainty, especially in light of the willingness by the Landlord to reduce its claim to a number significantly less than the time charges.

23

*Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420 (1977), the Trustee concluded that

the assignment of rent provision in Paragraph TWENTY-FOURTH of the Lease was an

unenforceable penalty provision and should serve only as security until the other cure obligations

were satisfied.  The Landlord disagreed, arguing that absent specific language stating that the

Space Lease payments were security for amounts owed to the Landlord, the Space Lease

payments constituted additional amounts owed to the Landlord.

44.    Given the current state of the case law, the Trustee believes he would

prevail on this issue.  However, there is some uncertainty due to the vague language of the Lease.

Specifically, although the Lease does not state that the assignment of rent is for security or as

additional security, the Lease also does not say that the assignment of rent is to be paid in

addition to the cure amount.  It is also unclear whether the Court would interpret Paragraph

TWENTY-FOURTH as a penalty provision.  Accordingly, the Trustee believes that litigation

concerning the Space Lease Proceeds would be uncertain, contentious, expensive and lengthy,

and cannot say that reasonable people could not disagree about the outcome.

E.    **The Debtor's Principal Objects to the Sale Motion**

45.    The Trustee's belief that the only way to put an end to the continuous

litigation was through a sale of the Asset was borne out by the Debtor's Principal's behavior after

the Trustee filed his motion seeking approval of bidding procedures and scheduling a sale of the

Asset (the "Sale Motion").  In response to the Sale Motion, Bildirici filed his Objection to the

Sale Motion (the "Bildirici Objection") and annexed a proposed plan (the "Plan") and disclosure

statement (the "Disclosure Statement").

24

46.    The Disclosure Statement made clear that Bildirici planned to continue the litigation against the Landlord and the Landlord, upon reading the Bildirici Objection, advised the Trustee that it would never consent to the Plan and would continue to litigate the existence of the Lease.  Moreover, the Landlord advised the Trustee that it was contemplating commencing a multi-million dollar tortious interference lawsuit against Bildirici in response to Bildirici's resort to the Bet Din to de-rail the earlier sale of the Lease.

47.    In addition, the Lender advised the Trustee that it objected to the proposed Plan and would fight confirmation.  The Lender's objections to the Bildirici Objection and Plan and Disclosure Statement were not only based on a desire to be paid its whole claim (which includes approximately $500,000 in legal fees as a result of the Lender Litigation and the related cash collateral battles) but to be guaranteed payment promptly and be done with Bildirici and his unnecessary and expensive litigation.

## THE STIPULATION OF SETTLEMENT AND MUTUAL RELEASES

48.    Cognizant of the Spanish philosopher George Santayana's admonition that "those who ignore history are destined to repeat it", the Trustee determined that merely settling the legal fee portion of the cure amount would not meaningfully move this case towards an amicable and cost-efficient resolution.  The Landlord made clear that absent a settlement with the Landlord, the Landlord would appeal the Trustee's sale of the Asset to the Purchaser, or another entity.  The appeal would be two-fold:  first, the Landlord would appeal the existence of the Lease and second, the Landlord would appeal the amount required to cure monetary defaults under the Lease.  Although the Trustee was fairly certain he would ultimately prevail, even if that

25

were the case there was no guarantee that the Purchaser would be willing to wait until the

conclusion of the appeal to close on the purchase of the Asset.  And of course if the Landlord

were to prevail on appeal as to the termination of the Lease, the consequences to the Estate and

its creditors would be disastrous.  Thus, the Trustee determined that there was a significant risk

to the Estate and the Debtor's creditors if resolution was not reached with the Landlord.

Moreover, because the underlying issues of the viability of the Lease and the Space Lease

proceeds directly impacted upon the Lender and the Lender Litigation, the Trustee determined

that the Estate would best be served by a global resolution amongst the Estate, the Lender and the

Landlord.

        49.     After many rounds of negotiation, the parties entered into a form of global

stipulation and mutual releases which resolved all of the issues between (i) the Trustee and the

Landlord; (ii) the Landlord and the Lender and (iii) the Lender and the Trustee.  Specifically, the

Stipulation provides, in salient part:

- Payment of Monetary Cure Costs:  The Trustee shall pay to the Landlord the sum of $1.7 million (the "Monetary Cure Amount") in full satisfaction of all monetary obligations under Section 365 of the Bankruptcy Code, subject to Bildirici appealing the Sale or this Motion.

- Repair of Non-Monetary Cure Costs:  The Trustee shall fund an escrow account in the amount of $200,000 at closing, from the proceeds of the sale, to pay the costs of all required repairs deemed necessary as a result of a physical inspection and survey of the Property to be conducted by the Landlord's engineer for the purpose of ascertaining and determining whether the repairs required by (i) the State Court Settlement and (ii) the February 16, 2005 Building Condition and Compliance Report (the "Repairs") have been completed satisfactorily, since completion of such tasks is a condition precedent to the assumption of the Lease.  Funding of the escrow account will satisfy the condition precedent.

- Lease in Full Force and Effect:  Subject to approval of the Stipulation, the closing of the sale of the Asset to the Purchaser or a qualified purchaser (the "Closing"),

the funding of the escrow account for the repairs referenced above and the receipt of the Monetary Cure Amount, the Landlord will agree that the Lease is in full force and effect and the Landlord will withdraw all claims that the Lease has terminated.

- <u>Waiver of Trustee's Claims Against Landlord</u>:  Subject to approval of the Stipulation and the Closing, the Trustee will waive any and all claims he and/or the Estate has against the Landlord including, without limitation, claims related to the First Litigation, the Second Litigation, the Diamond Decision, the Space Lease Dispute, the Appellate Litigation and the Court of Appeals Litigation (each of the foregoing litigations collectively, the "Litigation").

- <u>Waiver of Landlord's Claims Against Estate</u>:  Subject to approval of the Stipulation and upon receipt of the Monetary Cure Amount, the Landlord shall waive any and all claims it has against the Debtor, the Trustee and/or the Estate related to the Litigation.

- <u>Mutual Release Between Lender and Landlord</u>:  Subject to approval of the Stipulation and the Closing, the Lender and the Landlord shall mutually release each other from any and all claims arising from or related to the Lender Litigation and the bond posted by the Lender will be discharged.

- <u>Satisfaction of Lender's Claim</u>:  The Trustee shall pay to the Lender $12,659733.13 in full satisfaction of the Lender's claim against the Estate, subject to adjustments for expenses and payments.

A copy of the form of Stipulation is annexed hereto as Exhibit A.

### **Standards For Reviewing a Bankruptcy Rule 9019 Application**

50.    Pursuant to Section 105(a) of the Bankruptcy Code, this Court has the power to issue any order, process or judgment in connection therewith that is necessary or appropriate to carry out the provisions of Title 11 of the United States Code.  11 U.S.C. § 105(a).

51.    Further, Bankruptcy Rule 9019(a), which governs approval of compromises and settlements, provides as follows:

On motion by the Trustee, and after notice and a hearing, the court may

27

approve a compromise or settlement.  Notice shall be given to creditors,
the United States trustee, the debtor and indenture trustees as provided in
Rule 2002 and to any other entity as the court may direct.

52.     Rule 2002(a)(3) provides that the Debtor and all creditors be given not less

than 20 days notice by mail of the hearing on approval of the compromise or settlement of a

controversy unless the court for cause shown directs that notice not be sent.

53.     Approval of a proposed compromise and settlement is within the sound

discretion of the Court.  Protective Committee for Independent Stockholders of TMT Trailer

Ferry, Inc. v. Anderson, 390 U.S. 414, reh'g denied, 391 U.S., 909 (1968); In re W.T. Grant Co.,

699 F.2d 599 (2d Cir. 1983), cert. denied, 464 U.S. 822 (1984).  In approving the compromise

and settlement, the Bankruptcy Court is required to make an "informed and independent

judgment" as to whether the compromise and settlement is fair and equitable based on an:

> [e]ducated estimate of the complexity, expense and likely duration of [any]
> litigation, the possible difficulties of collecting on any judgment which
> might be obtained, and all other factors relevant to a full and
> fair assessment of the wisdom of the proposed compromise.  Basic to this
> process, in every instance of course, is the need to compare the terms of
> the compromise with the likely reward of litigation.

Protective Committee v. Anderson, 390 U.S. 414, 424-25.  See American Can Co. v. Herpel (In

re Jackson Brewing Co.), 624 F.2d 605, 607 (5th Cir. 1980); Chopin Assocs. v. Smith (In re

Holywell Corp.), 93 B.R. 291, 294 (Bankr. S.D. Fla. 1988); In re Arrow Air, Inc., 85 B.R. 886,

891 (Bankr. S.D. Fla. 1988); In re Bell & Beckwith, 77 B.R. 606, 611 (Bankr. N.D. Ohio 1987).

54.     As stated in Arrow Air, the "approval of [a] proposed compromise and

settlement is a matter of this Court's sound discretion."  85 B.R. at 891.  In passing upon a

proposed settlement, "the bankruptcy court does not substitute its judgment for that of the

28

trustee." <u>Depo v. Chase Lincoln First Bank, N.A. (In re Depo)</u>, 77 B.R. 381, 384 (N.D.N.Y.

1987), <u>aff'd</u>, 863 F.2d 45 (2d Cir. 1988).  "Nor is the bankruptcy court 'to decide the numerous

questions of law and fact raised by [objectors] but rather to canvas the issues and see whether the

settlement fall[s] below the lowest point in the range of reasonableness.'" <u>W.T. Grant Co.</u>, 699

F.2d at 608.  <u>See</u> <u>Holywell</u> 93 B.R. at 294 ("In order to exercise this discretion properly, the

Court must consider all the relevant facts and evaluate whether the compromise suggested falls

below the 'lowest point in the range of reasonableness'" (quoting <u>In re Teltronics Services, Inc.</u>,

762 F.2d 185, 189 (2d Cir. 1985)).  In passing upon the reasonableness of the proposed

compromise, the Court "may give weight to the opinions of the Trustee [or the Examiner], the

parties and their counsel." <u>Bell & Beckwith</u>, 77 B.R. at 612.  In making its determination, the

court should consider whether the proposed compromise is in the "best interest of the estate." <u>In

re Depo</u>, 77 B.R. at 383.

> 55.   The Second Circuit has held that a bankruptcy court does not need to

know all of the relevant facts in deciding whether to approve a compromise because "[t]he

Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect

conduct one." <u>In re Cellular Information Systems, Inc.</u>, 171 B.R. 926, 948 (Bankr. S.D.N.Y.

1994), citing <u>Weinberger v. Kendrick</u>, 698 F.2d 61, 74 (2d Cir. 1982), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u>,

<u>Lewy v. Weinberger</u>, 464 U.S. 818 (1983); <u>see</u> <u>also</u> <u>Drexel Burnham Lambert Group Inc.</u>, 138

B.R. 723, 759 (Bankr. S.D.N.Y. 1992) ("Approval of a settlement does not require a 'mini-trial'

on the merits.")

> 56.   In determining whether to approve a proposed compromise and settlement

a court should consider:

(a)      The probabilities of success should the case go to trial versus the

benefits of the settlement without the delay and expense of a trial and subsequent appeals;

(b)      The prospect of complex and protracted litigations if the settlement

is not approved;

(c)      The proportion of class members who support the settlement;

(d)      The competency and experience of counsel who support the

settlement;

(e)      The benefits believed to be received by the individuals or class;

and

(f)      The extent to which the settlement is a product of arms length

negotiating.

<u>In re Texaco, Inc.</u>, 84 B.R. 893 (Bankr. S.D.N.Y. 1988).


## APPLICATION OF THE GOVERNING
## STANDARDS TO THE SETTLEMENT AGREEMENT

57.    The Trustee firmly believes that all of the relevant factors bankruptcy

courts consider in determining whether to approve settlements weigh in favor of approval here.

58.    The Trustee believes that, if there were no settlement, he would ultimately

prevail and the Court of highest review would find that the Lease exists and can be assigned.

However, despite this Court's decision in the Estate's favor, there is fair ground for litigation,

and the result on appeal is uncertain.  Furthermore, the Trustee believes that the Court of highest

review would ultimately find the cure amount due and owing to the Landlord would be less than

the $1.7 million the Trustee negotiated as the <u>total</u> monetary cure cost to be paid to the Landlord.

However, the Monetary Cure Amount reflects payment of more than the Landlord's legal costs; it

also represents payment for the value of not having to incur ongoing litigation expenses, the

certainty that the Lease is capable of being assumed and favorable resolution of the $2 million

Space Lease Dispute.

59.    Finally, the cost of potential "victory" in paying less than the Monetary

Cure Amount must be offset against the potential loss, the contemplated expense (including the

legal fees which will be accrued by all parties), uncertain results, delays and inconvenience that

would be occasioned by the doubtless months of litigation.  Accordingly, although the Trustee

believes he would prevail in any and all litigation and could establish a significant reduction in

the fees to be paid to the Landlord's counsel, in the Trustee's business judgment the settlement is

in the best interest of the Debtor's estate and should be approved.

60.    Set forth below is an analysis, on a component by component basis, of the

costs and risks compromised and settled by approval of the Stipulation.

**A.    Reasonableness of Attorneys' Fees**

61.    As set forth above, to date the Landlord has expended well in excess of

$1,940,000 in litigating and protecting its rights under the Lease.  Although the amount sought by

the Landlord is high, the Trustee's analysis of the applicable law and the relevant provisions of

the Lease led him to believe that the Landlord could make a credible argument that it was entitled

to the majority of the $1,940,000 in legal fees and expenses.  Although the Trustee believes it is

unlikely that the Landlord would prevail, given the terms of the Lease and the United States

31

Supreme Court's recent analysis in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric*, 127 S.Ct. 1199 (2007), the Trustee believes that is a distinct possibility that the Landlord would be entitled to a significant portion of the attorneys' fees.

62.    Specifically, the Trustee identified 17 different categories (including one miscellaneous category) to which time could have been separately billed.  The Trustee reviewed every single time entry of Tofel & Partners, LLP ("Tofel"), Weil Gotshal & Manges, LLP ("WGM") and Itkowitz & Harwood ("IH"; Tofel, WGM and IH are collectively referred to hereinafter as the "Landlord's Professionals") and categorized each of their respective entries for the time period commencing January 2005 and continuing through June 2007[10].  In total, the three law firms accrued in excess of $1,940,000 in fees and expenses.

(i)    <u>Insurance Costs</u>

63.    The Trustee's review and analysis of the time records demonstrated that the Landlord's Professionals expended 199.35 hours on matters relating to insurance for a total aggregate amount of $91,169.25.  By the Trustee's calculation three attorneys and one legal assistant at Tofel expended 171.35 hours for a total of $75,244.75 and three attorneys and one legal assistant at WGM expended 28 hours for a total of $15,944.50.

64.    Reimbursement for legal fees related to insurance is governed by Paragraph TENTH of the Lease which provides, in relevant part, that:

> [c]ommencing immediately the Landlord shall be entitled to periodically review insurance coverage for the premises and to request such changes in the insurance coverage as he may consider appropriate.  The Tenant agrees to make such changes in the insurance coverage as the Landlord shall require within fifteen (15) days after notice by

---

[10]    The Trustee notes that Tofel and WGM continue to accrue legal time and expenses for which they are not seeking compensation.

32

the Landlord to the Tenant of the changes he deems appropriate. The Tenant agrees that the reviews shall be at Tenant's expense, and the Landlord agrees that the reviews shall only be as reasonably required and shall not be more frequently then once every three (3) years. The Landlord further agrees that any requests for changes to the insurance coverage shall not be unreasonable. If any dispute shall arise between the Landlord and Tenant as to the reasonableness of the review and the changes required by the review, the parties shall resolve such dispute by arbitration, in the manner provided for in Paragraph "NINETEENTH" hereof. In no event, however, shall the insurance coverage be less than that originally provided in this Paragraph "TENTH".

65.     In reviewing the Landlord's Professionals' time records, and after consultation with Tofel's principal, it became evident that the Landlord believed that the Debtor had failed to obtain the necessary insurance required under the Lease. In order to make such determination, Tofel was required to review and analyze the various insurance options proposed by the Debtor. As a result of such analysis, the Landlord determined that the insurance proposed by the Debtor did not comply with the requirements of Paragraph TENTH. Accordingly, pursuant to Paragraph TWELFTH of the Lease, which provides:

> [i]f the Tenant shall default in the performance of any covenant contained herein and to be performed on the Tenant's part, the Landlord may, after thirty days' notice to the Tenant, or without notice if in the Landlord's opinion an emergency exists, perform the same for the account and at the expense of the Tenant.

the Landlord sought reimbursement for the cost of the insurance it was required to purchase and, when the Debtor failed to reimburse the Landlord, the Landlord was forced to then litigate that matter. The Landlord was successful in protecting its rights and obtaining reimbursement for the insurance expense and, as provided by the Lease, the Landlord should, likewise, be reimbursed for the legal fees it incurred in obtaining such relief.

66.     The Trustee is acutely aware of the time spent by all parties on issues pertaining to insurance. Immediately upon being appointed Chapter 11 Trustee, the Trustee's

33

professionals were forced to dive into the insurance morass because the Debtor's policy was up for renewal for the second time during the bankruptcy process. The Trustee's professionals spent many hours obtaining pricing and analyzing policies to determine if the policy the Trustee and/or the Debtor was able to obtain would be satisfactory to the Landlord and fulfill the requirements of Lease Paragraph TENTH.

67.    Because the Tenant's obligation to provide adequate insurance was specifically delineated in Paragraph TENTH, and the Landlord's authority to review the insurance and make sure that it conformed to the requirements of the Lease was also specifically set forth in Paragraph TENTH, the Trustee determined that the vast majority of Tofel's time spent reviewing the insurance policies was reasonable and appropriate under the Lease. Furthermore, because Paragraph TWELFTH provided the Landlord the opportunity to cure defaults as they arose, and failure to have adequate insurance under the Lease constituted such a default, the Trustee determined that the work performed by Tofel in obtaining a reimbursement of premiums from the Debtor was warranted.

68.    Thus, at the conclusion of his review and given the fact that the Trustee's conversations with the Landlord were not hindered by a litigious underpinning and still took many, many hours, the Trustee finds it reasonable that time spent by the Landlord's Professionals totals no less than 199.35 hours aggregating $91,169.25 of legal fees.

(ii)    Notice of Termination

69.    The Trustee's review of the Landlord's Professionals' time records showed that Tofel and WGM collectively incurred legal fees of $62,541 in matters related to Lease termination (which category also included lease analysis). The Trustee's review and

analysis of the time records demonstrated that the Landlord's Professionals expended 119.05

hours on matters relating to analysis of the lease and termination-related issues.  By the Trustee's

calculation, four attorneys at Tofel expended 34.85 hours for a total of $14,274 and four

attorneys at WGM expended 84.2 hours for a total of $48,267 on legal work related to these

issues.

70.    As with the insurance-related costs, the Trustee reviewed the relevant

provisions related to Lease termination.  The Trustee believes that much of the work performed

by Tofel and WGM was warranted under Paragraph THIRTEENTH which provides in pertinent

part:

> In the event of any such default of the Tenant, and at any time thereafter following the
> expiration of the respective grace periods above referred to, the Landlord may serve a
> written notice upon the Tenant that the Landlord elects to terminate this lease upon a
> specified date not less than twenty days after the date of the serving of such notice (except
> in the case of a default under subdivision (2) (a) hereof of non-payment of rent, in which
> event such date shall be not less than five days after the expiration of any twenty day
> notice given under subdivision (2)(a)), and this lease shall then expire on the date so
> specified as if that date had been originally fixed as the expiration date of the term herein
> granted.  No defaults shall be deemed waived unless in writing and signed by the
> Landlord, except that a default under subdivision (2) hereof shall be deemed waived if
> such default is made good before notice of termination of this lease is served on the
> Tenant.

71.    Thus, in order to declare the Lease in default, the Landlord was required to

prepare and serve a notice of Lease termination.  Moreover, once the Debtor had filed for

bankruptcy court protection, Tofel performed legal research to determine the impact of the filing

and the implications of the automatic stay.  Work related to Lease termination also included the

Landlord's preparations to enforce the termination and commence operation of the Property,

including the analysis and anticipated collection of Space Lease  proceeds and the administration

35

of the Debtor's affairs at the Property.  Based on all of the foregoing, the Trustee determined that most, if not all, of the work in this category was justified.

72.     Accordingly, the Trustee has determined, in his business judgment, that payment of most of the $62,541 in legal fees, is warranted.

(iii)    Inspection and Engineering Report

73.     The Trustee reviewed the time expended on "inspection" and engineering report in the context of the specific language of Paragraph SEVENTH of the Lease which provides that:

> The Tenant shall permit an inspection of the demised premises by the Landlord, or the Landlord's agents or representatives, and by or on behalf of prospective purchasers, during business hours, at any time during the term hereby granted, and during the year next preceding the expiration of this lease or of the final renewal thereof shall permit inspection thereof by or on behalf of prospective tenants.

74.     As set forth above, at the time the Debtor took the assignment of the Lease, the previous tenant, and subsequently the Debtor, were in violation of the repair obligations under the Lease.  Furthermore, the First Litigation, which was settled pursuant to the State Court Settlement, required the identification and completion of repair work.  Thus, most of the fourteen hours and $4,925.25 of work performed by three Tofel lawyers and one Tofel legal assistant was reasonable in the Trustee's business judgment.

(iii)    Appellate Division and Court of Appeals Litigation

75.     The Appellate Division category contains time entries for all of the litigation leading up to the Lease's alleged termination.  The Trustee's review and analysis of the time records demonstrated that  Tofel expended 327.25 hours on matters relating to Appellate Division, and Tofel expended 356.9 and WGM expended 104.3 additional hours on Court of

36

Appeals Litigation and related work on researching and appealing orders entered adverse to its

position for a total aggregate amount of $341,616.75.  Thus, the Landlord's Professionals

expended $341,616.75 in an effort to protect the Asset which, at a minimum, is worth $16.2

million.

76.    As set forth in greater detail above, the Debtor and Landlord had entered

into the State Court Settlement pursuant to which the Landlord consented to the assignment of

the Lease to the Debtor and the Debtor agreed to rectify all the engineering deficiencies

previously noted in an engineering report and have any additional work performed that the

Landlord's engineer believed necessary.  As explained above, having entered into the State Court

Settlement the Debtor breached the terms of the agreement and obtained a *Yellowstone* type

injunction, resulting in the Landlord drafting pleadings responding to the Second Litigation

complaint and then, in order to protect its rights, moving for summary judgment seeking, among

other things, to nullify the *Yellowstone* injunction Justice Diamond initially issued.  Justice

Diamond herself found that the Debtor's argument that the notice of default issued by the

Landlord was in bad faith was "entirely without merit.  There is no evidence of bad faith. . . . The

plaintiff [Debtor] has failed to explain how, under these circumstances, the defendant [Landlord]

has acted in bad faith by attempting to hold plaintiff to its agreement to correct these very

conditions."  Thus, the work performed by the Landlord in this respect to protect its Asset was

brought about by the Debtor's actions and seems reasonable in scope[11].

---

[11]    Paragraph THIRTEENTH of the Lease provides, in relevant part, that:

The Tenant agrees that in no event shall Tenant seek what is popularly known as a "Yellowstone Injunction" if the Tenant should be served with a default notice pursuant to this paragraph, if such default notice is with respect to the non payment of monies due to the Landlord for rent

37

77.    Because the Debtor failed to respond to the Diamond Decision, on March

10, 2005, the Landlord gave notice to the Debtor that, by virtue of prior defaults and the passage

of time[12], the Lease would terminate effective April 1, 2005.  The Debtor responded to the

Diamond Decision by moving by order to show cause for a rehearing and reconsideration of the

Diamond Decision.  The Landlord's attorneys naturally conducted research and prepared

thorough pleadings in opposition to the order to show cause.  Ultimately, because the Debtor had

no basis for a rehearing or reconsideration of the Diamond Decision, the Landlord was successful

in opposing the Debtor's unfounded pleadings.  Nonetheless, the Landlord again incurred

unnecessary fees and expenses.

78.    After being denied on rehearing, the Debtor served a Notice of Appeal of

the Diamond Decision and sought a preliminary appellate injunction enjoining the Landlord from

commencing any action or proceeding to recover possession of the Property or  interfering with

---

and/or additional rent (including but not limited to payments required under Paragraph
"EIGHTH" hereof) in order to extend the period during which the default may be cured, or for
any other purpose and hereby expressly waives its right to do so.  In the event that despite the
language of this provision, the Tenant does so move, the Tenant agrees that any motion for a stay
as well as the action itself should be dismissed by the Court, and Tenant further agrees that the
Court should issue sanctions against the Tenant in any amount that the Court considers
reasonable, but in the very least for the amount of reasonable legal fees and disbursements
incurred in opposing said motion and action.

[12]    Paragraph THIRTEENTH also provides, in relevant part, that:

In the event of any such default of the Tenant, and at any time thereafter following the expiration
of the respective grace periods above referred to, the Landlord may serve a written notice upon
the Tenant that the Landlord elects to terminate this lease upon a specified date not less than
twenty days after the date of the serving of such notice (except in the case of a default under
subdivision (2)(A) hereof of non-payment of rent, in which event such date shall be not less than
five days after the expiration of any twenty day notice given under said subdivision (2)(a)), and
this lease shall then expire on the date so specified as if that date had been originally fixed as the
expiration date of the term herein granted. ...

the Debtor's use, occupancy and possession of the Property and staying proceedings with respect

to the Landlord's counterclaims, all pending hearing and determination of the appeal.  In reaction

to the appeal, the Landlord understandably spent many[13] hours researching, drafting and revising

pleadings.   This research included an extensive analysis of the implications of the *Mann* decision

and the Appellate Division's ability to preserve the Debtor's continued right to possession of the

Property (and the resulting right to collect rents) in light of the fact that the cure period under the

Lease had run.

       79.     The Trustee believes that the Landlord is entitled to reimbursement for the

majority of (if not all of ) its legal fees related to the Second Litigation, including the Appellate

Litigation.  The Trustee's analysis is two-fold:  first, he determined that, pursuant to Paragraph

FOURTH[14] of the Lease and Paragraph THIRTEENTH[15] of the Lease there had been a default of

---

[13]      As this Court noted, the Landlord is not seeking compensation pursuant to 503(b) and is not required to prepare time records in accordance with the United States Trustee's Guidelines. Transcript at pp. 54-55, lines 22-25, 1-2.

[14]      Paragraph FOURTH provides in relevant part:

      Commencing immediately, the Landlord shall be entitled to have periodic engineering inspections of the building, which inspections shall be at the Tenant's expense, but in no event shall such inspections be more frequent than every three (3) years.  In the event the engineering inspection reveals that structural repairs or repairs required by governmental regulations are necessary, the Tenant agrees to make such repairs within a reasonable period after notice by the Landlord to the Tenant advising of the necessary repairs.  If any dispute shall arise between the Landlord and the Tenant as to the required repairs and the length of time required for the repair, the parties shall promptly resolve such dispute by arbitration ...

[15]      Paragraph THIRTEENTH of the Lease provides in relevant part:

      Each of the following shall be deemed a default by the Tenant and a breach of this lease:

      (2)(a) Default in the payment of the rent herein reserved, or any part thereof, other than additional rent, for a period of twenty (20) days after written notice; (b) a default in the

the Debtor's obligation under the Lease.

80.     The Trustee next looked to Paragraph FOURTEENTH of the Lease which provides for the measure of damages in the event of default.  Paragraph FOURTEENTH provides that if the Lease is terminated pursuant to Paragraph THIRTEENTH the Debtor is required to pay, at a minimum, "[a]n amount equal to all expenses, if any, including reasonable counsel fees, incurred by the Landlord in recovering possession of the demised premises . . .".  In analyzing the validity of the legal fee component of the cure cost, the Trustee was cognizant of the modifier "reasonable" in front of counsel fees.  However, in his business judgment, the Trustee determined that much of these litigation fees are reasonable because they were generally in response to litigation commenced by the Debtor.  Commencing with the First Litigation[16], pursuant to the terms of the Lease, the Landlord was within its rights to litigate to protect the value of its Asset.  Moreover, although the Appellate Division issued a temporary stay granting the Debtor the right to continue in possession of the Premises, that decision was by no means final and the Landlord still has the opportunity to pursue its position further.

81.     The reasonableness of the Landlord's fees are further supported by the cost

_____

performance of any other covenant or condition of this lease on the part of the Tenant to be performed for a period of thirty (30) days after written notice.  Any notice given pursuant to this subdivision which refers to a default consisting of a failure to do work shall specify in general terms the work required to be done to cure the default.

[16]     The bulk of the Itkowitz & Harwood time, totaling $17,978.05, was related to the First Litigation which arose as a result of the Debtor's monetary and non-monetary defaults under the Lease.  The Court noted at the March 10th Hearing that it had little concern about the pre-petition time expended by the Landlord's Professionals.  Transcript at p.41, line 4-7.  The Trustee believes that reimbursement of these fees are justified under Paragraphs FOURTH, TENTH and TWELFTH of the Lease.  Moreover, as was often the case, the Debtor caused additional fees to accrue unnecessarily.  For example, the Debtor repeatedly frustrated the State Court's attempts to convene settlement conferences, thereby preventing any hope of an amicable and cost-effective settlement.

of the Court of Appeals litigation.  At the hearing before the Appellate Division, the Debtor's

counsel made certain misrepresentations upon the record.  When asked by the Landlord to enter

into a stipulation clarifying the record, the Debtor refused.  Landlord's counsel then expended

more legal time researching the appropriate case law, preparing a record and drafting pleadings

seeking permission to appeal.  Landlord's counsel was also required to prepare for and appear

before the Court of Appeals to argue its case.  At the conclusion of the Court of Appeals hearing,

the Debtor consented to the requested relief[17].  Thus, payment to the Landlord of the majority of

the fees  incurred by the Landlord's Professionals is reasonable in light of the fact that, but for

the Debtor's recalcitrance, the Landlord would never have had to incur the legal fees in the first

place.

82.    Accordingly, although the Landlord's Professionals expended an aggregate

of 788.2 hours for a total of $341,616.75 on appellate issues, the majority of the work is

compensable pursuant to the terms of the Lease and the Bankruptcy Code.

(iv)    Lender Litigation

83.    The Landlord's Professionals expended approximately $124,600 on the

Lender Litigation and related matters.  Over 99% of this work was performed by four Tofel

attorneys and one legal assistant over the course of 200 hours.

84.    The Trustee has reviewed the Lease and determined that such fees are

mostly reasonable in light of the work performed and the Asset at risk.  Paragraph TWENTY-

SEVENTH of the Lease provides that:

---

[17]    Similarly, the Debtor initially opposed the relief requested in the Trustee Motion but
ultimately consented to the requested relief.

41

[i]f, by reason of any default by the Tenant, other than a default under subdivision (1) of Paragraph "THIRTEENTH" hereof, either this lease or any renewal thereof shall be terminated at the election of the Landlord prior to the stated expiration therefor, the Landlord will enter into a new lease of the demised premises with such mortgagee (i.e., the holder of a first mortgage to this lease who shall become entitled to notice, as provided in the first paragraph of this paragraph "TWENTY-SEVENTH" hereof) for the remainder of the term, effective as of the date of such termination, at the rent and additional rent and upon the terms, provisions, covenants and agreements herein contained, subject, however to the rights, if any, of any parties then in possession of any part of the demised premises, provided (a) said mortgagee shall make written request upon the Landlord for such new lease within forty (40) days after the date of such termination and such written request is accompanied by payment to the Landlord of all sums then due to the Landlord under this lease; (b) said mortgagee shall pay to the Landlord, at the time of the execution and delivery of said new lease, any and all sums, in addition to those which would at the time of the execution and delivery thereof be due under this lease but for such termination, and in addition thereto, any expenses, including legal and attorney's fees, to which the Landlord shall have been subjected by reason of such default; and (c) said mortgagee shall, on or before execution and delivery of said new lease, perform and observe all the other covenants and conditions herein contained on the Tenant's part to be performed and observed to the extent that the Tenant shall have failed to perform and observe the same.

85.    As soon as the Landlord determined that the Lease was terminated, it believed it was required to enter into a new lease with the Lender if the Lender so requested within 40 days of the date of termination: April 1, 2005 by the Landlord's calculation.  In order to enter into a new lease with the Landlord, however, the Lender was required to cure defaults under the Lease, including making payment to the Landlord's Professionals for attorneys' fees incurred in connection with the termination of the Lease.  Thus, Tofel[18] began to negotiate the cure costs with the Landlord.  Due to banking regulations, the Lender did not want to be the tenant under the Lease.  Thus, part of the Landlord's work involved preparing projections and arranging for potential assignees of the Lender to review applicable documents and view the Asset.

---

[18]    WGM incurred *de minimis* legal fees of $873 in connection with the Lender Litigation.

86.     The Lender and Landlord were unable to come to terms concerning the

monetary and non-monetary cure costs associated with the "pick up" lease.  Given the 40-day

window of opportunity in which the Lender was entitled to make its written request to enter into

a new lease with the Landlord, and the parties' inability to negotiate monetary and non-monetary

cure obligations, the Lender moved, by order to show cause, to extend its time to cure.  The

parties continued to negotiate their dispute and sought to negotiate modifications to the Lease.

These efforts, while initially positive, did not bear fruit.  Thus, the Lender commenced the

Lender Litigation seeking declaratory judgment and sought to toll its time to pick up the Lease.

The Landlord filed detailed responsive pleadings.

87.     Although the fees related to the Lender Litigation are high, the Trustee

determined that there were legitimate litigable issues which required the Landlord's attention.

Accordingly, the Trustee has determined that a significant portion of the $124,597.50 in legal

fees are justifiable.

(v)     <u>Space Lease Proceeds and Cash Collateral</u>

88.     Pursuant to Paragraph TWENTY-FOURTH of the Lease:

[i]f the Tenant shall be in default in the payment of rent for 20 days after written notice is
given as provided in (2)(a) of Paragraph "THIRTEENTH" hereof, or is in default for
thirty (30) days after demand or notice as provided with respect to such default in (2)(b)
of paragraph "THIRTEENTH" hereof and until such default shall have been made good,,
[sic] the Tenant hereby assigns to the Landlord all subleases and subtenancies now or
hereinafter to be made of the demised premises or any parts thereof, as well as all rents or
other sums of money which may hereafter become due and payable thereunder to the
Tenant, and all security at any time deposited for the payment of rent and the performance
of any other terms of such subleases. ...

89.     Based on Paragraph TWENTY-FOURTH, the Landlord took the position

that all of the Space Lease Proceeds from and after April 1, 2005, belonged to it.  However, the

43

Appellate Division issued a "stay" of the Diamond Decision on May 26, 2005 (the "May 26th

Stay"), without prejudice to the Landlord's claim that the Lease termination had rendered the

appeal moot.  Thus, when the Debtor filed for Chapter 11 protection one business day before the

Debtor was required to perfect its appeal of the Diamond Decision, the Landlord remained

steadfast in its belief that the Space Lease Proceeds belonged solely to it, not to the Debtor.

90.    At an August 10th hearing before this Court, the Court permitted the

Debtor and the Lender to stipulate to certain matters including the limited use of the Lender's

cash collateral (the "Cash Collateral"), subject to reservation of the Landlord's rights concerning

the pre-bankruptcy assignment of the Space Lease and the Space Lease Proceeds to the Landlord.

The Debtor was required to fulfill certain obligations in exchange for the right to use the Cash

Collateral such as funding a $75,000 carve-out for professional fees for the Landlord's and

Lender's counsel and escrowing a portion of the budgeted management fee.  The Debtor did

neither in a timely fashion.

91.    The Landlord took the position that the May 26th Stay was vacated by

reason of the Appellate Division's December 15th Order which upheld the Diamond Decision.

Thus, the Landlord argued to the Lender that pursuant to Lease Paragraph TWENTY-FOURTH,

as well as the Lease termination as of April 1, 2005, all of the adequate protection payments the

Lender had been receiving were not, in fact, the Lender's collateral but rather were the

Landlord's property.

92.    When the Lender failed to agree with the Landlord's interpretation of the

state of affairs and would not turn over to the Landlord funds which had been escrowed for the

Lender's benefit, the Landlord moved by order to show cause for an Order Directing the Release

44

and Return to the Landlord of all Space Lease Proceeds.

93.    The Trustee has reviewed the applicable portion of the Lease, as well as the pleadings prepared by the Landlord, the Lender and the Debtor.  Although the Trustee disagrees with the Landlord's position concerning the Space Lease Proceeds as a matter of law, he is not unaware of the fact that the language of Paragraph TWENTY-FOURTH is vague and susceptible to conflicting interpretation.  Thus, while he believes that ultimately, the Space Lease Proceeds are not the Landlord's property, he believes that given the conflicting and confusing decisions of the Appellate Division, the ambiguities inherent in the Lease and the state of the law, it was not unreasonable for the Landlord to expend much of the 349.7 hours (Tofel expended 197.3 hours and WGM expended 152.4 hours) in researching and litigation services in seeking to prevent/limit the use of Cash Collateral and recapture the Space Lease Proceeds which, as of the date hereof, aggregate approximately $2 million over the past 2 years.

(vi)    <u>Motion to Assume</u>

94.    Pursuant to its Motion to Assume, the Debtor moved to assume the Lease. Although the Landlord remained steadfast in its position that the Lease had terminated, it filed its objection to the Motion to Assume out of an abundance of caution.  It was no surprise that the Landlord did not believe that the Debtor would be able to provide it with adequate assurance of future performance given the history of the Debtor's misconduct both before and during the Debtor's Chapter 11 case.  As set forth above, the Debtor, among other things, commingled the sub-tenants' security deposits, failed to follow Court directives, failed to seek authorization to retain a real estate broker, prevented the sale of the Lease and the payment, in full, to the Debtor's creditors, breached various provisions of the Lease and caused needless litigation.  In

45

addition, according to the Landlord, the Debtor's projections were contradicted by the historical

lack of profitability in the Lease and the Debtor had not sought financing.

95.     Accordingly, the Landlord prepared a thorough objection, complete with

Affidavit in Opposition to the Motion to Assume, setting forth the many reasons the Landlord did

not believe the Debtor would be able to assume the Lease.

96.     The hearing on the Assumption Motion was never completed.  At the

conclusion of the first hearing, the Court requested supplemental briefing on the issue of whether

the Lease had been terminated.  Thus, both the Landlord and the Debtor were required to

research and submit supplemental submissions on that issue.  The Landlord researched and

analyze the implications of the *Mann*, *Empire State Building Association* and *TW Dress

Corporation* decisions.

97.     After the submission of the supplemental pleadings, a second hearing was

held, at which time the Court held that the Lease had not been terminated.  The Court did not,

however, rule on the Assumption Motion.  Rather, the parties engaged in heated argument over

the scope of discovery the Debtor was entitled to take with respect to the Landlord's

Professionals' fees.  As this went to the Debtor's ability to cure monetary defaults under the

Lease, the hearing on the Assumption Motion was continued.

98.     Because the Court ruled, for purposes Assumption Motion, that the Lease

had not terminated, the Landlord appealed that portion of the Court's March 10th Decision.

Specifically, Tofel and WGM spent approximately $48,000 preparing pleadings seeking leave to

appeal the Court's interlocutory appeal.  Given the complexity of the litigation history underlying

the appeal and the voluminous nature of the record on appeal, the Trustee believes that the

46

majority of the time spent preparing these pleadings was reasonable.

99.     The Trustee has reviewed both WGM's and Tofel's time records for work done with respect to the Debtor's proposed assumption, as well as legal time spent in analyzing and attending to discovery. The Assumption Motion laid bare the fundamental issue of this case: was the Lease terminated on March 31, 2005? Thus, the Trustee believes that the $169,174.75 (Tofel expended 142.7 hours and WGM expended 208.2 hours) and the $90,453.25 spent on discovery issues related to cure costs (Tofel expended 177.55 hours and WGM expended 24.6 hours) are reasonable.


**B.      Elimination of Additional Litigation Costs**

100.    The attorneys' fees represent only a portion of the cure cost. The Trustee and the Landlord take diametrically different views on the Landlord's right to the Space Lease Proceeds. Moreover, because the terms of the Lease are vague, determination as to this issue will involve extensive litigation. As demonstrated by the costs incurred by both sides in the Lender Litigation, this litigation will be costly. By entering into the Stipulation, the Trustee is compromising this potential litigation and saving the Estate not only the costs associated with litigating this issue, but a potential cost of more than $2 million dollars in Space Lease Proceeds.

101.    As set forth above, absent approval of the Stipulation, the very sale of the Asset is at issue. The Landlord has taken the position that there is no Lease for the Trustee to assume and assign. Although this Court has held otherwise, *see* Transcript of March 10th Hearing at page 72, lines 22-24, the Landlord remains steadfast in its belief that the Lease has, in fact, terminated. Although the Trustee believes that the Landlord is wrong and that the Trustee

47

would prevail, given the interlocutory posture of the appeal, and Judge Diamond's earlier

decision, the Trustee believes that there is a risk that an appellate court would find that the Lease

had terminated.  If this came to pass, the Trustee would have nothing to sell to the Purchaser.

Similarly, if the appellate process dragged on, the Purchaser might decide it was not interested in

awaiting a final decision and walk away from the deal.  In that case, the Trustee runs the real risk

that his victory would be phyrric.

   102. All told, the Trustee anticipated that it would cost the Estate at least

$500,000 to litigate the open issues with the Landlord.  Moreover, the Landlord might be entitled

to some or all of its additional litigation costs, thereby further reducing the amount available for

the Estate's creditors and Equity.  And of course if the Landlord prevailed on the issue of lease

termination, this could be a "no asset" case.


**C.**  **The Debtor's Largest Creditor Constituency Supports the Settlement**

   103. The Lender, the Debtor's largest creditor, has urged the Trustee to proceed

with the sale of the Asset.  A sale, the Lender believed, represented its best opportunity to get

paid, in full, and in a "timely" fashion.  Although the Lender believed that the Trustee would

prevail in any litigation commenced by or against the Landlord, the inherent costs of litigation

lessened the chance that the Lender would be paid in full.  Specifically, the Lender was

concerned that the Purchaser might choose not to proceed with the sale.  Additionally, the Lender

believed a consensual sale provided it with the opportunity to be paid in the next few months, as

opposed to the next few years.  Finally, a consensual sale would allow the Lender to terminate

the Lender Litigation and stop all the costs associated therewith.

48

**D.**    **Remaining Factors Weigh in Support of the Settlement**

104.    If this Court were to look only at the reduction in legal fees, the Court would see that the Trustee had negotiated an approximately 14% reduction in monetary cure costs.  However, when the Court considers the estimated $500,000 reduction/elimination in litigation costs, the Trustee has negotiated a 30% reduction in monetary cure costs.  In addition, there is $2 million reduction in potential Space Lease Proceeds.  If, for argument's sake, the Landlord were entitled to the full amount of the Space Lease Proceeds, the $1.7 million Monetary Cure Amount represents a 62% decrease in the monetary cure amount otherwise due and owing to the Landlord.

105.    As to the competency and experience of counsel supporting the settlement, the Trustee's counsel is highly competent and experienced – with many years' experience in bankruptcy litigation and involvement in many large settlements.  Counsel to Landlord is also highly experienced and has represented their client vigorously and ably in this matter.  The Lender's counsel is also qualified and has aggressively represented its client's interest.

106.    The final factor to be considered by the Court is whether the settlement is the product of arms-length negotiation.  Each party was represented by able counsel throughout the  settlement negotiations.  Neither the Trustee, the Lender or the Landlord exerted undue influence on the other, and each was free to accept or reject the negotiated agreement.  Each party believes that the Stipulation represents a fair compromise and is in their best interest.


## DECISION TO MOVE BY ORDER TO SHOW CAUSE AND SHORTEN NOTICE

107.    The Lease is the Debtor's sole asset and sale of that asset represents the

49

creditors only chance to recover in this case.

108.    As set forth in greater detail in the July 26, 2007 Affidavit of Judith L. Siegel in Support of the Order to Show Cause[19], the Trustee is now poised to sell the Lease to the Purchaser or another bidder who makes a higher and better offer.  The sale can only proceed, however, if the Trustee satisfies the prerequisite of Bankruptcy Code Section 365(b)(1); namely that the Trustee cure all defaults under the Lease.  In order to cure the defaults, the Trustee must cure both monetary and non-monetary defaults.

109.    As a result of his efforts, the Trustee has negotiated a tri-party stipulation which not only compromises and settles the monetary cure costs associated with the assumption and assignment of the Lease (at a considerable discount) but also provides a mechanism for, and cap on, non-monetary cure obligations.  Moreover, the Stipulation negotiated by the Trustee contemplates an end to all of the litigation that occurred prior to and during the Debtor's Chapter 11 case.

110.    Absent approval of the Stipulation, the Landlord will not consent to the assumption and assignment of the Lease.  Moreover, although the Purchaser has signed a contract committing to purchase the Lease, there is no guarantee that the Purchaser would wait to close on the sale of the Lease if the Landlord appealed the sale of the Lease over its objections.

111.    Accordingly, the Trustee requests permission to shorten the twenty-day notice period proscribed by Federal Rule of Bankruptcy Procedure 2002(a)(3) and allow the Trustee to proceed by order to show cause.

---

[19]    A copy of both the Affidavit and the Order to Show Cause are annexed hereto as Exhibits B and C, respectively.

112.    A copy of this Motion, with exhibits, and the signed Order to Show Cause will be provided to:  (1) the Office of the United States Trustee for the Southern District of New York; (2) counsel to the Debtor; (3) the Landlord's counsel; (4) the Lender's counsel; (5) all persons or entities known to the Trustee to have asserted a lien on, or security interest in, all or any portion of the Lease; and (6) Joseph Bildirici's counsel.  The Trustee will provide a copy of the Notice, in the form annexed hereto as Exhibit D, on: (1) all potential bidders known to the Trustee who previously made offers to the Debtor or its agent or to the Trustee or his agent; (2) all creditors of the Debtor as identified in the Debtor's Chapter 11 petition; (3) all Space Lease Tenants; (4) the Department of Justice; (5) all persons or entities who or which have filed a notice of appearance in this case; (6) the Internal Revenue Service; (7) New York State Department of Taxation and Finance; and (8) New York City Department of Finance  In light of the nature of the relief requested herein, the Trustee submits that no other or further notice is required.

## WAIVER OF MEMORANDUM
## OF LAW REQUIREMENT

113.    Inasmuch as the relevant points and authorities relied upon in support of the application are set forth above, the Trustee respectfully requests that the requirement of a separate memorandum of law be waived in this instance.

114.    No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Trustee respectfully requests that the Court enter the Order

Approving Assumption and Assignment of Lease to Purchaser in the form annexed hereto as

Exhibit E and grant the Trustee such other and further relief as the Court may deem proper.

      Dated:  Tarrytown, New York
              July 27, 2007

                                  KITTAY & GERSHFELD, P.C.
                                  Attorneys for the Trustee


                                  __/s/ David R. Kittay_____
                                  David R. Kittay (DK 0481)
                                  100 White Plains Road
                                  Tarrytown, New York 10591
                                  (914) 332-8000

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                            :
In re:                                      :            Chapter 11
                                            :
EAST 44TH REALTY, LLC,                      :            Case No. 05-16167 (RDD)
                                            :
                            Debtor.         :
------------------------------------------------------X

**GLOBAL STIPULATION AND MUTUAL RELEASES BETWEEN AND
AMONG DAVID R. KITTAY, CHAPTER 11 TRUSTEE FOR THE DEBTOR,
NEW YORK COMMUNITY BANK AND EAST FORTY-FOURTH STREET, L.L.C.**

The following global stipulation and mutual releases (the "Stipulation") is made between
and among David R. Kittay, (the "Trustee") Chapter 11 Trustee for the Estate of East 44th
Realty, LLC (the "Debtor" or the "Estate"), in Case No. 05-16167 (RDD), pending in the United
States Bankruptcy Court for the Southern District of New York, New York Community Bank
(the "Lender"), as successor by merger to Roslyn Savings Bank, and East Forty-Fourth Street,
L.L.C. (the "Landlord"):

WHEREAS, on August 5, 2005 (the "Filing Date"), the Debtor filed a voluntary petition
for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the
United States Bankruptcy Court for the Southern District of New York (the "Court"); and

WHEREAS, the Debtor's sole principal asset is its claim to the rights as tenant under a
ground lease (the "Ground Lease") and the corresponding rights as sub-lessor to space leases (the
"Space Leases", collectively the Ground Lease and the Space Leases will be referred to as the
"Lease"), all related to the real property and building owned by the Landlord and located at 228-

1

238 East 44th Street, New York, New York (the "Property"); and

WHEREAS, on January 22, 2007, the Landlord filed a motion seeking the appointment of a Chapter 11 Trustee (the "Trustee Motion"); and

WHEREAS, on February 2, 2007, the Lender filed a response in support of the Trustee Motion; and

WHEREAS, on February 2, 2007, the Debtor and Joseph Bildirici, the Debtor's managing member, filed an objection to the Trustee Motion but subsequently, at the hearing on the Trustee Motion, consented to the appointment of a Trustee; and

WHEREAS, on February 14, 2007, the Court entered an order (the "Trustee Order") granting the Trustee Motion and directing the appointment of a Chapter 11 Trustee having all of the powers and duties arising under Section 1104(a) of the Bankruptcy Code; and

WHEREAS, pursuant to the Trustee Order, on or about February 16, 2007, David R. Kittay was appointed Chapter 11 Trustee of the Debtor's Estate; and

WHEREAS, the Trustee accepted this appointment and is the qualified and duly acting Trustee; and

WHEREAS, prior to and since the commencement of the Debtor's Chapter 11 case, the Debtor, the Landlord and the Lender have engaged in extensive litigation concerning the Debtor's defaults under the terms of the Ground Lease, the alleged subsequent termination of the Ground Lease, the Lender's rights and obligations (including its asserted "pick-up rights" under the Ground Lease) flowing from any such termination of the Ground Lease and issues related to title to and possession of rental payments from the Debtor's tenants in its capacity as Sub-lessor under the Space Leases; and

2

WHEREAS, although the Lender sought and obtained a stay of its time to request a pick-up lease from the Supreme Court of the State of New York, County of New York ("New York Supreme"), its claims remain pending and the $2 million bond posted by the Lender remains in place (the "Bond"); and

WHEREAS, the referenced litigation has occurred both within the Bankruptcy Court, as embodied in the litigation captioned in this case and in the adversary proceeding styled East 44th Realty, L.L.C. v. East Forty-Fourth Street, LLC, Adv. Pro. No. 05-3136 (the "Turnover Litigation") and in the New York State Court system (the "State Court Litigation"); and

WHEREAS, as part of the State Court Litigation, the Lender has asserted claims against the Landlord and the Landlord has also asserted claims against the Lender and the Debtor's predecessor-in-interest in a plenary action in the Supreme Court, New York County; and

WHEREAS, the State Court Litigation between and among the Landlord, the Lender and the Debtor is pending, collectively, in the following actions: (i) East 44th Realty, LLC v. East Forty-Fourth Street LLC, Index No. 110952/04 (the "Debtor's Case"); (ii) New York Community Bank v. East Forty-Fourth Street LLC, Index No. 106297/05 (the "Lender's Case"); and (iii) East Forty-Fourth Street LLC v. New York Community Bank and C.S. East 44th Street L.P., Index No. 602675/05 (the "Landlord's Case"). The Lender's Case and the Landlord's Case, are referred to hereinafter collectively as, the "Lender Litigation"; and

WHEREAS, by motion dated June 13, 2007 (the "Sale Motion"), the Trustee sought: (I) an Order (A) Approving an Agreement for the Trustee to Assume and Assign, Sell and Convey Leases, (B) Approving Bidding Procedures (Including Break-Up Fee), and (C) Approving Notice and (II) an Order Approving the Trustee's Sale of the Leases; and

3

WHEREAS, the Sale Motion identifies Global Capital Holding L.L.C. (the "Purchaser"), as the stalking horse bidder for the Lease as a result of the Purchaser's entering into a contract with the Trustee to purchase the Lease for $16.2 million, subject to higher and better offers and Bankruptcy Court approval; and

WHEREAS, the Sale Motion contemplates the Trustee's assumption and assignment of the Lease to the Purchaser; and

WHEREAS, in order to assume and assign the Lease to the Purchaser (or such other person or entity who or which is the successful bidder at the August 8, 2007 auction for the Lease), the Trustee must, among other things, satisfy the requirements of Bankruptcy Code Sections 365(b)(1) and 365(f)(2); and

WHEREAS, pursuant to Bankruptcy Code Section 365(b)(1), the Trustee must promptly cure any outstanding defaults under the Ground Lease; and

WHEREAS, the Landlord asserts that in order to cure the monetary defaults under the Ground Lease the Landlord is owed not less than $5.3 million dollars (the "Monetary Cure Obligations"); and

WHEREAS, in the Debtor's Case, both the New York Supreme Court and the Appellate Division thereof determined and confirmed the existence of certain defaults by the Debtor under the Ground Lease related to the repair and condition of the Property; and

WHEREAS, prior to the appointment of the Trustee, the Debtor claimed to have remedied such repair defaults. The parties hereto and the Purchaser are, however, unaware of whether such repairs have, in fact, been made and whether the defaults have been remedied. As a material part of this Stipulation, and proposed sale and assumption of the Lease, the Trustee and

4

the Landlord have agreed, as provided in paragraph 2 hereof, to implement a process to identify

and remedy any repairs which would otherwise need to be undertaken and completed as a

condition of the Trustee's assumption of the Ground Lease; and

WHEREAS, the Sale Motion contemplates the complete satisfaction of the Lender's

claim from the proceeds of the sale of the Lease; and

WHEREAS, the Lender has a claim against the Debtor's estate pursuant to the

Consolidated Amended and Restated Promissory Note dated December 4, 2002, between the

Debtor and Roslyn Savings Bank (the "Note") and the Consolidated, Amended and Restated

Mortgage, Security Agreement and Assignment of Leases and Rents made December 4, 2002, by

the Debtor and The Roslyn Savings Bank (the "Mortgage") in the amount of $12,659,733.13[20]

(the "Lender Claim") which includes legal fees and related costs of $499,760.98 through July 23,

2007; and

WHEREAS, the Trustee, the Landlord and the Lender are each desirous of forever

resolving, settling, compromising and discharging any and all existing litigation, claims, causes

of action, or rights asserted by any of them, or any such actions, claims or rights which could

have been properly asserted by any of them (including their respective officers, directors, agents

and legal and personal representatives) arising from or related to the Lease.

NOW, THEREFORE, the parties to this Stipulation hereby stipulate and agree as follows:

1.      Subject to the closing (the "Closing")of the Trustee's assumption

---

[20]     This amount will be adjusted at the Closing (as defined in paragraph 1) to take into account costs and expenses incurred, as well as payment(s) made, and additional interest accrued from July 24, 2007 through the date of the Closing.

5

and sale of the Lease on or before October 15, 2007[21] (the "Closing Deadline"),

to Purchaser or to another entity that the Trustee in his business judgment

(subject to court approval) determines is the highest and best bidder for the

Lease (a "Qualified Bidder"), and which transaction satisfies the requirements

of Bankruptcy Code Sections 365(b)(1) and 365(f)(2), and, subject to the

provisions of paragraph 2, below, the Trustee shall at Closing: (a) pay to the

Landlord by wire transfer or certified or cashier's check, the sum of $1.7

million in immediately available funds (the "Cure Payment") in full and

complete satisfaction of all of the Trustee's monetary obligations pursuant to

Bankruptcy Code Sections 365(b)(1) and 365(f)(2), subject to the provisions of

footnote 2 hereof; (b) pay to the Lender by wire transfer or certified or cashier's

check, the sum of $12,659,733.13 (adjusted for additional costs and expenses

incurred, as well as payment(s) made, and additional interest accrued from July

24, 2007 through the date of the Closing as set forth in footnote 1 hereof) in

immediately available funds in full and complete satisfaction of the Lender

Claim; and (c) file a stipulation of dismissal, with prejudice and without costs,

of the Turnover Litigation.  The Closing Deadline may be extended upon

---

[21]    To the extent the Closing does not take place on or before October 15, 2007, and the
Landlord incurs additional legal fees as a result of the delay in Closing occasioned by any objection to
the sale of the Lease or an objection to approval of this Stipulation, the Trustee will review and analyze
such fees and allow the Landlord further claim for monetary cure costs.  The Trustee will seek approval
of the payment of such additional amounts by a motion brought on by presentment (the "Supplemental
Cure Motion").  To the extent additional litigation is occasioned by the Supplemental Cure Motion, the
Trustee will make oral application for payment of the Landlord's legal fees resulting from the
Supplemental Cure Motion at the hearing on the Supplemental Cure Motion such that the Landlord is in
no way penalized by agreeing to a Monetary Cure Amount through the signing of this Stipulation and the
approval of same.

6

mutual agreement, in writing, executed by the Trustee, Landlord and Lender, or

their authorized representatives.  Landlord agrees that receipt of the Cure

Payment as aforesaid, subject to the provisions of footnote 2 hereof, will satisfy

all Monetary Cure Obligations set forth in the Landlord's Objection of East

Forty-Fourth Street, L.L.C. to Debtor's Motion to Assume Lease dated January

31, 2006, as well as any and all such Monetary Cure Obligations accruing from

the date thereof to the present time.

2.      The Trustee and the Landlord have agreed that, at the Debtor's expense

(estimated not to exceed $5,000), the Landlord's engineer (H. Nejat Haim, P.E.)

shall undertake and perform a physical inspection and survey of the Property

(presently scheduled for July 26, 2007) for the purpose of ascertaining and

determining what repairs required by (i) the May, 2003 Settlement Agreement

between, *inter alia*, the Debtor, the Debtor's predecessor and the Landlord; and

(ii) the February 16, 2005 Building Condition and Compliance Report

(collectively the "Repairs") have been completed satisfactorily and which, if

any, require remediation or completion; it being understood that, but for the

Landlord's consent and agreement pursuant to this Stipulation, completion of

such Repairs is a condition precedent to assumption of the Lease.   The

Landlord agrees that the creation of the Repair Escrow and funding of the

remedial work to make the Repairs (up to the amount of the Repair Escrow)

satisfies any non-monetary cure obligation.  As a further condition of

Landlord's consent to the Trustee's assumption and sale of the Lease, at

7

Closing the Trustee will, from the proceeds of sale, fund an escrow account (to

be maintained by the Trustee's counsel), in the amount of two hundred

thousand ($200,000) dollars.  The proceeds of this fund (the "Repair Escrow")

shall be used to satisfy the cost of all required Repairs subject to the following

procedure:  the Landlord shall obtain an estimate (the "Estimate") of the cost

and scope of such work and shall provide a written copy of the Estimate to the

Trustee.  The Trustee will review the Estimate for reasonableness and he shall

so advise the Landlord, in writing, within three business days of receipt of the

Estimate; upon receipt of an invoice (the "Invoice") demonstrating that the

work was done in accordance with the Estimate, the Trustee shall pay the

Invoice from the funds in the Repair Escrow within three business days of

receipt of the Invoice (the Trustee and the Landlord understand and agree that

the Trustee shall also fund, from the Repair Escrow, any "advance" or "down

payment" for payments for such Repairs as are required by the person or

persons performing the Repairs).  If the Trustee is provided with an Estimate,

the cost of  which he determines, in his business judgment, to be unreasonable,

the Trustee shall retain professionals to perform the necessary services and

attend to the timely completion of such repairs.  In addition, to the extent the

remediation of the Repairs require the Landlord to provide legal services (and

not managerial services), the Trustee will likewise review the legal services

invoice(s) and pay the same from the Repair Escrow if the services are deemed

reasonable.  If the Trustee deems a portion of the services unreasonable, he will

8

pay the reasonable portion and explain the differential to the Landlord. The Trustee and the Landlord agree that (i) by providing for the Repair Escrow and (ii) performance by the Trustee of his obligations under and pursuant to this paragraph in respect of payment for Repairs, the Trustee will have met the condition precedent to assumption of the Lease and that in no event will the Landlord claim that the cost of the Repairs exceeds the Repair Escrow.

3.       If and to the extent that any member or members of the Debtor, or any person, firm or entity acting for, through on behalf of or as assignee of or successor to any such member or members of the Debtor (including, without limitation, Joseph Bildirici, collectively, "Equity") assert, threaten or prosecute any claim or alleged claim of any nature or description in any forum, civil, religious or otherwise, against the Landlord, its Manager, Members, employees, agents, officers, directors, affiliates, successors, assigns, beneficiaries, legal or personal representatives (collectively the "Landlord Parties") or the Lender, its employees, agents, officers, directors, affiliates, successors, assigns, beneficiaries, legal or personal representatives (collectively, the "Lender Parties") or the Landlord Parties' or the Lender Parties' respective members, employees, officers, agents, directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries and legal or personal representatives, arising from or relating to the Note, the Mortgage, the Lease or the Property, any and all costs suffered, incurred or sustained by the Landlord, the Landlord Parties, the Lender and/or the Lender Parties on account thereof, including their fees

9

and costs of counsel, shall constitute an allowed administrative expense claim against the Debtor, which claim Landlord and Lender agree to subordinate to the allowed claims of the estate's administrative, priority unsecured and general unsecured creditors (not including those creditors holding late filed claims as defined by the Court and specifically not subordinate to any claims filed directly or indirectly by Equity and/or the Debtor's insiders as such term is defined by Bankruptcy Code Section 101(31)).  The Trustee further agrees to file a plan of liquidation (a "Plan") and include in the Plan he files with the Court a permanent injunction against the assertion by Equity of any claims against the Landlord, the Landlord Parties, the Lender and the Lender Parties. The Trustee further agrees to use his best efforts to obtain Court approval of such Plan, including, without limitation, the injunction provision.

4.        Subject to approval of this Stipulation by the Court and the Closing, in accordance with the requirements hereof and upon receipt of the Cure Payment and establishment of the Repair Escrow, the Landlord agrees that the Ground Lease is in full force and effect and the Landlord will withdraw all claims that the Ground Lease has terminated.

5.        Subject to approval of this Stipulation by the Court and the Closing, each of the Trustee, on behalf of himself, the Debtor and the Debtor's Estate, and each of their respective members, employees, agents, officers, directors, subsidiaries, affiliates, successors, assigns, heirs, beneficiaries and legal and personal representatives, (a) hereby waives, sets aside, discharges,

10

settles, compromises and releases any and all claims, causes of action, rights or

remedies of any kind or nature, including, without limitation, the claims in the

Turnover Litigation and the State Court Litigation or arising from the Trustee

Motion, which the Trustee and/or the Debtor and the Debtor's Estate, or their

respective members, employees, agents, officers, directors, subsidiaries,

affiliates, assigns, successors, heirs, beneficiaries or legal or personal

representatives did assert or could have asserted against Landlord, and/or the

Landlord Parties or their respective members, employees, agents, officers,

directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries or

legal or personal representatives; and (b) shall cause, or execute and file such

documents as are necessary to cause, the State Court Litigation to be

discontinued with prejudice and the Turnover Litigation to be dismissed with

prejudice and without costs except as expressly provided herein.

6.          Subject to approval of this Stipulation by the Court and the

Closing, and in accordance with the requirements hereof and upon receipt of the

Cure Payment and establishment of the Escrow Fund and the Trustee's

performance of his obligations in paragraph 2, the Landlord, on behalf of itself,

each of the Landlord Parties and each of their respective members, officers,

directors, employees, agents, subsidiaries, affiliates, assigns, successors, heirs,

beneficiaries and legal and personal representatives, (a) hereby waives, sets

aside, discharges, settles, compromises and releases any and all claims, causes

of action, rights or remedies of any kind or nature, including (without

11

limitation) claims in the State Court Litigation, which Landlord, the Landlord

Parties and their respective members, officers, directors, employees, agents,

subsidiaries, affiliates, assigns, successors, heirs, beneficiaries or legal or

personal representatives did assert or could have asserted against the Trustee

and/or the Debtor or the Debtor's Estate or their respective employees, agents,

subsidiaries, affiliates, assigns, successors, heirs, beneficiaries or legal or

personal representatives (it being understood and agreed that the claims of the

Landlord and the Landlord Parties and their respective members, officers,

directors, employees, agents, subsidiaries, affiliates, assigns, heirs, beneficiaries

and legal and personal representatives against Equity are expressly preserved);

and (b) shall cause, or execute such documents as are necessary to cause, the

State Court Litigation  to be discontinued with prejudice and the Turnover

Litigation to be dismissed with prejudice and without costs except as expressly

provided herein.

7.       Subject to approval of this Stipulation by the Court and the Closing,

and in accordance with the requirements hereof and upon the Landlord's receipt

of the Cure Payment and establishment of the Repair Escrow, the Landlord, on

behalf of itself, each of the Landlord Parties and each of their respective

members, officers, directors, employees, agents, subsidiaries, affiliates, assigns,

successors, heirs, beneficiaries and legal and personal representatives, (a)

hereby waives, sets aside, discharges, settles, compromises and releases any and

all claims, causes of action, rights or remedies of any kind or nature, including

12

(without limitation) the Lender Litigation, and any claim concerning the Bond,

which the Landlord, and/or the Landlord Parties or their respective its members,

officers, directors, employees, agents, subsidiaries, employees, agents,

affiliates, assigns, heirs, beneficiaries or legal or personal representatives did

assert or could have asserted against the Lender and/or the Lender Parties, their

employees, officers, directors, subsidiaries, affiliates, assigns, successors, heirs,

beneficiaries or legal or personal representatives and (b) shall execute and

deliver[22] to counsel for the Trustee, simultaneously with the mutual execution

and delivery of this Stipulation, Stipulations of Discontinuance in the forms

annexed as Exhibits A and B hereto (the "Discontinuance Stipulations"), and a

Stipulation Canceling Bond in the form of Exhibit C hereto (the "Bond

Stipulation"; collectively with the Discontinuance Stipulations, the "State

Stipulations").  The Lender shall also execute and deliver, simultaneously with

the mutual execution and delivery of this Stipulation, counterparts for the State

Stipulations to counsel for the Trustee.  Immediately upon receipt of executed

State Stipulations from both counsel to the Lender and counsel to the Landlord

(with respect to the Landlord, such delivery shall mean delivery of the original

executed version of the State Stipulations via overnight delivery; the Lender

need only provide proof of execution to the Trustee's counsel by transmitting a

---

[22]    The Landlord shall deliver a copy of the Stipulations of Discontinuance and the Bond
Stipulation, each as defined below, by facsimile to the Trustee upon signing of this Stipulation and shall
provide an original executed copy of each of the Stipulations of Discontinuance and the Bond Stipulation
to the Trustee by overnight delivery.

13

facsimile copy of the executed State Stipulations), counsel for the Trustee shall turn over the State Stipulations to counsel for the Lender who shall hold such State Stipulations in escrow.  Upon (i) this Stipulation being approved and (ii) receipt by the Lender and the Landlord of the funds contemplated to be paid pursuant to paragraph 1 hereof and the funding by the Trustee of the Repair Escrow, the Lender shall deliver the Bond Stipulation to the appropriate court to be "so ordered" within three business days of the Closing.  Counsel for the Landlord shall be obligated to cooperate and execute documents prepared by the Lender necessary or required to have the Bond Stipulation "so ordered".  Counsel for the Lender shall provide proof of filing of the State Stipulations with the Clerk's Office of New York Supreme to counsel for the Landlord within three business days of counsel for Lender's receipt of the "so ordered" Bond Stipulation from the Court.  In the event this global Stipulation is not approved or the Closing does not occur, counsel for the Lender shall return the State Stipulations signed by the Landlord to counsel for the Landlord.

8.      Each of the Landlord and Lender agree to support the expeditious approval of this Global Stipulation and each of the agreements reflected herein, and further agree to take no action inconsistent with the agreements, terms and provisions hereof.  In the event either Landlord or Lender (said party, for purposes of this paragraph 8, a "Breaching Party") materially fails to perform its obligations hereunder, including, without limitation, takes any action which causes the Trustee, in his reasonable judgment (after notice and an opportunity to cure), not

14

to provide the State Stipulations to counsel for the Lender pursuant to paragraph 7, hereof, and, as a result, there is new and/or additional litigation concerning matters this Global Stipulation was intended to resolve, then, the Breaching Party hereby indemnifies and holds the other harmless from and against any and all damage, loss, cost, claim or expense (including reasonable fees and costs of counsel) arising from or relating to such material failure to perform.

9.      Subject to approval of this Stipulation by the Court and the Closing (including, without limitation, collection in full by the Lender of the Lender Claim Amount, as adjusted pursuant to footnote one and paragraph 1(b) hereof, and the receipt by counsel to the Lender of the State Stipulations) the Lender, on behalf of itself, and each of the Lender Parties, and each of their respective employees, agents, officers, directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries and legal and personal representatives, hereby waives, sets aside, discharges, settles, compromises and releases any and all claims, causes of action, rights or remedies of any kind or nature, including (without limitation) in any way concerning the Lender Litigation, the Note, the Mortgage, the Lease and/or the Property, which the Lender, the Lender Parties, their employees, officers, agents, directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries and legal and personal representatives did assert or could have asserted against the Landlord and/or the Landlord Parties or their respective members, employees, agents, officers, directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries or legal or personal representatives.

15

10.    Subject to approval of this Stipulation by the Court and the Closing (including, without limitation, collection in full by the Lender of the Lender Claim Amount, as adjusted pursuant to footnote 1 and paragraph 1(b) hereof, and receipt by counsel to the Lender of the State Stipulations), the Lender, on behalf of itself, and each of the Lender Parties, and each's employees, members, officers, agents, directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries and legal and personal representatives hereby waives, sets aside, discharges, settles, compromises and releases any and all claims, causes of action, rights or remedies of any kind or nature in any way concerning the Lender Litigation, the Note, the Mortgage, the Lease, and/or the Property, which Lender, the Lender Parties and their members, employees, agents, officers, directors, subsidiaries, affiliates, assigns, heirs, beneficiaries and legal or personal representatives did assert or could have asserted against the Trustee, the Debtor or the Debtor's Estate or their respective members, employees, agents, officers, directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries and legal and personal representatives.

11.    Subject to approval of this Stipulation by the Court and the Closing, the Trustee, on behalf of himself, each of the Debtor and the Debtor's Estate and each of their respective members, employees (other than as set forth above), agents, officers, directors, subsidiaries, affiliates, assigns, successors, heirs, beneficiaries and legal and personal representatives, hereby waives, sets aside, discharges, settles, compromises and releases any and all claims, causes

16

of action, rights or remedies of any kind or nature concerning the Lender

Litigation, the Note, the Mortgage, the Lease, and/or the Property which he

and/or the Debtor and the Debtor's Estate or their respective members,

employees, agents, officers, directors, subsidiaries, affiliates, assigns, heirs,

beneficiaries or legal or personal representatives did or could have asserted

against the Lender, the Lender Parties, their employees, agents, officers,

directors, subsidiaries, affiliates, assigns, heirs, beneficiaries and legal and

personal representatives in any way.

12.       Nothing herein shall in any manner be deemed or construed as an

admission of liability by any party to this Stipulation.  The parties to this

Stipulation hereby agree and understand that this Stipulation is executed for the

purpose of compromising highly disputed claims, and avoiding the expense,

delay and inconvenience that would be occasioned by litigation and not because

any party to this Stipulation admits any liability with respect to any fact, claim

or transaction that has been alleged, or that could have been alleged.

13.       Each party signing this Stipulation hereby covenants and warrants

to the other parties to this Stipulation that he or she is fully authorized to sign

this Stipulation on behalf of the party indicated, and is fully authorized to bind

the party to all terms of this Stipulation.

14.       The parties understand and acknowledge that this Stipulation is

subject to approval by the Court.  The Trustee agrees to promptly seek approval

of this Stipulation by the Court and the parties agree to take all reasonable

17

actions necessary to secure such order.  If the Court does not approve this

Stipulation on or prior to August 8, 2007, then the Trustee shall adjourn

consideration by the Court of the Sale Motion to no earlier than September 5,

2007, and Landlord's time and right to object to the Sale Motion shall be

enlarged and extended through August 31, 2007.

15.        In the event that this Stipulation is not approved by the Court, the

terms hereof shall become null and void and neither the terms nor statements

contained in this Stipulation, any motion or motions filed seeking an order from

the Court approving this Stipulation, nor correspondence related to the

negotiation, drafting or approval of this Stipulation, shall be argued nor deemed

to be an admission against any party's interest in any litigation by and between

the parties.

16.        The parties represent and acknowledge that, in executing this

Stipulation they do not rely and have not relied upon any representation or

statement made by any party or such party's agents, representatives or

attorneys, with regard to the subject matter, basis or effect of this Stipulation or

otherwise, other than as specifically stated in this Stipulation.

17.        Should any immaterial provision of this Stipulation be declared or

be determined by any court of competent jurisdiction to be illegal, invalid or

unenforceable, the legality, validity and enforceability of the remaining parts,

terms or provisions shall not be affected thereby and said illegal, unenforceable

or invalid part, term or provision shall be deemed not to be a part of this

18

Stipulation.

18.      This Stipulation sets forth the entire agreement between the parties and fully supersedes any and all prior agreements and understandings, written or oral, between the parties pertaining to the subject matter hereof.

19.      No modification of this Stipulation shall be binding or enforceable unless in writing and signed by the parties.  This Stipulation shall be binding upon and inure to the benefit of the Parties, their respective heirs, executors, successors, administrators and assigns. This Stipulation may be executed in one or more counterparts, including by facsimile, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

20.      No further documentation shall be necessary or required to effectuate the releases contained herein.

21.      The parties to this Stipulation shall execute any other necessary documents and shall otherwise cooperate to effectuate the purposes of this Stipulation.

22.      The parties to this Stipulation will each support Court approval of this Stipulation and the global agreements reflected herein.


**[Remainder of page left blank intentionally]**

19

23.         The parties agree that this Court shall retain jurisdiction to enforce

this Stipulation.

EXECUTED this ___ day of July, 2007

DAVID R. KITTAY
Chapter 11 Trustee for the Debtor.

By: _____
100 White Plains Road
Tarrytown, New York 10591
(914) 332-8000

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Attorneys for New York Community Bank

By: _____

Ronald S. Greenberg (R.-5651)
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

TOFEL & PARTNERS, LLP
Attorneys for East Forty-Forth Street, L.L.C.

By: _____

Lawrence E. Tofel (LT-8631)
800 Third Avenue
New York, NY 10022
(212) 752-0007

WEIL GOTSHAL & MANGES LLP
Attorneys for East Forty-Fourth Street LLC

By:_____
Judy G.Z. Liu (JL-6449)
767 Fifth Avenue
New York, New York
(212) 310-8000

20

SUPREME COURT STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————x

EAST FORTY-FOURTH STREET L.L.C.,  :
    :    Index No. 602675/05
    Plaintiff,   :
    :
    v.    :    IAS Part 48
    :    Justice Marylin G. Diamond

NEW YORK COMMUNITY BANK and  :
C.S. EAST 44TH STREET L.P.,   :    **STIPULATION OF**
    :    **DISCONTINUANCE**
    Defendants.  :

———————————————————————x

It is hereby stipulated and agreed by and between the undersigned counsel for the respective parties that the above-referenced action including, without limitation, all counterclaims, cross-claims and third-party claims that were or could have been asserted herein, is hereby discontinued with prejudice and without costs as against any party.   This Stipulation may be executed in counterparts

Dated:              New York, New York
 July __, 2007

- 21 -

KL3 2603967.1

TOFEL & PARTNERS, LLP                    KRAMER LEVIN NAFTALIS
                                         & FRANKEL LLP


By: _____          By: _____
        Lawrence E. Tofel                        Ronald S. Greenberg

     800 Third Avenue, 12th Floor              1177 Avenue of the Americas
New York, New York  10022                New York, New York  10036
(212) 573-0000                           (212) 715-9100

     Attorneys for Plaintiff                    Attorneys for Defendants

- 22 -

KL3 2603967.1

SUPREME COURT STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————————x

NEW YORK COMMUNITY BANK,     :

                              :           Index No. 106297/05

               Plaintiff,    :

                              :           IAS Part 48

                v.             :           Justice Marylin G. Diamond

                              :

EAST FORTY-FOURTH STREET, L.L.C., :      **STIPULATION OF**

                              :      **<u>DISCONTINUANCE</u>**

               Defendant.   :

                              :

————————————————————————————x

        It is hereby stipulated and agreed by and between the undersigned counsel for the respective parties that the above-referenced action including, without limitation, all counterclaims, cross-claims and third-party claims that were or could have been asserted herein, is hereby discontinued with prejudice and without costs as against any party.  This Stipulation may be executed in counterparts

      Dated:                       New York, New York
       July __, 2007

- 23 -

TOFEL & PARTNERS, LLP                    KRAMER LEVIN NAFTALIS
                                         & FRANKEL LLP


By: _____          By: _____
        Lawrence E. Tofel                        Ronald S. Greenberg

      800 Third Avenue, 12th Floor             1177 Avenue of the Americas
New York, New York  10022                New York, New York  10036
(212) 573-0000                           (212) 715-9100

      Attorneys for Defendant                  Attorneys for Plaintiff



SUPREME COURT STATE OF NEW YORK
COUNTY OF NEW YORK
_____x
_____

NEW YORK COMMUNITY BANK,           :
                                   :        Index No. 106297/05
                   Plaintiff,      :
                                   :        IAS Part 48
            v.                     :        Justice Marylin G. Diamond
                                   :
EAST FORTY-FOURTH STREET, L.L.C.,  :        **STIPULATION**
                                   :        **CANCELLING BOND**
                   Defendant.      :
                                   :
_____x
_____



      It is hereby stipulated and agreed by and between the undersigned counsel for the

respective parties that:  (i) "Yellowstone-Type" Toll Bond No. 10BSBDS0305 in the amount of

$2,000,000 dated October 25, 2005 (as amended by Rider to Bond dated October 28, 2005), issued

by Hartford Fire Insurance Company (the "Bond") is hereby forever discharged; and (ii) plaintiff,

- 24 -

KL3 2603963.1

Hartford Fire Insurance Company and their respective parents, affiliates, successors, assigns and subsidiaries are hereby fully and unconditionally released from any and all past, present and future liability, whether now known or unknown, in any way related to the Bond.  This Stipulation may be executed in counterparts.

Dated:                             New York, New York
July __, 2007

TOFEL & PARTNERS, LLP            KRAMER LEVIN NAFTALIS
& FRANKEL LLP

By: _____     By: _____
       Lawrence E. Tofel                   Ronald S. Greenberg

     800 Third Avenue, 12th Floor          1177 Avenue of the Americas
New York, New York  10022          New York, New York  10036
(212) 573-0000                        (212) 715-9100

     Attorneys for Defendant             Attorneys for Plaintiff

                                     SO ORDERED:

- 25 -

**Exhibit B**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EAST 44TH REALTY, LLC, | : | Case No. 05-16167 (RDD) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------X

**AFFIDAVIT OF JUDITH L. SIEGEL
UNDER LOCAL BANKRUPTCY RULE**

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | : ss.: | |
| COUNTY OF WESTCHESTER | ) | |

Judith L. Siegel, being duly sworn, deposes and says:

1.     I am an attorney duly admitted to practice in the Courts of the State of New York, the

District Courts for the Southern and Eastern District of New York and the Second Circuit

Court of Appeals.

2.     I am the attorney for David R. Kittay, the Chapter 11 Trustee (the "Trustee") of the

bankruptcy estate of East 44th Realty, LLC (the "Debtor").  I submit this affidavit in

support of the *Trustee's Motion Pursuant to Federal Rule of Bankruptcy Procedure*

*9019(a) Seeking Approval of Global Stipulation and Mutual Releases Between and*

- 1 -

1

*Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank
and East Forty-Fourth Street L.L.C.* (the "Motion").

3       The Debtor's sole principal asset is its claim to the rights as tenant under a ground lease

(the "Ground Lease") and the corresponding rights as sub-lessor to space leases (the

"Space Leases", collectively the Ground Lease and the Space Leases will be referred to as

the "Lease"), all related to the real property and building owned by the Landlord and

located at 228-238 East 44th Street, New York, New York (the "Property").

4       The sale of the Lease represents the Debtor's estate's creditors' only chance to recover in

this case.

5       The Trustee is now poised to sell the Lease to Global Capital L.L.C. (the "Purchaser") or

another bidder who makes a higher and better offer.  The sale can only proceed, however,

if the Trustee can satisfy the prerequisite of Bankruptcy Code Section 365(b)(1); namely,

that he cure all defaults under the Lease.  In order to cure the defaults, the Trustee must

cure both monetary and non-monetary defaults.

6       The Trustee has negotiated a tri-party stipulation (the "Stipulation") between (a) the

holder of a mortgage on the Lease, New York Community Bank (the "Lender"), as

successor by merger to Roslyn Savings Bank, (b) the landlord for the Lease, East Forty-

Fourth Street L.L.C. (the "Landlord") and (c) the Trustee, which not only compromises

and settles the monetary cure costs associated with the assumption and assignment of the

Lease (at a considerable discount) but also provides a mechanism for, and cap on, non-

monetary cure obligations.  Moreover, the Stipulation contemplates an end to all of the

litigation that occurred prior to and during the Debtor's Chapter 11 case.

- 2 -

KL3 2603963.1

7      Absent approval of the Stipulation, it is probable that the Landlord will not consent to the assumption and assignment of the Lease.

8      An immediate sale of the Lease is required for a variety of reasons, including, significantly, the current fluctuations in the value of the Lease as a result of the volatile real estate market.  A delay of the sale will also result in the estate incurring additional taxes, operating costs and insurance costs.  Furthermore, obtaining approval of the Stipulation after August 8, 2007, and consequently holding the auction to sell the Lease after August 8, 2007, would be significantly detrimental to this estate.  Rescheduling the sale after building momentum, advertising and marking, would likely discourage potential bidders, resulting in fewer potential bidders participating in the auction.

9      The Trustee is moving by order to show cause to seek the Court's approval of the terms of the Stipulation.

10      Accordingly, I respectfully request that the Court enter an order to show cause, in the form annexed to the Motion, (i) scheduling the time, date and place of a hearing for the Court to consider the Motion, (ii) seeking approval of the terms of Stipulation, (iii) shortening the twenty-day notice period proscribed by Federal Rule of Bankruptcy Procedure 2002(a)(3), (iv) authorizing and directing the Trustee to give notice of the relief requested herein by (a) serving a copy of the Motion, with exhibits, and the Court's Order to Show Cause via Federal Express to (1) the Office of the United States Trustee for the Southern District of New York; (2) counsel to the Debtor; (3) the Landlord's counsel; (4) the Lender's counsel; (5) all persons or entities known to the Trustee to have asserted a lien on, or security interest in, all or any portion of the Lease; and (6) Joseph

- 3 -

Bildirici's counsel and (b) serving a copy of the *Notice of Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Seeking Approval of Global Stipulation and Mutual Releases Between and Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street L.L.C.*, in the form annexed to the Motion, via first class mail to: (1) all potential bidders known to the Trustee who previously made offers to the Debtor or its agent or to the Trustee or his agent; (2) all creditors of the Debtor as identified in the Debtor's Chapter 11 petition; (3) all sub-lease tenants at the Property; (4) the Department of Justice; (5) all persons or entities who or which have filed a notice of appearance in this case; (6) the Internal Revenue

Service; (7) New York State Department of Taxation and Finance; and (8) New York City Department of Finance; and (iv) granting such other relief as is just and proper.

       /s/ Judith L. Siegel
       JUDITH L. SIEGEL

Sworn to before me this
the 26th day of July, 2007

/s/ Robin Meyer Konigsberg
Notary Public

ROBIN MEYER KONIGSBERG
Notary Public, State of New York
No. 02KO6154089
Qualified in Westchester County
Commission Expires October 23, 2010

- 4 -

4

**Exhibit C**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                              :
In re:                                        :        Chapter 11
                                              :
EAST 44ᵀᴴ REALTY, LLC,                        :        Case No. 05-16167 (RDD)
                                              :
                          Debtor.             :
-----------------------------------------------------X

## ORDER TO SHOW CAUSE

Upon the annexed *Trustee's Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Seeking Approval of Global Stipulation and Mutual Releases Between and Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street L.L.C.* (the "Motion"), dated July __, 2007, of David R. Kittay, (the "Trustee"), as Chapter 11 Trustee for the estate of East 44th Realty, LLC (the "Debtor"), seeking entry of an order: (i) scheduling the time, date and place of a hearing for the Court to consider the Motion seeking approval of the terms of the *Global Stipulation and Mutual Release Between and Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street, L.L.C.* (the "Stipulation"), (ii) shortening the twenty-day notice period proscribed by Federal Rule of Bankruptcy Procedure 2002(a)(3), (iii) authorizing and directing the Trustee to give notice of the relief requested herein by (a) serving a copy of the Motion, with exhibits, and this Court's Order to Show Cause, via Federal Express to: (1) the Office of the United States Trustee for the Southern District of New York; (2) counsel to the Debtor; (3) the Landlord's[23]

---

[23] Terms not otherwise defined herein are ascribed the meaning set forth in the Motion

- 1 -

counsel; (4) the Lender's counsel; (5) all persons or entities known to the Trustee to have

asserted a lien on, or security interest in, all or any portion of the Lease; and (6) Joseph Bildirici's

counsel and (b) serving a copy of the *Notice of Motion Pursuant to Federal Rule of Bankruptcy*

*Procedure 9019(a) Seeking Approval of Global Stipulation and Mutual Releases Between and*

*Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East*

*Forty-Fourth Street L.L.C.* (the "Notice of Hearing"), in the form annexed to the Motion as

Exhibit __, via first class mail to: (1) all potential bidders known to the Trustee who previously

made offers to the Debtor or its agent or to the Trustee or his agent; (2) all creditors of the Debtor

as identified in the Debtor's Chapter 11 petition; (3) all sub-lease tenants at the Property; (4) the

Department of Justice; (5) all persons or entities who or which have filed a notice of appearance

in this case; (6) the Internal Revenue Service; (7) New York State Department of Taxation and

Finance; and (8) New York City Department of Finance; and (iv) granting such other relief as is

just and proper, as more fully set forth in the Motion; and upon the affidavit pursuant to Local

Bankruptcy Rule 9077-1(a) of Judith L. Siegel (the "Affidavit"), sworn to on July 26, 2007,

showing why proceeding by Order to Show Cause is necessary; and sufficient cause appearing

therefore, it is

ORDERED, that (i) the Office of the United States Trustee for the Southern District of

New York; (ii) counsel to the Debtor; (iii) the Landlord and its counsel; (iv) the Lender and its

counsel; (v) all persons or entities known to the Trustee to have asserted a lien on, or security

interest in, all or any portion of the Lease; (vi) Joseph Bildirici's counsel; (vii) all potential

bidders known to the Trustee who previously made offers to the Debtor or its agent or to the

Trustee or his agent; (viii) all creditors of the Debtor as identified in the Debtor's Chapter 11

- 2 -

petition; (ix) all sub-lease tenants at the Property; (x) the Department of Justice; (xi) all persons

or entities who or which have filed a notice of appearance in this case; (xii) the Internal Revenue

Service; (xiii) New York State Department of Taxation and Finance;(xiv) New York City

Department of Finance; and (xv) any other person or entity with standing to be heard, show cause

before this Court at the United States Bankruptcy Court, One Bowling Green, New York, New

York, at 10:00 a.m. on the 8th day of August, 2007 (the "Hearing") or as soon thereafter as

counsel can be heard, why the Court should not enter an order (i) approving the Stipulation

settling the claims and pending litigation between and among the Trustee, Lender and the

Landlord and (ii) granting such other relief as is just and proper, and it is further

ORDERED, that the twenty-day notice period proscribed by Federal Rule of Bankruptcy

Procedure 2002(a)(3) is hereby shortened; and it is further

ORDERED, that on or before _____ __, 2007, the Trustee is hereby directed to serve (i)

a copy of the Motion, with exhibits and this Court's Order to Show Cause, via Federal Express

to: (1) the Office of the United States Trustee for the Southern District of New York; (2) counsel

to the Debtor; (3) the Landlord's counsel; (4) the Lender's counsel; (5) all persons or entities

known to the Trustee to have asserted a lien on, or security interest in, all or any portion of the

Lease; and (6) Joseph Bildirici's counsel and (ii) a copy of the Notice of Hearing via first class

mail to: (1) all potential bidders known to the Trustee who previously made offers to the Debtor

or its agent or to the Trustee or his agent; (2) all creditors of the Debtor as identified in the

Debtor's Chapter 11 petition; (3) all sub-lease tenants at the Property; (4) the Department of

Justice; (5) all persons or entities who or which have filed a notice of appearance in this case; (6)

the Internal Revenue Service; (7) New York State Department of Taxation and Finance; and (8)

- 3 -

New York City Department of Finance; and it is further

ORDERED, that service of this Order, the Motion and the Notice of Hearing in

accordance with the foregoing decretal paragraphs, shall constitute good and sufficient notice of

the Hearing on the Motion and the relief requested therein, and notice pursuant to Fed. R. Bankr.

P. 2002 and 9006 and all other and further notice be, and it hereby is, dispensed with and waived;

and it is further

ORDERED, that objections, if any, to the relief requested in the Motion shall be made in

writing, shall conform to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure

and shall be filed with the Court (with a copy to the Chambers of the Honorable Robert D. Drain)

and personally served on Kittay & Gershfeld, P.C., attorneys for the Trustee, 100 White Plains

Road, Tarrytown, New York 10591 by no later than 4:00 p.m. on August 6, 2007; and it is

further

ORDERED, that the Hearing may be adjourned without further order by announcement of

such adjournment in open court.

New York, New York
_____ , 2007

_____
United States Bankruptcy Judge

- 4 -

KL3 2603963.1

**Exhibit D**

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT | **HEARING DATE: AUGUST 8, 2007** |
| SOUTHERN DISTRICT OF NEW YORK | **HEARING TIME: 10:00 A.M.** |

-----------------------------------------------------X
                                         :

In re:                          :          Chapter 7
                                   :

EAST 44TH REALTY, LLC,        :          Case No. 05-16167 (RDD)
                                   :

                Debtor.    :

-----------------------------------------------------X

**NOTICE OF HEARING OF TRUSTEE'S MOTION PURSUANT TO FEDERAL
RULE OF BANKRUPTCY PROCEDURE 9019(a) SEEKING APPROVAL OF
GLOBAL STIPULATION AND MUTUAL RELEASES BETWEEN AND
AMONG DAVID R. KITTAY, CHAPTER 11 TRUSTEE FOR THE DEBTOR,
NEW YORK COMMUNITY BANK AND EAST FORTY-FOURTH STREET L.L.C.**

     **PLEASE TAKE NOTICE,** that pursuant to an Order of the U.S. Bankruptcy Court dated July 27, 2007, a hearing (the "Hearing") will be held on **August 8, 2007, at 10:00 a.m.**, or as soon thereafter as counsel can be heard, before the Honorable Robert D. Drain, United States Bankruptcy Judge, in his Courtroom in the Bankruptcy Court, The Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, seeking entry of an order granting the relief requested in the *Trustee's Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Seeking Approval of Global Stipulation and Mutual Releases Between and Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street L.L.C.* (the "Motion"). The Motion seeks approval pursuant to Federal Rule of Bankruptcy Procedure 9019, of: (i) the terms of a global stipulation (the "Stipulation") settling the claims and pending litigation between and among the David R. Kittay, the Chapter 11 Trustee (the "Trustee") for the bankruptcy estate (the "Estate") of East 44th Realty, LLC (the "Debtor"), New York Community Bank (the "Lender"), as successor by merger to Roslyn Savings Bank and East Forty-Fourth Street L.L.C. (the "Landlord"), and (ii) such other relief as is just and proper.

     **PLEASE TAKE FURTHER NOTICE THAT ATTENDANCE AT THE HEARING IS NOT NECESSARY, WITH THE EXCEPTION OF THE TRUSTEE AND THOSE PARTIES IN INTEREST, IF ANY, WHO HAVE FILED AN OBJECTION TO THE MOTION.**

     **PLEASE TAKE FURTHER NOTICE** that the salient terms of the Stipulation provide:

-     <u>Payment of Monetary Cure Costs</u>: The Trustee shall pay to the Landlord the sum

5

of $1.7 million (the "Monetary Cure Amount") in full satisfaction of all monetary obligations under Section 365 of the Bankruptcy Code, subject to Josef Bildirici, the Debtor's principal, appealing this Motion or the sale of the lease (the "Lease") to real property located at 228-238 East 44th Street, New York, New York (the "Property").

- **Repair of Non-Monetary Cure Costs**:  The Trustee shall fund an escrow account (the "Repair Escrow") in the amount of $200,000 at closing, from the proceeds of the sale, to pay the costs of all required repairs deemed necessary as a result of a physical inspection and survey of the Property to be conducted by the Landlord's engineer for the purpose of ascertaining and determining whether the repairs required by (i) the May, 2003 Settlement Agreement between, *inter alia*, the Debtor, the Lender and the Landlord; and (ii) the February 16, 2005 Building Condition and Compliance Report have been completed satisfactorily, since completion of such tasks is a condition precedent to the assumption of the Lease. Funding of the escrow account will satisfy the condition precedent.

- **Lease in Full Force and Effect**:  Subject to approval of the Stipulation, the closing (the "Closing") of the sale of the Lease, the funding of the Repair Escrow and the receipt of the Monetary Cure Amount, the Landlord will agree that the Lease is in full force and effect and the Landlord will withdraw all claims that the Lease has terminated.

- **Waiver of Trustee's Claims Against Landlord**:  Subject to approval of the Stipulation and the Closing, the Trustee will waive any and all claims he and/or the Estate has against the Landlord including, without limitation, claims asserted in the actions titled *East 44th Realty, LLC v. East Forty-Fourth Street, LLC*, Adv. Pro. No. 05-3136 and  *East 44th Realty, LLC v. East Forty-Fourth Street L.L.C.*, Index No. 110952/04 (collectively "the Litigation").

- **Waiver of Landlord's Claims Against Estate**:  Subject to approval of the Stipulation and upon receipt of the Monetary Cure Amount, and funding of the Repair Escrow, the Landlord shall waive any and all claims it has against the Debtor, the Trustee and/or the Estate related to the Litigation.

- **Mutual Release Between Lender and Landlord**:  Subject to approval of the Stipulation and the Closing, the Lender and the Landlord shall mutually release each other from any and all claims arising from or related to the actions titled *New York Community Bank v. East Forty-Fourth Street L.L.C.*, Index No. 106297/05 and *East Forty-Fourth Street L.L.C. v. New York Community Bank and C.S. East 44th Street L.P.*, Index No. 602675/05, and the bond posted by the Lender will be discharged.

6

- <u>Satisfaction of Lender's Claim</u>:  The Trustee shall pay to the Lender $12,659,733.13, in full satisfaction of the Lender's claim against the Estate subject to adjustments, at closing, for expenses and payments.

**PLEASE TAKE FURTHER NOTICE** that interested parties may obtain a copies of the Motion **free of charge**, by contacting the Trustee, through his attorneys Kittay & Gershfeld, P.C., 100 White Plains Road, Tarrytown, New York 10591, (914) 332-8000, Attn: Judy Siegel, Esq.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion shall be in writing, shall be served upon the undersigned attorneys for the Trustee with a courtesy copy to Chambers, so as to be received no later than 4:00 p.m. on August 6, 2007; and shall be filed with the Clerk of the Bankruptcy Court together with proof of service.

**PLEASE TAKE FURTHER NOTICE** that each such objection shall state the name of the objecting party, its status as a party in interest, whether it has filed a claim in the above-captioned case, the amount of such claim and the nature and basis of its objection and conform with the following requirements:

objections filed by parties with legal representation shall be filed (a)(i) through the Bankruptcy Court's electronic filing system (in accordance with General Order M-182), which may be accessed (with a password which is available by contacting the Bankruptcy Court's technical assistance number at (212) 668-2870, ext. 3522, available Monday-Friday 8:30 a.m. through 5:00 p.m.) through the Internet at the Bankruptcy Court's website: www.nysb.uscourts.gov using Netscape Navigator software 3.0 or higher, and (ii) in portable document format (PDF) using Adobe Acrobat Exchange software for conversion; or (b) if a party is unable to file electronically, such party shall submit the objection in PDF format on a diskette in an envelope with the case name, case number, type and title of the document, document number of the document to which the objection refers and the file name on the outside of the envelope; or (c) if a party is unable to file electronically or use the PDF format, such party shall submit the objection on a diskette in either Word, WordPerfect or DOS text (ASCII) format.  An objection filed by a party with no legal representation shall comply with section (b) or (c) as set forth herein.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be adjourned from time to time without further notice to any creditor or other party in interest other than by announcement of the adjourned date in open court on the date of the Hearing.

DATED:      Tarrytown, New York
              July 27, 2007

7

**BY ORDER OF THE COURT**
Counsel to the Trustee

By /s/ David R. Kittay
David R. Kittay (DK-0481)
100 White Plains Road
Tarrytown, New York 10591
(914) 332-8000

**Exhibit E**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                          :
In re:                          :       Chapter 11
                                            :
EAST 44TH REALTY, LLC,           :       Case No. 05-16167 (RDD)
                                          :
                        Debtor.     :
-----------------------------------------------------X

### ORDER APPROVING GLOBAL STIPULATION AND MUTUAL RELEASES BETWEEN AND AMONG DAVID R. KITTAY, CHAPTER 11 TRUSTEE FOR THE DEBTOR, NEW YORK COMMUNITY BANK AND EAST FORTY-FOURTH STREET, L.L.C.

Upon the *Trustee's Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Seeking Approval of Global Stipulation and Mutual Releases Between and Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street L.L.C.* dated July 27, 2007 (the "Motion"), of David R. Kittay, (the "Trustee"), as Chapter 11 Trustee for the estate of East 44th Realty, LLC (the "Debtor"), seeking entry of an order approving the terms of the *Global Stipulation and Mutual Releases Between and Among David R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street, L.L.C.*; and the Trustee having moved by Order to Show Cause, such Order to Show Cause having been supported by the Affidavit of Judith L. Siegel dated July 26, 2007; and the Order to Show Cause having been signed by the Court on July __, 2007; and the Trustee, having complied with the terms of the Order to Show Cause, served (a) a copy of the Motion, with exhibits, and this Court's Order to Show Cause, via Federal Express on: (1) the Office of the United States Trustee

1

for the Southern District of New York; (2) counsel to the Debtor; (3) the Landlord's[24] counsel; (4)

the Lender's counsel; (5) all persons or entities known to the Trustee to have asserted a lien on, or

security interest in, all or any portion of the Lease; and (6) Joseph Bildirici's counsel and (b) a

copy of the *Notice of Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Seeking*

*Approval of Global Stipulation and Mutual Releases Between and Among David R. Kittay, Chapter*

*11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street L.L.C.* (the

"Notice of Hearing"), in the form annexed to the Motion as Exhibit D, via first class mail to: (1) all

potential bidders known to the Trustee who previously made offers to the Debtor or its agent or to

the Trustee or his agent; (2) all creditors of the Debtor as identified in the Debtor's Chapter 11

petition; (3) all space lease tenants at the Property; (4) the Department of Justice; (5) all persons or

entities who or which have filed a notice of appearance in this case; (6) the Internal Revenue

Service; (7) New York State Department of Taxation and Finance; and (8) New York City

Department of Finance; and a copy of the certificate of service having been filed with the Clerk of

the Court; and no objections to the relief requested in the Motion having been interposed; and a

hearing having been held on the relief requested in the Motion on August 8, 2007; and all parties

wishing to be heard having been provided with such an opportunity; and due deliberation having

been given; and sufficient cause appearing therefore, it is now hereby

ORDERED, that the relief requested in the *Motion* is hereby granted in its entirety, and it is

further

ORDERED, that the *Global Stipulation and Mutual Releases Between and Among David*

---

[24]     Terms not otherwise defined herein are ascribed the meaning set forth in the Motion

2

*R. Kittay, Chapter 11 Trustee for the Debtor, New York Community Bank and East Forty-Fourth Street L.L.C.* is hereby approved in its entirety, and it is further

ORDERED, that service of (a) a copy of the Motion, with exhibits, and this Court's Order to Show Cause, via Federal Express to: (1) the Office of the United States Trustee for the Southern District of New York; (2) counsel to the Debtor; (3) the Landlord's counsel; (4) the Lender's counsel; (5) all persons or entities known to the Trustee to have asserted a lien on, or security interest in, all or any portion of the Lease; and (6) Joseph Bildirici's counsel and (b) a copy of the Notice of Hearing, via first class mail to: (1) all potential bidders known to the Trustee who previously made offers to the Debtor or its agent or to the Trustee or his agent; (2) all creditors of the Debtor as identified in the Debtor's Chapter 11 petition; (3) all space lease tenants at the Property; (4) the Department of Justice; (5) all persons or entities who or which have filed a notice of appearance in this case; (6) the Internal Revenue Service; (7) New York State Department of Taxation and Finance; and (8) New York City Department of Finance, constitutes good and sufficient notice of the Hearing of the Motion and the relief requested therein; and it is further

ORDERED that this Court shall retain jurisdiction over any and all disputes arising under or related to the Motion and/or the Stipulation.

New York, New York
August __, 2007

_____
United States Bankruptcy Judge

3