| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Return Date: December 5, 2007<br>Return Time: 10:00 a.m. |

---------------------------------------------------------x
In re:                                                            :        Chapter 11
　　　　　　　　　　　　　　　　　　　　　　　　:
EAST 44TH REALTY, LLC,                         :        Case No. 05-16167 (RDD)
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Debtor.           :
---------------------------------------------------------x

**RESPONSE OF DAVID R. KITTAY, CHAPTER 11
TRUSTEE FOR ESTATE OF EAST 44TH REALTY, LLC TO
OBJECTION OF YUSEF BILDIRICI TO MOTION MADE
BY TRUSTEE FOR COMMISSION AND BY
KITTAY & GERSHFELD, P.C. FOR COMPENSATION**

　　　　David R. Kittay (the "Trustee"), Chapter 11 Trustee for the Estate of East 44th Realty, LLC (the "Debtor" or the "Estate"), for his reply to Yusef Bildirici's *Objection to Trustee's Application for Compensation, and to Kittay & Gershfeld, P.C.'s Application for Compensation* (the "Objection"), respectfully states:

**Background**

　　　　1.　　Much of Mr. Bildirici's Objection is a rearguing of points raised and rejected by this Court on the Trustee's motions to sell the ground lease and to settle with the Landlord.  Most striking in this regard is his continued assertion that this Court's determination that the ground lease had not terminated pre-petition would be binding on a higher court reviewing an appeal by the Landlord from the sale order.  This Court explicitly rejected this possibility:

> [t]he first issue, the issue of pre-petition termination, was one that I decided as a threshold matter before considering the issues raised by the debtor. ... I concluded that it had not been fully terminated or, perhaps better stated, that the debtor still maintained an interest in the lease. That issue is one that is still subject to appeal. An interlocutory appeal was denied, but that threshold issue is one that I recognize a different court could view differently.

*Transcript of August 9, 2007 Hearing on Motion to Approve Tri-Party Stipulation.*, pp. 39-40.

Thus Bildirici's foundational argument that "the Debtor had already won the Lease termination issue," Objection Para. 7, is wrong. Bildirici's remaining arguments, that the Trustee is not entitled to his full statutory commission and that Kittay & Gershfeld's fees should be reduced, are equally meritless for the reasons set forth below.

2.  Earlier this year this Court appointed the Trustee to see if he could resolve years of rancorous litigation and determine if the Debtor's sole asset could be sold or if the case should be converted to a case under Chapter 7 of the Bankruptcy Code. The Trustee was appointed upon the motion of the Debtor's Landlord as a result of Yusef Bildirici's repeated breaches of his fiduciary duties to the Debtor and its creditors and chronic disregard of this Court's directions and orders.

3.  As this Court knows, and as set forth in greater detail in the Trustee's *First Application of David R. Kittay [For] Allowance of Interim Compensation* (the "Commission Application"), Bildirici and the Landlord and in many cases the Debtor's lender (the "Lender") had diametrically opposed views as to every facet of this Chapter 11 case. Most telling was Bildirici's view that the Debtor's ground lease (and related sub-leases[1]) was capable of being assumed and assigned and the Landlord's position that the Lease had terminated in Spring of 2005 and did not constitute an Estate asset.

4.  As set forth in the Commission Application, the Trustee believed that the Lease was capable of being assumed and assigned. Nonetheless, as he has repeatedly stated in the 9019 motion to approve a tri-party agreement with the Landlord and the Lender (the "9019 Motion"), the Commission Application and on the record at the hearing (the "Hearing") on the

---

[1] The ground lease and sub-leases are hereinafter referred to collectively as the "Lease".

2

9019 Motion, the Trustee also believed that there was a substantial likelihood that the Landlord would prevail in his position and the Trustee would be left with no asset to sell. Nonetheless, the Trustee determined that the only way to create value for the Debtor's estate was to sell the Lease.

**Sale of the Lease**

5.      Given his predilection for the "underdog", upon determining to sell the Lease, the Trustee believed Bildirici (if partnered with another entity) was entitled to bid on the Lease. As set forth in the Kittay Affirmation[2], although the Trustee met and spoke with Bildirici and urged him to bid, Bildirici and his counsel and representatives chose not to bid on the Lease. Ironically, while Bildirici's conduct throughout this case has resulted in diminishment of the Debtor's value, the Trustee's actions have created a potential surplus for Bildirici, yet Bildirici seeks to increase that surplus claiming the Trustee did a "terrible" job.

6.      In order to sell the Lease, the Trustee was required to cure all outstanding obligations under the Lease. The Landlord asserted that he was entitled to more than $1.9 million in legal fees and approximately $2 million in sub-lease proceeds. As set forth in the Kittay Affirmation, the Trustee carefully analyzed each and every one of the Landlord's time entries, the Lease provisions and the applicable law and determined that: (a) the Landlord was entitled to approximately $1.7 million under the terms of the Lease; (b) a legitimate question existed as to the Landlord's rights to the sub-lease proceeds; and (c) the Lease actually may have terminated in Spring 2005.

7.      As detailed in the Kittay Affirmation, the Trustee believed that the Landlord's claim that the Lease had terminated pre-petition was supported by the facts that: (a)

---

[2]     A copy of the Affirmation of David R. Kittay is being filed under separate cover.

the Appellate Division, First Department, had granted the Landlord permission to address whether the Debtor's appeal of an earlier decision was moot because the Lease had terminated; (b) the District Court for the Southern District of New York's determination was on a purely interlocutory basis; and (c) this Court had acknowledged that the matter was still subject to appeal and that a higher court could come to a different conclusion than this Court's "threshold" determination.

8.  Given the size of the Landlord and Lender's claims, and the range of stalking horse offers the Trustee received for the Lease, the Trustee determined he would only be able to sell the Lease if he could negotiate a compromise and settlement of the Landlord's cure costs. A detailed explanation of his analysis is set forth in the 9019 Motion annexed to the Kittay Affirmation.

## The Trustee is Entitled to the Statutory Maximum Amount of Commission

9.  As set forth in detail in the Commission Application, the extraordinary results achieved by the Trustee in this case warrant payment of the maximum amount under Bankruptcy Section 326. Succinctly stated, the Trustee guaranteed the existence of a viable asset capable of being assumed and assigned, obtained a reduction of legal fees owed to the Landlord and obtained a waiver of approximately $2 million in sub-lease proceeds arguably owing to the Landlord. The Trustee anticipates a 100% distribution to Estate creditors.

10. Moreover, if at the end of the day, the sale had not been successful, the only entities bearing that risk were the Trustee, his professionals and the Debtor's creditors; the Debtor's Lender would have retained its rights under the Lease and/or the Landlord would have recovered the Lease. The risks borne by the Trustee were of a far greater magnitude than those

in a typical case. Here, within days of his appointment, the Trustee discovered that the tenants' security deposits were missing, and had good cause to worry that he, as a fiduciary, could be held personally responsible to restore them. If that were not bad enough, after the Trustee was appointed he discovered that there was inadequate insurance to protect the Estate and apparently no money to pay for it. Thus, besides facing the risk that there would not be sufficient funds to pay his commission and his professionals' fees, the Trustee faced the risk that he could be personally liable for problems created by Bildirici's conduct.

        11.     This case is in marked contrast to the one Judge Bernstein described in *Brous* where a Chapter 7 trustee merely retains a real estate broker, reviews offers for a property and sells the property to the highest and best bidder. Here, the Trustee negotiated a tri-party stipulation that resolved years of rancourous litigation and allowed a sale to go forward that turned out to be the means of paying all creditors in full. Moreover, as a result of the Trustee's efforts, the Court ruled that the Trustee had the right to retain the deposit of the defaulting purchaser[3] which will constitute the surplus to be returned to the Debtor's principals.

        12.     Applying the *Brous* Court's lodestar approach in a case such as this one fails to consider the risk inherent in a trustee's work. As set forth in the Commission Application, within days of his appointment, the Trustee discovered that the tenants' security deposits were missing, and had good cause to worry that he, as a fiduciary, could be held personally responsible to restore them. In addition, after the Trustee was appointed he

---

[3]     G Squared Management LLC ("GSM") and G Squared Associates LLC ("GSA"; GSM and GSA are collectively referred to as "G Squared") were the successful bidder for the Lease. However, after they were unable to close in accordance with the explicit terms of the sale contract, the Trustee declared G Squared in default and obtained the release of G Squared's $1.67 million deposit. The Trustee's retention of the deposit is presently on appeal to the District Court for the Southern District of New York, case no. 07-CV-9565 (PAC).

discovered that there was inadequate insurance to protect the Estate and apparently no money to pay for it. This risk was also borne by the Trustee. Payment of the full statutory amount would not constitute a "bonus", rather it would compensate the Trustee for the risk he assumes in running a case such as this where, if he is unsuccessful, he and his professionals have incurred hundreds of thousands of dollars of work, with no source of payment and he also faces personal liability for financial loss resulting from the Debtor's principals' derelictions in failing to insure the Lease and commingling the tenant's security deposits.

13. Applying *Brous* in cases such as this one, where the results have been spectacular and the risk borne by the Trustee substantial, would cause qualified trustees, who are appointed as bankruptcy trustees precisely because of their expertise in complex bankruptcy matters, to flee trustee work. Why should a trustee work on a contingent fee basis when the reward is an hourly fee, and the personal and liability risks significant, when he or she could go to a large firm and charge $800/hour or more representing wealthy clients?

14. Such an approach to trustee compensation would be at odds with the statutory scheme crafted by Congress. If Congress had intended for trustees in cases like this one to be paid solely on a lodestar basis, there would be no need for the percentage limitations of Bankruptcy Code Section 326.

### The Trustee's Commission Should Be Calculated Based on the Full $17,883,330.10 in Disbursements

15. Bildirici's assertion that the Trustee is not entitled to calculate his commission based on money that the Trustee did not personally handle through his "69 account" is incorrect. The Trustee is entitled to calculate his statutory commission based on monies he collected and turned over to creditors. The House Report to the Bankruptcy Reform Act of 1978

6

makes clear that the phrase "moneys disbursed or turned over" was crafted to cover situations such as the instant case where a trustee sells an asset on an all cash basis and ensures that the debtor's secured creditor receives payment on its claim:

> It should be noted that the base on which the maximum fee is computed includes moneys turned over to secured creditors, to cover the situation where the trustee liquidates property subject to a lien and distributes the proceeds.

H.R. Rep. No. 95-595, at 329 (1977).

16.     The District Court for the Southern District of New York in *United States Trustee v. Messer (In re Pink Cadillac Assoc.)*, 1997 WL 164282 (S.D.N.Y. Apr. 8, 1997), examined the question of what constitutes money or property disbursed in the context of a commission calculation that included the value of a credit bid where the property was merely surrendered to the secured creditor *without* any money being exchanged. As the District Court explained:

> The emphasis on "moneys," rather than property or value, accords with the drafter's understanding that "The trustee's principal duty is to collect and reduce to money property of the estate for which he serves, and to close up the estate is [sic] expeditiously as is compatible with the best interests of parties in interest.""

*Id.* at *3 (quotations in the original, citations omitted).

17.     In the instant case, the Trustee and the parties in interest (the Landlord, the Lender and Global) determined to utilize a third party agent, Intracoastal Title Company ("Intracoastal"), to serve as their respective agent. Such a determination is usual and customary in commercial real estate transactions of this nature. Global, as purchaser, borrowed $11 million from the Lender[4] to finance the transaction. In anticipation of the closing, Global wired $5.5

---

[4] Global sought funding from approximately 20 other sources but only Lender would finance this transaction.

million[5] to Intracoastal. Pursuant to a letter dated October 11, 2007 (the "Settlement Letter") from the Trustee to the purchaser, the Trustee authorized the purchaser (and the agreed upon title company) to fund the Estate's obligations in accordance with a settlement statement attached to the letter. A copy of the Settlement Letter is annexed hereto as Exhibit A.

18. As of the date of the closing, and as evidenced by the payoff letter (the "Payoff Letter"), the Lender was owed $12,675,517.90. A copy of the Payoff Letter is annexed hereto as Exhibit B. The Lender was paid in two tranches: (a) Intracoastal disbursed $1,675,517.90 to the Lender; and (b) the Lender paid itself $11 million to satisfy the pre-existing mortgage. Payment of the $11 million is evidenced by: (a) the Loan Settlement Statement issued by the Lender to the purchaser on October 11, 2007; (b) the Uniform Commercial Code Termination statement; (c) the Termination of Collateral Assignment of Rents and Leases; and (d) the Satisfaction of Mortgage. Copies of each of these documents are annexed hereto as Exhibits C, D, E and F, respectively. The Lender then loaned purchaser a new $11 million. As is customary in commercial real estate transactions of this nature, the Lender did not wire $11 million to Intracoastal for the sole purpose of having Intracoastal wire the same funds back to it. Rather, it made the appropriate book entries evidencing the loan satisfaction and the issuance of the new loan. It also issued a new mortgage to purchaser, as is evidenced by, among other things, the $308,000 mortgage recording tax Bildirici now objects to. Further evidence of the existence of the new loan is provided by the affidavit of Charles Baker, a senior vice-president of Lender, the form of which is attached hereto as Exhibit G.

19. Additional disbursements were made by Intracoastal. Specifically,

---

[5] Global had previously given the Trustee a $1.7 million down payment.

Intracoastal paid $1.7 to the Landlord. In addition, the Trustee's bankruptcy counsel paid the Trustee's real estate broker $324,000 and my court-appointed managing agent made significant distributions in the course of running the Debtor's building. A copy of the Trustee's Form 2 evidencing the payments is annexed to the Commission Application.

20. Courts have held that money disbursed to creditors, even though a trustee does not himself write the check, but instead directs a third party to make the distributions, constitutes moneys turned over by a trustee to parties in interest. *See Blair v. Stratton (In re Blair)*, 329 B.R. 358, 2005 WL 2009303, *3 (9th Cir. BAP (Cal) 2005) (court upholds Bankruptcy Court's decision to allow calculation of chapter 7 trustee's commission based on monies disbursed to a secured creditor by escrow company finding "the escrow handler was acting as the trustee's agent and following the trustee's instructions when it distributed funds to the secured creditors. Therefore, in a legal sense, the distributions were made by the trustee."); *In re Tyczka*, 287 B.R. 465, 469 (Bankr. E.D. Mo. 2002) (bankruptcy court holds that it is of "no consequence that the disbursement of sale proceeds to the secured creditors and for expenses were actually made by the title company, rather than by Trustee. Trustee authorized these disbursements through his participation in the closing process. Therefore, the disbursements made by the title company are properly included in the calculation of Trustee's commission"); *In re Reid*, 251 B.R. 512, 518 (Bankr. S.D. Mo. 2000) (court finds that "moneys can be disbursed by the trustee to creditors even though the trustee does not write the check or deliver an envelope with cash to such creditors. Buyers of real property may well be more comfortable, and more willing to buy, if the sale is closed through a third party, such as a title company or real estate broker. That third party, who makes the actual disbursements to the secured creditor, does so

pursuant to instructions from the trustee. In that situation, I find that disbursements are made 'by' the trustee"). Similarly, in the instant case, the Lender's payment to itself of the $11 million necessary to satisfy the original loan is analogous to a payment by a third party title agent.

21. The case law cited by Bildirici is distinguishable, and inapplicable in the instant case, because it involves cases of three types: (a) cases where the trustee sought to calculate commission based on a theory of "constructive disbursement" of property other than money[6] (*i.e.*, assumption of liens, value of credit bids or value of settlements and claims released); (b) cases where the Trustee used a third party to disburse the funds but had not authorized the third party to act as the trustee's agent[7]; and (c) cases where non-agents paid the Debtor's secured creditor[8].

22. Accordingly, the Trustee was correct in determining to include the $11 milion disbursement in his commission calculation.

### Global Was Required to Obtain a New Mortgage; Global Could Not Assume the Mortgage

---

[6] *See, e.g., United States Trustee v. Messer*, 1997 WL 164282 (S.D.N.Y. April 8, 1997); In re New England Fish Co., 34 B.R. 899 (Bankr. W.D. Wash. 1983); *In re Barnett*, 133 B.R. 487 (Bankr. N.D. Iowa 1991).

[7] *See, e.g., In re Moreno*, 295 B.R. 402 (Bankr. S.D. Fla. 1987) (court holds that trustee was not entitled to calculate commission on monies disbursed by settlement agent who was not authorized to act as trustee's agent). In the instant case, the Trustee was authorized by this Court to take whatever actions necessary to consummate the sale and the Trustee required the Lender to loan new monies to the purchaser. The fact that the Trustee did not require the Lender to wire money back and forth to itself does not change the substance of what transpired: the Lender was paid in full on the first mortgage and provided new monies to the purchaser as evidenced by the documents described above and annexed hereto.

[8] *See, e.g. In re Palm Beach Resort Prop., Inc.*, 73 B.R. 323 (Bankr. S.D. Fla. 1987). In *Palm Beach*, the purchaser and the trustee had entered into an agreement whereby the purchaser paid $75,000 to the debtor's estate and the remainder to the debtor's secured creditor. Here, the purchaser paid $1.7 million to the Trustee, $5.5 million to the title company and borrowed $11 million from the Lender in new monies which were used to satisfy the outstanding mortgage on the Lease.

23. While it is true that if the Lender had agreed that Global could assume the existing mortgage, the Trustee would have objected pursuant to paragraph 3 of the Sale-Purchase Agreement executed by Global (the "Global Agreement") which stated that, the sale of the Lease was an all cash transaction, subject to no financing contingencies. The Lender did not, however, agree to allow Global to assume the mortgage; it expressly stated that it wanted the old loan off its books.

24. The Trustee also would also have objected to Global's assumption of the mortgage because it would have contravened the Court-approved bidding procedures and form of contract pursuant to which all potential bidders were required to bid. The Trustee had structured the sale process in this way to ensure that all bidders bid on a level playing field. In the course of determining that Global was the successful stalking horse bidder, the Trustee rejected the bids of two potential bidders who conditioned their bids on a change to the form of contract.

25. Thereafter, Global sought permission to modify the form of contract and was denied such permission as contrary to the terms pursuant to which stalking horse bids were solicited. In addition, the Trustee was forced to reject the advances of many potential higher and better bidders because they, too, sought modifications to the form of contract.

26. Accordingly, the Lender's decision to issue a new mortgage was consistent with preserving the *bona fides* of the sale process.

### Kittay & Gershfeld, P.C. Provided Unique and Valuable Services to the Trustee and the Debtor

27. As set forth in Kittay & Gershfeld's Fee Application, Kittay & Gershfeld performed yeoman's work with outstanding results on behalf of the Trustee and the Estate.

28. The work performed by K&G with respect to the real estate contract was separate and apart from that performed by the Trustee's special real estate counsel Proskauer Rose LLP ("Proskauer"). Proskauer was retained to answer the Trustee's questions about the Lease's terms and viability. Although Proskauer provided the Trustee with an initial draft of a sale agreement, the agreement represented a "normal" commercial real estate transaction and did not address issues relating to the Debtor's bankruptcy. K&G's review and comments to the many iterations of the form of contract included, but were not limited to,: (a) the one-day closing and time is of the essence requirement – each of which was inserted to bolster the Trustee's request for a waiver of the Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 6004 and 6006 stay; (b) the removal of a purchaser's ability to seek an adjournment of the time to close – again to address Bankruptcy Rules 6004 and 6006; (c) language mandating that the purchaser was obligated for all transfer taxes if a chapter 11 plan was not confirmed; (d) the removal of all representations and warranties on the part of the Trustee – the creation of an "as is - where is" sale; and (e) removing "customary" language that would have deemed the agreement terminated if the Lease terminated by reason of a fire or other casualty, or by virtue of a condemnation.

29. Ironically, K&G was repeatedly advised by Proskauer and the Debtor's Lender that the Lease was so "one-sided" that the Trustee would never locate a purchaser willing to enter into the contract. K&G persuaded the Trustee to allow the Trustee's real estate professionals to market the Lease with the proposed form of contract and was proven correct. The Trustee identified two potential purchasers who were willing to execute the proposed form of contract.

12

30. Ironically, it was only because of the Trustee's and K&G's concern that Bildirici or the Landlord would appeal the Trustee's sale of the Lease that the one-day closing provision was included in the proposed form of contract. That provision led to G Squared's default and the only source of a potential surplus for Bildirici.

31. In addition, the work K&G performed with respect to the two closings was separate and apart from the work performed by Proskauer. K&G worked with Proskauer to determine how to put Global on notice that it had to proceed to close, but K&G negotiated the terms of the letter agreement with Global that modified the terms of the Global Agreement to allow Global to adjourn the closing date. K&G also worked with Global's title company addressing specific bankruptcy-related concerns. If K&G had not been able to satisfy the title company's concerns, the Trustee may have been deemed in default under the Global Agreement and he might have had to return Global's deposit and lost his only remaining bidder for the Lease. Finally, K&G, as the entity that had negotiated and documented the tri-party settlement with the Landlord and the Lender, was aware of, and kept the proceedings moving along in accordance with the timing requirements in the tri-party stipulation.

## Conclusion

32. For all of the foregoing reasons, the Trustee respectfully states that Commission Application and the Interim Application be awarded in full and Bildirici's Objection should be denied in its entirety.

Dated: Tarrytown, New York
December 4, 2007

KITTAY & GERSHFELD, P.C.
Attorneys for the Trustee

/s/ David R. Kittay

David R. Kittay (DK 0481)
100 White Plains Road
Tarrytown, New York 10591
(914) 332-8000