UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:                                              :        Chapter 11
                                                    :
EAST 44TH REALTY, LLC,                            :        Case No. 05-16167 (RDD)
                                                    :
                            Debtor.                 :
---------------------------------------------------------x

**TRUSTEE'S RESPONSE TO OBJECTION
TO KITTAY & GERSHFELD, P.C.'S SECOND
INTERIM APPLICATION FOR COMPENSATION**

David R. Kittay (the "Trustee"), Chapter 11 Trustee for the Estate of East 44th Realty, LLC (the "Debtor" or the "Estate"), for his reply to Yusef Bildirici's[1] *Objection to Kittay & Gershfeld's Second Interim Application for Compensation* (the "Objection") respectfully states:

**Background**

Bildirici, whose conduct caused the appointment of the Chapter 11 Trustee, now objects to Kittay & Gershfeld's Second Interim Fee Application. If he is successful, the money collected through the efforts of Kittay & Gershfeld, P.C., in protecting the interests of all of the Debtor's creditors, will be returned to Bildirici. Such a result is unwarranted and inequitable. For the reasons set forth below, Bildirici's Objection should be denied in its entirety and Kittay & Gershfeld should be awarded fees and expenses as requested.

**The Debtor's Estate is Administratively Solvent**

1.       The Debtor's Estate is administratively solvent. As set forth in Section I.(A)(2) of the Trustee's proposed Disclosure Statement for Trustee's Chapter 11 Plan of Liquidation (the "Disclosure Statement"), there is approximately $2,303,927 (the "Gross Funds")

---

[1] At various points during this case Mr. Bildirici has held himself out as Yusef Bildirici, Josef Bildirici and Joseph Bildirici. For convenience sake, he will hereinafter be referred to as "Bildirici".

in the Trustee's bank account for the bankruptcy Estate.

        2.        The Trustee has determined to reserve various amount from the Gross Funds to accurately reflect actual cash available for distribution on the effective date. unpaid administration expenses arising from legal and accounting services which have been provided but not awarded which aggregate $872,031.90[2]. Administration Tax Claims have been filed in the amount of $4,068.36. In addition, the Trustee has determined to reserve $150,000 for projected future professional fees[3]. *See* Section II.(D)(3) and IV.(B)(4) of the Disclosure Statement.

        3.        As set forth in greater detail in Section II.(D)(1) of the Disclosure Statement, by Order of the Court dated September 12, 2007 (the "Escrow Order"), the Court authorized the Trustee to retain all of G Squared's $1.67 million down payment as liquidated damages on account of G Squared's failure to timely close on the sale of the Debtor's ground

---

[2] This amount includes the fees and expenses sought in the Second Interim Fee Application dated May 1, 2008 of Kittay & Gershfeld., P.C. ("K&G") To the extent the Bankruptcy Court approves the payment of the requested fees and expenses, this figure will be reduced by the amount authorized by the Bankruptcy Court.

[3] As the Court may remember, pursuant to Section 3 of the global stipulation entered into between and among the Debtor, East Forty-Fourth Street L.L.C. (the Debtor's landlord) and New York Community Bank (the Debtor's secured lender), the Trustee was obligated to use "best efforts" to confirm a plan of liquidation that permanently enjoins the Debtor's equity holders from asserting claims against the Debtor's landlord, lender or related entities. Although the Trustee believes that his proposed plan of liquidation (the "Plan") complies with the requirements of the Bankruptcy Code, given the litigious nature of the parties involved, he anticipates litigation might ensue if the Plan is not confirmed.

In addition, the District Court for the Southern District has not yet ruled on G Squared Management LLC ("GSM") and G Squared Associates LLC's ("GSA"; GSM and GSA are collectively referred to hereinafter as "G Squared") appeal of the Bankruptcy Court's order authorizing the Trustee to retain G Squared's down payment. The Trustee has reserved substantial amounts for legal fees and expenses anticipating further appeal to the Second Circuit Court of Appeals with respect to this litigation.

lease and related sub-leases.  G Squared has appealed the Escrow Order and District Court Judge Crotty has not yet heard oral argument.

        5.      As set forth in paragraph 23 of the Trustee's Response of Chapter 11 Trustee to G Squared Management LLC and G Squared Associates LLC's Objection to Motion to Release Funds from Escrow dated September 11, 2007, the Debtor's Estate suffered real and calculable damages as a result of G Squared's failure to close.  Specifically, as of the time of the hearing on the Trustee's motion to retain the G Squared down payment, the Estate had incurred at least $439,000 in expenses and lost profit because of G Squared's default.  Subsequently, the Estate incurred legal fees (during the Second Interim Fee Application period) of approximately $76,000 in defending the Court's Escrow Order.  Thus, although the Trustee believes he will prevail in the G Squared appeal and will be entitled to retain the full $1.67 million for the benefit of the Debtor's Estate, out of an abundance of caution, he has determined to reserve all but $515,000 of the down payment.  A more detailed explanation of this matter can be found in Section II.(D)(1) of the Disclosure Statement.

        6.      The Trustee has also determined to reserve from the Gross Funds $15,000 for payment of United States Trustee Quarterly Fees (the "UST Reserve"), $1,000 for a tax reserve (the "Tax Reserve") and $99,400 (the "Repair Reserve") from the repair reserve required pursuant to the global stipulation between the Debtor, its landlord and secured lender.  *See* Sections I.(A)(2), IV.(B)(3) and II.(C), respectively.

        7.      Thus, the Trustee has determined to reserve $1,420,000 from the Gross Funds.

        8.      Accordingly, after reserving $1,420,000 and paying administration

expenses for professionals of $872,031 and administration tax expenses of $4,068 at the Effective Date, $7,427 remains for payment to the Debtor's general unsecured creditors and equity holders. Put another way, as of the effective date of the Debtor's plan of liquidation, the monies available to pay holders of allowed claims and interests will be:

| | |
|---|---|
| Total Money in Estate: | $ 2,303,927 |
| Less Funds Reserved: | $(1,420,400) |
| | $ 883,527 |
| Payment in Full to Chapter 11 Professionals: | $ (872,031) |
| | $ 11,495 |
| Payment in Full to Administration Tax Claims: | $ ( 4,068) |
| | $ 7,427 |
| Funds Available for Unsecured Creditors and Equity | $ 7,427. |

9. Bildirici argues that because this Court's order directing the release of the G Squared down payment to the Debtor's estate may be overturned and the Trustee may be directed to return the entire down payment to G Squared, that unlikely event requires this Court to conclude that the Debtor's estate is insolvent and that K&G should not be paid. This argument is belied by the fact that neither the Debtor nor G Squared sought or obtained a stay of the Court's order releasing the down payment. Thus, the Trustee would be entirely within his rights to determine that the entire amount of the G Squared down payment could be released at the effective date. However, out of an abundance of caution, he has determined to reserve a portion of the down payment. Even utilizing the highly unlikely scenario that the Trustee has to return all but $515,000 of the down payment, the Debtor's estate is solvent.

10. Thus, payment of interim compensation is appropriate and, in this case, justified.

**Because the result of the G Squared Appeal is Uncertain, the Trustee Determined
to Consider Litigation Against the Debtor's Principal and Its Former Managing Agent**

11. The results of litigation are never guaranteed. Thus, although the Trustee believes that he will prevail in the G Squared appeal, this result is not guaranteed. Moreover, the Trustee is unsure when Judge Crotty will rule on G Squared's appeal. Although the Trustee was originally advised by Judge Crotty's Chambers that oral argument would be held in March or April 2008, that time has come and gone and the Trustee has not been advised as to when oral argument will be held.

12. The Trustee did not believe that the Debtor's creditors and equity holders distribution under a plan of liquidation should be delayed by the uncertainties of the District Court's schedule. However, the Trustee was also mindful of the fact that, although he considered such a result to be unlikely, the Court's order on the G Squared matter could be modified or reversed. In order to protect the estate in those unlikely circumstances, the Trustee directed his counsel to research potential causes of action against Bildirici and B&F.

13. During the initial 18 months of the bankruptcy, the Debtor's day-to-day activities were managed by B&F Imports, Inc. ("B&F"). B&F was at all relevant times owned by Bildirici, the Debtor's managing member.

14. During that time, Bildirici, both personally and through B&F, caused the Debtor to act in ways contrary to the best interests of the Debtor and its creditors. Specifically, Bildirici caused B&F to commingle tenants' security deposits with regular operating accounts, causing the Trustee to make a more than $300,000 adjustment to the purchase price of the lease when the Trustee sold it to Global Capital Holding LLC. In addition, B&F and/or Bildirici failed to make necessary repairs to the building and allowed violations to occur at the building. Moreover, Bildirici, repeatedly ignored the Court's directives and deliberately prevented a sale of

5

the ground lease which would have resulted in payment in full for the Debtor's creditors and a distribution to the Debtor's equity holders ("Equity") prior to the appointment of the Trustee.

15. Because assuming that this Court's order in the G Squared matter would be affirmed, all or most of the recovery from the lawsuit would be paid over to the Debtor's Equity, the Trustee determined to offer Bildirici and B&F the opportunity to toll the filing of the complaint pending a resolution of the G Squared appeal. Given Bildirici's prior recalcitrance to act in the best interests of the Debtor's Estate, the Trustee believed the only way to encourage Bildirici and/or B&F to focus on the issue was to present them with a complaint detailing the causes of action the Trustee was prepared to assert against Bildirici and/or B&F. Accordingly, the Trustee directed his counsel to research and prepare a complaint and provide the complaint, as well as a proposed tolling agreement to Bildirici's counsel.

16. The Trustee believes he was required to protect the interests of all creditors and members of Equity, not just Bildirici, and the preparation of the complaint and tolling agreement was justified and in the best interests of the Debtor's estate.

### Review of the Claims of Eastern Property Associates LLC, United Capital Associates LLC and B&F Imports Was Necessary to the Formulation of the Plan of Liquidation

17. In order to draft a plan of liquidation, the Trustee needed to assess the validity and nature of the claims and interests asserted against the Debtor's Estate.

18. Beyond determining if the claims were valid claims against the Debtor's estate, the Trustee also had to determine the nature of such claims so that they could be properly classified.

19. The claims of Eastern Property Associates LLC ("Eastern") and United

Capital Associates LLC ("United") were filed without indicating the nature of the claim or the amount. Instead, both Eastern and United attached copies of an Assignment and Assumption of Lease Agreement dated September 29, 2006 (the "Assignment Agreement"), entered into by the Debtor and United and a letter agreement, dated February 27, 2007 (the "Sharing Agreement"), entered into between Eastern and Bildirici. Thus, the Trustee had no choice but to review the claim and research the legal basis therefore. In addition, the Trustee was asked to be a party to an agreement (which has yet to be finalized) settling the claims between Equity, on the one hand, and Eastern and United on the other. Accordingly, as the Trustee could not prepare a plan without analyzing these claims, the work related thereto was necessary and beneficial to the Estate.

20.    Similarly, B&F filed a general unsecured claim in the amount of $30,753. Given the issues surrounding B&F's conduct during the initial 18 months of the Debtor's Chapter 11 case, it was necessary to assess the validity and classification of its claim.

### The Work Performed in Connection with Kittay & Gershfeld P.C.'s Two Interim Fee Applications Was Justified and Compensable

21.    The time incurred by Kittay & Gershfeld, P.C., as set forth on its second Interim Fee Application (the "Second Fee Application") is compensable. Although the Second Fee Application includes $79,697.25[4] in "professional fees", as set forth in the contemporaneous time records annexed hereto as Exhibit A, this amount can be broken down further:

- Hearing preparation, attending hearing and

---

[4] Although the Bildirici Objection references $40,207 in non-compensable fees and states that the objectionable time entries are attached, no such time entries were attached to the copy provided to the Trustee by Bildirici or filed electronically.

7

|   |   |   |
|---|---|---|
| | Court-requested revisions to order: | $8,790[5] |
| • | Analysis of potential distributions based on fee application amounts: | $   470 |
| • | Davidoff Malito: | $8,370 |
| • | Proskauer: | $   730 |
| • | Gary Lampert: | $   130 |
| • | Tax Issues: | $   100 |
| • | United States Trustee: | $   590 |
| • | Drafting Commission Application: | $7,290 |
| • | Drafting First Fee Application: | $1,640 |
| • | Drafting Second Fee Application: | $10,380 |
| • | Preparation and service of First Fee Application: | $ 3,380 |
| • | Initial commission research: | $ 2,470 |
| • | Judge-directed commission research: | $ 9,710 |
| • | Response to Bildirici Objection to First Fee Application: | $6,570 |
| • | Response to Bildirici Objection to Commission: | $18,530. |

22.    As the Court can see from the foregoing analysis, over $19,300 (approximately 25%) of the fees incurred in the "professional fees" section was spent preparing K&G's first and second fee applications and the Trustee's commission application. Given the litigious nature of all the participants in this case, the Trustee felt it necessary to prepare thorough

---

[5]    Amounts have been rounded to the nearest ten dollars.

and very detailed applications. The Trustee's beliefs were borne out by the necessity of researching and filing a response to Bildirici's objection to K&G's first interim fee application (much of which re-hashed earlier arguments Bildirici had unsuccessfully made regarding the sale of the Debtor's ground lease and the remainder of which asserted that K&G's efforts had not benefitted the Estate). K&G was forced to incur an additional $6,570[6] in preparing its response.

23. In essence, K&G and the Trustee were forced to expend almost $26,000 in defending their efforts from the very person whose actions caused the Trustee to be appointed.

24. In addition, both the Debtor's landlord and the Office of the United States Trustee were concerned about the amount of fees sought by the Debtor's Chapter 11 counsel, Davidoff and Malito, as well as fees taken by it without prior Court approval and issues related to the status and compensation of certain of its attorneys. Both the Debtor's landlord and the United States Trustee requested K&G to look into and research these issues. In response to such requests, K&G expended more than $8,300 (approximately 11% of the entire professional fee amount).

25. In preparing the Trustee's commission application, K&G anticipated potential objections given the conflicting case law on this issue. Accordingly, K&G incurred approximately $2,470 (3%) in legal fees researching this issue. As a result of its research, the Trustee believed his application was appropriate and well-founded.

26. Not surprisingly, Bildirici opposed the Trustee's commission application and K&G was forced to incur $18,530 (approximately 23%) in fees to rebut and provide relevant

---

[6] If this additional $6,570 is added to the $19,310 expended in preparing the fee and commission applications, the amount represents approximately 33% of the total amount expended in the professional fees section.

counter-veiling law for the Court.  In doing so, K&G spoke to, and obtained, written confirmation from the title company and the purchaser's lender and its real estate counsel, as well as sought the counsel of the Trustee's real estate attorneys.

27. At the hearing on the Trustee's commission application, the Court concluded that K&G and the Trustee had provided valuable services to the Debtor's estate and awarded the Trustee a significant, initial commission award pending further briefing.  The Court also directed both K&G and the Office of the United States Trustee to comprehensively brief the commission issue for the Court.  The Trustee directed his counsel to begin such research immediately.  Not surprisingly, there are hundreds of cases arguably relevant to the issue at hand.  Thus, while K&G expended approximately $9,710 (approximately 12% of all "professional fees") during this compensation period, the Court-directed research will be time-consuming and necessary.

WHEREFORE, for the reasons set forth above, the Trustee believes the fees requested by K&G, in the amount agreed upon with the Office of the United States Trustee, be approved.

Dated: Tarrytown, New York
       June 2, 2008

                                         KITTAY & GERSHFELD, P.C.
                                         Counsel to the Trustee

                              By:   /s/ Judith L. Siegel
                                    Judith L. Siegel (JS 1208)
                                    100 White Plains Road
                                    Tarrytown, New York 10591
                                    (914) 332-8000