UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:                                          :        Chapter 11
                                                :
EAST 44TH REALTY, LLC,                     :        Case No. 05-16167 (RDD)
                                                :
                     Debtor.                    :
---------------------------------------------------------x

**OBJECTION, PURSUANT TO
BANKRUPTCY CODE SECTION 1125,
OF DAVID R. KITTAY, CHAPTER 11 TRUSTEE
FOR THE ESTATE OF EAST 44TH REALTY, LLC, AND
KITTAY AND GERSHFELD, P.C., TO THE
<u>DISCLOSURE STATEMENT FILED BY ALBERT ANTEBI</u>**

To:    The Honorable Robert D. Drain,
       United States Bankruptcy Judge

David R. Kittay, the Court-appointed Chapter 11 Trustee for the estate of East 44th Realty, LLC (the "Debtor" or the "Estate") and Kittay & Gershfeld, P.C. ("K&G"), as and for their respective objections to the disclosure statement dated June 18, 2008 (the "Antebi Disclosure Statement") filed by Albert Antebi ("Antebi") respectfully state:

<u>Preliminary Statement</u>

1.    Albert Antebi's filing of the Antebi Disclosure Statement and his plan of reorganization (the "Antebi Plan") is a barely disguised attempt to vacate this Court's February 14, 2007 order (the "Trustee Order") which, with the Debtor's express consent, directed the appointment of the Trustee and removal of the debtor-in-possession. Although proposed by Antebi, the Plan seeks to vest the Debtor[1] with not only the more than $2 million in assets collected by the Chapter 11 Trustee for the Estate's benefit but also the ability to decide to pay or

---

[1]    Because Antebi has not stated otherwise, the Trustee and K&G assume that the post-petition Debtor will be comprised of all of the same members as the Debtor.

not pay the Debtor's creditors. Lest the Court think this is an unrealistic concern, the Court need only remember some of the reasons the Trustee was appointed: (a) the Debtor's commingling and use of tenant security deposits; (b) the Debtor's disregard of this Court's Orders (including the Debtor's failure to sell the Lease when it received multiple offers at or above the target price of $20 million) and the New York State courts' orders (including a Court-ordered stipulation settling a lawsuit); (c) the Debtor's misrepresentations to the Court; (d) the Debtor's use of the Jewish rabbinical court to halt the sale of the lease; (e) the Debtor's failure to fulfill its fiduciary obligations to its creditors; and (f) the Debtor's retention of a real estate broker without Court approval. Thus, if Antebi is permitted to proceed with this charade, the same harms that the Trustee was put in place to prevent will most likely be revisited upon the Debtor's creditors.

2. In addition, Antebi's Plan is patently unconfirmable on its face. In order to be confirmed, a plan must satisfy all the conditions set forth in Bankruptcy Code Section 1129. One of these requirements, that a plan must be proposed in "good faith", cannot be satisfied. The Debtor's conduct, both pre and post-petition, precludes a determination that the Plan was filed in good faith.

3. The Trustee's First Amended Plan of Liquidation, on the other hand, provides the same 100% distribution to holders of allowed, undisputed claims as the proposed Antebi Plan, but does so through the auspices of the Chapter 11 Trustee, a Court-appointed fiduciary who has the money in hand to make such distributions, has always complied with the Court's directives and is bonded and insured.

4. Moreover, even if this Court were to conclude that the Antebi Plan might somehow be confirmed, the Antebi Disclosure Statement does not contain adequate information

to enable a hypothetical claimant to make an informed judgment about the Plan. Accordingly, the Antebi Disclosure Statement cannot be approved.

### The Plan is Patently Unconfirmable on Its Face

5.  The Court can only confirm the Antebi Plan if it satisfies <u>all</u> of the elements of Section 1129(a). The Antebi Plan fails to satisfy Section 1129(a)(3) which requires that the "plan has been proposed in good faith ...", 11 U.S.C. §1129(a)(3), and thus cannot be confirmed.

6.  In making its determination, this Court may consider a debtor's pre-filing conduct. *In re Toy and Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). *See also In re Future Energy Corp.*, 83 B.R. 470, 486 (Bankr. S.D. Ohio 1988). Moreover, a determination as to good faith can also include an analysis of whether or not the person or entity at issue has neglected or refused to fulfill a duty or contractual obligation. *In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D. N.J. 1990).

7.  In the instant case, the Debtor's[2] most notable pre-petition conduct, which ultimately jeopardized the lease's existence and caused the Debtor's estate to have to pay millions of dollars in legal fees, was its refusal to make $15,000 in repairs to the building. Instead of making the repairs (and risking the loss of the lease, the estate's sole asset), the Debtor chose to litigate the Landlord's declaration that the Debtor was in default under the terms of the lease. The Debtor thereafter settled the lawsuit, pursuant to a State Court so-ordered stipulation, but willfully chose not to satisfy the terms of the stipulation and refused to make the agreed upon repairs. This caused a series of events including the Landlord's declaration that: (a) the lease was

---

2.  Although the Debtor has a new managing member in Antebi, there is no evidence that Antebi opposed the Debtor's conduct at any time. Moreover, there is no guarantee that prior to or upon plan confirmation, Mr. Bildirici, the Debtor's prior managing member, won't resume control of the Debtor.

in default and subsequently terminated; and (b) as a result of the Debtor's conduct, the Landlord was owed millions of dollars of sub-lease rents and legal fees. Ultimately, after the Debtor filed for bankruptcy court protection, the Debtor's estate was forced to pay millions in legal fees to satisfy[3] cure costs pursuant to Bankruptcy Code Section 365.

8.  During the Debtor's bankruptcy case, but prior to the appointment of the Trustee, the Debtor: (a) commingled approximately $300,000 of tenants' security deposits with regular operating accounts which were often used for operating expenses resulting in a significant shortfall in security deposits; (b) failed to make necessary repairs to the building; (c) allowed violations to occur at the building; (d) failed to maintain adequate insurance to cover rental stream income; (e) retained a real estate broker without Court authorization.

9.  Moreover, the Debtor acted contrary to the best interest of its creditors in order to protect the interests of its equity holders. Notwithstanding the fact that the Debtor had entered into a stipulation[4] with the Landlord pursuant to which the Debtor had a limited time period to market the Lease (which the Landlord had agreed to modify to attract potential purchasers) and was in fact obligated to accept any offer equal to or in excess of $20 million, the Debtor failed to report (and refused to accept) at least eight such offers.

10. In addition, after identifying a buyer and agreeing upon a sale price that

---

[3]   As this Court is aware, the Trustee was able to negotiate a tri-party stipulation between and among the Landlord, the Bank and the Trustee which, among other things, reduced the legal fees due and owing to the Landlord to $1.7 million, completely eliminated the need to pay the Landlord any monies for sub-lease rent and capped the non-monetary cure costs at $200,000. Most importantly, as a result of the stipulation, both the Bank and the Landlord conceded the existence of the Lease, thereby preserving the estate's sole asset.

[4]   The Corrected Stipulation and Order was approved by the Court on July 13, 2006.

would generate a 100% recovery to the Debtor's creditors, the Debtor commenced a proceeding before the Jewish Bet Din Rabbinical Court and obtained an order tantamount to an injunction prohibiting the potential purchaser (who was a religious individual) from proceeding with the sale.

11. Now, Antebi – a member of the Debtor – purports to be the creditors' "white knight" by replacing Bildirici and funding a distribution to the Debtor's unsecured creditors. Estate creditors have no assurances, however, that the money is available or will be available upon the Effective Date. Rather, the Antebi Disclosure Statement states "Mr. Antebi will cause $80,000 to be placed in a confirmation account maintained by [his attorneys] so that all unsecured creditors will be paid in full in cash on the Effective Date, (or a sufficient amount available to be reserved to cover any such Claim in the event of an objection to any such Claim)." Disclosure Statement at p.6, ¶17. Given the Debtor's past conduct, a reference to future funding is of limited value to the Debtor's creditors.

12. As a result of these activities, the Court must hold that Antebi's Plan was not filed in good faith and is patently unconfirmable on its face. Accordingly, there is no point in reviewing, much less approving, Antebi's Disclosure Statement.

**Even if the Court Determines Antebi's Plan is Not Patently Unconfirmable on Its Face, Antebi's Disclosure Statement Does Not Contain Adequate Information to Permit a Hypothetical Creditor to Make an Informed Decision**

13. In order to be approved, the Disclosure Statement must contain adequate information "of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. §1125(a)(1).

14. Case law under Section 1125 of the Bankruptcy Code has produced a list of factors courts can consider in determining if the disclosure is adequate. Although adequacy is determined on a case-by-case basis, these factors provide a non-exhaustive framework for the Court's analysis:

(1) the events leading to the filing of the bankruptcy petition;

(2) a description of the available assets and their value;

(3) the anticipated future of the company;

(4) the source of information stated in the disclosure statement;

(5) a disclaimer;

(6) the present condition of the debtor while in Chapter 11;

(7) the scheduled claims;

(8) the estimated return to creditors under a Chapter 7 liquidation;

(9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information;

(10) the future management of the debtor;

(11) the Chapter 11 plan or a summary thereof;

(12) the estimated administrative expenses, including attorneys' and accountants' fees;

(13) the collectibility of accounts receivable;

(14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

(15) information relevant to the risks posed to creditors under the plan;

(16) the actual or projected realizable value from recovery of preferences;

(17) litigation likely to arise in a nonbankruptcy context;

    (18)    tax attributes of the debtor; and

    (19)    the relationship of the debtor with affiliates.

*In re United States Brass Corp.*, 194 B.R. 420, 427 (Bankr. E.D. Tex. 1996). *See also In re Reilly*, 71 B.R. 132, 134 (Bankr. D. Mont. 1987); *In Re Metrocraft Publishing Servs.*, 39 B.R. 567, 568-69 (Bankr. N. D. Ga. 1984).

    15.    While disclosure of all of the foregoing factors is not required, Antebi's Disclosure Statement notably fails to address four keystone factors that would influence a reasonable investor's decision making: (1) the events leading to the bankruptcy filing; (6) the condition of the debtor while in Chapter 11; (14) financial information relevant to creditors' decision to accept the plan; and (15) information relevant to the risks posed to creditors under the plan. Accordingly, the Disclosure Statement cannot be approved.

A.    <u>Events Leading to the Bankruptcy Filing</u>

    16.    Antebi's description of the events leading up to the filing of the Debtor's Chapter 11 case is inadequate and precludes approval of the Disclosure Statement. In fact, Antebi's description of the events leading to the Chapter 11 filing is so non-descript as to be misleading. Although factually accurate, the description fails to convey the essence of what is being described. Without a detailed description of the events leading up to the Debtor's filing for bankruptcy court protection, creditors cannot make a meaningful determination about the likelihood that Antebi, a member of the Debtor, will perform as indicated in the Antebi Disclosure Statement.

17. Specifically, Antebi's Disclosure Statement[5] fails to detail the years of meritless litigation that preceded the Debtor's filing for bankruptcy. The Disclosure Statement does not include a discussion of how the Debtor commenced litigation (the "First Litigation") in New York State Supreme Court (the "State Court") seeking, among other things, a declaration that there had been no breach of the lease and then settled the First Litigation by agreeing to rectify all of the engineering deficiencies previously noted in an engineering report and to have any additional work performed that the Landlord's engineer believed necessary. There is no discussion explaining why the Debtor determined to enter into the State Court-approved settlement which mandated that the Debtor make the required repairs and then refused to make such repairs. The Debtor failed to explain that in response to its failure to make the repairs, the Landlord served a default notice and the Debtor commenced another litigation in State Court. The Disclosure Statement contains no discussion concerning the State Court's determination, in the second litigation, that the Debtor was obligated to make the approximately $15,000 in repairs in question. Nor is there any discussion of the literally hundreds of thousands of dollars of litigation costs the Debtor and the Debtor's Landlord incurred pre-petition as a result of the Debtor's conduct, which amounts the Debtor's Estate was required to pay in order to assume and assign the lease.

18. A detailed discussion of the events leading up to the Debtor's filing for bankruptcy will provide creditors with a more thorough understanding of the type of entity Antebi seeks to have re-vested with the more than $2 million the Trustee has collected on behalf of the

---

[5] The Trustee's First Amended Disclosure Statement contains a 3 page description of the events leading up to the Debtor's Chapter 11 filing. *See* First Amended Disclosure Statement at pp. 15-17, Section II.A.

8

Debtor's creditors and interest holders[6].

B.    The Condition of the Debtor While in Chapter 11

19.    The only reference made to events during the Debtor's Chapter 11 case is two sentences found at page 3, paragraph 6 of the Antebi Disclosure Statement: "Given the equity the Debtor believed it had in the Lease, the Debtor's intention was to preserve that value for the benefit of its bankruptcy estate, its creditors and Interest holders.  Accordingly, the Debtor made a motion to assume the Lease."  A discussion of the events that occurred during the period before the Trustee was appointed is necessary to enable a creditor to make a meaningful assessment of the likelihood that appropriate and timely distributions will occur under the Antebi Plan.

20.    The Antebi Disclosure Statement[7] contains no discussion of the events that precipitated the appointment of the Trustee.  There is no description of the Debtor's failed attempt to assume the lease nor any discussion of how Bankruptcy Code Section 365 would have precluded such assumption because of the Debtor's inability to demonstrate adequate assurance of future performance.   Nor is there any discussion of how, absent the tri-party stipulation negotiated by the Trustee, the lease would have been deemed terminated and the Debtor would have been without an asset.

21.    The Antebi Disclosure Statement is also devoid of any discussion of Antebi's failure to prevent the Debtor from breaching its fiduciary duty to its creditors and

---

[6]    The Trustee notes that the Antebi Plan was filed by Antebi and questions whether the other members of the Debtor were advised of its preparation and filing.

[7]    The Trustee's First Amended Disclosure Statement contains a 4 page description of the events prior to the Trustee's appointment.  *See* First Amended Disclosure Statement at pp. 18-21, Section II.B.

9

chronically disregarding the directions and Orders of this Court. There is no discussion of the Debtor's decision to fail to accept many offers for the lease at or in excess of $20 million. Likewise, there is no discussion of the Debtor seeking relief from the Jewish rabbinical court to stop a sale of the lease that was not "rich" enough for the Debtor's members' liking. Antebi also neglects to describe the repeated misrepresentations the Debtor made to the Court.

22. A description of each of these events would assist a hypothetical investor in determining if it believed the plan proponent was risk-worthy and if the hypothetical investor wished to vote on the Plan.

C. <u>Financial Condition of the Debtor and Risk of Voting for the Plan</u>

23. The Disclosure Statement contains a one sentence explanation for the source of funds that will be used to pay the Debtor's creditors. As compared to the Trustee's First Amended Plan, where the Trustee -- a bonded, Court-appointed fiduciary who is presently holding approximately $2 million for the benefit of the Debtor's creditors and interest holders – will make distributions, the Antebi Plan proposes that Antebi will cause $80,000 to be placed in a confirmation account to be maintained by Antebi's and Bildirici's counsel. There is no discussion in the Disclosure Statement about: (a) when the money will be deposited with Antebi's attorneys; (b) the source of the money; (c) the terms governing the deposit and if Antebi will have any control over the funds once they are deposited; (d) any legally binding obligation that requires Antebi to fund the money; and (e) what, if any, assurances exist that the money will be paid out to creditors.

24. Similarly, there is no discussion in the Antebi Disclosure Statement concerning: (a) how, why and when Antebi came to be the managing member of the Debtor; (b)

why it is that Bildirici or somebody else could not replace Antebi as managing member at any time; or (c) why the Debtor's creditors should believe that Antebi will follow this Court's directives and orders when he seemingly did nothing to contravene the Debtor's decision to disregard its fiduciary obligations and Orders of this Court in the past.

25. In addition, given the Debtor's prior disregard for this Court's Orders, the Trustee and K&G[8] believe that a discussion explaining how the Debtor will guarantee that the money to pay K&G's fees and the claims of creditors will not be commingled with some other asset of the Debtor or the Debtor's members and what guarantee K&G has that the Debtor will actually honor the Court's Order and pay K&G and the Debtor's other creditors. The Debtor's creditors, including K&G and the Trustee, should not be put into a position where they are forced to litigate with the Debtor to obtain previously approved claims and/or fees.

26. Likewise, the Trustee has been advised by counsel to the Landlord that the Landlord is very concerned that any member of the Debtor would have control over the $99,400 remaining in the Repair Fund. Given the Debtor's failure to make State Court-ordered repairs in the past, the Landlord is justifiably concerned that the post-petition Debtor will not make payments in accordance with the terms of the Court-approved tri-party stipulation.

D.   Additional Necessary Disclosure

27. The Disclosure Statement fails to provide any discussion regarding the Debtor's standing to step into the shoes of the Trustee in the G Squared Litigation.

28. The Disclosure Statement fails to explain the relationship between the

---

[8] As of the date hereof, K&G is owed approximately $150,692 in holdbacks and the Trustee has also sought approval for $249,849.92 in unawarded commissions.

Debtor and its members including: (a) how and why Bildirici is no longer the managing member of the Debtor; (b) Antebi's involvement in the Debtor's decision making prior to the appointment of the Trustee; (c) how and by whom Antebi was chosen to become the managing member of the Debtor; (d) what safeguards have been put in place to insure that Antebi will not resign as managing member on or before the Effective Date; and (e) why the other members of the Debtor did not support or join in the filing of the Plan.

29.     The Disclosure Statement fails to explain how the Antebi Plan contemplates that any transfers of real property undertaken in contemplation of or pursuant to a plan are entitled to be exempt from stamp or similar taxes in light of the Supreme Court's recent *Florida Dep't of Revenue v. Picadilly Cafeterias, Inc.* decision.

WHEREFORE, the Trustee and K&G respectfully request that either: (a) Antebi's Plan be found patently unconfirmable and the Antebi Disclosure Statement denied; or (b) the Antebi Disclosure Statement is denied as not containing adequate information pursuant to Bankruptcy

Code Section 1125; and (c) granting the Trustee and Kittay & Gershfeld, P.C. such other relief as is just and proper.

Dated: Tarrytown, New York
July 11, 2008

                              KITTAY & GERSHFELD, P.C.
                              Counsel to the Trustee

By: /s/ Judith L. Siegel
     Judith L. Siegel (JS 1208)
     100 White Plains Road
     Tarrytown, New York 10591
     (914) 332-8000